

# EXHIBIT 1



# Civil / Probate Justice System - Docket Information

BACK TO SEARCH RESULTS                    ALL PARTIES                    START A NEW SEARCH

## COOL INTERNATIONAL HOLDINGS LTD vs BLUE EQUITY PETROHOLDINGS LTD
* Click on BOOK/PAGE of a particular docket to see the image if it is available *

**Case Number (LOCAL):** 2013-20458-CA-01     **Dockets Retrieved:** 6     **Filing Date:** 06/10/2013
**Case Number (STATE):** 13-2013-CA-020458-0000-01     **Judicial Section:** 13

| Date | Book/Page | Docket Entry | Comments |
|------|-----------|--------------|----------|
| 06/17/2013 | 28684 / 659<br>Pages: 7 | COURT ORDER | BK:28684 PG:0659 FOR TEMPORARY INJUNCTION |
| 06/11/2013 | | EFILE NUMBER | : 2812882 |
| 06/10/2013 | | MOTION: | EFILED |
| 06/10/2013 | | COMPLAINT | |
| 06/10/2013 | | CIVIL COVER | |
| 06/10/2013 | | DEMAND FOR JURY TRIAL | |

BACK TO SEARCH RESULTS                    ALL PARTIES                    START A NEW SEARCH

Civil Search Home | Civil Court Information | Email | Login
Home | Privacy Statement | Disclaimer | Contact Us | About Us
2008 Clerk of the Court. All Rights reserved.



S0141755

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | CIVIL COVER SHEET | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ FAMILY<br>☐ OTHER | | |

| PLAINTIFF | VS. DEFENDANT | CLOCK IN |
|---|---|---|
| COOL INTERNATIONAL HOLDINGS LTD, a British Virgin Islands incorporated company, individually and derivatively in the right and for the benefit of BE TAG HOLDINGS LIMITED, a St. Lucia International Business Company, ⊞ | BLUE EQUITY PETROHOLDINGS, LTD., a St. Lucia International Business Company; BLUE EQUITY LLC; JONATHAN BLUE, an individual; DAVID ROTH an individual; and MAUREEN SMITH an individual. | |

The civil cover sheet and the information contained here does not replace the filing and service of pleadings or other papers as required by law. This form is required by the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. See instructions and definitions on reverse of this form.

**TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x in both the main category and subcategory boxes.

☐ 001 - Eminent Domain
☐ 003 - Contracts and Indebtedness
☐ 010 - Auto Negligence
☐ 022 - Products Liability
☐ 023 - Condominium
☒ **Negligence - Other**
  ☐ 097 - Business Governance
  ☒ 098 - Business Torts
  ☐ 099 - Environmental/Toxin Tort
  ☐ 100 - Third Party Indemnification
  ☐ 101 - Construction Defect
  ☐ 102 - Mass Tort
  ☐ 103 - Negligent Security
  ☐ 104 - Nursing Home Negligence
  ☐ 105 - Premises Liability - Commercial
  ☐ 106 - Premises Liability - Residential
  ☐ 107 - Negligence - Other
☐ **Real Property/Mortgage Foreclosure**
  ☐ 108 - Commercial Foreclosure $0 - $50,000
  ☐ 109 - Commercial Foreclosure $50,001 - $249,999
  ☐ 110 - Commercial Foreclosure $250,000 - or more
  ☐ 111 - Homestead Residential Foreclosure $0 - $50,000
  ☐ 112 - Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 113 - Homestead Residential Foreclosure $250,000 or more
  ☐ 114 - Non-Homestead Residential Foreclosure $0 - $50,000
  ☐ 115 - Non-Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 116 - Non-Homestead Residential Foreclosure $250,000 or more
  ☐ 117 - Other Real Property Actions $0 - $50,000
  ☐ 118 - Other Real Property Actions $50,001 - $249,999

☐ 119 - Other Real Property Actions $250,000 or more
☐ **Professional Malpractice**
  ☐ 094 - Malpractice - Business
  ☐ 095 - Malpractice - Medical
  ☐ 096 - Malpractice - Other professional
☐ **Other**
  ☐ 120 - Antitrust/Trade Regulation
  ☐ 121 - Business Transactions
  ☐ 122 - Constitutional Challenge - Statute or Ordinance
  ☐ 123 - Constitutional Challenge - Proposed amendment
  ☐ 124 - Corporate Trust
  ☐ 125 - Discrimination - Employment or Other
  ☐ 126 - Insurance Claims
  ☐ 127 - Intellectual Property
  ☐ 128 - Libel/Slander
  ☐ 129 - Shareholder Derivative Action
  ☐ 130 - Securities Litigation
  ☐ 131 - Trade Secrets
  ☐ 132 - Trust Litigation
☐ 133 - **Other Civil Complaint**
  ☐ 009 - Bond Estreature
  ☐ 014 - Replevin
  ☐ 024 - Witness Protection
  ☐ 080 - Declaratory Judgment
  ☐ 081 - Injunctive Relief
  ☐ 082 - Equitable Relief
  ☐ 083 - Construction Lien
  ☐ 084 - Petition for Adversary Preliminary Hearing
  ☐ 085 - Civil Forfeiture
  ☐ 086 - Voluntary Binding Arbitration
  ☐ 087 - Personal Injury Protection (PIP)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐  No ☐

REMEDIES SOUGHT (check all that apply):

☒ monetary;

☒ non-monetary declaratory or injunctive relief;

☐ punitive

NUMBER OF CAUSES OF ACTION: [ 9 ]

(specify) Breach of Contract, Breach of Covenant of Good Faith, Breach of Fiduciary Duty(3 separate counts)
Fraudulent Inducement, Unjust Enrichment, Conversion, Declaratory Judgment,

IS THIS CASE A CLASS ACTION LAWSUIT?

☐ Yes

☒ No

HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?

☒ No

☐ Yes   If "Yes", list all related cases by name, case number, and court.

_____

_____

_____

IS JURY TRIAL DEMANDED IN COMPLAINT?

☒ Yes

☐ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature  s/ Robert C.L. Vaughan                     Florida Bar # _____130095_____

Attorney or party                                                    (Bar # if attorney)

Robert C.L. Vaughan, P.A.                                          June 10,2013

(type or print name)                                       Date

IN THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

COOL INTERNATIONAL HOLDINGS
LTD, a British Virgin Islands
incorporated company, individually
and derivatively in the right and for
the benefit of BE TAG HOLDINGS LIMITED,
a St. Lucia International Business Company,

     *Plaintiff*

                         CASE NO. _____

v.

BLUE EQUITY PETROHOLDINGS, LTD.,
a St. Lucia International Business Company;
BLUE EQUITY LLC; JONATHAN BLUE,
an individual; DAVID ROTH an individual;
and MAUREEN SMITH an individual.

     *Defendants*.

_____/

## <u>VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

The plaintiff Cool International Holdings, Limited ("CIHL"), individually and derivatively on behalf of BE TAG Holdings Limited ("BE TAG"), brings this civil action against the defendants, Blue Equity LLC, ("Blue Equity") Blue Equity Petroholdings Ltd. ("BEP"), Jonathan Blue, David Roth and Maureen Smith.  Together, BE TAG, BEP, Jonathan Blue and David Roth are sometimes referred to as the "Blue Equity Defendants."  In support of its complaint, plaintiff states as follows:

CASE NO. _____

## **NATURE OF THE CASE**

This is an action by CIHL arising from the defendants' breaches of a shareholder agreement and several fraudulent acts designed to steal shares from the minority shareholders for the benefit of the majority shareholders, the Blue Equity Defendants.  After fraudulently misrepresenting its ability or intention to support the business' ongoing working capital requirements, Blue Equity and its agents and affiliates including Jonathan Blue and David Roth, designed a secret plan to acquire shares in a Jamaican company called Cool Petroleum Limited ("CPL") and then flip that share interest for a quick profit at the sole expense of the minority shareholders.  On the road to achieving that secret objective, Blue Equity, Jonathan Blue, and David Roth in concert with Maureen Smith and other unnamed persons, committed fraudulent acts designed to maximize Blue Equity's "dividend" opportunities at the expense of the minority shareholders and to maximize Blue Equity's potential recovery from a secret sale orchestrated by Blue Equity—also at the sole expense of the minority shareholders.  These improper acts included, but were not limited to, fraudulently inducing the shareholders and bond holders to agree to an early debt payment at the expense of preserving working capital reserves—which decision inured solely to the benefit of Blue Equity and further, falsely concocting a "capital call" designed solely to shift shares from the minority shareholders to the Blue Equity Defendants as well as several fraudulent acts designed to cover up the fraudulent "capital call." CIHL also seeks damages for Blue Equity, Jonathan Blue, David Roth and Maureen Smith's continuous and repeated breaches of their fiduciary obligations to the minority shareholders. CIHL seeks a trial by jury of all issues so triable.

CASE NO. _____

## <u>THE PARTIES</u>

1.      The plaintiff, CIHL, is a British Virgin Islands Business Company with its principal place of business in Jamaica.  CIHL is a minority shareholder of BE TAG which owned a 100 per interest in CPL, later known as The Antilles Group ("TAG").

2.      The defendant, BEP, is a St. Lucia International Business Company with its principal place of business in Saint Lucia 1st Floor Financial Center, No. 1 Bridge Street, Castries, St. Lucia W.I.  Upon information and belief, BEP is the single purpose entity used by Blue Equity to hold its share holdings in BE TAG.  BE TAG was also formerly known as Cool Petroleum Holdings Limited ("CPHL").

3.      Upon information and belief, the defendant Blue Equity is a Delaware Business Company with its principal place of business in Louisville, Kentucky.  Blue Equity is represented by its principals to be an independent, private equity firm.

4.      The defendant Jonathan Blue is a resident of Louisville, Kentucky.  Jonathan Blue is the Chairman, Chief Executive Officer, and upon information and belief is also the Treasurer of Blue Equity, BE TAG and each of its subsidiaries.

5.      The defendant David Roth is a resident of Louisville, Kentucky.  David Roth is the Vice Chairman and a Director of BE TAG and upon information and belief is also a Director and shareholder of BEP and the Vice Chairman and Chief Legal Officer of Blue Equity.

6.      The defendant Maureen Smith is a resident of Kingston, Jamaica.  Maureen Smith was the Corporate Secretary and primary in-house legal officer of The Antilles Group ("TAG"),

3

CASE NO. _____

formerly CPL, a Jamaican Limited Company which shares were 100 percent owned by BE TAG.[1]

## JURISDICTION AND VENUE

7.     This is an action for temporary and permanent injunctive relief and for damages totaling more than $15,000, exclusive of interest, attorney's fees and costs.

8.     This Court has jurisdiction pursuant to Fla. Stat. §§ 26.012 and 48.193 and pursuant to written agreement of the parties.

9.     By virtue of the parties' agreement, the Court has jurisdiction and venue is proper in Miami-Dade County.

10.     Venue and jurisdiction are proper in Miami-Dade County by virtue of the clause in the parties' shareholder agreement, which stipulates that each party to the Shareholder Agreement irrevocably consents to and agrees to submit to personal jurisdiction and venue in any federal or state court in Miami, Florida, for all purposes and as to any and all claims.

11.     All conditions precedent to bringing this action have been waived, excused, or otherwise have occurred or have been performed.

12.     Plaintiffs have agreed to pay the undersigned counsel their attorneys' fees and costs in this action.

## COMMON ALLEGATIONS OF FACT

13.     On or about 2005, Cool Corp Limited ("Cool Corp"), along with Neal and Massy Holdings, Ltd. ("Neal & Massy"), formed CPHL to acquire and hold all the assets then owned by The Shell Company (W.I.) Limited "Shell Jamaica."  Through its subsidiary CPL and other

---

[1] Before its name was changed, TAG was known as CPL.  Before its name was changed, BE TAG was known as CPHL.  The names TAG/CPL and BE TAG/CPHL are used interchangeably throughout the complaint and unless otherwise stated, are only a rough indicator of the period of time relevant to a particular allegation or other factual reference.

CASE NO. _____

subsidiaries, the new company's assets included among other things, 54 owned and/or branded service stations; a commercial fuels and lubricants business; a chemicals business; two petrol tank farms; and, by virtue of a call option entered into with Shell Jamaica, the beneficial rights to a shared interest in a sea-port located in Montego Bay, Jamaica.

14.     In or about 2010, Neal and Massy expressed an interest in selling their share interest in CPHL and subsequently, Cool Corp began the search for a new equity investor in CPHL.

15.     Cool Corp approached Mayberry Investments Limited, Jamaica ("Mayberry"), a Jamaican finance and investment company and retained them to identify and secure a suitable replacement partner to acquire the equity interest held by Neal and Massy.

**Cool Corp Meets Blue Equity and Jonathan Blue**

16.     In or about late August 2010, Cool Corp was introduced to Blue Equity by Mayberry in Jamaica and in particular by Stephen Whittingham ("Whittingham") who was introduced to Cool Corp as the Mayberry representative, working on behalf of Cool Corp to identify and secure a new equity investor for CPHL.

17.     Cool Corp later learned that Whittingham was not merely the Mayberry representative who had found Blue Equity as a potential investor, but in fact, he was also a business partner and employee of Blue Equity and Jonathan Blue, its principal.

18.     Representatives of Cool Corp and Blue Equity met on several occasions in Miami, Jamaica and Trinidad and discussed among other things, the fact that the CPL business— the subsidiary through which the bulk of the CPHL operations were handled—survived and was successful despite having high existing debt obligations, primarily because of its reliable access to working capital financing through its relationship with Neal and Massy

CASE NO. _____

     a.      Specifically, the Cool Corp and Blue Equity representatives met on several occasions between October 2010 and June 2011;

     b.      Cool Corp described how, for the past six years, CPL had managed to meet all of its current cash obligations;

     c.      Cool Corp described the importance of seeking and obtaining capital funding to replace the Neal and Massy working capital facilities to support CPL's day to day and operations and import purchases;

     d.      Cool Corp also described the negative impact that would accrue to the business without adequate working capital financing;

     e.      Cool Corp explained that Neal and Massy had ensured the existence of working capital through its support of an LC[2] facility at Citibank.

19.     In addition to the financial security that this working capital facility provided to CPL's existing bond-holders, the working capital financing and in particular, the existing LC supported and guaranteed by Neal and Massy was an integral component of CPL's existing purchasing and operations model which relied heavily on importing a significant portion of CPL's total petroleum products for sale into the local market:

     a.      Cool Corp explained to Blue Equity that the petroleum import practice could not be supported without adequate working capital financing and that the domestic or local purchases of petroleum, by themselves, were insufficient to sustain, let alone grow the CPL business.

     b.      Further, Cool Corp explained to Blue Equity's representatives that any acquirer of the Neal and Massy share interests would have to ensure adequate

---

[2] Throughout the Complaint, the term "LC" refers to Letter of Credit.  The term "SBLC" refers to Stand By Letter of Credit.

CASE NO. _____

LC support for working capital needs or provide alternate sources of working capital support if the business was to continue to maintain or improve its earnings levels.

20.    CPL's particular purchasing and operations model was possible in large part, because of CPL's beneficial ownership interest, through Shell Jamaica, in the largest privately held petroleum "tank farm" facility in the island.

21.    Cool Corp explained to Blue Equity that the combination of the access to the tank farm and adequate working capital financing allowed CPL to take advantage of periodic adjustments in the market cost of acquiring imported fuel as compared to the market cost of local fuel purchases.

22.    At the initial meetings with Blue Equity, Cool Corp and its representatives specifically informed Jonathan Blue, David Roth and Terry Stapp (introduced to Cool Corp as Blue Equity's Chief Financial Officer), that any prospective or future equity partners would be required, at a minimum, to satisfy the LC considerations if the CPL earnings forecasts were to be achieved or, alternatively, would be required to provide other forms of working capital financing to replace the existing Neal and Massy LC facility.

23.    These points, in particular, were raised at every meeting between Cool Corp, Jonathan Blue and Blue Equity in Miami, Jamaica and Trinidad, respectively.

24.    It was repeatedly made clear to Blue Equity and to Jonathan Blue that the CPL business derived a considerable portion of its earnings by having access to sufficient quantities of imported petroleum product in addition to its domestic purchases to allow CPL to take advantage of the differences in the domestic and import market prices of petroleum and petroleum products.

CASE NO. _____

25.     It was also repeatedly emphasized to Blue Equity that any agreement with a potential or future equity partner would be predicated upon the equity partner's ability to access and make available, adequate working capital financing to replace the Neal and Massy LC facility.

26.     Blue Equity and in particular Jonathan Blue and David Roth repeated that access to working capital financing and in particular a Letter of Credit facility, would not be a problem or an issue for Blue Equity.

27.     To support these misrepresentations, Jonathan Blue and David Roth specifically asserted that Jonathan Blue and Blue Equity's relationship with JP Morgan bank in Louisville, Kentucky was such that the necessary working capital LC would be "easily" obtained by Blue Equity at minimal cost and effort.

28.     Based upon these several, repeated misrepresentations regarding Blue Equity's "easy" access to working capital financing, Cool Corp was induced to proceed to contract with Blue Equity and to support Blue Equity's purchase of an equity interest in CPHL.

29.     The original terms agreed to by the parties, anticipated that Blue Equity was to acquire an aggregated 48.5% of CPHL in exchange for an aggregated consideration of approximately $10 million in cash, plus a LC to serve as the replacement of the Neal and Massy LC on terms to be agreed upon and approved by CPL's bondholders.  Blue Equity also initially agreed to provide access to working capital of an additional $10 to $16 million.

30.     Under the original terms, the $10 million in cash from the Blue Equity investment was to be disbursed with approximately $8,000,000 going directly into the CPL business.

CASE NO. _____

31.     All parties to the transaction agreed that there were key conditions precedent that needed to occur before the CPL-Blue Equity closing, which was initially scheduled for February 2011.

32.     The parties all agreed and understood that the material terms of the proposed transaction, all needed to be approved by the bondholders before the parties could proceed further with the proposed transaction.

33.     Based on the continued misrepresentations made by Jonathan Blue, David Roth, Blue Equity and its representatives to Cool Corp and the bondholders regarding Blue Equity's ability to access working capital financing, all parties to the transaction agreed that Blue Equity was a suitable potential equity partner to replace Neal and Massy in CPHL.

34.     Based upon the continued misrepresentations from Blue Equity, David Roth and Jonathan Blue, Cool Corp prepared and sent communication to the CPL bondholders urging them to expedite a previously arranged 21 day Bondholder Approval process to approve the CPL-Blue Equity transaction.

35.     Based upon the continued misrepresentations from Blue Equity, Jonathan Blue and David Roth regarding Blue Equity's ability and intention to secure replacement LC facility, Cool Corp agreed to allow Blue Equity to pay down existing bondholder debt without any change in existing debt service payments, using the bulk of Blue Equity's capital injection

36.     At the January 2011 meeting with bondholders, Blue Equity was made aware that their financial information would be required to obtain bondholder approval for the proposed transactions.  Despite this, Blue Equity did not provide this information during the bondholder review period and for some months afterwards.

CASE NO. _____

37.     Cool Corp and CIHL subsequently discovered that although Blue Equity undertook to pursue discussions with Citibank about continuing or replacing the LC facility which was previously guaranteed by Neal and Massy, Blue Equity had failed to timely and completely provide financial information to Citibank to facilitate a prompt and complete review of their application for a replacement LC.   According to representatives from Citibank, this was a key consideration in their decision to decline to provide financing facilities to a Blue Equity led CPL.

38.     It later became clear that Blue Equity had no intention of securing the promised LC which was the reason for their inexplicable delays.

39.     Upon information and belief, despite the several misrepresentations about closing as early as February 2011, Blue Equity did not even contact Citibank about continuing the LC facility until late May 2011 and failed to provide proper financial information to Citibank.

40.     As the re-scheduled May 31 closing date approached, it became obvious that notwithstanding the impending closing, Blue Equity was still not doing anything to move the transaction forward, but seemed instead to be further stalling the proposed transaction by delaying the process at every opportunity.

41.     Blue Equity continued to insist, despite its unexplained delays, that it was still in a position to "easily" secure the required LC and any needed additional working capital financing and blamed the closing delays on a number of "new" factors including an alleged "Environmental Report" that it claimed—in June 2011, despite not having raised this as an issue prior—was necessary for closing.

42.     Blue Equity, Jonathan Blue and David Roth continued to persist in their misrepresentations that securing the required LC was not an issue as they had a strong

CASE NO. _____

relationship with J.P. Morgan Chase such that the required LC would "take $1 and 1 day" to be acquired from them.

43.     By the end of May 2011, as anticipated, the Bondholders had signed off on the CPL-Blue Equity transaction and had given their approval for Blue Equity to purchase the equity interests then held by Neal and Massy.

44.     Blue Equity, Jonathan Blue and David Roth negotiated a pay down of the bondholder debt against their continued fraudulent misrepresentations to both the bondholders and Cool Corp that they would provide working capital support in the form of an LC from JP Morgan Chase.

45.     Had Cool Corp and the other minority shareholders known that Blue Equity, Jonathan Blue and David Roth had no ability or intention to provide a replacement LC, there would never have been an agreement to allow Blue Equity to replace Neal and Massy as a shareholder and even worse, to use all of Blue Equity's initial capital injection to pay down the bondholder debt at the expense of working capital financing.

46.     The decision to pay down bond holder debt at the expense of working capital financing inured solely to the benefit of Blue Equity, Jonathan Blue and David Roth and to the immediate and long term disadvantage of Cool Corp and the minority shareholders specifically and the company in general.

47.     With the Bondholders' approval secured and CPL and Cool Corp "locked" into the transaction for all practical purposes, Blue Equity aggressively started to change key terms of the agreed-upon transaction.

CASE NO. _____

**The Blue Equity Defendants Change the Deal**

48.     Upon information and belief, in or about April 2011 and towards the end of the initial due diligence exercise, Blue Equity and Jonathan Blue discussed key terms of the pending CPL-Blue Equity transaction with persons at Neal and Massy and determined, based upon those conversations, that there was an opportunity for Blue Equity to have secured a larger equity position in exchange for their investment as a CPL equity partner.

49.     Blue Equity in concert with Jonathan Blue, David Roth and others set upon a concerted effort to try and wrest—by any means possible—as much additional equity or cash as they could from CPL and Cool Corp for Blue Equity's agreed upon investment.

50.     Blue Equity was well aware—and counted on the fact that—since the proposed transaction had already been publicly announced, any perceived uncertainty with respect to completing the transaction and in particular any perceived uncertainty in the eyes of CPL's existing suppliers, would have resulted in a tightening of the existing working capital and "credit" available to CPL with significant negative impact to the business and the existing shareholders.

51.     Contrary to the original understanding, Blue Equity insisted that Cool Corp would not be allowed to take any cash out at the closing of the pending transaction, but rather was required to inject additional capital and was to be issued "Class B" preferred shares instead.  This was a material change from the terms discussed before bondholder approval was secured.

52.     Next, also by way of example of the Blue Equity Defendants' escalating bad faith, Blue Equity insisted that although the Class B preferred shares were to be treated *pari pasu* (at an 8% coupon rate) with certain Class A preferred shares (all held by Blue Equity), the Class B

CASE NO. _____

shares would **not** be treated on a first pay basis as would the Class A shares, in the event of a sale or other liquidity event.

53.     Throughout all of these post-bondholder-approval-changes, however, Blue Equity, Jonathan Blue and David Roth continued to misrepresent to Cool Corp that securing the required LC to replace the Neal and Massy LC was not a problem for Blue Equity and would be "easy" due to their existing relationship with J.P. Morgan Chase and its alleged "preapproval" of the required LC.

54.     Blue Equity's continued and persistent misrepresentations regarding its ability to secure the required LC despite trying to change several other terms of the transaction—was a tacit acknowledgment of the importance of the LC facility and the fact that without their stated ability and agreement to secure the LC, neither CPL, the Bondholders nor Cool Corp would have been interested in pursuing a transaction with Blue Equity and Jonathan Blue.

55.     Upon information and belief, Blue Equity, Jonathan Blue and David Roth made the calculated decision not to attempt to change the LC requirement because they were well aware that any attempt to back away from the LC obligation while the parties were free to halt the transaction would have resulted in an end to the transaction.

56.     Throughout the entire due diligence process, however, Blue Equity refused to disclose any audited financial statements to Cool Corp; to Citibank; to the two trustees for the bondholders; or to representatives of Shell (the company under whose brand CPL operated).

57.     Upon information and belief, following—and likely as a result of their review of Blue Equity's unaudited financial statements—Citibank (though it did not veto the CPL-Blue Equity transaction) declined to do business directly with Blue Equity by way of providing working capital through a continued LC facility or other financing.

CASE NO. _____

58.     In yet another surprise move, Blue Equity and Jonathan Blue demanded an annual "management" fee of $600,000, insisting that since they would be responsible for all matters financial, legal, and related to their "management expertise", this was a fee to which they were entitled.

59.     This "management fee" turned out to be nothing more than an additional, preferential dividend payment to Jonathan Blue as Blue Equity ultimately provided none of the legal, financial or management services and expertise it claimed it was going to provide.

60.     Jonathan Blue's insistence on a $600,000 "management fee" was inserted into the transaction after the parties had secured bondholders' approval for the transaction.  Blue Equity, Jonathan Blue and David Roth intentionally did not disclose their intention to seek a "management fee" to the bondholders prior to obtaining their approval for the transaction.

61.     The CPL-Blue Equity transaction eventually closed on January 6, 2012—almost a full year behind the initially contemplated schedule and seven (7) months after the revised May 31, 2011 deadline.

62.     After the closing, Cool International Holdings Limited ("CIHL")—a new group of minority shareholders—replaced Cool Corp, becoming the largest minority shareholder in CPL.  Blue Equity replaced Neal and Massy as a stakeholder and, through BEP, became the new majority shareholder.

**Blue Charges Improper Expenses to CPL**

63.     Immediately leading up to closing the CPL-Blue Equity transaction, Jonathan Blue and David Roth represented that Blue Equity had incurred approximately US$1 million in "costs" to complete the CPL-Blue Equity transaction for which they were entitled to

CASE NO. _____

"reimbursement" or other equity consideration from CPL.  This notion was soundly ejected by CIHL and the matter seemed to have been resolved pre-closing.

64.     In the months immediately following closing, the CPL treasurer was improperly ordered by Jonathan Blue to process several invoices received from Jonathan Blue and Blue Equity for "reimbursements" going as far back as October 2011—well before the January 2012 closing date.  The CPL treasurer was instructed to hide these requests from CIHL.

65.     Jonathan Blue, David Roth and Blue Equity attempted to justify these questionable expenses by referring back to the $1 million in transaction "costs" that they allegedly incurred to close the CPL-Blue Equity deal.

66.     Despite repeated demand, no documentation was ever provided by Jonathan Blue, David Roth or Blue Equity to support these alleged "transaction costs" and claimed reimbursed expenses.

67.     These improper "reimbursements" were a preferential dividend to Blue Equity and were secured over objection and at the expense of the minority shareholders who were fraudulently made to bear a disproportionate share of Blue Equity's unrelated expenses.

68.     Subsequently, Jonathan Blue as representative of the majority shareholder, and CIHL, the new minority shareholder, "agreed" that all Blue Equity expenses to be paid by CPL were to be disclosed to and preapproved by CIHL and all CIHL expenses to be paid by CPL or its parent company were to be disclosed to and preapproved by Jonathan Blue himself.

69.     Notwithstanding the parties' agreement, Jonathan Blue continued to try and push through, and in many cases succeeded in pushing through improper expenses on the CPL accounts without CIHL's knowledge or preapproval.

CASE NO. _____

70.     In or about February 2012, Jonathan Blue attempted to purchase a customized armor plated SUV for his personal use, using funds from the CPL accounts.

71.     Despite receiving a quote for this vehicle which was well in excess of US$250,000, Jonathan Blue nevertheless instructed the CPL treasurer and Human Resources executive to purchase the vehicle for his exclusive personal use while in the island.

72.     Upon information and belief, only after the matter of the armor plated SUV was brought to the attention of the CFO of CPL/TAG was the matter shelved by Jonathan Blue.

73.     Jonathan Blue and the Blue Equity team continued, however, to improperly run expenses through the CPL accounts without the knowledge and approval of the minority shareholders and in particular CIHL.  For example, upon information and belief,  travel expenses for Blue Equity executives traveling to Jamaica and elsewhere on unrelated Blue Equity business were routinely and improperly charged to CPL.

74.     From January to November 2012 alone, CPL/TAG's expense reports reflect in excess of $20 million Jamaican dollars attributed to Jonathan Blue for "travel expenses" for himself and at least one other Blue Equity Director.  Upon information and belief, these expenses included among other things the charter of a private jet for expenses unrelated to CPL business.

75.     During this same period, other uncategorized and unexplained expenses in excess of $2.5 million Jamaica dollars are reflected on the CPL accounts—again attributed solely to Jonathan Blue—without required documentary support or proper approval.

76.     The "management fees" alone during this period for Blue Equity and Jonathan Blue were in excess of $58 million Jamaica dollars.

CASE NO. _____

77.     Upon information and belief, Blue Equity, Jonathan Blue and David Roth also improperly charged over $156,000.00 in interest charges believed to be owed by Blue Equity to J.P. Morgan, to the CPL/TAG accounts.

78.     In addition to the management fees, Blue also fraudulently charged in excess of $5 million Jamaican dollars for additional "expenses" for the consulting firm of Brockman Arbuckle Stapp, where Blue's Chief Financial Advisor, Terry Stapp, also served as that firm's Managing Partner.

79.     Mr. Stapp was represented to Cool Corp as, and—as far as the Blue Equity-CPL deal was concerned—always functioned as Blue Equity's Chief Financial Advisor.   In this capacity, his "cost" was initially misrepresented as a part of the surprise $600,000 "management fee" demanded by Blue Equity as a part of the transaction for Blue Equity's legal, financial and management services and expertise.

80.     Additionally, lower level employees who were on Blue Equity's local Jamaica payroll and who were employed to do unrelated Blue Equity business before the CPL-Blue Equity transaction, were shifted (post-transaction) and without approval from CIHL to CPL's payroll with no financial offset made for work that they were doing which was unrelated to CPL business.

81.     By doing so, Blue Equity, Jonathan Blue and David Roth impermissibly passed a portion of these unrelated expenses on to the CPL/TAG minority shareholders and in particular to CIHL and created for themselves a super-dividend or unfair benefit at the expense of the minority shareholders.

82.     Upon information and belief, on at least one occasion, Jonathan Blue individually, or in concert with David Roth and others at Blue Equity and CPL, arranged to make improper

17

CASE NO. _____

and fraudulent salary adjustments and payments to certain "chosen" CPL employees.  Jonathan

Blue specifically instructed CPL personnel to hide the information from the company CFO and

the minority shareholders at CIHL.  These secret compensation agreements were a violation of

company policy and in direct contrast to Jonathan Blue's usual insistence on the CFO's "sign-

off" on approved salary adjustments.

83.     These actions were taken to secure a unique and individual super benefit to Blue

Equity and Jonathan Blue for their sole benefit and to the detriment and expense of the minority

shareholders of CPL/TAG and in particular CIHL.

84.     Despite their assurances and initial agreement that they would not do so, Jonathan

Blue and Blue Equity eventually arranged and pushed to change the name of the company from

CPL to TAG ("The Antilles Group") and changed the name of the parent company from Cool

Petroleum Holdings Limited ("CPHL") to BE TAG Holdings Limited ("BE TAG").

85.     In or about February 2012, when it was clear that Jonathan Blue and Blue Equity

had no intention of putting in place the agreed-upon LC, the minority shareholders and in

particular CIHL, suggested that Blue Equity consider making arrangements for a cash backed LC

secured by the shares held by CIHL with terms to be agreed upon between Blue Equity and

CIHL.

86.     CIHL suggested that under this scenario, even in the event of a default or late

payment on the new LC, the only negative impact would be to the CIHL minority shareholders

whose shares would have been put up as security for the cash backed LC.

87.     The suggestion was rejected outright by Jonathan Blue, Blue Equity and David

Roth despite a clear warning from the CIHL shareholders that prolonged failure to replace the

CASE NO. _____

Neal and Massy LC was jeopardizing the company's operations and jeopardizing the company's revenue position.

**The Forced Capital Call**

88.     In February 2012, less than two months after closing, Jonathan Blue and David Roth raised with the CPL/TAG CFO Rodney Davis, the issue of the immediate cash needs of CPL which they represented to be "urgent" in the event of failed financing efforts then being undertaken by CPL.

89.     Mr. Davis was the person who on behalf of CIHL, had earlier suggested that the company should secure a cash-backed LC, even if secured against the shares of the minority shareholder CIHL.  Mr. Davis again suggested that by revisiting and adopting this option, an unnecessary and imprudent capital call would be avoided and company's short-term capital needs would be met.

90.     In or about May 2012, less than five (5) full months after closing, Jonathan Blue and his Vice Chairman and Chief Legal Officer David Roth, also a member of the Board of Directors of CPL/TAG, began to aggressively insist that the company needed to have an immediate Capital Call because the company was in a "desperate" financial condition.

91.     The decision to proceed with a capital call was taken over the objections of the minority shareholders and in particular, CIHL which continued to insist that the working capital needs of the company were "short-term" needs which did not require the permanence of a capital call solution.

92.     Jonathan Blue, David Roth and Blue Equity insisted that the company needed to have a lump sum $10 million dollar capital call because of a constrained revenue stream and

CASE NO. _____

immediate overdue payment obligations to TAG's (formerly CPL's) existing vendors and suppliers.

93.     The terms of the fraudulent capital call required that any existing shareholder that wished to exercise the option to purchase additional shares—dubbed "Class C" shares—would be required to timely deposit funds equivalent to their pro-rata share of the full $10 million dollar capital call share issue.

94.     Specific instructions were issued to the existing shareholders detailing the instructions and deadlines for deposits for payments for the new Class C shares.  A copy of the June 18, 2012 Notice of Determination To Seek Additional Capital addressed to CIHL is attached hereto as Exhibit "A".

95.     Contrary to their representations and the specific requirements of the forced Capital Call, Blue Equity and Jonathan Blue never made the required deposit in the time required to allow them to exercise purchase rights for any shares under the forced capital call.

96.     Contrary to their subsequent misrepresentations and the requirements of the Capital Call, Blue Equity and Jonathan Blue never made the required deposit in the manner required to allow them to exercise purchase rights for any shares under the forced Capital Call.

97.     As confirmed by David Roth in subsequent emails to Rodney Davis, Blue Equity never deposited their pro-rata share of the capital call funds as required by the terms of the forced Capital Call.

98.     Additionally, upon information and belief, not only did Blue Equity fail to make the deposit in the time and manner required, but Blue Equity never intended to make the lump sum capital injection required by the capital call.

CASE NO. _____

99.     Rather, Blue Equity in concert with Jonathan Blue, David Roth and others, fraudulently adopted the very suggestion that was initially made by CIHL in February 2012 and instead of providing "capital" as required—in full, timely paid up funds—Blue Equity made the funds available outside of the company to secure an LC and then only made those funds available to the company on an as needed basis as determined at the sole discretion of Blue Equity and without any consultation to CIHL or local management.  This approach worked against the initial represented purpose of the capital call and left the company no better off following the capital call and arguably harmed the company in the longer term.

100.     Despite having failed to meet the requirements of the fraudulent capital call, Blue Equity, Jonathan Blue and David Roth nevertheless issued to themselves all 10 Class C preferred shares.

101.     To cover up their fraudulent conduct, Blue Equity, Jonathan Blue and David Roth caused Blue Equity to create a false statement of accounts showing deposits and withdrawals from a "capital call account".

102.     This fraudulent statement was in truth and in fact, not a statement of a capital call account as represented by Blue Equity, Jonathan Blue and David Roth but rather was merely an internal "accounting" of monies that the Blue Equity Defendants allegedly accessed to meet CPL's demands for draws against the "capital call account."

103.     To add insult to injury, Blue Equity and Jonathan Blue, upon information and belief, charged all fees and costs associated with this secret credit facility to CPL/TAG—to its benefit and to the detriment of the minority shareholder, CIHL.

104.     Blue Equity, Jonathan Blue and David Roth fraudulently took measures to cover up the fact that they never made the lump sum capital call deposits as required and took

CASE NO. _____

measures to hide the fact that the monies "drawn" from the capital call account were never placed in a TAG/CPL account.

105. In order to facilitate the forced capital call, Jonathan Blue, David Roth, Blue Equity and several of its officers—for the several months leading up to the forced Capital Call—engaged in a series of acts designed to fraudulently manipulate the company (TAG), and the minority shareholders, into a compromised financial condition.

106. Blue Equity, Jonathan Blue and David Roth had concluded that by compromising the company through manipulation of its finances—i.e., restricting revenue and limiting access to working capital—they would be able to force a capital call and secure for themselves a significant portion of the minority shareholders' existing shares through the fraudulently contrived "capital call".

107. Through this fraudulent capital call, Jonathan Blue, David Roth and Blue Equity were able to improperly effect a transfer of approximately sixteen (16%) percent share value in the company away from the minority shareholders and to themselves.

108. The manipulation of the company's finances and the plan to secure additional shares were important to allow Blue Equity and Jonathan Blue to secure their target recovery in a sale of the company that Blue Equity, Jonathan Blue and David Roth were negotiating in secret and without any disclosure to CIHL or the other minority shareholders.

109. These acts of financial manipulation included among other things:

a. Improperly and with fraudulent purpose, restricting access to working capital contrary to their initial assurances and promises leading up to the closing of the CPL-Blue Equity transaction, thereby resulting in underperforming revenue numbers and compromising the company and the minority shareholders;

CASE NO. _____

b.      Forcing unnecessary and unilateral purchasing and expense decisions either over objection or without consulting top executives in the company, that severely limited the company's working capital reserves, thereby compromising the company and the minority shareholders;

c.      Making decisions regarding overstocking slow moving inventory and refusing to purchase other types of faster selling inventory which resulted in CPL having inventory well in excess of what it could historically sell within the time required for payments to creditors or not having inventory which upon sale would result in additional working capital;

d.      Improperly and fraudulently forcing improper and inflated expenses through the CPL/TAG company accounts resulting in a super-dividend to Blue Equity and reduction in working capital reserves for the company.

110.    Contrary to the requirements of the fraudulent capital call, Blue Equity never deposited the $10 million dollars it claims to have deposited into an account for TAG (formerly CPL) and which was the alleged basis for its allocation—to itself—of 10 Class C preferred shares or the equivalent of thousands of additional common shares.

111.    Blue Equity, Jonathan Blue and David Roth refused, and were in fact unable to provide any bank statements or other independent proof of Blue Equity's "deposit" of the required funds pursuant to the forced capital call because, upon information and belief, Blue Equity never made the required lump sum Capital Call deposit.

112.    Instead, upon information and belief, Jonathan Blue, David Roth and others caused Blue Equity to use the very same LC they had promised to put in place at the beginning

CASE NO. _____

of the transaction—or a portion thereof—and attempted to fraudulently secure for themselves additional preferred shares despite using this facility.

113.    To support their fraudulent claim of a "lump sum deposit", Jonathan Blue and his Vice Chairman, David Roth, an attorney in Kentucky, caused Blue Equity to create and provide to the minority shareholders a fraudulent "Statement of Account" reflecting deposits and withdrawals from a fictional "Trust Account".

114.    As reflected below, the only explanation received from Blue Equity through David Roth was that the monies were placed into an attorney "bank account" or other "escrow account" where it was co-mingled with funds from other projects and other "clients":

> Dear Rodney,
> As previously explained, the escrow is being held within a bank account which contains funds held for others as well.  Therefore, the bank statements contain confidential information which is not relevant to TAG. For purposes of facilitating the SBLC's that have been issued by JPMorgan Chase, we have been serving as an escrow agent as to the funds being held for TAG, all as reflected in the spreadsheet provided.

(Excerpted from email from D. Roth to R. Davis dated Nov. 26, 2012.)

> Dear Rodney,
> Please see my prior email. As you know, I have always referred to the funds as being held by us in an escrow account for TAG and not in a separate bank account.  As you know through the prior emails, because of the Atlantic Supply and initial Shell Trinidad timing issues, we were not able to get JPMorgan Chase to clear TAG under the Know Your Customer rules quick enough to use a new account for TAG's purposes.
> Best,
> David

(Excerpted from email from D. Roth to R. Davis dated Nov. 26, 2012.)

115.    By Blue Equity's own admissions through its Director, Vice Chairman and Chief Legal Officer David Roth, the "capital call" funds were never deposited as required by the terms

CASE NO. _____

of the fraudulent capital call but rather, these funds were allegedly in an "escrow account" and comingled with "funds held for others as well."

116.    Pursuant to the terms of the fraudulent capital call, any monies paid in by the shareholders for Class C shares were to be timely deposited into a specific account set up on the behalf of and for the sole benefit of CPHL by David Roth or at his instruction.  See Exhibit "A".

117.    The minority shareholders did not know of, let alone authorize any circumstance which would have or could have resulted in the co-mingling of CPL/TAG corporate funds with the funds of any unrelated entity or other "Blue Equity clients."

**The Surprise Sale To Rubis**

118.    On November 13, 2012, less than four (4) months after the fraudulent capital call, Blue Equity finally disclosed that it had been in "talks" to sell the shares of the company to a third party, eventually identified to the minority shareholders as "Rubis".

119.    Upon information and belief, this late disclosure was forced because Rubis and Blue Equity had agreed to terms of sale and were poised to make a public announcement in that regard.

120.    Upon information and belief, in order to finalize the sale to Rubis, Blue was compelled to seek a vote of the CPL/TAG Board of Directors and obtain the necessary corporate resolutions as a part of their due diligence and pre-closing obligations.

121.    At a TAG board meeting on November 13, 2012, only minimal details of the proposed sale were disclosed to the minority shareholders—which details among other things did not include the final sales price nor did they include the names of the prospective buyers.

122.    The November 13 Board meeting was temporarily suspended to allow for the minority shareholders to review "excerpts" of the sales documents presented to them by Blue

CASE NO. _____

Equity and to review "excerpts" of the various models supporting the proposed sales prices also presented to them by Blue Equity.  These "excerpts" were created and selected at Blue Equity, Jonathan Blue and David Roth's sole discretion.

123.    Only minimal information was provided by Blue Equity to the minority shareholders to allow them to "review" the proposed sales alternatives before a vote was forced to approve Blue Equity to "pursue" the various alleged sales alternatives.

124.    At the continued board meeting on November 20, 2012, Blue Equity, Jonathan Blue and David Roth continued to refuse to disclose the details of the pending sale and refused to provide sufficient information to the minority shareholders to review and analyze the terms of the proposed sales alternatives.

125.    Despite demand for the information by certain minority shareholders, Blue Equity, Jonathan Blue and David Roth provided only such information as they deemed in their sole discretion as "relevant" to the minority shareholder's analysis of the proposed sales alternatives.

126.    Over objection of CIHL, Blue forced a vote to secure for itself *carte blanche* right to negotiate, accept and execute a sale of the shares of CPL (now known as TAG) to an (as yet undisclosed) third party.

127.    Blue provided the minority shareholders with no meaningful opportunity to analyze the proposed sales transaction, including for example:

       a.    no information regarding the ultimate disbursements to the shareholders;

       b.    no information regarding any associated fees and expenses associated with the transaction;

CASE NO. _____

     c.     no information regarding associated transactions which may have affected the terms of the transaction;

     d.     and, no information regarding how the share price was ultimately arrived at.

128.    Indeed, up until December 31, 2012—the day of the proposed closing—no closing statement or other document detailing the manner or amount of disbursement to the minority shareholders was provided.

129.    In fact, as late as mid-May 2013, some five (5) months after the reported December 2012 closing, the minority shareholders had yet to have been advised about the details of the closing, the proceeds of the sale or the distribution of any such proceeds of sale.

130.    Through to and including May 2013, no documents from the sale or other pertinent information had been provided by Blue Equity, Jonathan Blue and David Roth to the minority shareholders or to the full Board of TAG/CPL regarding the CPL/Rubis transaction.

131.    Rather, Blue Equity, Jonathan Blue and David Roth provided only such documents and information (pre-closing) as they selected in their sole discretion.

132.    For example, through information and belief, the purchaser, Rubis required the resignation of the existing Directors of TAG, the company being sold.  Rather than provide a basic resignation document meeting that minimal objective, Blue Equity, Jonathan Blue and David Roth attempted to have the Directors execute a Resignation, Release and Waiver of "all claims" that the Directors may have after the sale.

133.    Similarly, resolutions purporting to authorize Blue Equity and Jonathan Blue to "represent" the Shareholders and Directors in negotiations, also attempted to grant Blue Equity

CASE NO. _____

and Jonathan Blue unrestricted rights to receive and distribute—in their sole discretion—any and all sums received from the sale.

134.    These same resolutions also purported to release Blue Equity, Jonathan Blue and David Roth from "any and all claims" held by the minority shareholders against the majority shareholders.

135.    Notwithstanding their failure to provide any meaningful information to the minority shareholders despite demand, Blue Equity, Jonathan Blue and David Roth forced a vote of the Board of Directors purporting to grant to them alone, *carte blanche* and unfettered rights to negotiate, accept or reject any proposal for sale of all shares of the company—including those of the minority shareholders.

136.    This vote was a farce and meaningless as Blue Equity, Jonathan Blue and David Roth had been conducting these negotiations for months before the vote and upon information and belief the sale discussions with Rubis and possibly other third party purchasers had also been pending for several months.

137.    Upon information and belief, the secret sale discussions—possibly even with Rubis—had been ongoing even before the forced capital call and may have been a driving factor for Blue Equity, Jonathan Blue and David Roth to force the fraudulent Capital Call in the first place.

138.    Despite having knowledge which they were obligated to disclose to all the shareholders and to the full Board of Directors, neither Blue Equity, Jonathan Blue, David Roth nor Maureen Smith nor any of the majority shareholder representatives nor any of the majority appointed directors disclosed the fact of the potential sale at the time of the fraudulent capital call.

CASE NO. _____

## Blue Equity Buys the Loyalty of the TAG/CPL Corporate Secretary

139.    Upon information and belief, the Corporate Secretary, Maureen Smith, was fully aware of the pending sale and the associated discussions before the capital call and also failed to disclose the information to the minority shareholders and minority Board representatives.

140.    In the months prior to the fraudulent capital call, there were discussions regarding Maureen Smith's employment future with the Company—with an imminent decision to be made about whether or when she was to be terminated from TAG/CPL.

141.    In fact, prior to the fraudulent Capital Call there were a number of complaints made about Maureen Smith's performance and in each circumstance, Blue Equity, through David Roth, intervened on her behalf or deflected the complaints to avoid negative company action.

142.    Without consultation or notice to the minority shareholder CIHL, Jonathan Blue made a unilateral decision to keep Maureen Smith employed despite the pending unresolved complaints and impending company action against her.

143.    The minority shareholders also subsequently learned that not only did Blue Equity, Jonathan Blue and David Roth unilaterally decide to retain Maureen Smith's continued employment at TAG/CPL, but they also unilaterally decided to increase her salary by almost 100 percent without disclosure to the Group CFO or to the minority shareholders.

144.    After being advised that his order to increase Maureen Smith's compensation would violate the company's existing salary structure and would require the approval of the Company's CFO, Rodney Davis, Jonathan Blue specifically instructed that the company salary structure be ignored and that no one was to make the CFO, Mr. Davis, aware of the extraordinary increase to Maureen Smith's salary.

CASE NO. _____

145.    Blue Equity, Jonathan Blue and David Roth deliberately concealed the decision to increase Maureen Smith's compensation in breach of the shareholder agreement and in violation of their fiduciary obligations to the minority shareholders, and in particular, CIHL.

146.    The decision to conceal Maureen Smith's extraordinary increase in compensation and benefits was specifically to facilitate her secret work on behalf of Blue Equity and Jonathan Blue and to the disadvantage of the minority shareholders and to reward her for her silence and complicity in Blue Equity, Jonathan Blue and David Roth's scheme to transfer additional shares from the minority shareholders.

147.    While she was still employed to CPL/TAG, Maureen Smith upon information and belief, worked on the proposed sales transaction providing services either as a consultant, or employee or both.

148.    All of Maureen Smith's secret work on the CPL/Rubis transaction was performed without disclosing to the minority shareholders and in particular to CIHL the fact and nature of her activities and services regarding the pending sales transaction(s).

149.    Maureen Smith had been serving as Corporate Secretary, Legal Officer and an employee of CPL/TAG and had a duty and an obligation to disclose to the minority shareholders, the full Board of Directors and to CPL/TAG her services on behalf of, and to the unique advantage of the majority shareholders Blue Equity, Jonathan Blue and David Roth and to the detriment of the minority shareholder CIHL to whom she also owed a fiduciary obligation.

150.    Upon information and belief, Maureen Smith was also richly compensated with other benefits separately, and in secret, either as a consultant or as an employee, without disclosure to the minority shareholders.

CASE NO. _____

151.    Upon information and belief, these payments to Maureen Smith and her secret working relationship with Blue Equity Jonathan Blue and David Roth compromised her service and fiduciary obligation to the company in several respects including but not limited to:

a.    Withholding important information regarding the potential sale from the minority shareholders which she was obligated to disclose in her capacity as Corporate Secretary and Legal Officer;

b.    Withholding information regarding the CPL/Rubis transaction due diligence process and her activities on behalf of Blue Equity, Jonathan Blue and David Roth with regard to the pending sale;

c.    Purposefully failing to properly record the discussions, decisions and agreements during Board Meetings where she acted as the Company recording secretary and purposefully misrepresenting the record of those meetings and associated discussions.

**The MZ Holdings' (Third Party) Debt**

152.    After disclosure of the pending sale, Blue Equity, Jonathan Blue and David Roth disclosed their unilateral intention to set off against any potential disbursements to CIHL, amounts allegedly owing by MZ Holdings Limited ("MZ Holdings") a third party company that was related to certain of the CIHL shareholders and that did business with CPL /TAG.

153.    The CIHL minority shareholders subsequently learned that without consulting or advising CIHL, Blue Equity, Jonathan Blue and David Roth had misrepresented to the third party purchaser Rubis, that there was an "agreement" that the alleged MZ Holdings receivable would be cleared in full before closing—the intention being a full and total set-off against the CIHL minority shareholders' potential distribution without their approval or consent.

31

CASE NO. _____

154.    This self-serving agreement was not disclosed by either Blue Equity, Jonathan Blue or David Roth to the Minority Shareholders, and in particular CIHL, prior to being consummated with the third party purchaser.

155.    This unilateral attempt to wipe out company debt against the equity interest of the minority shareholder CIHL was a further attempt to secure a super dividend by Blue Equity, David Roth and Jonathan Blue at the expense and to the disadvantage of the minority shareholder CIHL.

**COUNT I**
**BREACH OF CONTRACT**
**(Against BEP)**

156.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

157.    There existed a written contract, a Shareholders Agreement, which was intended to govern the parties' operation and management of BE TAG and its subsidiaries.  A copy of that Shareholder Agreement is attached hereto as Exhibit "B".

158.    BEP breached the Shareholders Agreement by among other things:

      a.     failing to disclose the fact of the pending sale;

      b.     running improper expenditures through BE TAG's subsidiary's accounts;

      c.     misappropriating BE TAG's funds to pay expenses incurred by BEP and is agents and affiliates, including but not limited to expenses going as far back as October 2011—well before the January 2012 closing date;

      d.     failing to deposit capital as required under the capital call;, and/or

      e.     otherwise acting against the best interests of CIHL and BE TAG and for its own unique and singular benefit.

32

CASE NO. _____

159.    As a result of BEP's material breach of the Shareholder Agreement, CIHL has been materially and significantly damaged.

WHEREFORE, CIHL demands judgment against BEP for breach of the Shareholders Agreement and seeks;

      a.    temporary and permanent injunctive relief;

      b.    all appropriate damages;

      c.    pre and post-judgment interest;

      d.    attorneys' fees and costs as permitted under Fla. Stat. § 608.601; and

      e.    any other relief that this Court deems just and proper.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against BEP)

160.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

161.    A valid and enforceable agreement existed between CIHL and BEP.

162.    BEP breached the agreement as more fully set forth in Count I above.

163.    BEP has also breached the covenant of good faith and fair dealing implied in the Shareholder Agreement by taking actions that were detrimental and destructive to Plaintiffs' rights under the Shareholder's Agreement.

164.    BEP unreasonably took actions to dilute CIHL's shareholdings in BE TAG in an effort to unreasonably deny CIHL the benefits and rights due to it as a shareholder.

165.    BEP took these improper actions, among others, in a bad faith effort to impose a financial hardship on CIHL and for BEP's own interest in an effort to improperly acquire shares from CIHL.

CASE NO. _____

166.    As a result of BEP's breach of the implied covenant of good faith and fair dealing, CIHL has suffered damages.

WHEREFORE, CIHL demands judgment against BEP for breach of the covenant of good faith and fair dealing and for the following relief:

    a.    all damages;

    b.    pre and post-judgment interest;

    c.    costs and attorneys' fees; and

    d.    any other relief that this Court deems just and proper.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(Against BEP)**

167.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

168.    As a majority shareholder, Defendant, BEP, owed to Plaintiff and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the Plaintiff and BE TAG with the utmost good faith.

169.    Defendant, BEP, breached its fiduciary duty to Plaintiff and BE TAG by, among other things:

    a.    Fraudulently and improperly running expenses through the CPL accounts without the knowledge and approval of the minority shareholders and in particular CIHL;

    b.    shifting lower level employees who were on Blue Equity's local Jamaica payroll and doing unrelated Blue Equity business to CPL's payroll, without making any financial offset for work that they were doing which was unrelated to CPL business;

34

CASE NO. _____

      c.      manipulating the company finances as outlined in the general allegations above;

      d.      misappropriating some of BE TAG's funds to pay expenses incurred by BEP;

      e.      unreasonably and fraudulently forcing a capital call for its own interest and against the interest of CIHL;

      f.      failing to disclose material information to the minority shareholders to the detriment of the shareholders and to the unique advantage of BEP;

      g.      failing to provide complete and accurate disclosures to CIHL and BE TAG regarding the financial condition of BE TAG and its subsidiaries; and

      h.      failing to provide full and timely disclosure regarding BEP's intent and plans to sell the shares of TAG to secure a unique and disproportionate benefit to itself at the expense of the minority shareholders.

170.   BEP's wrongful conduct in connection with its breach of fiduciary duty has caused CIHL and BE TAG to suffer significant damages.

      WHEREFORE, plaintiff demands judgment against BEP and the following relief:

      a.      temporary and permanent injunctive relief;

      b.      all damages;

      c.      pre and post-judgment interest;

      d.      alternatively, for restitution; or

      e.      the imposition of a constructive trust to hold for the benefit of the plaintiff its 47.5 % ownership interest in the company, or any portion thereof;

      f.      costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

CASE NO. _____

g.      any other relief that this Court deems just and proper.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### (Against Jonathan Blue and David Roth)

171.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

172.    There is the existence of a fiduciary duty owed by Jonathan Blue to CIHL and BE TAG.

173.    As the Chairman, Chief Executive Officer, and Treasurer of BE TAG and each of its subsidiaries, Defendant, Jonathan Blue, owes to CIHL and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the plaintiff with the utmost good faith

174.    As the Vice Chairman and Chief Legal Officer of Blue Equity and BE TAG and each of its subsidiaries, Defendant, David Roth, owes to CIHL and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the plaintiff with the utmost good faith.

175.    Jonathan Blue and David Roth were in a position of trust and confidence with CIHL and BE TAG.

176.    Given their respective roles, Jonathan Blue and David Roth were under a duty to act for or to give advice for the benefit of and the best interest of BE TAG and its shareholders, including CIHL.

177.    Given their roles, Jonathan Blue and David Roth were precluded from receiving any personal advantage without the fullest disclosure to, and assent of, all shareholders concerned, which would include CIHL.

36

CASE NO. _____

178.    Defendants, Jonathan Blue and David Roth, breached their fiduciary duties to Plaintiff by, among other things:

        a.    failing to provide CIHL and the board of directors of BE TAG with all relevant and necessary information needed to determine whether it was appropriate to demand a capital call and whether it was appropriate for CIHL to make a capital contribution;

        b.    manipulating the company finances as outlined in the general allegations above;

        c.    misappropriating some of BE TAG's funds to pay expenses incurred by BEP and Jonathan Blue;

        d.    providing misleading information to shareholders regarding deposits and withdrawals from a fictional "trust account";

        e.    failing to provide complete and accurate disclosures to CIHL and BE TAG regarding the financial condition of BE TAG and its subsidiaries;

        f.    failure to provide full and timely disclosure regarding intent to sell the shares of TAG; and

        g.    fraudulently or improperly arranging to make salary adjustments and payments to CPL employees, for the defendants' ultimate benefit, without the knowledge, approval or advice of the CFO or the minority shareholders, and in particular CIHL.

179.    Jonathan Blue and David Roth's wrongful conduct in connection with their breach of fiduciary duty has caused CIHL and BE TAG significant damages.

CASE NO. _____

WHEREFORE, CIHL demands judgment against Jonathan Blue and the following relief:

a.      temporary and permanent injunctive relief;

b.      all appropriate damages;

c.      pre and post-judgment interest;

d.      alternatively, for restitution; or

e.      the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

f.      costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

g.      any other relief that this Court deems just and proper.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (Against Maureen Smith)

180.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

181.    There is the existence of a fiduciary duty owed by Maureen Smith to CIHL and BE TAG.

182.    As the Corporate Secretary, Legal Officer and an employee of BE TAG and each of its subsidiaries including CPL/TAG, Defendant, Maureen Smith, owed to CIHL and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the plaintiff with the utmost good faith.

183.    Maureen Smith was in a position of trust and confidence with CIHL and BE TAG.

CASE NO. _____

184.    Given her role, Maureen Smith was under a duty to act for or to give advice for the benefit of BE TAG and CIHL.

185.    Given her role, Maureen Smith was precluded from receiving any personal advantage without the fullest disclosure to, and assent of, all concerned, which would include the minority shareholder CIHL.

186.    Defendant, Maureen Smith, breached her fiduciary duty to CIHL and BE TAG by, among other things:

        a.    failing to provide CIHL and the full Board of Directors of BE TAG and CPL/TAG with all relevant and necessary information needed to determine whether it was appropriate to demand a capital call and whether it was appropriate for CIHL to make a capital contribution;

        b.    failing to provide complete and accurate disclosures to CIHL and BE TAG regarding the financial condition of BE TAG and its subsidiaries;

        c.    failing to disclose to the minority shareholders and in particular CIHL her secret activities and services for Blue Equity, Jonathan Blue and David Roth regarding the pending sale of TAG to Rubis, while she was still employed to CPL ("TAG"); and

        d.    receiving compensation separately, and in secret, either as a consultant or as an employee, without disclosure to the minority shareholders and in particular CIHL.

187.    Maureen Smith's wrongful conduct in connection with her breach of fiduciary duty has caused CIHL and BE TAG significant damages.

CASE NO. _____

WHEREFORE, plaintiff demands judgment against Maureen Smith and the following relief:

      a.     temporary and permanent injunctive relief;

      b.     all damages;

      c.     pre and post-judgment interest;

      d.     alternatively, for restitution; or

      e.     costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

      f.     any other relief that this Court deems just and proper.

### COUNT VI
### FRAUDULENT INDUCEMENT
**(Against Blue Equity, Jonathan Blue & David Roth)**

188.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

189.    Defendants, Jonathan Blue, Blue Equity and David Roth made false statements of material fact regarding their ability, willingness and intention to provide ready access to working capital financing if selected as replacement equity partners in CPHL.

190.    Defendants, Jonathan Blue, Blue Equity and Roth falsely represented that:

      a.     they had access to working capital of an additional $10 million to $16 million; and

      b.     that securing the required LC was not an issue as Blue Equity had a strong relationship and "preapproval" from J.P. Morgan Chase for the required LC;

CASE NO. _____

191.    Jonathan Blue, Blue Equity and Roth knew that these statements that they made were false at the time that they were made, and they never intended to act on these representations.

192.    Defendants made these false statements and misrepresentations with the intent of inducing Cool Corp, CIHL and the other minority shareholders to rely on them to enter into the Shareholders Agreement and to agree to an imprudent and unreasonable reduction in the existing bondholder debt at the expense of necessary working capital financing.

193.    CIHL, Cool Corp and the minority shareholders reasonably relied, to their detriment, upon these material misrepresentations of fact by Blue Equity, Jonathan Blue and Roth.

194.    CIHL has been directly and proximately damaged by Jonathan Blue, Blue Equity and David Roth's unlawful and fraudulent conduct.

WHEREFORE, CIHL demands judgment against Jonathan Blue, Blue Equity and David Roth and the following relief:

    a.    temporary and permanent injunctive relief;

    b.    all damages;

    c.    pre and post-judgment interest;

    d.    alternatively, for restitution; or

    e.    the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

    f.    costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

    g.    any other relief that this Court deems just and proper.

CASE NO. _____

## COUNT VII
## UNJUST ENRICHMENT
### (the Blue Equity, Jonathan Blue & David Roth)

195.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

196.    CIHL and/or BE TAG conferred a significant benefit to Jonathan Blue, Blue Equity and David Roth in the form of additional shares in TAG/CPL which are the property of CIHL and the other minority shareholders.

197.    Jonathan Blue, Blue Equity and David Roth have knowledge of the benefits conferred and have voluntarily accepted the benefits conferred and have been unjustly enriched by receiving those benefits.

198.    It would work an injustice for the Defendants to retain the benefits obtained without paying their full value to CIHL and/or BE TAG.

199.    An adequate remedy at law does not exist for CIHL and/or BE TAG's claims against the Defendants.

WHEREFORE, CIHL demands judgment against Jonathan Blue, Blue Equity and David Roth and the following relief:

        a.    temporary and permanent injunctive relief;

        b.    all damages;

        c.    pre and post-judgment interest;

        d.    alternatively, for restitution; or

        e.    the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

CASE NO. _____

f.      costs and attorneys' fees as permitted under Fla. Stat. § 608.601;

and

g.      any other relief that this Court deems just and proper.

### COUNT VIII
### CONVERSION
**(Derivatively and individually against Jonathan Blue, Blue Equity and David Roth)**

200.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

201.    CIHL and/or BE TAG conferred a significant benefit to Jonathan Blue, Blue Equity and David Roth in the form of BE TAG shares.

202.    Jonathan Blue, Blue Equity and David Roth, without authorization, have converted to their own use shares or their equivalent value that were the property of CIHL and/or BE TAG.

203.    Jonathan Blue, Blue Equity and David Roth's acts have wrongfully deprived CIHL and/or BE TAG of property with the intent that this deprivation be permanent.

204.    The deprivation is inconsistent with CIHL's and/or BE TAG's ownership interest in the converted share interests.

205.    CIHL and/or BE TAG have been damaged by the conduct of Jonathan Blue, Blue Equity and David Roth.

206.    CIHL and/or BE TAG have demanded the return of the property, but such demand has been refused or rendered otherwise futile by the actions of Blue Equity, Jonathan Blue and David Roth.

207.    WHEREFORE, CIHL demands judgment against Jonathan Blue, Blue Equity and David Roth and the following relief:

CASE NO. _____

    a.       temporary and permanent injunctive relief;

    b.       all damages;

    c.       pre and post-judgment interest;

    d.       alternatively, for restitution; or

    e.       the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

    f.       costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

    g.       any other relief that this Court deems just and proper.

## COUNT IX
## DECLARATORY JUDGMENT
### (Against All Defendants)

208.    Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

209.    Plaintiffs contend that there is a bona fide, actual, present practical need for the declaration.

210.    The declaration sought deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

211.    A bona fide, actual, present and continuing controversy exists between the plaintiff and the defendants in regards to the required procedure to obtain Class C Shares in the Company by contribution of capital in response to the Notice of Determination To Seek Additional Capital, dated June 18, 2012.

212.    Some immunity, power, privilege or right of Plaintiff's is dependent upon the facts or the law applicable to the facts.  Plaintiff's rights as shareholders and entitlement to

CASE NO. _____

certain proceeds are dependent upon this Court's interpretation of the terms and provisions regarding the requirements for any shareholder to acquire Class C Shares by capital contributions in response to the Notice of Determination To Seek Additional Capital, dated June 18, 2012.

213.    Specifically, Plaintiff seeks a declaration that strict compliance with Section 4.4 of the Shareholders Agreement and the procedures outlined in the June 18, 2012 Notice was required for any shareholder to purchase Class C Shares and failure to comply would result in forfeiture of any such right to purchase Class C Shares.

214.    Unless the Court grants declaratory relief, the plaintiffs will continue to suffer immediate and irreparable harm now and into the future.

215.    Plaintiffs are not merely seeking legal advice or an advisory opinion.

WHEREFORE, the plaintiffs respectfully seek a declaratory judgment against the defendants that:

      a.    establishes the required procedures for any shareholder to purchase Class C Shares;

      b.    establishes that strict compliance with the procedures is required for any shareholder to purchase Class C Shares;

      c.    awards costs of bringing this claim for declaratory relief; and

      d.    any other relief that this Court deems just and proper.

CASE NO. _____

**REQUEST FOR IMPOSITION OF CONSTRUCTIVE TRUST**

216.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

217.    BEP, Jonathan Blue, Blue Equity and David Roth made promises, express or implied, to CIHL, including that they would be responsible for the financial, legal and "management" affairs of BE TAG.

218.    Based on these promises, CIHL entrusted and reposed confidence in BEP, Jonathan Blue, Blue Equity and David Roth to handle BE TAG's financial, legal and management affairs.

219.    In reliance on BEP, Jonathan Blue, Blue Equity and David Roth's promises and omissions, CIHL entered into a Shareholders Agreement and were induced to agree to the fraudulent capital call.

220.    As a result of BEP, Jonathan Blue, Blue Equity and David Roth's misrepresentations and omissions, the Defendants were able to secure a capital call for TAG which was specifically designed and did subsequently cause BEP, Jonathan Blue, Blue Equity and David Roth to obtain additional shares in TAG, which allowed BEP and its shareholders and affiliates to improperly obtain a significant portion of shares belonging to CIHL and other minority shareholders.

221.    Upon information and belief, BEP, Blue Equity, Jonathan Blue and David Roth obtained proceeds from the sale of TAG shares and are now in possession of the property or its value and have been unjustly enriched by retaining the property.

WHEREFORE, CIHL demands the entry of a preliminary injunction imposing a constructive trust over the funds or property which are the proceeds of the sale, and requiring

46

CASE NO. _____

BEP, Jonathan Blue, Blue Equity and David Roth to transfer the funds of or other property of TAG into an escrow account, which will be held in said escrow account until such time as this Court issues an order regarding the proper disbursement of the funds and the propriety of the fraudulent capital call.

**REQUEST FOR ENTRY OF PERMANENT INJUNCTION**

222.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

223.    This is a request for permanent injunction and for equitable relief.

224.    CIHL and BE TAG have been and continue to be irreparably harmed by BEP's, Jonathan Blue's, Blue Equity's, David Roth's and Maureen Smith's past and continuing breaches of their fiduciary duties.

225.    The Defendants' actions continue to enrich Jonathan Blue, Blue Equity and David Roth and continue to injure CIHL and BE TAG.

226.    CIHL and BE TAG have no adequate remedy at law for the ongoing injury caused by Defendants' past and continuing breaches.

WHEREFORE, CIHL demands an order enjoining BEP, Jonathan Blue, Blue Equity, David Roth and Maureen Smith from further breaching their fiduciary duties, including transferring any assets to themselves, or using any BE TAG resources to benefit themselves; an order enjoining Jonathan Blue, David Roth and Maureen Smith from operating BE TAG's business in furtherance of the breach of their fiduciary duties, and any other relief that this Court deems just and proper.

CASE NO. _____

## DEMAND FOR TRIAL BY JURY

227.     Pursuant to Fla. R. Civ. P. 1.430, CIHL demands a trial by jury on all issues so triable.


Dated: June 10, 2013.

                                        Respectfully submitted,

                                        Kim Vaughan Lerner LLP
                                        *Attorneys for Plaintiffs*
                                        One Financial Plaza, Suite 2001
                                        Fort Lauderdale, FL  33394
                                        Telephone:     (954) 527-1115
                                        Facsimile:      (954) 527-1116
                                        Primary E-mail: rvaughan@kvllaw.com
                                        Primary E-mail: blerner@kvllaw.com
                                        Secondary E-mail: rbaggett@kvllaw.com


                                        By:  /s/ Robert C.L. Vaughan
                                             Robert C. L. Vaughan, P.A.
                                             Fla. Bar No. 130095
                                             Brian Lerner
                                             Fla. Bar No.  177202
                                             Cherine Smith Valbrun, Esq.
                                             Fla. Bar No. 27046

## VERIFICATION

I, **JOSEPH JOHN ISSA**, have personally appeared before the undersigned Notary Public, and do on my oath, depose and state that:

1.      I am a **Director** of Cool International Holdings, Limited ("CIHL"), the plaintiff in the above-referenced action and have been authorized to execute this affidavit on behalf of CIHL.

2.      I have read the allegations of the foregoing Verified Complaint and I hereby declare that they are true and correct.

_____
Signature (on behalf of CIHL)

JOSEPH ISSA
_____
Print name

The foregoing instrument was acknowledged before me this 10ᵗʰ day of June, 2013, by JOSEPH ISSA _____, and (s)he presented such proof of such verification by being personally known to me or by providing _____ as identification, and (s)he acknowledged before me that (s)he executed the same freely and voluntarily.

_____
Notary Public,

My Commission Expires: _____

**RICHARD DONALDSON**
**NOTARY PUBLIC**
St. Ann, Jamaica W.I.
**my commission is for life**

# Exhibit A
("June 18 Capital Call Notice")



# THE ANTILLES GROUP HOLDINGS LIMITED

c/o The Antilles Group Limited, 236 Windward Road, Rockfort, Kingston 2, Jamaica

**June 18, 2012**

**VIA EMAIL & EXPRESS DELIVERY**
<u>RETURN RECEIPT REQUESTED</u>

**Cool International Holdings Limited**
**c/o Trident Trust Company (BVI) Limited**
**Trident Chambers**
**PO Box 146**
**Road Town, Tortola, BVI**

> **NOTICE OF DETERMINATION TO SEEK ADDITIONAL CAPITAL, ISSUANCE OF NEW CLASS C NONVOTING CONVERTIBLE PREFERRED SHARES, AND OPTION TO PURCHASE CLASS C NONVOTING CONVERTIBLE PREFERRED SHARES**

**Gentlemen/Ladies,**

This notice (**"Notice"**) is being given to you pursuant to, and in accordance with, the terms and conditions of Regulation 17 of the **Amended and Restated Articles of Association of Cool Petroleum Holdings Limited** (the **"Articles of Association"**) and Sections D(3) and 4.4 of that certain **Shareholders Agreement**, *as amended through the date hereof* (the **"Shareholders Agreement"**), regarding **Cool Petroleum Holdings Limited**, a St. Lucia International Business Company (the **"Company"**), to which Shareholders Agreement you are a party.

Please be advised, as you already know from your approval of such action at the **Extraordinary General Meeting of the Shareholders** held on **June 14, 2012,** the Board of Directors of the Company, at a **Special Meeting of the Board of Directors** held on **June 14, 2012,** determined, reasonably and in good faith, that it is advisable for the Company to seek additional capital beyond that already contributed, or required to be contributed, to date by the Shareholders of the Company, for the purpose of *(i)* providing working capital reasonably necessary in the ordinary course of the business of the Company and/or the Company's subsidiaries, *and/or (ii)* providing funds to repay some of the debts, obligations, and/or other liabilities of the Company and/or the Company's subsidiaries that the Company and/or such subsidiaries are unable to pay as they have become due. The Board of Directors further determined that, in order to avoid hardship to the Company or any subsidiary of the Company, it is reasonably necessary to establish a period of **30 days** as the **"Capital Raise Notice Period"** (as such term is defined in the Articles of Association and Shareholders Agreement) for purposes permitting the current Shareholders of the Company a first opportunity to purchase the Class C Shares being issued.

The total additional capital contribution currently being sought from all of the Shareholders of the Company, in the aggregate, pursuant to such determination of need by the Board of Directors and approval by the Shareholders, is **US$10,000,000.00.** The Company will be issuing, in the aggregate, a total of **10** newly created equity interests in the Company, to be called **Class C Nonvoting Convertible Shares** (collectively, the **"Class C Shares"**), **US$1,000,000.00 par value per Share**, in exchange for such additional **$10,000,000.00** total additional capital contribution. The issuance of fractional Class C Shares is allowable. Thus, by way of illustration and not by way of limitation, the acquisition of each new Class C Share will require a cash contribution of **US$1,000,000.00** to be made to the Company, the acquisition of one-half of a new Class C Share will require a cash contribution of **US$500,000.00** to be made to the Company, etc. If the current Shareholders of the Company do not purchase all of such Class C Shares, the Board of Directors may, during a specified period, cause the Company to issue any remaining Class C Shares available to any other Person.

Cool International Holdings Limited
June 18, 2012
Page 2

The rights, preferences, and other characteristics of such new Class C Shares are detailed in that certain **Amended and Restated Rights Resolution** attached hereto and made a part hereof as **EXHIBIT A** to this Notice (the **"Rights Resolution"**).

Please note that the Class C Shares will have certain dividend, distribution, and liquidation preferences vis-à-vis the existing Class A Preferred Shares, Class B Nonvoting Preferred Shares, and Common Shares of the Company, all of which preferences are detailed in the Rights Resolution attached as **EXHIBIT A** to this Notice.

Please be advised that, pursuant to Regulation 17 of the Articles of Association and Sections D(3) and 4.4 of the Shareholders Agreement, you have the right and option to acquire a prorata portion of the Class C Shares by contributing in cash to the capital of the Company, *on or before* **July 20, 2012,** a prorata portion of the **US$10,000,000.00** total additional capital contribution currently being sought in the aggregate., in accordance with your respective Percentage Interest with respect to all of the Shareholders of the Company (regardless of the Class of Shares held by any Shareholder). According to the Company's records, the prorata portion of the Class C Shares which you are currently entitled to acquire, and the prorata capital contribution required in connection with such acquisition by you, is as follows:

**Shares Currently Held By You** ...................................................................... **5,000 Common Shares**

**Percentage Interest Vis-à-vis All Shares of the Company Currently Outstanding (Regardless of Class)**.......................................................................**47.574%**

**Prorata Number of New Class C Shares You Are Entitled To Acquire** ...............................................................**4.7574**
**Class C Shares**

**Capital Contribution Required To Purchase Each New Class C Share (Full Share)**..............................................................**US$1,000,000.00**
**Per Class C Share**

**Total Cash Capital Contribution Required If You Wish To Purchase Your Entire Prorata Portion of New Class C Shares** ...............................................**$4,757,373.90**

**In order to exercise your right to purchase your prorata portion of new Class C Shares, or any fewer number of new Class C Shares (or any fractional Class C Share) as you may deem advisable, <u>you must remit to the Company, *on or before* July 20, 2012, an amount equal to *the product of*</u>**

    *(i)*      **US$1,000,000.00 (the required capital contribution amount per full Class C Share), *multiplied by***

    *(ii)*      **The number of Class C Shares you wish to purchase (*limited, however,* to the prorata number of Class C Shares you are entitled to purchase, as set forth above).**

**Thus, if you wish to purchase your entire prorata portion of the new Class C Shares (*that is, 4.7574* Class C Shares), you must remit to the Company the total amount of $4,757,373.90 *on or before* July 20, 2012.**

Cool International Holdings Limited
June 18, 2012
Page 3

---

**Such capital contribution amount should be remitted either by wire transfer to the following bank account for the benefit of, and for further direction by, the Company (per the wire transfer instructions set forth below), or by delivery to the Company of a valid check, for such amount on or before July 20, 2012. The instructions for remitting funds as a contribution to the capital of, and for the benefit of, the Company by wire transfer are as follows:**

| | |
|---|---|
| Bank ............................................. | **PNC Bank** |
| | **Louisville, Kentucky** |
| ABA Routing Number ................ | **083000108** |
| For Credit To ............................... | **David M. Roth PSC Attorney Trust Company** |
| Account Number ......................... | **302**█████ |
| | |
| For Benefit Of: ........................... | **Cool Petroleum Holdings Limited** |

---

If you or any other Shareholder of the Company fails or neglects to contribute such Shareholder's prorata portion of such additional contribution on or before **July 20, 2012**, then the Shareholders who have contributed their prorata portions of such additional capital contribution within such period shall have the right (but not the obligation), during an additional period of **10 days** thereafter, to make the additional capital contribution which such Shareholder failed or neglected to make, in accordance with their relative and respective Percentage Interests among themselves as a group, or in such other percentages as those Shareholders wishing to make all or any part of such additional capital contribution may otherwise agree. In such event, the remaining available Class C Shares shall be issued to those Shareholders who actually make such additional capital contribution in accordance with the percentage of the total additional capital contribution contributed by each (*that is,* based on a contribution of **US$1,000,000.00** per full Class C Share).

If you fail or neglect to fully exercise on a timely basis your right to purchase the entire prorata portion of the Class C Shares available to you pursuant to Regulation 17 of the Articles of Association and Sections D(3) and 4.4 of the Shareholders Agreement, you will continue to own the same number and class of Shares that you currently own, but your relative percentage of ownership of the Company will be significantly diluted. Furthermore, your rights to receive dividends, distributions of Net Cash Flow, distributions of Net Proceeds From Sales or Other Capital Transactions, and liquidation proceeds as a holder of Class A Preferred Shares, Class B Nonvoting Preferred Shares, and/or Common Shares, as applicable, will be subordinated to the preferential rights to which the holders of the Class C Shares are entitled. Accordingly, upon any subsequent sale of the assets and/or equity interests of the Company, you will be entitled to a smaller percentage of the net sales proceeds. Although neither the Company, nor any Affiliate of the Company, has currently received any offer to purchase its equity interests or assets, various expressions of general interest continue to be received and/or discussed from time to time and it is always possible that a sales transaction in such regard could be negotiated and implemented at any time. Furthermore, it is possible that any such sales transaction could be based on a valuation of the Company which is significantly greater or less than the valuation at which the Class C Shares are being issued. If you exercise your option to purchase your entire prorata portion of the Class C Shares, you will continue to maintain your same relative Percentage Interest in the Company by virtue of the combination of the Class A Preferred Shares, Class B Nonvoting Preferred Shares, Common Shares, and Class C Shares then owned by you.

All capitalized terms used in this Notice and not otherwise defined shall have the same meaning as are ascribed to such capitalized terms in the Articles of Association and/or Shareholders Agreement

**Cool International Holdings Limited**
**June 18, 2012**
**Page 4**

(and in the case of any conflict between such documents, the terms and conditions of the Shareholders Agreement shall control).

*Before exercising, or failing or neglecting to timely exercise, your option rights with respect to the purchase of any or all of the Class C Shares which are available for purchase by you pursuant to the provisions of Regulation 17 of the Articles of Association and Sections D(3) and 4.4 of the Shareholders Agreement, you should carefully review the terms, conditions, and other provisions and statements of the Rights Resolution, the Articles of Association, the Shareholders Agreement, and this Notice carefully and consult with competent legal and financial advisors to such extent as you may deem such consultation to be advisable.*

If you have any questions about this matter or the procedures for exercising your option to purchase Class C Shares, please do not hesitate to contact **David M. Roth, Vice Chairman and Director** of the Company, by telephone at **(502) 451-7765** or by email at **droth@blueequity.com**.

**Very truly yours,**

**David M. Roth**
**Vice Chairman and Director**


**ATTACHMENT:**

**EXHIBIT A..................**Amended and Restated Rights Resolution

**Copy:**
**Joseph Issa**
**2 Graham Street**
**Guardian Building, 2nd Floor**
**Ocho Rios, St Ann, Jamaica WI**

**Joseph Issa (By Email)**

**Rodney Davis (By Email)**

**Colin Hendrick (By Email)**

**Gwen Kennedy**
**609 Calle del Cerrito**
**San Clemente, CA 92672**

**Gwen Kennedy (By Email)**

## EXHIBIT A

*Amended and Restated Rights Designation Resolution*

| **A.  THIS AGREEMENT** | | |
|---|---|---|
| **(1)** | RESOLUTION; EFFECTIVE DATE | This **Amended and Restated Rights Designation Resolution** (**"Resolution"**) is an exhibit to, and is being adopted as an integral party of, resolutions of the Board of Directors and Shareholders of **Cool Petroleum Holdings Limited** (the **"Company"**) dated as of **June 14, 2012**. This Resolution supersedes on a prospective basis any and all prior resolutions providing for the designations, powers, preferences, rights, qualifications, limitations and restrictions of Shares of the Company. |
| **(2)** | TWO PORTIONS OF RESOLUTION | The text of this Resolution is divided into two parts: *(a)* this initial portion (Pages **Error! Bookmark not defined.** through **Error! Bookmark not defined.**) which contains sections designated initially with letters (A, B, C, etc.)(the **"Initial Portion"**), *and (b)* the portion of this Resolution immediately following this Initial Portion, entitled and referred to as the **"General Terms and Conditions"** (Pages **Error! Bookmark not defined.** Through **Error! Bookmark not defined.**), which contains Sections thereof initially designated with numbers (1, 2, 3, etc.). In the event of a conflict between any of the terms and conditions set forth in this Initial Portion of this Resolution and any of the General Terms and Conditions, the terms and conditions set forth in this Initial Portion of this Resolution shall govern. |

| **B.  BUSINESS** | | |
|---|---|---|
| **(1)** | BUSINESS | The **"Business"** is the business carried on by the Company and/or the Company's subsidiaries of *(i)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to petroleum (excluding liquid petroleum gases (**"LPG"**), fuels, bio-fuels, lubricants, and related products and activities (collectively, **"Petro Products"**) within, to, in, or from Jamaica, through retail, wholesale, commercial, and/or any other channels, *(ii)* selling, distributing, marketing, and/or exchanging from retail outlets located at or adjacent to the retail fuel stations owned, operated, controlled, licensed, or franchised by the Company and/or its Affiliates, empty, partially empty, or already filled LPG cylinders, canisters, bottles, and/or other such small LPG containers and/or selling from retail outlets LPG motor vehicle conversion kits and related equipment (collectively, the **"Shared LPG Activities"**, and *(iii)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to grocery, convenience, sundry, and/or other consumer products to and through the gas station and/or convenience store retail channels owned, controlled, or otherwise managed or affiliated as a franchisee or otherwise by or with, the Company and/or the Company's subsidiaries, or to or through the wholesale, commercial, or other channels generally used by the Company and/or the Company's subsidiaries, *and (iv)* internet activities and other activities reasonably related to the foregoing. For the avoidance of doubt, nothing in clause (iii) or clause (iv) of the foregoing definition of the term "Business" shall be construed as restricting in any way the right of any Party or any Party's Related Party or Affiliate to sell, distribute, market, export, import, and otherwise deal in and with respect to grocery, convenience, sundry, and/or other consumer products through any retail, wholesale, commercial, and/or other channel (but, in such regard, the term "grocery, convenience, sundry, and/or other consumer products" shall not be construed as including any Petro Products or Shared LPG Activities). |

| **C.  CURRENT SHARES OF THE COMPANY** | | |
|---|---|---|
| **(1)** | CLASSES OF | The issued and outstanding equity interests of the Company are divided into shares and |

| | | |
|---|---|---|
| | **SHARES** | currently consist of **four (4)** classes of shares (collectively, the **"Shares"**) as follows: |

> **(a)** **Class A Preferred Shares** (collectively, the **"Class A Preferred Shares"** and each individually a **"Class A Preferred Share"**). The Class A Preferred Shares are convertible into Common Shares upon a Liquidity Event as more fully set out in Section D below and under the Governing Instruments of the Company. The Class A Preferred Shares are voting shares of the Company and the holders thereof shall have the right to designate a majority of the Directors of the Company. The holders of the Class A Preferred Shares are sometimes referred to herein as the **"Class A Preferred Shareholders."**

> **(b)** **Class B Nonvoting Preferred Shares** (collectively, the **"Class B Nonvoting Preferred Shares"** and each individually a **"Class B Nonvoting Preferred Share"**). The Class B Nonvoting Preferred Shares are nonvoting shares of the Company and are not convertible into Common Shares. The holders of the Class B Nonvoting Preferred Shares are sometimes referred to herein as the **"Class B Preferred Shareholders."**

> **(c)** **Class C Nonvoting Convertible Preferred Shares** (collectively, the **"Class C Nonvoting Preferred Shares"** and each individually a **"Class C Nonvoting Preferred Share"**). The Class C Nonvoting Preferred Shares are convertible into Common Shares upon a Liquidity Event as more fully set out in Section D below and under the Governing Instruments of the Company. The Class C Nonvoting Preferred Shares are nonvoting shares of the Company. The holders of the Class C Nonvoting Preferred Shares are sometimes referred to herein as the **"Class C Preferred Shareholders."**

> **(d)** **Common Shares** (collectively, the **"Common Shares"** and each individually a **"Common Share"**). The Common Shares are voting shares of the Company. The holders of the Common Shares are sometimes referred to herein as the **"Common Shareholders."**

> The Class A Preferred Shareholders, Class B Preferred Shareholders, Class C Preferred Shareholders, and Common Shareholders are sometimes referred to herein collectively as the **"Shareholders"** and each individually as a **"Shareholder."**

| | | |
|---|---|---|
| **(2)** | **RESTRICTIONS ON TRANSFER** | The Class A Preferred Shares, Class B Nonvoting Preferred Shares, Class C Nonvoting Preferred Shares, and Common Shares are subject to various options and restrictions on transfer as set forth in Article 5. |
| **(3)** | **ADDITIONAL CAPITAL** | Subject to the preemptive rights and other restrictions and limitations provided for under Section 2.3 of the General Terms and Conditions, additional capital may be raised by the Board of Directors at any time in exchange for the issuance of such additional Shares or other equity interests as the Board of Directors may deem advisable. Except as required pursuant to any Shareholder's exercise of such Shareholder's preemptive rights under Section 2.3 of the General Terms and Conditions, or required under any separate written agreement entered into by such Shareholder, no Shareholder of the Company shall be obligated to contribute to the Company any additional capital at any time, nor shall any Shareholder be obligated to loan the Company any funds at any time. |

## D.  DISTRIBUTIONS

| | | |
|---|---|---|
| **(1)** | **DISTRIBUTIONS OF NET CASH FLOW UNTIL CLASS C BASE PAYBACK IS** | Until Class C Base Payback (as hereinafter defined) is achieved, **100%** of the Net Cash Flow (as hereinafter defined) of the Company for each Fiscal Year of the Company shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each) in |

| | | |
|---|---|---|
| | **ACHIEVED** | quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter). Once Class C Base Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(1) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(2)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS C BASE PAYBACK IS ACHIEVED AND UNTIL CLASS B BASE PAYBACK IS ACHIEVED** | After Class C Base Payback is achieved and until Class B Base Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Section D(1) above in order to achieve Class C Base Payback during such Fiscal Year, if applicable)shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each) in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter). Once Class B Base Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(2) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(3)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS C BASE PAYBACK AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS A BASE PAYBACK IS ACHIEVED** | After both Class C Base Payback and Class B Base Payback are achieved and until Class A Base Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1) and D(2) above in order to achieve Class C Payback and/or Class B Payback during such Fiscal Year, if applicable) (the **"Class A Preferential Remaining Net Cash Flow"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and in the following order of priority. Should Class A Base Payback be achieved due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter, no further distributions of Net Cash Flow pursuant to this Section D(3) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| | | **(a)**     *First,* **85.9091%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **4.0909%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **10%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(a) with respect to such Fiscal Year equal to *the lesser of (x)* **$1,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter. |
| | | **(b)**     *Second,* **81.1364%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **3.8636%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in |

accordance with the number of Class B Nonvoting Preferred Shares held by each), and **15%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(b) and Section D(3)(a) above with respect to such Fiscal Year equal to *the lesser of (x)* **$2,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(c)**    *Third,* **76.3637%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **3.6363%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **20%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(c) and Sections D(3)(a) and D(3)(b)above with respect to such Fiscal Year equal to *the lesser of (x)* **$3,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(d)**    *Fourth,* **66.8182%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **3.1818%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **30%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(d) and Sections D(3)(a), D(3)(b), and D(3)(c) above with respect to such Fiscal Year equal to *the lesser of (x)* **$4,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(e)**    *Fifth,* **62.0455%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **2.9545%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **35%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), until a cumulative aggregate amount has been distributed pursuant to this Section D(3)(e) and Sections D(3)(a), D(3)(b), D(3)(c), and D(3)(d) above with respect to such Fiscal Year equal to *the lesser of (x)* the amount necessary to achieve Class A Base Payback, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(4)    DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS C BASE PAYBACK, AND CLASS B BASE PAYBACK, AND CLASS A BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS C RETURN PAYBACK**    After Class C Base Payback, Class B Base Payback, and Class A Base Payback are achieved and until Class C Return Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1), D(2), and D(3) above in order to achieve Class C Base Payback, Class B Base Payback, and/or Class A Base Payback as during such Fiscal Year, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each) in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash

| | | |
|---|---|---|
| | **IS ACHIEVED** | Flow of the Company, if any, for each Fiscal Quarter). Once Class C Return Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(4) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(5)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS C BASE PAYBACK, CLASS B BASE PAYBACK, CLASS A BASE PAYBACK, AND CLASS C RETURN PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class B Base Payback and Class A Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (each as hereinafter defined) are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1), D(2). D(3), and D(4) above in order to achieve Class C Base Payback, Class B Base Payback, Class A Base Payback, and/or Class C Return Payback during such Fiscal Year, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: *(i)* with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares held by each) and **4.5454%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once Class A Return Payback and Class B Return Payback have both been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(5) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(6)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class B Base Payback, Class A Base Payback, Class C Return Payback, Class A Return Payback, and Class B Return Payback are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1), D(2), D(3), D(4), and D(5) above in order to achieve Class C Base Payback, Class B Base Payback, Class A Base Payback, Class C Return Payback, Class A Return Payback, and Class B Return Payback during such Fiscal Year, if applicable) (the **"Ultimate Remaining Net Cash Flow"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter), in the following manner, as applicable: |
| | | **(a)**        Unless and until the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, (A) the Applicable Class C Portion (as hereinafter defined) of the Ultimate Remaining Net Cash Flow shall be distributed to the holders of the Class C Nonvoting Preferred Shares (on a prorata basis in accordance with the |

number of Class C Nonvoting Preferred Shares held by each), *and* (**B**) the remaining balance of the Ultimate Remaining Net Cash Flow shall be distributed **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each).

**(b)**      After the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, **100%** of the Ultimate Remaining Net Cash Flow shall be distributed to the holders of the Common Shares (on a prorata basis in accordance with the number of of Common Shares held by each), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares Class C Nonvoting Preferred Shares as provided under Sections D(24) and D(25) below.

| | | |
|---|---|---|
| **(7)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT UNTIL CLASS C BASE PAYBACK IS ACHIEVED** | Until Class C Base Payback is achieved, the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with (*i*) a sale or exchange of all or substantially all of the operating assets of the Company and/or the Company's subsidiaries, (*ii*) a merger or consolidation of the Company, (*iii*) an initial public offering ("**IPO**") by the Company of any equity interests, (*iv*) any sale or exchange of equity interests in the Company in any transaction as to which the Tag-Along Rights *or* Drag-Along Rights (as such terms are hereinafter defined) apply, *or* (*v*) any other liquidating, recapitalization, or other liquidity transaction with respect to the Company which results in payments or distributions of significant cash, notes, tradable securities (without regard to any Rule 144 or other temporary restrictions imposed on the sale of such securities) and/or other readily marketable tangible or intangible property to all Shareholders of the Company (without regard to any temporary restrictions imposed on the sale of such property) (any such transaction described in clauses (i), (ii), (iii), (iv), or (v), as applicable, being hereinafter sometimes referred to as a "**Liquidity Event,**" shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, **100%** to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Preferred Shares held by each). For the purposes of clarity, a Liquidity Event does not include a refinancing of the Bonds existing as of **December 30, 2012,** and/or the issuance of Preference Shares, but any excess proceeds, if any, from any such refinancing shall be taken into account in computing the Net Cash Flow for the Company. Once Class C Base Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this Section D(7) shall be required or made. |
| **(8)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS C BASE PAYBACK IS ACHIEVED AND UNTIL CLASS A BASE PAYBACK IS ACHIEVED** | After Class C Base Payback is achieved and until Class A Base Payback is achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Section D(7) above in order to achieve Class C Base Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, **95.4546%** to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), *and* **4.5454%** to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once Class A Base Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds |

pursuant to this Section D(8) shall be required or made.

| | | |
|---|---|---|
| **(9)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS C BASE PAYBACK AND CLASS A BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS B BASE PAYBACK IS ACHIEVED** | After both Class C Base Payback and Class A Base Payback are achieved and until Class B Base Payback is achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7) and D(8) above in order to achieve Class C Base Payback and Class A Base Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once Class B Base Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this Section D(9) shall be required or made. |
| **(10)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS C BASE PAYBACK, CLASS A BASE PAYBACK, AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS C RETURN PAYBACK IS ACHIEVED** | After Class C Base Payback, Class A Base Payback, and Class B Base Payback are achieved and until Class C Return Payback is achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7), D(8), and D(9) above in order to achieve Class C Base Payback, Class A Base Payback, and/or Class B Base Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each). Once Class C Return Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this Section D(10) shall be required or made. |
| **(11)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS C BASE PAYBACK, CLASS A BASE PAYBACK, AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class A Base Payback, and Class B Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (as such terms as hereinafter defined) are achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7), D(8), D(9), and D(10) above in order to achieve Class C Base Payback, Class A Base Payback, Class B Base Payback, and/or Class C Return Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: *(i)* with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares held by each) and **4.5454%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once both Class A Return Payback and Class B Return Payback have been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this |

Section D(11) shall be required or made.

| | | |
|---|---|---|
| **(12)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class A Base Payback, Class B Base Payback, Class C Return Payback, Class A Return Payback and Class B Return Payback are achieved, the remaining balance, if any, of the Net Proceeds from any Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7), D(8), D(9), D(10), and D(11) above in order to achieve Class C Base Payback, Class A Base Payback, Class B Base Payback, Class C Return Payback, Class A Return Payback, and Class B Return Payback, if applicable) (the **"Ultimate Remaining Net Proceeds"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in the following manner, as applicable: |

**(a)**    Unless and until the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, **(A)** the Applicable Class C Portion (as hereinafter defined) of the Ultimate Remaining Net Proceeds shall be distributed to the holders of the Class C Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each), *and* **(B)** the remaining balance of the Ultimate Remaining Net Proceeds shall be distributed **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each).

**(b)**    After the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, **100%** of the Ultimate Remaining Net Proceeds shall be distributed to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares and Class C Nonvoting Preferred Shares as provided under Sections D(24) and D(25) below.

| | | |
|---|---|---|
| **(13)** | **DEFINITION OF CLASS A BASE PAYBACK** | For all purposes of this Resolution, **"Class A Base Payback"** shall be achieved when both **(A)** the holders of the Class A Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(3) and/or D(8) above, equal to *the sum of* *(i)* **$9,500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class A Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (A)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class A Preferred Shares the amounts provided for under the foregoing clauses (A)(i) and (A)(ii) on a Tax-free basis, *and* **(B)** the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(3) and/or D(8) above, equal to *the sum of (i)* **$500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (B)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (B)(i) and (B)(ii) on a Tax-free basis; *provided,* |

*however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class A Preferred Shares and the Class B Nonvoting Preferred Shares). The amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(i) and/or (B)(i) above (but not the amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(ii) and/or (B)(ii) above) are hereinafter referred to, collectively, as the **"Class A Return of Investment Amounts"**).

| **(14)** | **DEFINITION OF CLASS B BASE PAYBACK** | For all purposes of this Resolution, **"Class B Base Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(2) and/or D(9) above, equal to *the sum of (i)* **$2,000,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (i) and (ii) on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class B Nonvoting Preferred Shares). The amounts received by the Class B Preferred Shareholders pursuant to clause (i) above (but not the amounts received by the Class B Preferred Shareholders pursuant to clause (ii) above) are hereinafter referred to, collectively, as the **"Class B Return of Investment Amounts"**). |
|---|---|---|
| **(15)** | **DEFINITION OF CLASS C BASE PAYBACK** | For all purposes of this Resolution, **"Class C Base Payback"** shall be achieved when the holders of the Class C Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(1) and/or D(7) above, equal to *the sum of (A) the product of (i)* **$1,000,000.00 USD**, *multiplied by (ii)* the number of Class C Nonvoting Preferred Shares ever issued and outstanding, in the aggregate, *plus (B)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class C Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (i) and any gross-up thereon (the intention being to effectively return to the holders of the Class C Nonvoting Preferred Shares the amounts provided for under the foregoing clause (A) on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class C Nonvoting Preferred Shares). The amounts received by the Class C Preferred Shareholders pursuant to clause (A) above (but not the amounts received by the Class C Preferred Shareholders pursuant to clause (B) above) are hereinafter referred to, collectively, as the **"Class C Return of Investment Amounts"**). |
| **(16)** | **DEFINITION OF CLASS A RETURN PAYBACK** | For all purposes of this Resolution, **"Class A Return Payback"** shall be achieved when the holders of the Class A Preferred Shares and Class B Nonvoting Preferred Shares, collectively, shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections D(5) and/or D(11) above, an amount (the **"Class A Return** |

Component") equal to an **8%** annual percentage rate of return, compounded annually, on the Class A Outstanding Balance (as hereinafter defined), as the Class A Outstanding Balance may change from time to time. For purposes of computing whether Class A Return Payback has been achieved, only the allocable portion of distributions made pursuant to the provisions of Sections D(5) and D(11) above which are stated to be in respect of the Class A Return Component shall be taken into account (and not the allocable portion of such distributions which are stated to be in respect of the Class B Return Component).

| (17) | DEFINITION OF CLASS A OUTSTANDING BALANCE | For all purposes of this Resolution, the term **"Class A Outstanding Balance"** as of any time shall mean *the sum of (i)* **$10,000,000.00 USD**, *minus (ii)* the total of all Class A Return of Investment Amounts received by the holders of the Class A Preferred Shares and/or the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections D(3) and/or D(8) above through such time. |
|---|---|---|
| (18) | DEFINITION OF CLASS B RETURN PAYBACK | For all purposes of this Resolution, **"Class B Return Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections D(5) and/or D(11) above, an amount (the **"Class B Return Component"**) equal to an **8%** annual percentage rate of return, compounded annually, on the Class B Outstanding Balance (as hereinafter defined), as the Class B Outstanding Balance may change from time to time. |
| (19) | DEFINITION OF CLASS B OUTSTANDING BALANCE | For all purposes of this Resolution, the term **"Class B Outstanding Balance"** as of any time shall mean *the sum of (i)* **$2,000,000.00 USD**, *minus (ii)* the total of all Return of Class B Investment Amounts received by the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections D(2) and/or D(9) above through such time. |
| (20) | DEFINITION OF CLASS C RETURN PAYBACK | For all purposes of this Resolution, **"Class C Return Payback"** shall be achieved when the holders of the Class C Nonvoting Preferred Shares shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections D(4) and D(10) above, an amount equal to an **8%** annual percentage rate of return, compounded annually, on the Class C Outstanding Balance (as hereinafter defined), as the Class C Outstanding Balance may change from time to time. |
| (21) | DEFINITION OF CLASS C OUTSTANDING BALANCE | For all purposes of these Articles, the term **"Class C Outstanding Balance"** as of any time shall mean *the sum of (A) the product of (i)* **$1,000,000.00 USD**, *multiplied by (ii)* the number of Class C Nonvoting Preferred Shares ever issued and outstanding, in the aggregate, *minus (B)* the total of all Return of Class C Investment Amounts received by the holders of the Class C Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections D(1) and D(7) above through such time. |
| (22) | DEFINITION OF APPLICABLE CLASS C PORTION | For all purposes of these Articles, the term **"Applicable Class C Portion"** shall mean *(A)* with respect to the Ultimate Remaining Net Cash Flow available for distribution at any time, a portion of such Ultimate Remaining Net Cash Flow which bears the same ratio to the total of such Ultimate Remaining Net Cash Flow then available for distribution as the Total Class C Conversion Number (as hereinafter defined) at such time bears to a number which is equal to *the sum of (x)* the total number of Common Shares then issued and outstanding (without including any Common Shares to be issued by reason of the conversion of any of the Class A Preferred Shares or the Class C Nonvoting Preferred Shares), *plus (y)* **936.84**, *and plus (z)* the Total Class C Conversion Number at such time, *and (B)* with respect to the Ultimate Remaining Net Proceeds |

available for distribution at any time, a portion of such Ultimate Remaining Net Proceeds which bears the same ratio to the total of such Ultimate Remaining Net Proceeds then available for distribution as the Total Class C Conversion Number at such time bears to a number which is equal to *the sum of (x)* the total number of Common Shares then issued and outstanding (without including any Common Shares to be issued by reason of the conversion of any of the Class A Preferred Shares or the Class C Nonvoting Preferred Shares), *plus (y)* **936.84**, *and plus (z)* the Total Class C Conversion Number at such time.

| | | |
|---|---|---|
| **(23)** | **DEFINITION OF TOTAL CLASS C CONVERSION NUMBER** | For all purposes of these Articles, the term **"Total Class C Conversion Number"** at any time shall mean a number equal to *the product of (A)* the number of then issued and outstanding Class C Nonvoting Preferred Shares (*including, but not limited to,* any fractional Class C Nonvoting Preferred Shares which are then issued and outstanding), *multiplied by (B)* the number **574**; *provided, however,* that if *on or before* **August 31, 2012,** *(x)* the Subject Financing (as hereinafter defined) has been consummated and the funding or credit thereof made available to the Company and/or the Company's Affiliates as applicable, *(y)* Class C Base Payback has occurred, *and (z)* Class C Return Payback has occurred, then the number **574** in the immediately preceding clause (B) shall be changed to the number **300** instead**.** For such purposes, the term **"Subject Financing"** shall mean *either (i)* that certain loan and credit facility from **National Commercial Bank Jamaica Limited** consisting of a **J\$3.7 billion Term Loan** and a **US\$25 million** General Banking Facility financing substantially as reflected in that certain **Indicative Term Sheet** dated **February 15, 2012**, a copy of which is attached hereto as **EXHIBIT C-1,** *or (ii)* that certain **US\$40 million** maximum amount secured revolving letter of credit facility substantially as reflected in that certain draft **Indicative Summary of Terms and Conditions** dated **June 2012**, a copy of which is attached hereto as **EXHIBIT C-2**. |
| **(24)** | **CONVERSION OF CLASS A PREFERRED SHARES TO COMMON SHARES UPON A LIQUIDITY EVENT** | Upon *the later to occur of (x)* a Liquidity Event at any time after the achievement of Class A Return Payback or *(y)* the achievement of Class A Return Payback by reason of the receipt by the holders of the Class A Preferred Shares, in the aggregate on a cumulative basis, of Net Proceeds as a result of a Liquidity Event, the Class A Preferred Shares, as a class, shall automatically be converted into **936.84** Common Shares of the Company. |
| **(25)** | **CONVERSION OF CLASS C NONVOTING PREFERRED SHARES TO COMMON SHARES UPON A LIQUIDITY EVENT** | Upon *the later to occur of (x)* a Liquidity Event at any time after the achievement of Class A Return Payback or *(y)* the achievement of Class A Return Payback by reason of the receipt by the holders of the Class A Preferred Shares, in the aggregate on a cumulative basis, of Net Proceeds as a result of a Liquidity Event, the Class A Preferred Shares, as a class, shall automatically be converted into **936.84** Common Shares of the Company. |
| **(26)** | **GENERAL PROVISIONS REGARDING DISTRIBUTIONS** | **(a)**     In determining the moment at which Class A Base Payback, Class B Base Payback, Class C Base Payback, Class A Return Payback, Class B Return Payback, or Class C Return Payback is achieved, distributions of Net Cash Flow available to be made at any time shall be made and taken into account before making and taking into account any distributions of Net Proceeds from Liquidity Events then available to be made. |
| | | **(b)**     If the equity interests distributable as Net Proceeds to the equityholders of the Company as a result of any Liquidity Event involve both control or super-voting shares and non-control, non-voting, or lesser voting shares, then the equity interests receivable |

in respect of any Common Shares, Class A Preferred Shares, and/or Class C Preferred Shares then held by Blue Equity (or Blue Equity's successors or assigns) shall first be comprised of the control or super-voting shares to the extent possible before being comprised of any non-control, non-voting, or lesser voting shares.

**(c)**     When Class B Return Payback is achieved, *(x)* all of the Class B Nonvoting Preferred Shares of the Company shall be conclusively deemed redeemed and retired by the Company, without requirement of any further payment by the Company, *(y)* the share certificate(s) and such instruments of transfer as the Company shall reasonably request shall be promptly executed and delivered to the Company by the holders of the Class B Nonvoting Preferred Shares, *and (z)* no further distributions of Net Cash Flow or other amounts shall be required to be made to the holders of the Class B Nonvoting Preferred Shares of the Company in such capacity.

## E.  MANAGEMENT

**(1)   BOARD OF DIRECTORS**

Unless and until changed in accordance with the terms, conditions, and limitations of this Resolution or changed in connection with a Liquidity Event, in accordance with and subject to the terms and conditions of Article 4 and other applicable provisions of this Resolution:

**(a)**     The Company and each of its subsidiaries shall be managed by a Board of Directors.

**(b)**     The Board of Directors of the Company and each of its subsidiaries shall consist of *(i)* up to **three (3)** Directors (the "**Common Directors**") who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, **Cool Corp. Limited** (the "**Common Directors**"), a Cayman Islands incorporated company ("**Cool Corp**"), *and (ii)* up to **five (5)** Directors (the "**Class A Preferred Directors**") who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, **Blue Equity Petroholdings, Ltd.,** a St. Lucia International Business Company ("**Blue Equity**"). The Class A Preferred Directors and the Common Directors of the Company and each subsidiary of the Company are hereinafter sometimes referred to collectively as the "**Directors**" and each individually as a "**Director**" of the Company or such subsidiary, as applicable. In addition, the Board of Directors may authorize other persons at any time and from time to time *(i)* to attend and participate, without any voting rights, in meetings of the Board of Directors, *(ii)* to receive any or all notices of meetings or proposed consent resolutions which are sent to the Directors, without any right to consent, approve, or otherwise act with respect to any such proposed consent resolution, *and/or (iii)* to have any or all of the same access to information about the Company and the Company's subsidiaries as the Directors are entitled to have, and the Board of Directors may and revoke or change any such authorization at any time. Such persons shall not be considered to be Directors of the Company or any subsidiary, shall have not voting or consent rights, and shall not be taken into account for purposes of determining any quorum.

**(c)**     *Except* with respect to a Joint Consent Matter or as otherwise provided under Section E(1)(d) below, the affirmative vote or written consent of a majority-in-number of the Directors of the Company or any subsidiary of the Company, as the case may be, then in office shall govern with respect to any matter and shall be the act of the Board of Directors and the Company or such subsidiary of the Company, as applicable. With respect to any **Joint Consent Matter** as to the Company or any subsidiary of the Company, the written consent of both a minimum of the holders of **80%** of the of the Common Shares of the Company or such subsidiary, as applicable, and a majority-in-

number of the Class A Preferred Directors of the Company or such subsidiary, as applicable, then in office, acting as a separate group, shall govern and be the act of the Board of Directors and the Company or such subsidiary, as applicable.

**(d)**      Notwithstanding any other provision hereof which might be construed to the contrary, any Class A Preferred Director of the Company or any subsidiary of the Company may require at any time that a matter or issue be submitted to the Shareholders of the Company for decision, in which case the Board of Directors of the Company or such subsidiary, as the case may be, shall not be authorized to decide such matter or issue and any prior decision by such Board of Directors as to such matter or issue shall be rendered null and void *ab initio*. In such event, *except* with respect to a Joint Consent Matter, the affirmative vote or written consent of the holders of a majority of the then issued and outstanding Common Shares and Class A Preferred Shares, in the aggregate (but excluding any and all of the Class B Nonvoting Shares) of the Company or such subsidiary, as the case may be, shall govern with respect to any matter and be the act of the Company or such subsidiary of the Company, as applicable. With respect to any Joint Consent Matter as to the Company or any subsidiary of the Company which is submitted to the Shareholders of the Company or such subsidiary, as the case may be, the written consent of both the holders of no less than 80% of the then issued and outstanding Common Shares, voting as a separate group, and the holders of a majority of the Class A Preferred Shares of the Company, voting as a separate group, shall govern and be the act of the Company or such subsidiary, as applicable. The holders of the Class B Nonvoting Preferred Shares of the Company, in such capacity, shall not have a right to vote on any such matters.

**(e)**      Unless stated to the contrary in this Resolution, any and all actions taken by the Board of Directors and each class of Directors of the Company and each subsidiary of the Company shall be made in good faith and in a manner reasonably intended by them to enhance equityholder value with respect to the Company.

**(f)**      For all purposes hereof, each of the following matters shall constitute a **"Joint Consent Matter"** as to the Company or any subsidiary of the Company, as applicable:

      **(i)** The commingling or co-investing of the funds of the Company or any subsidiary of the Company with those of any other individual or entity other than the Company and/or the Company's subsidiaries.

      **(ii)**      The fixing or changing of the compensation, if any, to be paid the Directors of the Company or any subsidiary of the Company in such Directors' capacities as such.

      **(iii)**      Permitting any deviation from the limitations on Related Party transactions which are required under any Shareholders Agreement executed by all of the Shareholders of the Company.

      **(iv)**      The Company or any subsidiary of the Company engaging in any business activity outside the scope of the Business.

      **(v)**      The issuance to employees, contractors, or other Persons, in consideration of services rendered, of any Shares and/or other equity interests, or options, warrants, or securities convertible by the Company and/or any of the Company's subsidiaries and/or the establishment of any employee stock ownership plan or similar employee benefit plan (*provided, however,* that none of **Joseph Issa ("Issa")**, **Jonathan Blue**, or **David Roth** may be a participant in such "phantom stock" plan or other such employee benefit plan *and provided further, however,* that if any such plan is

established by the Company, Cool Corp on the one hand, and the Class A Directors acting as a separate group, on the other hand, shall each have the right to name the participants as to one-half of the interests authorized under such plan).

(vi)        Any prepayment of the bond indebtedness of the Company and/or the Company's subsidiaries that is not required under the terms and conditions of such bond indebtedness, *other than (A)* by use of the net proceeds received by the Company and/or any of the Company's subsidiaries in respect of a sale of the Rockfort pier, in respect of the issuance of the Class A Preferred Shares, and/or in respect of the issuance of the Class B Nonvoting Preferred Shares, *(B)* in connection with the refinancing or replacement of such bond indebtedness, *and/or (C)* in connection with a Liquidity Event.

(vii)        Any other matter or issue as to which the written consent of both a majority-in-number of the Common Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, is specifically and expressly required under this Resolution.

(viii)        The approval of any termination of, reduction or increase in, the Blue Equity Fees and/or the CPMIC Fees (as such terms are defined in Section 1.1(f)) payable by the Company.

(ix)        The change of the name of the Company to any name which contains the word "Blue".

(x)        The change in the definition of "Business."

(xi)        Payment of compensation in excess of **$180,000.00 per** year to any Chief Executive Officer who is not totally independent of, and unaffiliated with, Blue Equity prior to his or her appointment; *provided, however,* that if Blue is the Chief Executive Officer, the payment of *any* compensation to him therefor (other than indirectly by reason of the Blue Equity Fees for the Blue Back-Office Services) shall constitute a Joint Consent Matter. In such regard, the term "compensation" shall not be construed as including any reimbursements or indemnity payments.

(xii)        Any decision not to exercise the Company's right of first refusal under that certain **Share Purchase Agreement** entered into effective as of **September 29, 2011** *by and among* the Company, Blue Equity, Cool Corp, Issa, **Colin Hendrick, Gwen Kennedy,** and **Caribbean Property Managers International Corp.,** a Panamanian corporation (**"CPMIC"**), as amended by a **First Amendment to Share Purchase Agreement** entered into effective as of **December 12, 2011** (as so amended and as the same may be subsequently amended in accordance with its terms, the **"Share Purchase Agreement"**) with respect to any new Business Opportunity (as defined in the Share Purchase Agreement) as to which a Purchaser Restricted Party (as defined in the Share Purchase Agreement) gives a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company as required under the Share Purchase Agreement, but such decision shall only constitute a Joint Consent Matter if after considering, in good faith, all of the relevant facts and circumstances at the time, it is reasonably ascertained that the Company would have the financial capability to take and consummate such Business Opportunity without depending on raising additional outside equity funds or incurring any level of additional debt which requires any personal guarantees or which the Board of Directors reasonably determines, in good faith, would be at a level that is not prudent for the Company to incur.

| (2) | **SUBSIDIARY BOARD OF DIRECTORS** | *Except* to the extent, if any, otherwise agreed to by both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group, the Board of Directors of each subsidiary of the Company, *including, but not limited to,* Cool Petroleum (St. Lucia) Limited, a St. Lucia international business company, and Cool Bio Diesel Limited, a Jamaican limited company, shall be automatically identical in its composition to the composition of the Board of Directors of the Company, as the same may change at any time and from time to time. The Company and its shareholders, Directors, and officers, as applicable, shall cause the Governing Instruments of each subsidiary of the Company to contain such provisions as are necessary to implement the foregoing requirement and as are necessary to require that each subsidiary of the Company operates in a manner subject to the Approved Budgets and otherwise substantially in accordance with the same governing and operating checks, balances, and internal controls as are provided for under this Resolution with respect to the Company (*other than* reflecting the Company as the sole shareholder and/or equityholder of each subsidiary other than any subsidiary which is not 100% owned by the Company or another subsidiary of the Company). If necessary for legal reasons, the Company and its shareholders, Directors, and officers, as applicable, shall cause each subsidiary of the Company to adopt and agree to the terms, conditions, and provisions of this Resolution in writing. |
| --- | --- | --- |
| (3) | **NO AUTHORITY FOR SHAREHOLDERS TO MANAGE** | Except indirectly through the power of certain Shareholders to elect, remove, and/or replace certain Directors as set forth above, none of the Shareholders, in their capacity as Shareholders, shall have the power or authority to control the actions of, or act on behalf of, the Company and/or any subsidiary of the Company. |

*[Only General Terms and Conditions Follow]*

# GENERAL TERMS AND CONDITIONS
*Rights Designation Resolution*

## ARTICLE 1

### DEFINITIONS

**1.1    Certain Definitions**

As used in this Resolution, and *unless* the context requires a different meaning:

**(a)**    The term **"Affiliate"** with respect to any Person shall mean **(i)** any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, **(ii)** any shareholder (*except* that if the subject Person is a publicly traded company, only a shareholder who owns more than 5% of the outstanding voting securities of such subject Person), partner, director, board of directors, governor, member, trustee, beneficiary, employee, agent, or relative by blood or marriage, as applicable, of such Person or of any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, *and/or* **(iii)** any personal representative, receiver, trustee in bankruptcy, guardian, curator, or conservator with respect to such Person. In such regard, the term **"control"** (including the terms **"controlled by"** and **"under common control with"**) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise, applying the same principles, interpretations and definitions as are applicable in defining the term "affiliate" for purposes of Rule 144 promulgated pursuant to the United States Securities Act of 1933, as amended.

**(b)**    The Common Shareholders, as a group, the Class A Preferred Shareholders, as a group, and the Class C Preferred Shareholders, as a group, are sometimes referred to in this Resolution collectively as the **"Classes of Shareholders"** and each individually as a **"Class of Shareholders."**

**(c)**    The Class A Preferred Shares, as a group, the Class B Nonvoting Preferred Shares, as a group, the Class C Nonvoting Preferred Shares, as a group, and the Common Shares, as a group, are hereinafter sometimes referred to collectively as the **"Classes of Shares"** and each group individually as a **"Class of Shares."**

**(d)**    The term **"Governing Instruments"** with respect to any Person other than an individual shall mean the Articles of Incorporation, Articles of Organization, Articles of Association, Certificate of Formation, Certificate of Incorporation, Certificate of Association, Certificate of Organization, By-Laws, Limited Liability Company Agreement, Operating Agreement, Memorandum of Incorporation, Memorandum of Association, Partnership Agreement, Certificate of Partnership, and/or any and all other governing and/or organizational documents with respect to such Person, as applicable.

**(e)**    The term **"Majority-in-Interest"** **(i)** shall mean, with respect to any single Class of Shareholders, at any time, those Shareholders of such Class of Shareholders holding more than **50%** of the Shares of the Class of Shares upon which such Class of Shareholders is based (*i.e.,* Common Shares with respect to Common Shareholders, Class A Preferred Shares with respect to Class A Preferred Shareholders, Class B Nonvoting Preferred Shares with respect to Class B Preferred Shareholders, and Class C Nonvoting Preferred Shares with respect to Class C Preferred Shareholders) which are owned by all of the Shareholders of such Class of Shareholders at such time, *or* **(ii)** shall mean, with respect to all of the Shareholders as a whole (regardless of the Class of Shares held by any Shareholder), at any time, those Shareholders (regardless of the Class of Shares held by any such Shareholder), holding more than **50%** of the total Shares then issued and outstanding (regardless of the Class of Shares) and entitled to vote (thus, without taking into account for any such calculation any Class B Nonvoting Preferred Shares or any Class C Nonvoting Preferred Shares).

**(f)**    The term **"Net Cash Flow"** with respect to the Company and/or any one or more of the Company's subsidiaries for any period shall mean, subject to and computed in accordance with applicable rules of consolidation, *the excess, if any, of* **(A) the sum of (i)** all gross receipts of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from any sources for such period, other than from Liquidity Events, *plus* **(ii)** any funds released by the Board of Directors of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from previously established reserves (referred to in *(B)(iv)(y)* below), *over* **(B)** *the sum of* **(i)** all cash expenses paid by the Company and/or such subsidiary or subsidiaries during such period during the course of business (*including, but not limited to,* salaries, bonuses (*including, but not limited to,* any bonuses or earn-out payments attributable with respect to such period, even if payable after such period), taxes, rent and occupancy costs, interest on any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, insurance premiums, supplies, guaranteed payments and fees), **(ii)** all capital expenditures paid in cash by the Company and/or such subsidiary or subsidiaries, as applicable, during such period, **(iii)** all payments during such period of the principal of any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, *and* **(iv)** unless the Board of Directors, in its sole discretion, determines that a lesser amount is advisable, a cash reserve in an amount equal to *the sum of* **(x)** *the greater of* **$3,000,000.00 USD**, *or* an amount equal to *the excess, if any, of* **$5,000,000.00 USD** *over* the Net Working Capital of the Company and the Company's subsidiaries with respect to such period (computed, however, without including any cash or cash equivalents of the Company and/or the Company's subsidiaries), *plus* **(y)** such additional amount, if any, that the Board of Directors reasonably and in good faith determines is

necessary to meet the future business, working capital, capital expenditure, tax, environmental, litigation, and/or expansion needs of the Company and/or the Company's subsidiaries; *provided, however,* that any payments referred to in *(B)(i), (ii), (iii),* or *(iv)* that are paid from previously established reserves or that are taken into account in determining Net Proceeds from a Liquidity Event shall not be taken into account in determining Net Cash Flow. In computing Net Cash Flow for any period, all costs, expenses and expenditures of the Company and the applicable subsidiary or subsidiaries of the Company shall be taken into account, *including, but not limited to, (a)* a fee to Blue Equity, LLC or its nominee (the **"Blue Equity Fee"**) of **$600,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such in-house legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"Blue Back-Office Services"**) as are provided by **Blue Equity, LLC**, a Nevada limited liability company (**"Blue Equity, LLC"**), and/or any of its Affiliates to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of Blue Equity, LLC, or other Persons, it being understood and agreed that the Blue Equity Fee does not include *(x)* any compensation, benefits, and other amounts paid to or for the benefit of the Chief Executive Officer of the Company *or (y)* any out-of-pocket expenditures to third parties for travel, lodging, international telephone calls, and other legitimate business expenses incurred by Blue Equity, LLC, its Affiliates, or their personnel, in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries, which amounts shall be reimbursable by the Company or an Affiliate of the Company, as applicable, to the extent that they are within the applicable Approved Budgets of the Company and the Subsidiaries and they are properly incurred, reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries generally applicable to employees of the Company and/or such Affiliate of the Company, *and (b)* a fee to CPMIC (the **"CPMIC Fee"**) of **$575,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"CPMIC Back-Office Services "**) provided by **Cool International Holdings Limited**, a British Virgin Islands corporation, Cool Corp, **MZ Holdings Limited**, a Jamaican company (**"MZ Holdings"**), **Cool Oasis Limited**, a Jamaican company, CPMIC, and/or any of their nominees or Affiliates (collectively and individually as applicable, the **"CPMIC Group"**) to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of the CPMIC Group or other Persons, it being understood and agreed that *(X)* the CPMIC Fee includes *(i)* the portion of the compensation, benefits, and other amounts allocable and chargeable to the Company and/or the Company's subsidiaries for the provision by the CPMIC Group, as applicable, of the financial, accounting, and supervisory services of Davis in his capacity as the Group CFO of the Company and the Company's subsidiaries (in which capacity Davis shall report directly to the Chairman and Vice Chairman of the Company and the Company's subsidiaries (subject, however, to the general supervision and control of the Board of Directors)) and of the political liaison and other consulting services of Issa as may be reasonably requested by the Company and/or the Company's subsidiaries (which services by Issa shall be only part-time and shall not require Issa to work any particular minimum of hours or provide any particular quantity of services), in each case on a shared basis between the CPMIC Group and its subsidiaries, on the one hand, and the Company and its subsidiaries, on the other hand, *(ii)* the compensation, benefits (including, but not limited to, other amounts paid by the CPMIC Group to or with respect to Colin Hendrick with respect to his serving, on a full time basis as the Director of Operations for the Company and the Company's subsidiaries, *and (iii)* the services provided for under that certain Agreement entered into as of March 1, 2006, *by and between* Cool Petroleum Limited and MZ Holdings regarding the provision of certain services by MZ Holdings to the Company and the Company's subsidiaries (the **"MZ Shared Services Agreement"**), *and (Y)* the CPMIC Fee does not include *(i)* any costs for the Company, the Company's subsidiaries, and/or their Affiliates or invitees to use or direct the use of the airplane owned by Cool Corp and/or its Affiliates when deemed advisable or authorized by the Board of Directors of the Company, *or (ii)* any out-of-pocket expenditures of the types currently paid to third parties by the Company and/or the Company's subsidiaries or paid to third parties by the CPMIC Group and reimbursed by the Company and/or the Company's subsidiaries for any travel (including car or car allowances and including gas), lodging, international telephone calls, and other legitimate business expenses incurred in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries by Hendrick, Davis, and/or Issa, or by Cool Corp with respect to such individuals, which are within the applicable Approved Budgets of the Company and the Subsidiaries and which are properly reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries, *or (iii)* the costs incurred by the Company and/or the Subsidiaries in providing BUPA Family Medical Insurance and corporate protection insurance for Hendrick and Issa at current coverage levels, which the Company shall continue to pay, or *(iv)* any costs incurred by Cool Corp and/or its Affiliates associated with providing intellectual, human or other capital resources to or for the benefit of the Company and/or any of the Company's subsidiaries to the extent that *(A)* such intellectual, human, or other capital resources are not already required to be so provided pursuant to currently existing agreements with the Company and/or any of the Company's subsidiaries (or any amendments, extensions, renewals, or novations thereof), *(B)* such intellectual, human, or other capital resources have not otherwise generally been provided by Cool Corp and/or its Affiliates to or for the benefit of the Company prior to the Effective Date of this Resolution, *(C)* such intellectual, human, or other capital resources are not specifically included in the CPMIC Back-Office Services set forth above, *and (D)* the provision of such intellectual, human, or other capital resources is undertaken, and the costs therefor incurred, pursuant to and in accordance with the terms and conditions of a written agreement entered into by and between one or more of Cool Corp and/or Cool Corp's Affiliates, on the one hand, and one or more of the Company and/or the Company's subsidiaries, on the other hand. The CPMIC Fee shall supersede *inter alia* the fee provided for under the MZ Shared Services Agreement, which fee provided for under the MZ Shared Services Agreement shall therefore no longer be separately due and payable by the Company or any of its subsidiaries to MZ Holdings.

**(g)**   The term **"Net Proceeds"** with respect to any Liquidity Event shall mean the gross proceeds derived by the Company and/or the Shareholders directly from such Liquidity Event *reduced by (i)* payment of all reasonable expenses incurred by the Company or the Shareholders, as the case may be, in furtherance of implementing such Liquidity Transaction, *including, but not by way of limitation,* any brokerage commissions, fees, and costs payable by the Company or, with the Company's consent, to or by the Shareholders, in connection with such Liquidity Event (*provided, however,* that any commission or fee payable to Blue Equity, Cool Corp, or any other Related Party or Shareholder for arranging such Liquidity Event may not, when added to the brokerage commissions and/or fees payable by the Company to Persons other than Related Parties in connection with such Liquidity Event, exceed an amount equal to 5% of the value of the total consideration from such Liquidity Event), *(ii)* payment of the amount of any indebtedness of the Company (*including* principal, interest, prepayment fees, and/or other fees, costs, or charges) made with such gross proceeds, *(iii)* capital expenditures or other expenditures required to made from the gross proceeds of such Liquidity Event under the applicable agreements with respect to such Liquidity Agreement, *and (iv)* any reasonable reserve established by the Board of Directors of the Company for satisfaction of any of the foregoing, any indemnities, escrow, or contingencies therefor. In determining the gross proceeds and Net Proceeds with respect to any Liquidity Event, any equity interests, bonds, and/or other tangible or intangible property (other than cash and cash equivalents) received with respect to a Liquidity Event shall be valued at the same amount as such equity interests, bonds, and/or other tangible or intangible property are valued for purposes of the Liquidity Event.

**(h)**   The term **"Person"** means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, syndicate, joint stock company, limited liability company, governmental authority, or other entity of any kind.

**(i)**   The term **"Tax"** or **"Taxes"** with respect to any Person shall mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental taxes, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated basis, or unitary basis or in any other manner which are required to be paid, withheld or collected by such Person.

**(j)**   The term **"Tax Return"** shall mean any return, declaration, reports and forms, claim for refund, or information return or statement relating to Taxes, including any necessary schedule or attachment thereto, and including any necessary amendment thereof.

### 1.2   Accounting Terms

All accounting terms which are used in this Resolution and which are not otherwise expressly defined in this Resolution shall have the respective meanings given to them in accordance with generally accepted International Financial Reporting Standards, consistently applied from period to period (**"IFRS"**) and all accounting concepts and principles referred to in this Resolution shall be construed in accordance with IFRS *except* to the extent otherwise specifically and expressly provided in this Resolution.

**ARTICLE
2**

**CAPITAL**

### 2.1   No Liability of Shareholders

*Except* as otherwise specifically provided under applicable law or specifically provided under a separate written agreement executed by such Shareholder, no Shareholder of the Company shall have any personal liability for the obligations of the Company and/or any subsidiary of the Company. Furthermore, no Shareholder shall be obligated to contribute additional funds or loan money to, or personally guarantee or endorse any debts or obligations of, the Company and/or any subsidiary of the Company *except* to the extent, if any, that such Shareholder specifically agrees under a separate written agreement executed by such Shareholder.

### 2.2   Percentage Interest Definition

**(a)**   For purposes of this Resolution, the term **"Percentage Interest"** at any time shall have the following meaning, as applicable:

**(i)**   The term **"Percentage Interest"** as to any Class A Preferred Shareholder, solely with respect to the Class A Preferred Shareholders as a group, shall mean that percentage which the number of Class A Preferred Shares (*including, but not limited to,* any fractional Class A Preferred Shares) then held by such Class A Preferred Shareholder at such time *bears to*

the aggregate of all Class A Preferred Shares (*including, but not limited to,* any fractional Class A Preferred Shares) then issued and outstanding;

(ii)     The term **"Percentage Interest"** as to any Class B Preferred Shareholder, solely with respect to the Class B Preferred Shareholders as a group, shall mean that percentage which the number of Class B Nonvoting Preferred Shares (including, but not limited to, any fractional Class B Nonvoting Preferred Shares) then held by such Class B Preferred Shareholder at such time bears to the aggregate of all Class B Nonvoting Preferred Shares (including, but not limited to, any fractional Class B Nonvoting Preferred Shares) then issued and outstanding;

(iii)     The term **"Percentage Interest"** as to any Class C Preferred Shareholder, solely with respect to the Class C Preferred Shareholders as a group, shall mean that percentage which the number of Class C Nonvoting Preferred Shares (including, but not limited to, any fractional Class C Nonvoting Preferred Shares) then held by such Class C Preferred Shareholder at such time bears to the aggregate of all Class C Nonvoting Preferred Shares (including, but not limited to, any fractional Class C Nonvoting Preferred Shares) then issued and outstanding;

(iv)     The term **"Percentage Interest"** as to any Common Shareholder, solely with respect to the Common Shareholders as a group, shall mean that percentage which the number of Common Shares (*including, but not limited to,* any fractional Common Shares) then held by such Common Shareholder at such time *bears* to the aggregate of all Common Shares (*including, but not limited to,* any fractional Common Shares) then issued and outstanding;

(v)     The term **"Percentage Interest"** as to any Shareholder with respect to all of the Shareholders as a group, regardless of the Class of Shares held by such Shareholders, shall mean that percentage which the number of Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then issued and outstanding; *and*

(vi)     The term **"Percentage Interest"** as to any Shareholder with respect to any group of Shareholders consisting of fewer than all of such Shareholders, regardless of the Class of Shares held by such Shareholders (for purposes of Section 2.3 of this Resolution or otherwise) shall mean that percentage which the number of Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then held by all Shareholders of the applicable group, in the aggregate; *provided, however,* that, notwithstanding any other provision of this Resolution which might be construed to the contrary, in determining the Percentage Interest of any Shareholder under Section 2.2(a)(v) above and/or this Section 2.2(a)(vi) for purposes of applying and implementing the provisions of Section 2.3 of this resolution, **(A)** the Class B Preferred Shares shall not be taken into account in the numerator or denominator *and* **(B)** the Class A Preferred Shares and Class C Nonvoting Preferred Shares shall be taken into account in both the numerator and denominator as if they had already all been converted into Common Shares in accordance with the conversion provisions set forth in Sections D(24) and D(25) of the Initial Portion of this Resolution.

(b)     Except when determining the Percentage Interest of any Shareholder with respect to all or some of the Shareholders, regardless of the Class of Shares held by any such Shareholder, pursuant to Section 2.2(a)(v) or Section 2.2(a)(vi) above, the Percentage Interest of any Shareholder who holds Shares of more than one Class of Shares shall be determined on a Class of Shares-by-Class of Shares basis, taking into account only such Shareholder's holdings of Shares of the Class of Shares in question and disregarding such Shareholder's holdings of the Shares of any other Class of Shares.

## 2.3     Additional Capital Contributions

(a)     If at any time the Board of Directors of the Company determines reasonably and in good faith that, in order **(i)** to provide cash for the expansion of the business of the Company and/or the Company's subsidiaries, through acquisition or otherwise **(ii)** to provide working capital reasonably necessary in the ordinary course of the business of the Company and/or the Company's subsidiaries, *and/or* **(iii)** to provide funds to repay any or all debts, obligations, and/or other liabilities of the Company and/or the Company's subsidiaries if the Company is unable to pay such debts, obligations, and/or other liabilities as they becomes due, it is advisable for the Company and/or any one or more subsidiaries of the Company to seek additional capital beyond that already then contributed, or required to be contributed, by the Shareholders of the Company, the Board of Directors of the Company shall cause notice of such determination to be given to each of the Shareholders (regardless of the Class of Shares held by such Shareholders) at least **90 days** before the last day on which such capital must be contributed or such shorter period of time (but not less than **30 days**) before the last day on which such capital must be contributed as is reasonably necessary to avoid hardship to the Company or any subsidiary of the Company or to avoid the loss of the proposed acquisition or other expansion transaction or opportunity, as the case may be (as applicable, the **"Capital Raise Notice Period"**). Such notice shall set forth the total additional capital contribution then being sought from all of the Shareholders in the aggregate and the number of Shares or other equity interests which will be issued by the Company and/or any subsidiary of the Company in exchange for such additional capital contribution (and the rights, preferences, and other characteristics of any such equity interests other than Shares). Any other equity interests so authorized by resolution of the Board of Directors of the Company may have such other rights, distribution preferences, voting preferences, liquidation preferences, and other characteristics as the Board of Directors may determine in its reasonable discretion and in good faith, *including, but not limited to,* preferences which make such class of equity interests senior in distributions and/or voting to any of the Shares or to any other class of equity interests previously issued; *provided, however,* that any dilution to be caused by the issuance of such new equity interests shall affect all of the then issued and outstanding Common Shares on a

proportionate basis. No vote of the Shareholders, or any Class of Shareholders, shall be required in connection with the issuance of additional Shares or any other class of equity interests, *except* to the extent, if any, provided by resolution of the Board of Directors of the Company in connection with the prior issuance of Shares or other equity interests under this Section 2.3.

**(b)**   Within such Capital Raise Notice Period, if any Shareholder wishes to acquire such Shareholder's pro rata portion of the Shares or other equity interests being offered by the Company and/or any of the Company's subsidiaries, as the case may be, in connection with such additional capital contribution, such Shareholder shall contribute in cash to the capital of the Company or such subsidiary or subsidiaries, as applicable, a pro rata portion of the total additional capital contribution then being sought in the aggregate, in accordance with such Shareholder's respective Percentage Interest with respect to all of the Shareholders of the Company (regardless of the Class of Shares held by any Shareholder) at such time.

**(c)**   If any Shareholder fails to contribute such Shareholder's pro rata portion of such additional capital contribution within the specified Capital Raise Notice Period, then the Shareholders who have contributed their pro rata portions of such additional capital contribution within the specified Capital Raise Notice Period shall have the right (but not the obligation), during a period of **10 days** thereafter, to make the additional capital contribution for which such Shareholder failed (with or without reason) to make, in accordance with their respective Percentage Interests among themselves as a group, or in such other percentages as those Shareholders wishing to make all or any part of such capital contribution may otherwise agree. In such event, the Shares or other equity interests offered with respect to such additional capital contribution shall be issued to those Shareholders who actually make such capital contribution in accordance with the percentage of such capital contribution contributed by each.

**(d)**   If the Shareholders of the Company, in the aggregate, do not timely contribute the full amount of any additional capital contribution sought by the Company and/or the Company's subsidiaries, as applicable, then the Company and/or the Company's subsidiaries, as applicable, shall have an additional **90 day** period to obtain such uncontributed funds from any one or more Shareholders or other Persons on the same terms as offered to the Shareholders in exchange for the issuance to such Person(s) of the Shares or other equity interests which were offered to the Shareholders in connection with such portion of the additional capital contribution.

**(e)**   Notwithstanding anything herein which might be construed to the contrary, the Board of Directors of the Company, acting reasonably and in good faith, may cause the Company and/or any subsidiary of the Company at any time to issue new Shares or other equity interests, or options to acquire new Shares or other equity interests, as an incentive in connection with the employment of any new or existing employee of the Company and/or any subsidiary of the Company, and the foregoing notice and "preemptive rights" as to the Shareholders of the Company shall not apply with respect to such issuances, provided such issuance is within the parameters set forth in Section E(1)(f)(v).

**2.4   Effect of Equity Issuances Pursuant to Section 2.3**

Any and all of the provisions of this Resolution shall be subject to amendment, change, or modification to such extent as the Board of Directors of the Company may reasonably deem necessary to implement the terms and conditions of any new issuance of equity interests pursuant to Section 2.3 hereof; *provided, however,* that such amendments, changes, or modifications may only be with respect to management controls if such new equity interests authorized pursuant to Section 2.3 hereof are only issued to Persons who are not already then Shareholders of the Company.

**2.5   No Interest on Capital Contributions**

No Shareholder shall be entitled to interest on any capital contribution made to the Company and/or any subsidiary of the Company, *except* to the extent otherwise expressly set forth in this Resolution or pursuant to the provisions of Section 2.3 hereof.

**ARTICLE
3**

**DISTRIBUTIONS**

**3.1   Distributions of Net Cash Flow and Net Proceeds From Liquidity Events**

**(a)**   The Net Cash Flow for each Fiscal Quarter with respect to the Company and the Company's subsidiaries *(i)* shall be distributed, with respect to the first three Fiscal Quarters of each Fiscal Year, within **30 days** after the end of such Fiscal Quarter, and with respect to the last Fiscal Quarter of every Fiscal Year, **30 days** following the finalization of the Company's audited consolidated statements with respect to such Fiscal Year *and (ii)* shall be distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries, as applicable, then held by each of them.

(b)   The Net Proceeds from Liquidity Events with respect to the Company and/or any subsidiary of the Company *(i)* shall be distributed within **120 days** following the receipt of such Net Proceeds by the Company or the Company's subsidiary, as applicable, *and (ii)* shall be authorized, if necessary, and distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries then held by each of them.

## ARTICLE
## 4

### MANAGEMENT

**4.1   Management In General**

(a)   *Except* to the extent otherwise specifically provided under this Resolution, all rights, powers and authority of the Company and each subsidiary of the Company shall be exercised by or under the authority of, and the business and affairs of the Company or such subsidiary, as applicable, as well as any liquidation or dissolution of the Company or such subsidiary, as applicable, shall be controlled and managed by or under the authority of, a Board of Directors for the Company or such subsidiary, as applicable, established as provided under Section E of the Initial Portion of this Resolution (the **"Board of Directors"**), each of the members of which may be referred to as a Director.

## ARTICLE
## 5

### WITHDRAWAL, ASSIGNMENT AND
### ADDITION OF SHAREHOLDERS

**5.1   Assignment of Shares**

*Except* as otherwise provided and permitted under this Article 5, no Shareholder may sell, assign, transfer, pledge, hypothecate, encumber, withdraw or otherwise dispose of (each of which actions constitutes a **"Transfer"** for all purposes of this Resolution) all or any portion of such Shareholder's Shares to any Person. Any purported Transfer which is not in compliance with the provisions of this Article 5 shall be null and void *ab initio* and of no force or effect, and the Shareholder purporting to make such Transfer shall, for all purposes hereof, remain a Shareholder.

**5.2   Tag Along and Drag Along Rights**

If, *other than* in a Transfer permitted under Section 5.5 below, any one or more of the Shareholders (collectively, the **"Selling Shareholder(s)"**) desire to sell or exchange, in any single Transfer or group of related Transfers, a number of Shares owned by such Selling Shareholder(s) which constitute more than **50%** in voting power of all of the voting Shares of the Company then issued and outstanding, in the aggregate (collectively, the **"Shares To Be Transferred"**), such Selling Shareholder(s) may consummate such sale or exchange of the Shares To Be Transferred, *but if and only if* such Selling Shareholder(s):

(a)   Cause the proposed purchaser of such Shares To Be Transferred to offer in writing to similarly purchase or exchange, in a sale or exchange to be consummated at the same time as the purchase or exchange of the Shares To Be Transferred is consummated, from each of the other Shareholders (each a "*Tag-Drag Shareholder*") a number of the Shares of the Company then owned by such Tag-Drag Shareholder (collectively, the **"Tag-Drag Shares"** of such Tag-Drag Shareholder) *which bears the same ratio to* the total number of Shares (regardless of the Class of Shares) then owned by such Tag-Drag Shareholder, in the aggregate, *as* the total number of Shares To Be Transferred *bears* to the total number of Shares (regardless of the Class of Shares) then owned by all of the Selling Shareholder(s), in the aggregate, at the same price or exchange value per Share, and on the same payment or exchange terms, as is applicable with respect to the Shares To Be Transferred; *and*

(b)   Either, in the sole discretion of the Board of Directors of the Company (*that is,* the Board of Directors must select one of the following two rights to apply),

(i)   Require each of the Tag-Drag Shareholders to sell or exchange all of the Tag-Drag Shares of such Tag-Drag Shareholder to the Purchaser, at the same price or exchange value per Share, and on the same payment or exchange terms, as applicable with respect to the Shares To Be Transferred, in which case each of such Tag-Drag Shareholders and the purchaser must comply with such required sale or exchange (**"Drag-Along Rights"**); *or*

(ii)   Allow each of the Tag-Drag Shareholders to accept or reject such offer, in such Tag-Drag Shareholder's sole discretion, in which case, and if such offer is accepted by such Shareholder, the proposed purchaser must purchase or acquire in exchange, and such Tag-Drag Shareholder must sell or exchange, the Tag-Drag Shares of such Tag-Drag Shareholder at the

same price or exchange value per Share and on the same payment or exchange terms as applicable with respect to the Shares To Be Transferred (**"Tag-Along Rights"**).

(c)     At the closing of the purchase and sale of the Shares To Be Transferred, the Tag-Drag Shareholder whose Shares are required to be sold pursuant to the Drag-Along Rights or who elects to sell any Tag-Drag Shares pursuant to the Tag-Along Rights, as the case may be, shall execute such instruments of assignment as shall be reasonably requested by the purchaser and/or the Board of Directors of the Company. If such Tag-Drag Shareholder fails to execute any such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Resolution or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 5.2(c) with respect to such Tag-Drag Shareholder's applicable Tag-Drag Shares if such Tag-Drag Shareholder fails to do so on a timely basis. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it. Notwithstanding any other provision hereof which might be construed to the contrary, *(i)* pricing and exchange values with respect to the Class A Preferred Shares, the Class B Nonvoting Preferred Shares, and the Class C Nonvoting Preferred Shares for all purposes of this Section 5.2 may differ from other Shares to the extent reasonably necessary to permit the Class A Base Payback, Class B Base Payback, Class C Base Payback, Class A Return Payback, Class B Return Payback, and Class C Return Payback amounts to be first received by the holders thereof (in the order of priority reflected with respect to the distribution of Net Proceeds from Liquidity Events) and then the balance shall be divided among and treated as the purchase price or exchange value for the applicable Common Shares, *and (ii)* for the purpose of such allocation of the remaining balance among the applicable Common Shares, the Class A Preferred Shares and the Class C Nonvoting Preferred Shares shall then be deemed to have been converted into Common Shares as provided for under Sections D(24) and D(25) of the Initial Portion of this Resolution.

**5.3     Voluntary Transfers By Certain Minority Common Shareholders**

(a)     If, at any time after *the first to occur of (x)* the **third anniversary** of the Effective Date of this Resolution, *or (y)* the date on which Class A Base Payback is achieved, any Common Shareholder who, together with all Related Parties and Affiliates of such Common Shareholder, then owns or controls, in the aggregate, less than **5%** of the then issued and outstanding Common Shares of the Company (a **"Selling Minority Shareholder"**) receives a bona fide written offer (**"Offer"**) by any Person, other than with respect to a Transfer permitted under Section 5.5 below or pursuant to the provisions of Section 5.2 above, to purchase all or any portion of such Selling Minority Shareholder's Common Shares and if the Selling Minority Shareholder desires to accept such Offer, then such Common Shares shall be subject to the following right of first refusal options:

(i)     The Selling Minority Shareholder shall give, or cause to be given, written notice of the options set forth below to the Company and to all of the other Common Shareholders, which notice shall contain a true and correct copy of the Offer (the **"Sales Notice"**). An election to exercise an option granted under this Section 5.3 shall be made by written notice given to the Selling Minority Shareholder within the time period permitted for exercise of such option. Unless otherwise specified in the notice of exercise, any exercise of an option under this Section 5.3 shall be deemed to be effective as to the maximum number of Common Shares of the Selling Minority Shareholder which such option holder is eligible to purchase pursuant to exercise of such option (which could be all of the Common Shares of the Selling Minority Shareholder then subject to the options granted under this Section 5.3 if no other option holder exercises such option holder's option with respect to such Common Shares). Any exercise of an option granted under this Section 5.3 shall be irrevocable once made (*subject, however,* to the provisions of Section 5.3(d) below).

(ii)     The Sales Notice shall constitute a first offer by the Selling Minority Shareholder to sell all of the Common Shares covered by the Offer to the other Common Shareholders (the **"Other Common Shareholders "**), and such Other Common Shareholders shall have the first option to purchase any or all of the Common Shares subject to the Offer, at the price and upon the other terms and conditions set forth below. If more than one of the Other Common Shareholders exercise the option granted under this Section 5.3(a)(ii), then such exercising Other Common Shareholders shall have the right to purchase the subject Common Shares on a prorata basis in accordance with their respective Common Share holdings, or in such other percentages as they may unanimously agree. The option granted each Other Common Shareholder under this Section 5.3(a)(ii) shall expire and no longer be exercisable if not exercised by such Other Common Shareholder within **30 days** following the date of delivery of the Sales Notice to such Other Common Shareholder.

(iii)     In the event, and to the extent, that the Other Common Shareholders shall fail or neglect to timely exercise their options as to all of the Common Shares which are subject to the Offer, then the Company shall have the second option to purchase any or all of such remaining Common Shares, at the price and upon the other terms and conditions set forth below. The option granted the Company under this Section 5.3(a)(iii) shall expire and no longer be exercisable if not exercised by the Company within **60 days** following the date of delivery of the Sales Notice to the Company.

(b)     The options of the Other Common Shareholders with respect to the Common Shares which are subject to the Offer and the option of the Company with respect to such Common Shares, as set forth above, shall be exercisable at a price for each such Common Share equal to the purchase price for such Common Share set forth in, or calculable under, the Offer. Such purchase price shall be payable in accordance with the payment terms set forth in the Offer; *provided, however,* that, unless otherwise agreed by the Selling Minority Shareholder and the purchasing Shareholder(s) and/or Company, as applicable, the closing of any such purchase and sale of Common Shares pursuant to this section shall take place at the general offices of the

Company no later than **90 days** after the latest date of delivery of the Sale Notice to any of the Other Common Shareholders or the Company. At the option closing, the Selling Minority Shareholder shall transfer and assign all of the Common Shares which are being sold to such Other Common Shareholder(s) and/or the Company, as applicable, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee, other than the Company, shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased.

        **(c)**    Upon the failure or neglect of the other Common Shareholders and the Company, in the aggregate, to purchase all of the Common Shares offered to them pursuant to the foregoing options, the Selling Minority Shareholder shall have, for a period of **60 days** following the date on which the last such option to purchase expires, the right to sell the Common Shares described in the Offer to the Person making the Offer at exactly the same price and upon exactly the same other terms and conditions set forth in the Offer; *provided, however,* that the Person making the Offer, or such Person's Affiliates, do not directly or indirectly compete with the Company or any of the Company's subsidiaries. In the event of such sale pursuant to the Offer, the transferee of the subject Common Shares shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the Person making the Offer and purchasing the subject Common Shares shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased. If the Selling Minority Shareholder fails or neglects to sell such Common Shares within such **60 day** period in accordance with the foregoing, or if any material term of the Offer is changed, modified or supplemented, then such Common Shares shall continue to be owned by the Selling Minority Shareholder, shall continue to be subject to the terms and conditions of this Resolution, and may not be sold without first again giving the other Common Shareholders and the Company the options to purchase such Shares as provided in this Resolution.

        **(d)**    *Notwithstanding anything herein which might be construed to the contrary,* if the other Common Shareholders and the Company, pursuant to their options under this Resolution, shall fail to exercise their options, in the aggregate, to purchase *all* of the Common Shares covered by the Offer, then none of the option exercises as to any of such Common Shares shall be valid or recognized and the Selling Minority Shareholder may sell the applicable Common Shares as provided under Section 5.3(c) above.

**5.4**    **Involuntary Transfers**

        **(a)**    In the event that any Shares of any Shareholder (**"Transferring Shareholder"**) are sought to be Transferred by any involuntary means (*other than* any Transfer by reason of the death or adjudication of incompetency of any Shareholder, *but including, but not limited to,* any Transfer by reason of attachment, garnishment, execution, levy, bankruptcy, or seizure or by reason of a transfer or division of interests as a result of, or in connection with, a divorce, marital dissolution, or other marital property settlement), then such Shares shall be subject to the following options:

        **(i)**    The other Shareholders (the **"Other Shareholders"**) shall have the first option to purchase any or all of the Shares sought to be involuntarily transferred at the price and upon the other terms and conditions set forth below. Each of the Other Shareholders shall have the right to purchase the applicable Shares in accordance with their Percentage Interests of Common Shares, among themselves, or in such other percentages as they may unanimously agree. If not all of the Other Shareholders exercise their options with respect to the applicable Shares, then those Other Shareholders exercising their options shall be entitled to purchase the balance in accordance with their Percentage Interests among themselves, or in such other percentages as they may unanimously agree.

        **(ii)**    In the event that the Other Shareholders shall fail to exercise their options as to all of the Shares which are sought to be so involuntarily Transferred, then the Company shall have the second option to purchase any or all of such remaining Shares of the applicable Class of Shares, at the price and upon the other terms and conditions set forth below. If the Company purchases any of such Shares pursuant to this option, all of such purchased Shares shall be immediately distributed and reissued to the Other Shareholders on a prorata basis in accordance with their respective Percentage Interests.

        **(iii)**    Whenever a Transferring Shareholder's Shares shall be subject to an option under this Section 5.4, substantially simultaneous notice of the option shall be given in writing by the Transferring Shareholder (or by the Transferring Shareholder's personal representative, heir, or other representative) to the Company and to each of the Other Shareholders; *provided, however,* that if there is an attempted (or assertedly completed) involuntary Transfer and the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable), fails to give the foregoing notice of the option within **five (5) days** after written demand therefor by the Company or any Shareholder, then the Company or any Shareholder may give such notice on behalf of, and in the name of, the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable). Such notice shall state the number and Class of Shares which is are subject to the attempted (or assertedly completed) involuntary transfer. The option period with respect to the

option given the Other Shareholders shall commence upon the last date of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **30 days** thereafter, unless sooner terminated by written refusal of all of the Other Shareholders to exercise such option. The option period with respect to the option given the Company shall commence upon the last day of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **60 days** thereafter. An election to exercise any option shall be made in a written instrument delivered to the Transferring Shareholder (or to such Transferring Shareholder's personal representative, heir, or other representative). Unless otherwise specified in the notice of exercise, *(A)* any exercise of an option under this Section 5.4 shall be deemed to be effective as to the maximum number of Shares of the Transferring Shareholder which such holder is eligible to purchase pursuant to exercise of such option (which could be all of the Shares of the Transferring Shareholder then subject to the options granted under this Section 5.4 if no other option holder exercises such holder's option with respect to such Shares), *and (B)* the exercise of any option by the Company shall only be effective as to any Shares sought to be involuntarily Transferred as to which none of the Other Shareholders has exercised its option under this Section 5.4,. Any exercise of an option granted under this Section 5.4 shall be irrevocable once made *unless* revocation of such option is permitted by written consent of the Board of Directors.

      **(iv)**    If, notwithstanding the provisions of this Resolution, any Shares are Transferred by involuntary means without compliance with the foregoing provisions of this Section 5.4, then the options referred to in this Section 5.4 shall be to purchase such Shares from the transferee(s).

    **(b)**    For purposes of this Section 5.4, the option purchase price for the Shares of a Transferring Shareholder to be purchased pursuant to the options shall be an amount equal to the Applicable Amount (as hereinafter defined) determined using the date of the notice of the attempted (or assertedly completed) involuntary Transfer as the Determination Date.

    **(c)**    The option purchase price for the portion of the applicable Shares of a Transferring Shareholder to be purchased by each purchasing Shareholder or the Company, as applicable, shall, at the option of such purchasing party, be paid either *(i)* in immediately available funds on the option closing date, *or (ii)* at least **20%** in immediately available funds on the option closing date, with the balance represented by a promissory note of such purchasing Shareholder or the Company, as applicable with respect to such Share(s), bearing interest at the Prime Rate (as hereinafter defined) *minus* **2%** and payable in not more than ten equal semi-annual installments of principal together with accrued interest.

    **(d)**    The option closing date with respect to the purchase of any Shares pursuant to the exercise of any option under this Section 5.4 shall occur on such date designated by the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, but in any event within **30 days** following the end of the option period during which such option could be exercised. On the option closing on the option closing date, the Transferring Shareholder (or other seller) shall transfer and assign to the purchaser(s) all of the Shares which are then required to be sold pursuant to exercise of the applicable option, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee (other than the Company) shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares or their subsequent Transfer. At the option closing, the Transferring Shareholder (or other seller) shall execute such instruments of assignment as shall be reasonably requested by each purchaser. If the Transferring Shareholder (or other seller) fails to execute such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Resolution or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 5.4(d) if such party is a Transferring Shareholder (or other seller) under this Section 5.4 and fails to do so. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it.

    **(e)**    Upon the failure of the Other Shareholders and/or the Company to purchase all of the Shares sought to be involuntarily transferred in accordance with this Section 5.4, the unpurchased Shares may be involuntarily transferred. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a "Shareholder" for purposes thereof.

    **(f)**    For all purposes of this Resolution, **"Applicable Amount"** as of any Determination Date with respect to the applicable Shares of the applicable Shares of the Transferring Shareholder to be purchased and sold pursuant to the options shall mean an amount determined as follows:

      **(i)**    If the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 5.4 shall agree upon an amount to constitute the Applicable Amount with respect to such purchase and sale of Shares, such agreed price shall constitute the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares (the **"Contemporaneously Agreed Price"**).

(ii)     If the purchasing and selling parties with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 5.4 shall fail or neglect to agree upon a Contemporaneously Agreed Price with respect to such purchase and sale of Shares within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a Contemporaneously Agreed Price be agreed upon, then the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares shall be an amount equal to the Appraised Value (as hereinafter defined) of such Shares as of the applicable Determination Date (the applicable **"Determination Date"**.

(g)     For all purposes of this Section 5.4, the term **"Appraised Value"** with respect to any Shares as of any Determination Date shall mean an amount determined in the following manner:

(i)     Whenever the Appraised Value of any Shares of a Transferring Shareholder as of any Determination Date is required to be determined with respect to a purchase or sale of Shares pursuant to this Section 5.4, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall attempt to mutually agree upon a single appraiser to appoint to determine the fair market value of the applicable Shares of the Transferring Shareholder to be so purchased and sold. If such purchasing and selling parties fail or neglect to agree upon a single appraiser within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a single appraiser be agreed upon, then, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall each appoint a qualified appraiser within **15 days** thereafter to determine the fair market value as of such Determination Date of the applicable Shares of the Transferring Shareholder to be purchased and sold.

(ii)     If a single appraiser is agreed upon by the purchasing and selling parties, such appraiser shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder within **30 days** following the date of such appraiser's engagement to render such appraisal (or within such reasonably longer period as may be required by such appraiser, and the Appraised Value of such Shares shall conclusively be deemed to be the value determined by such appraiser.

(iii)     If two appraisers are appointed, each of the two appraisers shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder to be purchased and sold within **30 days** following the close of the **15-day** period referred to in Section 5.4(g)(i) above (or within such reasonably longer period as may be agreed upon by the two appraisers), each of which determinations shall be delivered to the purchasing and selling parties. If the two appraisals differ by **10% or less** of the higher appraisal, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the average of such two appraisals. If the two appraisals differ by **more than 10%** of the higher appraisal, the two appraisers shall, within **10 days** after delivery to the purchasing and selling parties of the second to be delivered of the two appraisals, appoint a third qualified appraiser who shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder within **30 days** following such third appraiser's appointment. In such event, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the middle appraisal of the three appraisals. If the first two appraisers are unable to agree upon a third appraiser within such **10 day** period, then any party may petition any court of competent jurisdiction to appoint the third appraiser (the first such valid petition filed to be the one effective for such purpose).

(iv)     If either the purchasing party or parties, on the one hand, *or* the selling party, on the other hand, shall fail to timely appoint its appraiser, or if the appraisal prepared by either party's designated appraiser shall not be provided to the other party within the applicable time period set forth in Section 5.4(g)(iii) above, then such defaulting party or parties shall be deemed to have forfeited its or their right to an appraisal and the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the appraisal of the appraiser appointed by the other party or parties, as the case may be.

(h)     For all purposes of this Resolution, the term **"Prime Rate"** with respect to any period shall mean the average base rate on corporate loans posted by at least **75%** of the **30** largest banks in the United States as being in effect during such period, as published in *The Wall Street Journal* or reported by any reliable internet-based service (or such reasonably comparable average interest rate as may be readily available if such average interest rate is not readily available in *The Wall Street Journal* or on any such internet-based service), as such average interest rate may change from time to time during such period.

### 5.5     Death, Incompetency, Etc. of a Shareholder; Gifts; Transfers To Affiliates

(a)     In the event of the death, bankruptcy or adjudication of incapacity or incompetence of a Shareholder, the personal representative, heirs, legatees and devisees of the Shareholder, as the case may be, shall have all of the rights of an assignee and Shareholder with respect to the Shares transferred thereby to such successor-in-interest (*subject, however, to* the Share purchase provisions of any applicable employment or engagement agreement, if any, between the Shareholder and the Company and/or any of the Company's subsidiaries). In all of the above cases, the successor-in-interest to the Shareholder shall not have any right to demand any payment or compensation with respect to the Shares by reason of any diminution or asserted diminution in value, or other damages or losses, by reason of any loss of voting rights or restrictions on Transfer with respect to such Shares. In such event, such successor-in-interest of any such Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares. In such event, the successor-in-interest shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the successor-in-interest of the provisions of this Resolution as a "Shareholder" for purposes thereof.

(b)   With the prior consent of the Board of Directors, which consent shall not be unreasonably withheld, conditioned, or delayed, any Shareholder may Transfer all or any part of such Shareholder's Shares to the Company and/or any subsidiary of the Company, to another Shareholder of the Company and/or any subsidiary of the Company at such time, or to an Affiliate of the transferring Shareholder if the proposed transferee is willing to accept such Transfer. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a "Shareholder" for purposes thereof.

**ARTICLE
6**

**GENERAL**

**6.1    Amendment and Termination**

(a)   *Except* as provided in Section 6.1(b) below, this Resolution may be modified or amended from time to time only in accordance with the terms and conditions set forth in a written resolution adopted by the holders of at least **80%** of the voting Common Shares of the Company at such time (*and, thus, excluding* the Class B Nonvoting Preferred Shares).

(b)   In the event that the Company and/or any subsidiary of the Company shall issue additional Shares or other equity interests (**"New Shares"**) for the reasons set forth in Section 2.3(a) (whether or not such New Shares will be sold and issued to a Person who is already then a Shareholder of the Company and/or any subsidiary of the Company, or to any Affiliate of any such Person), the Board of Directors of the Company may, in good faith and without the vote of any of the Shareholders, amend this Resolution and the Governing Instruments of the Company and/or any of the Subsidiaries to such extent as is reasonably necessary or appropriate *(i)* to facilitate and provide for the issuance of such New Shares and the implementation of the rights and privileges to which the holders of such New Shares are entitled, *(ii)* to provide for the inclusion of such New Shares and their holders in the various definitions, descriptions, and concepts regarding Shares, Shareholders, Shareholders, Classes of Shares, Classes of Shareholders, Percentage Interests, meetings, management, and similarly general definitions, descriptions, and concepts, *and/or (iii)* to provide for the adoption and execution of this Resolution (as amended) by the holders of such New Shares; *provided, however,* any other provision of this Resolution which might be construed to the contrary, any amendment of the provisions of Section E(1)(b) of this Resolution pursuant to this Section 6.1(b) will only be permitted if such amendment still empowers any Shareholder who holds **15%** or more of the issued and outstanding Shares of the Company in the aggregate (*other than and excluding* any Class B Nonvoting Preferred Shares) to elect or appoint at least one Director of the Company *unless and until* a Liquidity Event occurs.

**6.2    Rules of Usage**

The following rules of usage shall apply to this Resolution, unless otherwise required by the context or unless otherwise defined therein:

(a)   Except as otherwise expressly provided, the use of any gender in this Resolution shall include all other genders, the singular shall include the plural, and the plural shall include the singular, as the context may require.

(b)   Except as otherwise expressly provided, references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits in or to this Resolution. Any annexes, appendices, schedules, and exhibits to this Resolution are incorporated into this Resolution by reference at the point where first mentioned and are expressly made a part of this Resolution, and any or all of such annexes, appendices, schedules, attachments, and exhibits to this Resolution may be bound separate from, or otherwise separated from, the other portions of this Resolution for reasons of convenience or otherwise without affecting the validity of this Resolution or the treatment of any such annexes, appendices, schedules, attachments, or exhibits as being a part of this Resolution.

(c)   The captions, headings, subheadings, indices, and table of contents used in this Resolution are solely for convenience of reference and shall not constitute a part of this Resolution or affect in any way the meaning, interpretation, construction or effect of any provision of this Resolution.

(d)   Except as otherwise expressly provided, reference to any agreement means such agreement as amended, modified, extended or supplemented from time to time in accordance with the applicable provisions thereof.

(e)   Except as otherwise expressly provided, references to any law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement thereof.

**(f)**    When used in this Resolution, words such as "hereunder", "hereto", "hereof" and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Resolution and not to any particular article, section, subsection, paragraph or clause hereof.

**(g)**    References to "including" means including without limiting the generality of any description preceding such term and, thus, the rule of *ejusdem generis* shall not be applicable with respect to this Resolution.

**(h)**    Except as otherwise expressly provided or clearly indicated by context, reference herein to "days," "months," "quarters," or "years" means calendar days, calendar months, calendar quarters, or calendar years.

*[End of General Terms and Conditions and Rights Designation Resolution]*

CASE NO. _____

# Exhibit B

(Shareholder Agreement)

# SHAREHOLDERS AGREEMENT

*Regarding*

# COOL PETROLEUM HOLDINGS LIMITED

*Effective Date: December 30, 2011*

# TABLE OF CONTENTS

*Shareholders Agreement of Cool Petroleum Holdings Limited*

## INITIAL PORTION TERMS AND CONDITIONS                                    Page

**A.    PARTIES** ........................................................................................................... 1
(1)    The Company ........................................................................................... 1
(2)    Blue Equity ............................................................................................... 1
(3)    Cool Corp. ............................................................................................... 1
(4)    Issa .......................................................................................................... 1
(5)    Hendrick ................................................................................................... 1
(6)    Kennedy ................................................................................................... 1
(7)    Luminus ................................................................................................... 1
(8)    CPMIC ...................................................................................................... 1
(9)    Davis ........................................................................................................ 1
(10)   CIHL ......................................................................................................... 1

**B.    THIS AGREEMENT** ......................................................................................... 2
(1)    Agreement; Effective Date ....................................................................... 2
(2)    Two Portions of Agreement ...................................................................... 2

**C.    BUSINESS** ...................................................................................................... 2
(1)    BUSINESS ................................................................................................ 2

**D.    CURRENT SHARES OF THE COMPANY** ....................................................... 2
(1)    Classes of Shares .................................................................................... 2
(2)    Restrictions on Transfer ........................................................................... 3
(3)    Additional Capital ..................................................................................... 3

**E.    DISTRIBUTIONS** ............................................................................................. 3
(1)    Distributions of Net Cash Flow Until Class B Base Payback Is Achieved ......... 3
(2)    Distributions of Net Cash Flow After Class B Base Payback Is Achieved and Until Class A Base Payback Is Achieved ....... 3
(3)    Distributions of Net Cash Flow After Both Class B Base Payback And Class A Base Payback Are Achieved And Until Both Class A Return Payback and Class B Return Payback Are Achieved ................... 4
(4)    Distributions of Net Cash Flow After Both Class A Return Payback and Class B Return Payback Are Achieved ................ 5
(5)    Distributions of Net Proceeds From a Liquidity Event Until Class A Base Payback Is Achieved ........................... 5
(6)    Distributions of Net Proceeds From a Liquidity Event After Class A Base Payback Is Achieved and Until Class B Base Payback Is Achieved ........................................................................ 5
(7)    Distributions of Net Proceeds From a Liquidity Event After Both Class A Base Payback and Class B Base Payback Are Achieved and Until Both Class A Return Payback And Class B Return Payback Are Achieved ................. 5
(8)    Distributions of Net Proceeds From a Liquidity Event After Both Class A Return Payback and Class B Return Payback Are Achieved ................................................................................. 6
(9)    Definition of Class A Base Payback ......................................................... 6
(10)   Definition of Class B Base Payback ......................................................... 6
(11)   Definition of Class A Return Payback ...................................................... 7
(12)   Definition of Class A Outstanding Balance ............................................. 7
(13)   Definition of Class B Return Payback ...................................................... 7
(14)   Definition of Class B Outstanding Balance ............................................. 7
(15)   Conversion of Class A Preferred Shares to Common Shares Upon a Liquidity Event .......... 7
(16)   General Provisions Regarding Distributions ............................................ 7

**F.    MANAGEMENT** ............................................................................................... 7
(1)    Board of Directors .................................................................................... 7
(2)    Subsidiary Board of Directors .................................................................. 10
(3)    No Authority for Shareholders to Manage ............................................... 10
(4)    Officers .................................................................................................... 10
(5)    Management In Accordance With Approved Budgets .............................. 10

**G.    SHARED INFORMATION AND SERVICES** ..................................................... 11
(1)    Shared Information ................................................................................... 11
(2)    Shared Services Agreement ..................................................................... 11

H.    INITIAL ADDRESSES FOR NOTICES ................................................................................................ 11

I.     APPLICABILITY AND SCOPE OF RESTRICTED COMPETITION AND RESTRICTED SOLICITATION COVENANTS ........ 13
    (1)   Cool Corp Restricted Parties ...................................................................................................... 13
    (2)   Blue Petroholdings Restricted Parties ......................................................................................... 13
    (3)   Cool Corp Restricted Competition Period and Cool Corp Restricted Solicitation Period ................... 14
    (4)   Blue Petroholdings Restricted Competition Period and Blue Petroholdings Restricted Solicitation Period ...... 14
    (5)   Restricted Area ......................................................................................................................... 14
    (6)   Cool Corp Permitted Activities .................................................................................................... 14
    (7)   Blue Petroholdings Permitted Activities ...................................................................................... 14

## GENERAL TERMS AND CONDITIONS  Page

**1 DEFINITIONS** ........................................................................................................................... **15**
    1.1   Certain Definitions ..................................................................................................................... 15
    1.2   Accounting Terms ...................................................................................................................... 17

**2 NAME AND OFFICE** .................................................................................................................... **17**
    2.1   Name ........................................................................................................................................ 17
    2.2   Assumed Name Certificates ....................................................................................................... 17
    2.3   Registration as a Foreign Limited Liability Company in Other Jurisdictions ................................... 17
    2.4   Principal Office .......................................................................................................................... 17

**3 PURPOSES AND TERM** .............................................................................................................. **18**
    3.1   Purposes ................................................................................................................................... 18
    3.2   Company's Power ....................................................................................................................... 18

**4 CAPITAL** .................................................................................................................................... **18**
    4.1   No Liability of Shareholders ....................................................................................................... 18
    4.2   Loans ........................................................................................................................................ 18
    4.3   Percentage Interest Definition .................................................................................................... 18
    4.4   Additional Capital Contributions ................................................................................................. 19
    4.5   No Interest on Capital Contributions ........................................................................................... 20

**5 ACCOUNTING** ........................................................................................................................... **20**
    5.1   Books and Records .................................................................................................................... 20
    5.2   Fiscal Year ................................................................................................................................ 20
    5.3   Reports ..................................................................................................................................... 20
    5.4   Shareholder's Request for Additional Information ........................................................................ 20
    5.5   Accounting ................................................................................................................................ 20

**6 BANK AND OTHER DEPOSITORY ACCOUNTS** ........................................................................... **21**
    6.1   Bank and Other Depository Accounts .......................................................................................... 21

**7 DISTRIBUTIONS** ........................................................................................................................ **21**
    7.1   Distributions of Net Cash Flow and Net Proceeds From Liquidity Events ....................................... 21

**8 MANAGEMENT** .......................................................................................................................... **21**
    8.1   Management In General ............................................................................................................. 21
    8.2   Number, Election and Term of Directors ...................................................................................... 22
    8.3   Removal and Resignation of Directors; Vacancies ........................................................................ 22
    8.4   Meetings of the Board of Directors; Quorum and Voting Requirements .......................................... 22
    8.5   Committees ............................................................................................................................... 23
    8.6   Approved Budgets ..................................................................................................................... 23
    8.7   Meetings of the Shareholders ..................................................................................................... 24
    8.8   Participation in Meetings Through Electronic Means; Proxies ....................................................... 25
    8.9   Action by Written Consent .......................................................................................................... 25
    8.10  Officers and Chairperson(s) of the Board .................................................................................... 25
    8.11  Standard of Care of Directors and Officers; Disclaimers and Exculpations ..................................... 27
    8.12  Indemnification of Directors, Officers, and Shareholders .............................................................. 28
    8.13  Confidentiality and Nondisparagement Covenants ....................................................................... 29
    8.14  Key Man Life and Disability Insurance ....................................................................................... 30
    8.15  Effect of Equity Issuances Pursuant to Section 4.4 ..................................................................... 30
    8.16  Restricted Competition and Restricted Solicitation Covenants ...................................................... 30

**9 WITHDRAWAL, ASSIGNMENT AND ADDITION OF SHAREHOLDERS** .................................................. 33
   9.1   Assignment of Shares ................................................................................................................... 33
   9.2   Tag Along and Drag Along Rights ................................................................................................ 33
   9.3   Voluntary Transfers By Certain Minority Common Shareholders ................................................ 33
   9.4   Involuntary Transfers .................................................................................................................... 35
   9.5   Death, Incompetency, Etc. of a Shareholder; Gifts; Transfers To Affiliates ............................... 37
   9.6   Admission of New Shareholder ..................................................................................................... 38

**10 DURATION, TERMINATION, ARBITRATION, AND REMEDIES** ..................................................... 38
   10.1   Duration and Termination ............................................................................................................ 38
   10.2   Automatic Termination ................................................................................................................. 38
   10.3   Rights and Remedies ................................................................................................................... 38
   10.4   Alternative Dispute Resolution Procedures ................................................................................ 38

**11 GENERAL** ............................................................................................................................................ 40
   11.1   Ratification and Incorporation By Reference of ROFO/ROFR Options ...................................... 40
   11.2   Notices ......................................................................................................................................... 40
   11.3   Amendment and Termination ....................................................................................................... 41
   11.4   Governing Law; Jurisdiction ........................................................................................................ 41
   11.5   Entire Agreement ........................................................................................................................ 41
   11.6   Controlling Agreement ................................................................................................................. 41
   11.7   No Partnership or Agency ............................................................................................................ 42
   11.8   No Waiver ..................................................................................................................................... 42
   11.9   Binding Agreement; Successors and Assigns ............................................................................. 42
   11.10  Execution in Counterparts; Photocopies or Faxed, Scanned, or Emailed Copies. ................... 42
   11.11  Severability ................................................................................................................................. 42
   11.12  Further Assurances .................................................................................................................... 42
   11.13  Rules of Usage ........................................................................................................................... 42
   11.14  Waiver of Right of Partition ......................................................................................................... 43
   11.15  Legend on Stock Certificates ..................................................................................................... 43

**12 REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PARTIES** ............................... 43
   12.1   Representations, Warranties and Covenants of the Shareholders .............................................. 43

# INDEX OF DEFINED TERMS

*Shareholders Agreement of Cool Petroleum Holdings Limited*

Each of the following terms is defined at the page of this Agreement so indicated:

ADR ....................................................................39
Affiliate ..............................................................15
Agreement ..........................................................2
Alternative Dispute Resolution Provisions..............38
Amended Proposed Budget ...................................24
Applicable Amount ...............................................36
Appraised Value ..................................................36
Approved Budget ..................................................24
Arbitratable Matter ...............................................38
Blue ......................................................................7
Blue Back-Office Services .....................................16
Blue Equity ...........................................................1
Blue Equity Fee ...................................................16
Blue Petroholdings Permitted Activities...................14
Blue Petroholdings Restricted Competition Period ...14
Blue Petroholdings Restricted Parties ....................13
Blue Petroholdings Restricted Solicitation Period......14
Board of Directors ................................................21
Budgeted Cash Reserve ........................................23
Budgeting Team ...................................................23
Business................................................................2
Businesses/Activities ...........................................28
CIHL ......................................................................1
Class A Base Payback ............................................6
Class A Outstanding Balance ...................................7
Class A Preferential Remaining Net Cash Flow ..........3
Class A Preferred Directors .....................................7
Class A Preferred Share ..........................................2
Class A Preferred Shareholder ................................1
Class A Preferred Shareholders ...............................1
Class A Preferred Shares .........................................2
Class A Return Component .......................................7
Class A Return of Investment Amounts .....................6
Class A Return Payback ...........................................7
Class B Base Payback .............................................6
Class B Nonvoting Preferred Share ..........................2
Class B Nonvoting Preferred Shares .........................2
Class B Outstanding Balance ....................................7
Class B Preferred Shareholder..................................1
Class B Preferred Shareholders ................................1
Class B Return Component .......................................7
Class B Return Payback ............................................7
Class of Shareholders ............................................15
Class of Shares ....................................................15
Classes of Shareholders ........................................15
Classes of Shares .................................................15
Common Directors ...................................................7
Common Share .......................................................2
Common Shareholder ...............................................1
Common Shareholders .............................................1
Common Shares .......................................................2
Company .................................................................1
Confidential Information .........................................29
Contemporaneously Agreed Price ...........................36
control .................................................................15
controlled by.........................................................15
Cool Corp ...............................................................1
Cool Corp Permitted Activities ...............................14
Cool Corp Restricted Competition Period ................13

Cool Corp Restricted Parties ..................................13
Cool Corp Restricted Solicitation Period .................13
Cool Oasis ..............................................................1
CPMIC ....................................................................1
CPMIC Back-Office Services ...................................16
CPMIC Fee ............................................................16
CPML ......................................................................1
Davis ......................................................................1
Determination Date ...............................................36
Director ..................................................................7
Directors .................................................................7
Disabled ................................................................22
Dispute .................................................................38
Drag-Along Rights .................................................33
Effective Date ..........................................................2
Fiscal Year ............................................................20
full meeting of the Shareholders.............................25
General Terms and Conditions .................................2
Germane Opportunity .............................................28
Governing Instruments ...........................................15
Hendrick ..................................................................1
IFRS ......................................................................17
Initial Address .......................................................11
Initial Portion ..........................................................2
IPO .........................................................................5
Issa .........................................................................1
Joint Consent Matter ...............................................7
Kennedy ..................................................................1
Liability .................................................................28
Liquidity Event ........................................................5
LPG .........................................................................2
Luminus ..................................................................1
Majority-in-Interest ................................................15
MZ Holdings ............................................................1
MZ Shared Services Agreement..............................16
Net Cash Flow .......................................................15
Net Proceeds .........................................................16
New Shares ...........................................................41
Notice ...................................................................40
Notices ..................................................................40
Offer .....................................................................33
Other Common Shareholders ..................................34
Other Shareholders ...............................................35
Parties.....................................................................1
Party .......................................................................1
Percentage Interest ...............................................18
Person ...................................................................17
Petro Products ........................................................2
Prime Rate .............................................................37
Proposed Budget ...................................................23
Proposed Business Plan.........................................23
Proposed Financial Budget ....................................23
Reffreger ................................................................7
Rejection Notice.....................................................24
Related Party .........................................................28
Restricted Area ......................................................14
Roth ........................................................................7
Sales Notice ..........................................................34
Selling Minority Shareholder ..................................33

Selling Shareholder(s) ...................................................33
Share Purchase Agreement...................................40
Shared LPG Activities..........................................2
Shareholder ..........................................................1
Shareholders ........................................................1
Shares ..................................................................2
Shares To Be Transferred....................................33
Significant Contract............................................10
Tag-Along Rights................................................33

Tag-Drag Shareholder.........................................33
Tag-Drag Shares..................................................33
Tax ......................................................................17
Tax Return...........................................................17
Taxes ...................................................................17
Transfer ...............................................................33
Transferring Shareholder.....................................35
under common control with ................................15

## SHAREHOLDERS AGREEMENT
## COOL PETROLEUM HOLDINGS LIMITED

**A. PARTIES**

The parties to this Agreement (collectively, the **"Parties"** and each individually, a **"Party"**) are as follows:

**(1)** The **"Company"** is:

**COOL PETROLEUM HOLDINGS LIMITED**
Pointe Seraphine, P.O. Box 195
Castries, St. Lucia
(The Company is a St. Lucia International Business Company)

**(2)** **"Blue Equity"** is the following or its designee:

**BLUE EQUITY PETROHOLDINGS, LTD.**
BESPOKE Corporate & Fiduciary Services Ltd.
Saint Lucia 1st Floor Financial Centre
No. 1 Bridge Street
Castries, St. Lucia W.I.
(Blue Equity is a St. Lucia International Business Company)

**(3)** **"Cool Corp"** is: :

**COOL CORP. LIMITED**
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
(Cool Corp is a Cayman Islands incorporated company)

**(4)** **"Issa"** is:

**JOSEPH ISSA**
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
(Issa is an individual residing in Ocho Rios, Jamaica)

**(5)** **"Hendrick"** is: :

**COLIN HENDRICK**

(Hendrick is an individual residing in Kingston, Jamaica)

**(6)** **"Kennedy"** is:

**GWEN KENNEDY**

(Kennedy is an individual residing in San Clemente, California)

**(7)** **"Luminus"** is: :

**LUMINUS CAPITAL PARTNERS LIMITED**
c/o Financial & Corporate Services Ltd.
1st Floor, Bourbon House
Bourbon Street
P.O. Box 1695
Castries, Saint Lucia
(Luminus is a St. Lucia International Business Company)

**(8)** **"CPMIC " "** is: :

**CARIBBEAN PROPERTY MANAGERS INTERNATIONAL CORP**
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
(CPMIC is a Panamanian corporation)

**(9)** **"Davis"** is:

**RODNEY DAVIS**

(Davis is an individual residing in Kingston, Jamaica)

**(10)** **"CIHL"** is: :

**COOL INTERNATIONAL HOLDINGS LIMITED**
c/o Trident Trust Company (BVI) Limited
Trident Chambers
PO Box 146
Road Town, Tortola, BVI
(CIHL is a British Virgin Islands incorporated company)

Blue Equity, Luminus, CPMIC, CIHL, and any other Persons subsequently holding Class A Preferred Shares, Class B Nonvoting Preferred Shares, or Common Shares of the Company, are hereinafter sometimes referred to collectively as the **"Shareholders"** and each individually as a **"Shareholder."** Blue Equity, Luminus, CIHL, and any other Persons subsequently holding Common Shares of the Company, are sometimes referred to collectively as the **"Common Shareholders"** and each individually as a **"Common Shareholder."** Blue Equity and any other Persons subsequently holding Class A Preferred Shares of the Company are sometimes referred to collectively the **"Class A Preferred Shareholders"** and each individually as a **"Class A Preferred Shareholder."** CPMIC and any other Persons subsequently holding Class B Nonvoting Preferred Shares of the Company are sometimes referred to collectively the **"Class B Preferred Shareholders"** and each individually as a **"Class B Preferred Shareholder."** Issa has beneficial control of Cool Corp, CIHL, CPMIC, **Cool Oasis Limited ("Cool Oasis")**, a Jamaican incorporated company, **MZ Holdings Limited**, a Jamaican company (**"MZ Holdings"**), **Caribbean Property Management Limited**, a Jamaican company (**"CPML"**) each of which directly or indirectly (through one or more Affiliates) engages in the Business (as hereinafter defined). Issa, Davis, Hendrick, and Kennedy are the sole shareholders of CIHL.

## B.  THIS AGREEMENT

**(1)  AGREEMENT; EFFECTIVE DATE**

This **Shareholders Agreement** ("**Agreement**") is entered into by the Parties, effective as of **December 30, 2011** (the "**Effective Date**").

**(2)  TWO PORTIONS OF AGREEMENT**

The text of this Agreement is divided into two parts: *(a)* this initial portion (Pages 1 through 14) which contains sections designated initially with letters (A, B, C, etc.)(the "**Initial Portion**"), *and (b)* the portion of this Agreement immediately following this Initial Portion, entitled and referred to as the "**General Terms and Conditions**" (Pages 15 Through 44), which contains Sections thereof initially designated with numbers (1, 2, 3, etc.). In the event of a conflict between any of the terms and conditions set forth in this Initial Portion of this Agreement and any of the General Terms and Conditions, the terms and conditions set forth in this Initial Portion of this Agreement shall govern.

## C.  BUSINESS

**(1)  BUSINESS**

The "**Business**" is the business carried on by the Company and/or the Company's subsidiaries of *(i)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to petroleum (excluding liquid petroleum gases ("**LPG**"), fuels, bio-fuels, lubricants, and related products and activities (collectively, "**Petro Products**") within, to, in, or from Jamaica, through retail, wholesale, commercial, and/or any other channels, *(ii)* selling, distributing, marketing, and/or exchanging from retail outlets located at or adjacent to the retail fuel stations owned, operated, controlled, licensed, or franchised by the Company and/or its Affiliates, empty, partially empty, or already filled LPG cylinders, canisters, bottles, and/or other such small LPG containers and/or selling from retail outlets LPG motor vehicle conversion kits and related equipment (collectively, the "**Shared LPG Activities**", and *(iii)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to grocery, convenience, sundry, and/or other consumer products to and through the gas station and/or convenience store retail channels owned, controlled, or otherwise managed or affiliated as a franchisee or otherwise by or with, the Company and/or the Company's subsidiaries, or to or through the wholesale, commercial, or other channels generally used by the Company and/or the Company's subsidiaries, *and (iv)* internet activities and other activities reasonably related to the foregoing. For the avoidance of doubt, nothing in clause (iii) or clause (iv) of the foregoing definition of the term "Business" shall be construed as restricting in any way the right of any Party or any Party's Related Party or Affiliate to sell, distribute, market, export, import, and otherwise deal in and with respect to grocery, convenience, sundry, and/or other consumer products through any retail, wholesale, commercial, and/or other channel (but, in such regard, the term "grocery, convenience, sundry, and/or other consumer products" shall not be construed as including any Petro Products or Shared LPG Activities).

## D.  CURRENT SHARES OF THE COMPANY

**(1)  CLASSES OF SHARES**

The issued and outstanding equity interests of the Company are divided into shares and currently consist of **three (3)** classes of shares (collectively, the "**Shares**") as follows:

**(a)  10 Class B Nonvoting Preferred Shares** (collectively, the "**Class B Nonvoting Preferred Shares**" and each individually a "**Class B Nonvoting Preferred Share**"), all of which Class B Nonvoting Preferred Shares are currently owned by CPMIC. The Class B Nonvoting Shares are nonvoting shares of the Company and are not convertible into Common Shares.

**(b)  500 Class A Preferred Shares** (collectively, the "**Class A Preferred Shares**" and each individually a "**Class A Preferred Share**"), which Class A Preferred Shares are currently owned by the following persons as follows:

| Class A Preferred Shareholder | Number of Class A Preferred Shares Owned |
|---|---|
| Blue Equity | 500 |

The Class A Preferred Shares are convertible into Common Shares upon a Liquidity Event as more fully set out in Section E below and under the Governing Instruments of the Company. The Class A Preferred Shares shall be voting shares of the Company.

**(c)  10,000 Common Shares** (collectively, the "**Common Shares**" and each individually a "**Common Share**"), which Common Shares are currently owned by the following Persons as

follows:

| Common Shareholder | Number of Common Shares Owned |
|---|---|
| CIHL | 5,195 |
| Blue Equity | 4,355 |
| Luminus | 450 |

In addition, by separate agreement, *(i)* Blue Equity has agreed to transfer up to another 150 Common Shares to Luminus depending upon the satisfaction of certain contingencies, *and (ii)* Blue Equity has control of all voting rights as to the 450 Common Shares initially issued to Luminus and will have voting rights as to any additional Common Shares transferred by Blue Equity to Luminus.

**(2) RESTRICTIONS ON TRANSFER**

The Class A Preferred Shares, Class B Nonvoting Preferred Shares, and Common Shares are subject to various options and restrictions on Transfer as set forth in Article 9.

**(3) ADDITIONAL CAPITAL**

Subject to the preemptive rights and other restrictions and limitations provided for under Section 4.4 of the General Terms and Conditions, additional capital may be raised by the Board of Directors at any time in exchange for the issuance of such additional Shares or other equity interests as the Board of Directors may deem advisable. Except as required pursuant to any Shareholder's exercise of such Shareholder's preemptive rights under Section 4.4 of the General Terms and Conditions, or required under any separate written agreement entered into by such Shareholder, no Shareholder of the Company shall be obligated to contribute to the Company any additional capital at any time, nor shall any Shareholder be obligated to loan the Company any funds at any time.

## E.  DISTRIBUTIONS

**(1) DISTRIBUTIONS OF NET CASH FLOW UNTIL CLASS B BASE PAYBACK IS ACHIEVED**

Until Class B Base Payback (as hereinafter defined) is achieved, 100% of the Net Cash Flow of the Company for each Fiscal Year of the Company shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each holder of the Class B Nonvoting Preferred Shares) in quarterly installments within 30 days following the end of each Fiscal Year during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter). Once Class B Base Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section E(1) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year.

**(2) DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS B BASE PAYBACK IS ACHIEVED AND UNTIL CLASS A BASE PAYBACK IS ACHIEVED**

After Class B Base Payback is achieved and until Class A Base Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Section E(1) above in order to achieve Class B Payback during such Fiscal Year, if applicable) (the **"Class A Preferential Remaining Net Cash Flow"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within 30 days following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and in the following order of priority. Should Class A Base Payback be achieved due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter, no further distributions of Net Cash Flow pursuant to this Section E(2) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year.

**(a)**     *First,* 85.9091% to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **4.0909%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **10%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(a) with respect to such Fiscal Year equal to *the lesser of (x)* **$1,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(b)**     *Second,* **81.1364%** to the holders of the Class A Preferred Shares (on a prorata basis in

accordance with the number of Class A Preferred Shares owned by each), **3.8636%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **15%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(b) and Section E(2)(a) above with respect to such Fiscal Year equal to *the lesser of (x)* **$2,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(c)**    *Third,* **76.3637%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **3.6363%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **20%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(c) and Sections E(2)(a) and E(2)(b)above with respect to such Fiscal Year equal to *the lesser of (x)* **$3,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(d)**    *Fourth,* **66.8182%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **3.1818%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **30%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(d) and Sections E(2)(a), E(2)(b), and E(2)(c) above with respect to such Fiscal Year equal to *the lesser of (x)* **$4,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(e)**    *Fifth,* **62.0455%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **2.9545%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **35%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), until a cumulative aggregate amount has been distributed pursuant to this Section E(2)(e) and Sections E(2)(a), E(2)(b), E(2)(c), and E(2)(d) above with respect to such Fiscal Year equal to *the lesser of (x)* the amount necessary to achieve Class A Base Payback, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(3)    DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS B BASE PAYBACK AND CLASS A BASE PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**    After both Class B Base Payback and Class A Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (as hereinafter defined) are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections E(1) and E(2) above in order to achieve Class B Base Payback and/or Class A Base Payback during such Fiscal Year, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within 30 days following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: *(i)* with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each) and **4.5454%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each). Once Class A Return Payback and Class B Return Payback have both been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section E(3) shall be required or made with respect to such Fiscal Quarter or with respect to any

subsequent Fiscal Quarter or Fiscal Year.

**(4) DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**

After both Class A Return Payback and Class B Return Payback are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections E(1), E(2), and E(3) above in order to achieve Class A Return Payback and Class B Return Payback during such Fiscal Year, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within 30 days following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter), in the following manner, as applicable:

**(a)** If the Class A Preferred Shares _have not been_ converted into Common Shares prior to the time of such distribution, then **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with their relative holdings of Class A Preferred Shares).

**(b)** If the Class A Preferred Shares _have been_ converted into Common Shares prior to the time of such distribution, then **100%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares as provided under Section E(15) below.

**(5) DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT UNTIL CLASS A BASE PAYBACK IS ACHIEVED**

Until Class A Base Payback is achieved, the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with *(i)* a sale or exchange of all or substantially all of the operating assets of the Company and/or the Company's subsidiaries, *(ii)* a merger or consolidation of the Company, *(iii)* an initial public offering ("**IPO**") by the Company of any equity interests, *(iv)* any sale or exchange of equity interests in the Company in any transaction as to which the Tag-Along Rights *or* Drag-Along Rights (as such terms are hereinafter defined) apply, *or (v)* any other liquidating, recapitalization, or other liquidity transaction with respect to the Company which results in payments or distributions of significant cash, notes, tradable securities (without regard to any Rule 144 or other temporary restrictions imposed on the sale of such securities) and/or other readily marketable tangible or intangible property to all Shareholders of the Company (without regard to any temporary restrictions imposed on the sale of such property) (any such transaction described in clauses (i), (ii), (iii), (iv), or (v), as applicable, being hereinafter sometimes referred to as a **"Liquidity Event,"** shall be authorized, if necessary, and distributed or paid, as a dividend, distribution, or otherwise, **95.4546%** to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), and **4.5454%** to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each). For the purposes of clarity, a Liquidity Event does not include a refinancing of the Bonds existing at the time of execution of this Agreement and/or the issuance of Preference Shares, but any excess proceeds, if any, from any such refinancing shall be taken into account in computing the Net Cash Flow for the Company.

**(6) DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS A BASE PAYBACK IS ACHIEVED AND UNTIL CLASS B BASE PAYBACK IS ACHIEVED**

After Class A Base Payback is achieved and until Class B Base Payback is achieved, **100%** of the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event after the distributions provided for under Section E(5) above are made shall be authorized, if necessary, and distributed or paid, as a dividend, distribution, or otherwise, to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each).

**(7) DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS A BASE PAYBACK AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**

After both Class A Base Payback and Class B Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (as such terms as hereinafter defined) are achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event after the distributions provided for under Sections E(5) and E(6) above are made shall be authorized, if necessary, and distributed or paid, as a dividend, distribution, or otherwise, on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: *(i)* with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each) and **4.5454%** of such allocable portion shall be distributed to the

holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each).

**(8)  DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**

After both Class A Return Payback and Class B Return Payback are achieved, then the remaining balance, if any, of the Net Proceeds from any Liquidity Event after the distributions provided for under Sections E(5), E(6), and E(7) above are made shall be distributed in the following manner, as applicable:

**(a)**   If the Class A Preferred Shares *have not been* converted into Common Shares prior to the time of such distribution, then **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with their relative holdings of Class A Preferred Shares).

**(b)**   If the Class A Preferred Shares *have been* converted into Common Shares prior to the time of such distribution, then **100%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares as provided under Section E(15) below.

**(9)  DEFINITION OF CLASS A BASE PAYBACK**

For all purposes of this Agreement, **"Class A Base Payback"** shall be achieved when both *(A)* the holders of the Class A Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections E(2) and/or E(5) above, equal to *the sum of (i)* **$9,500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class A Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (A)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class A Preferred Shares the amounts provided for under the foregoing clauses (A)(i) and (A)(ii)on a Tax-free basis; *and (B)* the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections E(2) and/or E(5) above, equal to *the sum of (i)* **$500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (B)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (B)(i) and (B)(ii)on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class A Preferred Shares and the Class B Nonvoting Preferred Shares). The amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(i) and/or (B)(i) above (but not the amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(iii) and/or (B)(iii) above) are hereinafter referred to, collectively, as the **"Class A Return of Investment Amounts"**.

**(10)  DEFINITION OF CLASS B BASE PAYBACK**

For all purposes of this Agreement, **"Class B Base Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections E(1) and/or E(6) above, equal to *the sum of (i)* **$2,000,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (i) and (ii) on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class B Nonvoting Preferred Shares).

| | |
|---|---|
| **(11) DEFINITION OF CLASS A RETURN PAYBACK** | For all purposes of this Agreement, **"Class A Return Payback"** shall be achieved when the holders of the Class A Preferred Shares and Class B Nonvoting Preferred Shares, collectively, shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections E(3) and/or E(7) above, an amount (the **"Class A Return Component"**) equal to an **8%** annual percentage rate of return, compounded annually, on the Class A Outstanding Balance (as hereinafter defined), as the Class A Outstanding Balance may change from time to time. For purposes of computing whether Class A Return Payback has been achieved, only the allocable portion of distributions made pursuant to the provisions of Sections E(3) and E(7) above which are stated to be in respect of the Class A Return Component shall be taken into account (and not the allocable portion of such distributions which are stated to be in respect of the Class B Return Component). |
| **(12) DEFINITION OF CLASS A OUTSTANDING BALANCE** | For all purposes of this Agreement, the term **"Class A Outstanding Balance"** as of any time shall mean *the sum of (i)* **$10,000,000.00 USD**, *minus (ii)* the total amount received by the holders of the Class A Preferred Shares and/or the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections E(2) and/or E(5) above through such time. |
| **(13) DEFINITION OF CLASS B RETURN PAYBACK** | For all purposes of this Agreement, **"Class B Return Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections E(3) and/or E(7) above, an amount (the **"Class B Return Component"**) equal to an **8%** annual percentage rate of return, compounded annually, on the Class B Outstanding Balance (as hereinafter defined), as the Class B Outstanding Balance may change from time to time. |
| **(14) DEFINITION OF CLASS B OUTSTANDING BALANCE** | For all purposes of this Agreement, the term **"Class B Outstanding Balance"** as of any time shall mean *the sum of (i)* **$2,000,000.00 USD**, *minus (ii)* the total amount received by the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections E(1) and/or E(6) above through such time. |
| **(15) CONVERSION OF CLASS A PREFERRED SHARES TO COMMON SHARES UPON A LIQUIDITY EVENT** | Upon *the later to occur of (x)* a Liquidity Event at any time after the achievement of Class A Return Payback or *(y)* the achievement of Class A Return Payback by reason of the receipt by the holders of the Class A Preferred Shares, in the aggregate on a cumulative basis, of Net Proceeds as a result of a Liquidity Event, the Class A Preferred Shares, as a class, shall automatically be converted into **936.84** Common Shares of the Company. |
| **(16) GENERAL PROVISIONS REGARDING DISTRIBUTIONS** | **(a)**     In determining the moment at which Class A Base Payback, Class B Base Payback, Class A Return Payback, or Class B Return Payback is achieved, distributions of Net Cash Flow available to be made at any time shall be made and taken into account before making and taking into account any distributions of Net Proceeds from Liquidity Events then available to be made. |
| | **(b)**     If the equity interests distributable as Net Proceeds to the equityholders of the Company as a result of any Liquidity Event involve both control or super-voting shares and non-control, non-voting, or lesser voting shares, then the equity interests receivable in respect of any Common Shares or Class A Preferred Shares then held by Blue Equity (or Blue Equity's successors or assigns) shall first be comprised of the control or super-voting shares to the extent possible before being comprised of any non-control, non-voting, or lesser voting shares. |
| | **(c)**     When Class B Return Payback is achieved, *(x)* all of the Class B Nonvoting Preferred Shares of the Company shall be conclusively deemed redeemed and retired by the Company, without requirement of any further payment by the Company, *(y)* the share certificate(s) and such instruments of transfer as the Company shall reasonably request shall be promptly executed and delivered to the Company by the holders of the Class B Nonvoting Preferred Shares, *and (z)* no further distributions of Net Cash Flow or other amounts shall be required to be made to the holders of the Class B Nonvoting Preferred Shares of the Company in such capacity. |

## F.   MANAGEMENT

| | |
|---|---|
| **(1) BOARD OF DIRECTORS** | Unless and until changed in accordance with the terms, conditions, and limitations of this Agreement or changed in connection with a Liquidity Event, in accordance with and subject to the terms and conditions of Article 8 and other applicable provisions of this Agreement: |
| | **(a)**     The Company and each of its subsidiaries shall be managed by a Board of Directors. |

**(b)** The Board of Directors of the Company and each of its subsidiaries shall consist of *(i)* up to **three (3)** Directors who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, Cool Corp (the "**Common Directors**"), *and (ii)* up to **five (5)** Directors who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, Blue Equity (the "**Class A Preferred Directors**"). The Class A Preferred Directors and the Common Directors of the Company and each subsidiary of the Company are hereinafter sometimes referred to collectively as the **"Directors"** and each individually as a **"Director"** of the Company or such subsidiary, as applicable. In addition, the Board of Directors may authorize other persons at any time and from time to time *(i)* to attend and participate, without any voting rights, in meetings of the Board of Directors, *(ii)* to receive any or all notices of meetings or proposed consent resolutions which are sent to the Directors, without any right to consent, approve, or otherwise act with respect to any such proposed consent resolution, *and/or (iii)* to have any or all of the same access to information about the Company and the Company's subsidiaries as the Directors are entitled to have, and the Board of Directors may and revoke or change any such authorization at any time. Such persons shall not be considered to be Directors of the Company or any subsidiary, shall have not voting or consent rights, and shall not be taken into account for purposes of determining any quorum.

**(c)** The initial Common Directors of the Company and each subsidiary of the Company appointed by the Common Shareholders are as follows:

> **Davis**,
> **Hendrick**, *and*
> **Kennedy**

**(d)** The initial Class A Preferred Directors and each subsidiary of the Company appointed by the Class A Preferred Shareholder(s) are as follows:

> **Jonathan S. Blue ("Blue")**,
> **David M. Roth ("Roth")**,
> **Terry L. Stapp**
> **John Owsley Cordt Huneke**, *and*
> **Juan Ignacio Reffreger ("Reffreger")**

**(e)** *Except* with respect to a Joint Consent Matter or as otherwise provided under Section F(1)(f) below, the affirmative vote or written consent of a majority-in-number of the Directors of the Company or any subsidiary of the Company, as the case may be, then in office shall govern with respect to any matter and be the act of the Board of Directors and the Company or such subsidiary of the Company, as applicable. With respect to any **Joint Consent Matter** as to the Company or any subsidiary of the Company, the written consent of both a minimum of the holders of **80%** of the of the Common Shares of the Company or such subsidiary, as applicable, and a majority-in-number of the Class A Preferred Directors of the Company or such subsidiary, as applicable, then in office, acting as a separate group, shall govern and be the act of the Board of Directors and the Company or such subsidiary, as applicable.

**(f)** Notwithstanding any other provision hereof which might be construed to the contrary, any Class A Preferred Director of the Company or any subsidiary of the Company may require at any time that a matter or issue be submitted to the Shareholders of the Company for decision, in which case the Board of Directors of the Company or such subsidiary, as the case may be, shall not be authorized to decide such matter or issue and any prior decision by such Board of Directors as to such matter or issue shall be rendered null and void *ab initio*. In such event, *except* with respect to a Joint Consent Matter, the affirmative vote or written consent of the holders of a majority of the then issued and outstanding Common Shares and Class A Preferred Shares, in the aggregate (but excluding any and all of the Class B Nonvoting Shares) of the Company or such subsidiary, as the case may be, shall govern with respect to any matter and be the act of the Company or such subsidiary of the Company, as applicable. With respect to any Joint Consent Matter as to the Company or any subsidiary of the Company which is submitted to the Shareholders of the Company or such subsidiary, as the case may be, the written consent of both the holders of no less than 80% of the then issued and outstanding Common Shares, voting as a separate group, and the holders of a majority of the Class A Preferred Shares of the Company, voting as a separate group, shall govern and be the act of the Company or such subsidiary, as applicable. The holders of the Class B Nonvoting Preferred Shares of the Company, in such capacity, shall not have a right to vote on any such matters.

**(g)** Unless stated to the contrary in this Agreement, any and all actions taken by the Board of

Directors and each class of Directors of the Company and each subsidiary of the Company shall be made in good faith and in a manner reasonably intended by them to enhance equityholder value with respect to the Company.

**(h)**     For all purposes hereof, each of the following matters shall constitute a **"Joint Consent Matter"** as to the Company or any subsidiary of the Company, as applicable:

**(i)**     The commingling or co-investing of the funds of the Company or any subsidiary of the Company with those of any other individual or entity other than the Company and/or the Company's subsidiaries (*see* Section 6.1 below).

**(ii)**     The fixing or changing of the compensation, if any, to be paid the Directors of the Company or any subsidiary of the Company in such Directors' capacities as such (*see* Section 8.1(d) below).

**(iii)**     Permitting any deviation from the limitations on Related Party transactions which are required under Section 8.11(e) below.

**(iv)**     The Company or any subsidiary of the Company engaging in any business activity outside the scope of the Business.

**(v)**     The issuance to employees, contractors, or other Persons, in consideration of services rendered, of any Shares and/or other equity interests, or options, warrants, or securities convertible by the Company and/or any of the Company's subsidiaries and/or the establishment of any employee stock ownership plan or similar employee benefit plan (*provided, however,* that none of Issa, Blue, or Roth may be a participant in such "phantom stock" plan or other such employee benefit plan *and provided further, however,* that if any such plan is established by the Company, Cool Corp on the one hand, and the Class A Directors acting as a separate group, on the other hand, shall each have the right to name the participants as to one-half of the interests authorized under such plan).

**(vi)**     Any prepayment of the bond indebtedness of the Company and/or the Company's subsidiaries that is not required under the terms and conditions of such bond indebtedness, *other than (A)* by use of the net proceeds received by the Company and/or any of the Company's subsidiaries in respect of a sale of the Rockfort pier, in respect of the issuance of the Class A Preferred Shares, and/or in respect of the issuance of the Class B Nonvoting Preferred Shares, *(B)* in connection with the refinancing or replacement of such bond indebtedness, *and/or (C)* in connection with a Liquidity Event.

**(vii)**     Any other matter or issue as to which the written consent of both a majority-in-number of the Common Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, is specifically and expressly required under this Agreement.

**(viii)**     The approval of any termination of, reduction or increase in, the Blue Equity Fees and/or the CPMIC Fees (as such terms are defined in Section 1.1(f)) payable by the Company.

**(ix)**     The change of the name of the Company to any name which contains the word "Blue".

**(x)**     The change in the definition of "Business."

**(xi)**     Payment of compensation in excess of **$180,000.00 per** year to any Chief Executive Officer who is not totally independent of, and unaffiliated with, Blue Equity prior to his or her appointment; *provided, however,* that if Blue is the Chief Executive Officer, the payment of *any* compensation to him therefor (other than indirectly by reason of the Blue Equity Fees for the Blue Back-Office Services) shall constitute a Joint Consent Matter. In such regard, the term "compensation" shall not be construed as including any reimbursements or indemnity payments.

**(xii)**     Any decision not to exercise the Company's right of first refusal under the Share Purchase Agreement with respect to any new Business Opportunity (as defined in the Share Purchase Agreement) as to which a Purchaser Restricted Party (as defined in the Share Purchase Agreement) gives a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company as required under the Share Purchase Agreement, but such decision shall only constitute a Joint Consent Matter if after considering, in good faith, all of the relevant facts and

circumstances at the time, it is reasonably ascertained that the Company would have the financial capability to take and consummate such Business Opportunity without depending on raising additional outside equity funds or incurring any level of additional debt which requires any personal guarantees or which the Board of Directors reasonably determines, in good faith, would be at a level that is not prudent for the Company to incur.

(2) **SUBSIDIARY BOARD OF DIRECTORS**

*Except* to the extent, if any, otherwise agreed to by both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group, the Board of Directors of each subsidiary of the Company, *including, but not limited to,* Cool Petroleum (St. Lucia) Limited, a St. Lucia international business company, and Cool Bio Diesel Limited, a Jamaican limited company, shall be automatically identical in its composition to the composition of the Board of Directors of the Company, as the same may change at any time and from time to time. The Company and its shareholders, Directors, and officers, as applicable, shall cause the Governing Instruments of each subsidiary of the Company to contain such provisions as are necessary to implement the foregoing requirement and as are necessary to require that each subsidiary of the Company operates in a manner subject to the Approved Budgets and otherwise substantially in accordance with the same governing and operating checks, balances, and internal controls as are provided for under this Agreement with respect to the Company (*other than* reflecting the Company as the sole shareholder and/or equityholder of each subsidiary other than any subsidiary which is not 100% owned by the Company or another subsidiary of the Company). If necessary for legal reasons, the Company and its shareholders, Directors, and officers, as applicable, shall cause each subsidiary of the Company to adopt and agree to the terms, conditions, and provisions of this Agreement in writing.

(3) **NO AUTHORITY FOR SHAREHOLDERS TO MANAGE**

Except indirectly through the power of certain Shareholders to elect, remove, and/or replace certain Directors as set forth above, none of the Shareholders, in their capacity as Shareholders, shall have the power or authority to control the actions of, or act on behalf of, the Company and/or any subsidiary of the Company.

(4) **OFFICERS**

Unless and until changed by the Board of Directors, the following shall be the duly authorized officers of the Company and each subsidiary of the Company, and, *subject to* the terms and conditions of this Agreement and *except* as otherwise provided under this Agreement, they shall have such powers, authority, duties, and obligations as are set forth in Section 8.10:

| Office(s) | Name of Officer |
| --- | --- |
| Chairman, Chief Executive Officer, and Treasurer | Blue |
| Vice Chairman, Chief Legal Officer, and Assistant Secretary | Roth |
| President | [Vacant] |
| Managing Director (With Such Portfolio As the Chairman May Determine) | Whittingham |
| Group CFO | Davis |
| Vice President | Gojman |
| Chief Operating Officer | Hendrick |
| General Counsel | Kennedy |

(5) **MANAGEMENT IN ACCORDANCE WITH APPROVED BUDGETS**

(a)     The Directors and officers of the Company and each of the Company's subsidiaries shall use their reasonable efforts in good faith to manage the Company and the Company's subsidiaries substantially in accordance with Approved Budgets (as defined in Section 8.6 of the General Terms and Conditions of this Agreement) and any variances therefrom to the extent deemed advisable from time to time by the Company's Board of Directors, Thus, decisions of the Board of Directors and the officers of the Company and each of the Company's subsidiaries, as well as decisions of any mediator, arbitrator, judge, or jury considering any issue with respect to the Company, the Company's subsidiaries, and/or their operations shall be generally guided by the intention of achieving the results set forth in the Approved Budgets to the extent applicable; *provided, however,* that nothing in this Section F(5) shall be construed as a representation, warranty, or guaranty by any Party to this Agreement that the results of the Approved Budgets will, in fact, be achieved by the Company and/or the Company's subsidiaries, and none shall be construed as limiting the discretion of the Board of Directors of the Company and/or any subsidiary of the Company in any way as to decisions regarding whether to increase the borrowings of the Company and/or any subsidiary or whether to seek additional capital contributions for the benefit

of the Company and/or the Company's subsidiaries.

**(b)**     Except to the extent already contemplated in an Approved Budget, any proposed Contract which would obligate the Company and/or any subsidiary of the Company to the expenditure of more than **$100,000.00 USD** within any consecutive **12-month period** (each, a **"Significant Contract"**) shall be presented to the Board of Directors, and be subject to the approval of the Board of Directors of the Company and/or such subsidiary of the Company, before being executed by any officer. Furthermore, unless determined by the Chairman not to be reasonably feasible because of timing or logistics, formal or informal notice of any proposed Significant Contract which is already contemplated in an Approved Budget shall be given to all of the Directors at least **seven (7) days** prior to being executed by any officer.

## G.   SHARED INFORMATION AND SERVICES

**(1)** **SHARING OF INFORMATION**

To the fullest extent permitted by applicable law, Cool Corp hereby agrees *(i)* to share, and cause its Affiliates to share, on a timely basis, with the Company and the Company's subsidiaries all material information and data any of them have, obtain, or develop regarding the Business, *and (ii)* to coordinate, and cause its Affiliates to coordinate, pricing and other business decisions and strategies with the Company and the Company's subsidiaries so as not to adversely affect the operations of Cool Corp and the Company and/or the Company's subsidiaries.

**(2)** **SHARED SERVICES AGREEMENT**

The Company and/or the Company's subsidiaries, as applicable, and Cool Corp and Cool Corp's Affiliates, as applicable, shall attempt in good faith to negotiate and enter into a written shared services agreement under which synergies and cost savings available between them with respect to their respective Business operations may be realized, it being the intention of the parties to thereby enhance equityholder value with respect to the Company upon a future sale, initial public offering, merger, consolidation, or other such transaction.

## H.   INITIAL ADDRESSES FOR NOTICES

Unless and until changed by any Party, the **"Initial Address"** for each Party for purposes of Section 11.2 of this Agreement shall be the postal address set forth for such Party in Section A above and/or, as applicable as to any other permitted method of transmission, such other contact information as is set forth below as to such Party (*including, but not limited to,* any copy requirements provided for below; *provided, however,* satisfying the copy requirement alone with respect to any Party without also satisfying the primary notice requirement as to such Party shall not constitute effective notice for purposes of this Agreement):

*As To the Company:*

Cool Petroleum Holdings Limited
c/o Blue Equity, LLC
333 East Main Street, Suite 200
Louisville, Kentucky 40202
Attention: Jonathan S. Blue, Chairman

Tel: (502) 589-8181
Fax: (502) 588-7150
Email: jblue@blueequity.com

*With a Copy To:*

David M. Roth
David M. Roth, P.S.C.
2225 Douglass Blvd.
 Louisville, Kentucky 40205-1903

Tel: (502) 548-1990
Fax: (502) 451-1805
Email: droth@rothworld.net

**As To Blue Equity:**

Blue Equity Petroholdings, Ltd.
c/o Blue Equity, LLC
333 E. Main Street, Suite 200
Louisville, Kentucky 40202
Attention: Jonathan S. Blue, Chairman

Tel: (502) 589-8181
Fax: (502) 588-7150
Email: jblue@blueequity.com

**As To Cool Corp:**

Cool Corp. Limited
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
Attention: Joseph Issa

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

**As To Issa:**

Joseph Issa
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

**As To Hendrick:**

Colin Hendrick



Tel: (876) 433-8866
Fax: (____) _____
Email: colin.hendrick@gmail.com

**As To Kennedy:**

Gwen Kennedy

Tel: (949) 481-0112
Fax: (____) _____
Email: wkcantab@cantab.net

*With a Copy To:*

David M. Roth
David M. Roth, P.S.C.
2225 Douglass Blvd.
Louisville, Kentucky 40205-1903

Tel: (502) 548-1990
Fax: (502) 451-1805
Email: droth@rothworld.net

### As To Luminus:

Luminus Capital Partners Limited
c/o Financial & Corporate Services Ltd.
1st Floor, Bourbon House
Bourbon Street
P.O. Box 1695
Castries, Saint Lucia
Attention: Steven Whittingham and Mauricio Gojman, Directors

Tel: (305) 794-7933 & (876) 452-9835
Fax: (____) _____
Email: steven.whittingham@gmail.com and
mgojman@gmail.com

### As To CPMIC:

Caribbean Property Managers
International Corp
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

**With a Copy To:**

Joseph Issa
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

### As To Davis:

Rodney Davis
████████████████

Tel: (____) _____
Fax: (____) _____
Email: _____

### As To CIHL:

Cool International Holdings Limited
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

**With a Copy To:**

Gwen Kennedy
████████████████████

Tel: (949) 481-0112
Fax: (____) _____
Email: wkcantab@cantab.net

## I.   APPLICABILITY AND SCOPE OF RESTRICTED COMPETITION AND RESTRICTED SOLICITATION COVENANTS

**(1)  COOL CORP RESTRICTED PARTIES**

For all purposes of this Agreement, the term **"Cool Corp Restricted Parties"** shall mean each and every one of the following Persons: *(i)* Cool Corp, *(ii)* CPMIC, *(iii)* Issa, *(iv)* Hendrick, *(v)* Davis, *(vi)* Kennedy, *(vii)* CIHL, *and (viii)* any Affiliates of any of the foregoing.

**(2)  BLUE PETROHOLDINGS RESTRICTED PARTIES**

For all purposes of this Agreement, the term **"Blue Petroholdings Restricted Parties"** shall mean each and every one of the following Persons: *(i)* Blue Equity, *(ii)* Luminus, and *(iii)* any Affiliates of any of the foregoing, but only while Blue Equity or an Affiliate of Blue Equity owns an interest in the Company.

**(3)  COOL CORP RESTRICTED COMPETITION PERIOD AND COOL**

For all purposes of this Agreement, the terms **"Cool Corp Restricted Competition Period"** and **"Cool Corp Restricted Solicitation Period"** shall each mean the period beginning on

| | | |
|---|---|---|
| | **CORP RESTRICTED SOLICITATION PERIOD** | the Effective Date and ending on *the later of (i)* the **fifth (5th) anniversary** of the Effective Date of this Agreement, or *(ii)* the first date on which none of the Cool Corp Restricted Parties beneficially owns or controls any shares or other securities of the Company. |
| **(4)** | **BLUE PETROHOLDINGS RESTRICTED COMPETITION PERIOD AND BLUE PETROHOLDINGS RESTRICTED SOLICITATION PERIOD** | For all purposes of this Agreement, the terms **"Blue Petroholdings Restricted Competition Period"** and **"Blue Petroholdings Restricted Solicitation Period"** shall each mean the period beginning on the Effective Date and ending on *the later of (i)* the **fifth (5th) anniversary** of the Effective Date of this Agreement, or *(ii)* the first date on which none of the Blue Petroholdings Restricted Parties beneficially owns or controls any shares or other securities of the Company. |
| **(5)** | **RESTRICTED AREA** | For all purposes of this Agreement, the term **"Restricted Area"** shall mean anywhere within Jamaica. |
| **(6)** | **COOL CORP PERMITTED ACTIVITIES** | For all purposes of this Agreement, the term **"Cool Corp Permitted Activities"** shall mean the current activities and operations of Cool Corp and its Affiliates as of the Effective Date of this Agreement; *provided, however,* that any expansion of, or opportunity to expand, the number of stations and/or other facilities owned, licensed, leased, or otherwise operated and/or otherwise dealt in or with respect to by Cool Corp and/or its Affiliates, by acquisition, exchange, lease, license, or otherwise, and any other new Business Opportunity (as defined in the Share Purchase Agreement) with respect to the Jamaica Business (as defined in the Share Purchase Agreement) as to which a Cool Corp Restricted Party is required to give a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company, shall, pursuant to the terms and conditions set forth in Section I(1) of the Share Purchase Agreement, be subject to a right of first refusal option by the Company which, if not exercised by the Company, may be taken by Cool Corp and/or its Affiliates and, if so taken, shall constitute part of the Cool Corp Permitted Activities. |
| **(7)** | **BLUE PETROHOLDINGS PERMITTED ACTIVITIES** | For all purposes of this Agreement, the term **"Blue Petroholdings Permitted Activities"** shall mean any new Business Opportunity (as defined in the Share Purchase Agreement) with respect to the Jamaica Business (as defined in the Share Purchase Agreement) *(i)* as to which a Blue Petroholdings Restricted Party is required to give a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company, *(ii)* as to which the right of refusal option provided for under the Share Purchase Agreement is not exercised by the Company, *and (iii)* which is taken by the Blue Petroholdings Restricted Party and/or any of the Affiliates of such Blue Petroholdings Restricted Party. |

*Only General Terms and Conditions, Signature Page, Schedules, Attachments, and Exhibits Follow]*

## GENERAL TERMS AND CONDITIONS

*Shareholders Agreement of Cool Petroleum Holdings Limited*

ARTICLE
1

DEFINITIONS

**1.1    Certain Definitions**

As used in this Agreement, and *unless* the context requires a different meaning:

**(a)**    The term **"Affiliate"** with respect to any Person shall mean *(i)* any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, *(ii)* any shareholder (*except* that if the subject Person is a publicly traded company, only a shareholder who owns more than 5% of the outstanding voting securities of such subject Person), partner, director, board of directors, governor, member, trustee, beneficiary, employee, agent, or relative by blood or marriage, as applicable, of such Person or of any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, *and/or (iii)* any personal representative, receiver, trustee in bankruptcy, guardian, curator, or conservator with respect to such Person. In such regard, the term **"control"** (including the terms **"controlled by"** and **"under common control with"**) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise, applying the same principles, interpretations and definitions as are applicable in defining the term "affiliate" for purposes of Rule 144 promulgated pursuant to the United States Securities Act of 1933, as amended.

**(b)**    The Common Shareholders, as a group, and the Class A Preferred Shareholders, as a group, are sometimes referred to in this Agreement collectively as the **"Classes of Shareholders"** and each individually as a **"Class of Shareholders."**

**(c)**    The Class A Preferred Shares, as a group, and the Common Shares, as a group, are hereinafter sometimes referred to collectively as the **"Classes of Shares"** and each group individually as a **"Class of Shares."**

**(d)**    The term **"Governing Instruments"** with respect to any Person other than an individual shall mean the Articles of Incorporation, Articles of Organization, Articles of Association, Certificate of Formation, Certificate of Incorporation, Certificate of Association, Certificate of Organization, By-Laws, Limited Liability Company Agreement, Operating Agreement, Memorandum of Incorporation, Memorandum of Association, Partnership Agreement, Certificate of Partnership, and/or any and all other governing and/or organizational documents with respect to such Person, as applicable.

**(e)**    The term **"Majority-in-Interest"** *(i)* shall mean, with respect to any single Class of Shareholders, at any time, those Shareholders of such Class of Shareholders holding more than **50%** of the Shares of the Class of Shares upon which such Class of Shareholders is based (*i.e.,* Common Shares with respect to Common Shareholders, and Class A Preferred Shares with respect to Class A Preferred Shareholders) which are owned by all of the Shareholders of such Class of Shareholders at such time, *or (ii)* shall mean, with respect to all of the Shareholders as a whole (regardless of the Class of Shares held by any Shareholder), at any time, those Shareholders (regardless of the Class of Shares held by any such Shareholder), holding more than **50%** of the total Shares then issued and outstanding (regardless of the Class of Shares) and entitled to vote.

**(f)**    The term **"Net Cash Flow"** with respect to the Company and/or any one or more of the Company's subsidiaries for any period shall mean, subject to and computed in accordance with applicable rules of consolidation, *the excess, if any, of (A)* the sum of (i) all gross receipts of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from any sources for such period, other than from  and/or Liquidity Events, *plus (ii)* any funds released by the Board of Directors of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from previously established reserves (referred to in *(B)(iv)(y)* below), *over (B)* the sum of (i) all cash expenses paid by the Company and/or such subsidiary or subsidiaries during such period during the course of business (*including, but not limited to,* salaries, bonuses (*including, but not limited to,* any bonuses or earn-out payments attributable with respect to such period, even if payable after such period), taxes, rent and occupancy costs, interest on any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, insurance premiums, supplies, guaranteed payments and fees), *(ii)* all capital expenditures paid in cash by the Company and/or such subsidiary or subsidiaries, as applicable, during such period, *(iii)* all payments during such period of the principal of any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, *and (iv)* unless the Board of Directors, in its sole discretion, determines that a lesser amount is advisable, a cash reserve in an amount equal to *the sum of (x) the greater of* **$3,000,000.00 USD,** *or* an amount equal to *the excess, if any, of* **$5,000,000.00 USD** *over* the Net Working Capital of the Company and the Company's subsidiaries with respect to such period (computed, however, without including any cash or cash equivalents of the Company and/or the Company's subsidiaries), *plus (y)* such additional amount, if any, that the Board of Directors reasonably and in good faith determines is necessary to meet the future business, working capital, capital expenditure, tax, environmental, litigation, and/or expansion needs of the Company and/or the Company's subsidiaries; *provided, however,* that any payments referred to in *(B)(i), (ii), (iii), or (iv)* that are paid from previously established reserves or that are taken into account in determining Net Proceeds from a Liquidity Event shall not be taken into account in determining Net Cash Flow. In computing Net Cash Flow for any period, all costs, expenses and expenditures of the Company and the applicable subsidiary or subsidiaries of the Company shall be taken into

account, *including, but not limited to, (a)* a fee to Blue Equity, LLC or its nominee (the **"Blue Equity Fee"**) of **$600,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such in-house legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"Blue Back-Office Services"**) as are provided by **Blue Equity, LLC**, a Nevada limited liability company, and/or any of its Affiliates to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of Blue Equity, LLC, or other Persons, it being understood and agreed that the Blue Equity Fee does not include *(x)* any compensation, benefits, and other amounts paid to or for the benefit of the Chief Executive Officer of the Company *or (y)* any out-of-pocket expenditures to third parties for travel, lodging, international telephone calls, and other legitimate business expenses incurred by Blue Equity, LLC, its Affiliates, or their personnel, in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries, which amounts shall be reimbursable by the Company or an Affiliate of the Company, as applicable, to the extent that they are within the applicable Approved Budgets of the Company and the Subsidiaries and they are properly incurred, reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries generally applicable to employees of the Company and/or such Affiliate of the Company, *and (b)* a fee to **CPMIC** (the **"CPMIC Fee"**) of **$575,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"CPMIC Back-Office Services "**) provided by CPML, Cool Corp, MZ Holdings, Cool Oasis, CPMIC, and/or any of their nominees or Affiliates (collectively and individually as applicable, the **"CPMIC Group"**) to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of the CPMIC Group or other Persons, it being understood and agreed that *(X)* the CPMIC Fee includes *(i)* the portion of the compensation, benefits, and other amounts allocable and chargeable to the Company and/or the Company's subsidiaries for the provision by the CPMIC Group, as applicable, of the financial, accounting, and supervisory services of Davis in his capacity as the Group CFO of the Company and the Company's subsidiaries (in which capacity Davis shall report directly to the Chairman and Vice Chairman of the Company and the Company's subsidiaries (subject, however, to the general supervision and control of the Board of Directors)) and of the political liaison and other consulting services of Issa as may be reasonably requested by the Company and/or the Company's subsidiaries (which services by Issa shall be only part-time and shall not require Issa to work any particular minimum of hours or provide any particular quantity of services), in each case on a shared basis between the CPMIC Group and its subsidiaries, on the one hand, and the Company and its subsidiaries, on the other hand, *(ii)* the compensation, benefits (including, but not limited to, other amounts paid by the CPMIC Group to or with respect to Colin Hendrick with respect to his serving, on a full time basis as the Director of Operations for the Company and the Company's subsidiaries, *and (iii)* the services provided for under that certain Agreement entered into as of March 1, 2006, *by and between* Cool Petroleum Limited and MZ Holdings Limited regarding the provision of certain services by MZ Holdings to the Company and the Company's subsidiaries (the **"MZ Shared Services Agreement"**), *and (Y)* the CPMIC Fee does not include *(i)* any costs for the Company, the Company's subsidiaries, and/or their Affiliates or invitees to use or direct the use of the airplane owned by Cool Corp and/or its Affiliates when deemed advisable or authorized by the Board of Directors of the Company, *or (ii)* any out-of-pocket expenditures of the types currently paid to third parties by the Company and/or the Company's subsidiaries or paid to third parties by the CPMIC Group and reimbursed by the Company and/or the Company's subsidiaries for any travel (including car or car allowances and including gas), lodging, international telephone calls, and other legitimate business expenses incurred in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries by Hendrick, Davis, and/or Issa, or by Cool Corp with respect to such individuals, which are within the applicable Approved Budgets of the Company and the Subsidiaries and which are properly reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries, *or (iii)* the costs incurred by the Company and/or the Subsidiaries in providing BUPA Family Medical Insurance and corporate protection insurance for Hendrick and Issa at current coverage levels, which the Company shall continue to pay, or *(iv)* any costs incurred by Cool Corp and/or its Affiliates associated with providing intellectual, human or other capital resources to or for the benefit of the Company and/or any of the Company's subsidiaries to the extent that *(A)* such intellectual, human, or other capital resources are not already required to be so provided pursuant to currently existing agreements with the Company and/or any of the Company's subsidiaries (or any amendments, extensions, renewals, or novations thereof), *(B)* such intellectual, human, or other capital resources have not been otherwise generally provided by Cool Corp and/or its Affiliates to or for the benefit of the Company prior to the Effective Date of this Agreement, *(C)* such intellectual, human, or other capital resources are not specifically included in the CPMIC Back-Office Services set forth above, *and (D)* the provision of such intellectual, human, or other capital resources is undertaken, and the costs therefor incurred, pursuant to and in accordance with the terms and conditions of a written agreement entered into by and between one or more of Cool Corp and/or Cool Corp's Affiliates, on the one hand, and one or more of the Company and/or the Company's subsidiaries, on the other hand. The CPMIC Fee shall supersede *inter alia* the fee provided for under the MZ Shared Services Agreement, which fee provided for under the MZ Shared Services Agreement shall therefore no longer be separately due and payable by the Company or any of its subsidiaries to MZ Holdings.

(g)    The term **"Net Proceeds"** with respect to any Liquidity Event shall mean the gross proceeds derived by the Company and/or the Shareholders directly from such Liquidity Event *reduced by (i)* payment of all reasonable expenses incurred by the Company or the Shareholders, as the case may be, in furtherance of implementing such Liquidity Transaction, *including, but not by way of limitation,* any brokerage commissions, fees, and costs payable by the Company or, with the Company's consent, to or by the Shareholders, in connection with such Liquidity Event (*provided, however,* that any commission or fee payable to Blue Equity, Cool Corp, or any other Related Party or Shareholder for arranging such Liquidity Event may not, when added to the brokerage commissions and/or fees payable by the Company to Persons other than Related Parties in connection with such Liquidity Event,

exceed a amount equal to 5% of the value of the total consideration from such Liquidity Event), *(ii)* payment of the amount of any indebtedness of the Company (*including* principal, interest, prepayment fees, and/or other fees, costs, or charges) made with such gross proceeds, *(iii)* capital expenditures or other expenditures required to made from the gross proceeds of such Liquidity Event under the applicable agreements with respect to such Liquidity Agreement, *and (iv)* any reasonable reserve established by the Board of Directors of the Company for satisfaction of any of the foregoing, any indemnities, escrow, or contingencies therefor. In determining the gross proceeds and Net Proceeds with respect to any Liquidity Event, any equity interests, bonds, and/or other tangible or intangible property (other than cash and cash equivalents) received with respect to a Liquidity Event shall be valued at the same amount as such equity interests, bonds, and/or other tangible or intangible property are valued for purposes of the Liquidity Event.

(h)     The term **"Person"** means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, syndicate, joint stock company, limited liability company, governmental authority, or other entity of any kind.

(i)     The term **"Tax"** or **"Taxes"** with respect to any Person shall mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental taxes, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated basis, or unitary basis or in any other manner which are required to be paid, withheld or collected by such Person.

(j)     The term **"Tax Return"** shall mean any return, declaration, reports and forms, claim for refund, or information return or statement relating to Taxes, including any necessary schedule or attachment thereto, and including any necessary amendment thereof.

## 1.2   Accounting Terms

All accounting terms which are used in this Agreement and which are not otherwise expressly defined in this Agreement shall have the respective meanings given to them in accordance with generally accepted International Financial Reporting Standards, consistently applied from period to period (**"IFRS"**) and all accounting concepts and principles referred to in this Agreement shall be construed in accordance with IFRS *except* to the extent otherwise specifically and expressly provided in this Agreement.

## ARTICLE 2

## NAME AND OFFICE

### 2.1   Name

*Unless and until* changed by the Board of Directors of the Company, the name of the Company shall be as set forth in Section A(1) of the Initial Portion of this Agreement. The Board of Directors of the Company and each subsidiary of the Company shall have the right and authority to operate the Company or such subsidiary, as applicable, under such name(s) as may be necessary or appropriate in any jurisdiction in which the Company or such subsidiary operates. Furthermore, the Board of Directors of the Company and each subsidiary of the Company shall have the right, power and authority, with full power of attorney on behalf of each of the Shareholders, *(i)* to change the name of the Company or such subsidiary, as applicable, at any time and from time to time, *and (ii)* to amend the Governing Instruments of the Company and/or the Company's subsidiaries, or take any other actions as may be necessary to effect and implement any such change of name, without any further, separate, or express authorization by any of the Shareholders.

### 2.2   Assumed Name Certificates

The Board of Directors of the Company and/or any subsidiary of the Company may cause the Company or such subsidiary of the Company, as applicable, to file such certificates of assumed name or fictitious name as shall be required by law or otherwise deemed advisable by such Board of Directors.

### 2.3   Registration as a Foreign Limited Liability Company in Other Jurisdictions

The Board of Directors of the Company and/or any subsidiary of the Company may cause the Company or such subsidiary to file such registrations to conduct business as a foreign corporation or other entity in any jurisdictions as may be required by law or otherwise deemed advisable by such Board of Directors.

### 2.4   Principal Office

The principal office of the Company and each subsidiary of the Company shall be at such place as shall be determined by the Board of Directors of the Company or such subsidiary from time to time with notice to the Shareholders. The books of the

Company and each subsidiary of the Company shall be maintained at such principal place of business or such other place that the applicable Board of Directors may deem appropriate.

## ARTICLE 3

## PURPOSES AND TERM

**3.1    Purposes**

The purposes of the Company and each of the Company's subsidiaries are as follows:

(a)    To engage directly or through one or more subsidiaries in the Business as described in Section C(1) of the Initial Portion of this Agreement to such extent and in such manner as the Board of Directors of the Company or such subsidiary of the Company, as applicable, may deem advisable from time to time.

(b)    To purchase, acquire, invest in, own, improve, maintain, lease, sell, exchange, and otherwise deal in and with respect to such property, real, personal or mixed, tangible or intangible, *including, but not limited to,* closely held and publicly held securities and interests in business entities as the Board of Directors of the Company or such subsidiary, as applicable, may reasonably deem necessary or appropriate in connection with the conduct of the Business referred to in Section 3.1(a) above, and related activities.

(c)    To use, invest, and distribute the funds of the Company and the Company's subsidiaries as contemplated in this Agreement or as otherwise required by law.

(d)    To do all other things necessary or desirable in connection with the foregoing or otherwise contemplated in this Agreement.

**3.2    Company's Power**

In furtherance of the purposes of the Company and each of the Company's subsidiaries as set forth in Section 3.1, the Company and such subsidiary, as applicable, shall have the power to do any and all things whatsoever necessary, appropriate or advisable in connection with such purposes, or as otherwise contemplated in this Agreement.

## ARTICLE 4

## CAPITAL

**4.1    No Liability of Shareholders**

*Except* as otherwise specifically provided under applicable law or specifically provided under a separate written agreement executed by such Shareholder, no Shareholder shall have any personal liability for the obligations of the Company and/or any subsidiary of the Company. Furthermore, no Shareholder shall be obligated to contribute additional funds or loan money to, or personally guarantee or endorse any debts or obligations of, the Company and/or any subsidiary of the Company *except* to the extent, if any, that such Shareholder specifically agrees under a separate written agreement executed by such Shareholder.

**4.2    Loans**

In order to facilitate the conduct of business and activities by the Company and each of the Company's subsidiaries, the Board of Directors of the Company or such subsidiary, as applicable, may cause the Company or such subsidiary to borrow such amounts from time to time as such Board of Directors may deem advisable on such terms, and with such mortgages, liens, and/or security interests in, on, or otherwise with respect to any of the assets of the Company or such subsidiary, as applicable, as collateral, as such Board of Directors may deem advisable. Such loans may be from commercial lenders or from any one or more other Persons, *including, but not limited to,* any one or more of the Shareholders, Directors, and/or their Affiliates, and a guarantee fee may be paid to any guarantor of any loan from a commercial lender, *including, but not limited to,* any one or more of the Shareholders, Directors, and/or their Affiliates, provided such fee does not exceed an percentage rate of **1% per annum** on the outstanding balance of such loan during the period of such guaranty. There shall be no guaranty fee charged by Blue Equity and/or Blue Equity's Affiliates with respect to its provision, contemporaneously with the Effective Date of this Agreement, of a certain partial guaranty with respect to a Tranche C of the current Common Creditor/Bondholder debt of the certain subsidiaries of the Company.

**4.3    Percentage Interest Definition**

(a)    For purposes of this Agreement, the term **"Percentage Interest"** at any time shall have the following meaning, as applicable:

(i)    The term **"Percentage Interest"** as to any Class A Preferred Shareholder, solely with respect to the Class A Preferred Shareholders as a group, shall mean that percentage which the number of Class A Preferred Shares (*including, but not*

*limited to,* any fractional Class A Preferred Shares) then held by such Class A Preferred Shareholder at such time *bears* to the aggregate of all Class A Preferred Shares (*including, but not limited to,* any fractional Class A Preferred Shares) then issued and outstanding;

(ii)     The term **"Percentage Interest"** as to any Common Shareholder, solely with respect to the Common Shareholders as a group, shall mean that percentage which the number of Common Shares (*including, but not limited to,* any fractional Common Shares) then held by such Common Shareholder at such time *bears* to the aggregate of all Common Shares (*including, but not limited to,* any fractional Common Shares) then issued and outstanding;

(iii)    The term **"Percentage Interest"** as to any Shareholder with respect to all of the Shareholders as a group, regardless of the Class of Shares held by such Shareholders, shall mean that percentage which the number of Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then issued and outstanding; *and*

(iv)    The term **"Percentage Interest"** as to any Shareholder with respect to any group of Shareholders consisting of fewer than all of such Shareholders, regardless of the Class of Shares held by such Shareholders (for purposes of Section 4.4 of this Agreement or otherwise) shall mean that percentage which the number of Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then held by all Shareholders of the applicable group, in the aggregate.

(b)     Except when determining the Percentage Interest of any Shareholder with respect to all or some of the Shareholders, regardless of the Class of Shares held by any such Shareholder, pursuant to Section 4.3(a)(iii) or Section 4.3(a)(iv) above, the Percentage Interest of any Shareholder who holds Shares of more than one Class of Shares shall be determined on a Class of Shares-by-Class of Shares basis, taking into account only such Shareholder's holdings of Shares of the Class of Shares in question and disregarding such Shareholder's holdings of the Shares of any other Class of Shares.

**4.4     Additional Capital Contributions**

(a)     If at any time the Board of Directors of the Company determines reasonably and in good faith that, in order *(i)* to provide cash for the expansion of the business of the Company and/or the Company's subsidiaries, through acquisition or otherwise *(ii)* to provide working capital reasonably necessary in the ordinary course of the business of the Company and/or the Company's subsidiaries, *and/or (iii)* to provide funds to repay any or all debts, obligations, and/or other liabilities of the Company and/or the Company's subsidiaries if the Company is unable to pay such debts, obligations, and/or other liabilities as they becomes due, it is advisable for the Company and/or any one or more subsidiaries of the Company to seek additional capital beyond that already then contributed, or required to be contributed, by the Shareholders of the Company, the Board of Directors of the Company shall cause notice of such determination to be given to each of the Shareholders (regardless of the Class of Shares held by such Shareholders) at least **90 days** before the last day on which such capital must be contributed or such shorter period of time (but not less than **30 days**) before the last day on which such capital must be contributed as is reasonably necessary to avoid hardship to the Company or any subsidiary of the Company or to avoid the loss of the proposed acquisition or other expansion transaction or opportunity, as the case may be (as applicable, the **"Capital Raise Notice Period"**). Such notice shall set forth the total additional capital contribution then being sought from all of the Shareholders in the aggregate and the number of Shares or other equity interests which will be issued by the Company and/or any subsidiary of the Company in exchange for such additional capital contribution (and the rights, preferences, and other characteristics of any such equity interests other than Shares). Any other equity interests so authorized by resolution of the Board of Directors of the Company may have such other rights, distribution preferences, voting preferences, liquidation preferences, and other characteristics as the Board of Directors may determine in its reasonable discretion and in good faith, *including, but not limited to,* preferences which make such class of equity interests senior in distributions and/or voting to any of the Shares or to any other class of equity interests previously issued; *provided, however,* that any dilution to be caused by the issuance of such new equity interests shall affect all of the then issued and outstanding Common Shares  on a proportionate basis. No vote of the Shareholders, or any Class of Shareholders, shall be required in connection with the issuance of additional Shares or any other class of equity interests, *except* to the extent, if any, provided by resolution of the Board of Directors of the Company in connection with the prior issuance of Shares or other equity interests under this Section 4.4.

(b)     Within such Capital Raise Notice Period, if any Shareholder wishes to acquire such Shareholder's pro rata portion of the Shares or other equity interests being offered by the Company and/or any of the Company's subsidiaries, as the case may be, in connection with such additional capital contribution, such Shareholder shall contribute in cash to the capital of the Company or such subsidiary or subsidiaries, as applicable, a pro rata portion of the total additional capital contribution then being sought in the aggregate, in accordance with such Shareholder's respective Percentage Interest with respect to all of the Shareholders of the Company (regardless of the Class of Shares held by any Shareholder) at such time.

(c)     If any Shareholder fails to contribute such Shareholder's pro rata portion of such additional capital contribution within the specified Capital Raise Notice Period, then the Shareholders who have contributed their pro rata portions of such additional capital contribution within the specified Capital Raise Notice Period shall have the right (but not the obligation), during a period of **10 days** thereafter, to make the additional capital contribution for which such Shareholder failed (with or without reason) to make, in accordance with their respective Percentage Interests among themselves as a group, or in such other percentages as those Shareholders wishing to make all or any part of such capital contribution may otherwise agree. In such event, the Shares or

other equity interests offered with respect to such additional capital contribution shall be issued to those Shareholders who actually make such capital contribution in accordance with the percentage of such capital contribution contributed by each.

**(d)**     If the Shareholders of the Company, in the aggregate, do not timely contribute the full amount of any additional capital contribution sought by the Company and/or the Company's subsidiaries, as applicable, then the Company and/or the Company's subsidiaries, as applicable, shall have an additional **90 day** period to obtain such uncontributed funds from any one or more Shareholders or other Persons on the same terms as offered to the Interest Shareholders in exchange for the issuance to such Person(s) of the Shares or other equity interests which were offered to the Shareholders in connection with such portion of the additional capital contribution.

**(e)**     Notwithstanding anything herein which might be construed to the contrary, the Board of Directors of the Company, acting reasonably and in good faith, may cause the Company and/or any subsidiary of the Company at any time to issue new Shares or other equity interests, or options to acquire new Shares or other equity interests, as an incentive in connection with the employment of any new or existing employee of the Company and/or any subsidiary of the Company, and the foregoing notice and "preemptive rights" as to the Shareholders of the Company shall not apply with respect to such issuances, provided such issuance is within the parameters set forth in Section F(1)(h)(v).

### 4.5   No Interest on Capital Contributions

No Shareholder shall be entitled to interest on any capital contribution made to the Company and/or any subsidiary of the Company, *except* to the extent otherwise expressly set forth in this Agreement or pursuant to the provisions of Section 4.4 hereof.

**ARTICLE 5**

**ACCOUNTING**

### 5.1   Books and Records

The Company and each of the Company's subsidiaries shall maintain the financial books and records of the Company or such subsidiary of the Company, as applicable, at the Company's or such subsidiary's principal place of business and/or at such other places as the Board of Directors of the Company or such subsidiary, as applicable, shall determine. All books and records shall be open to the inspection and examination of all Shareholders in person or by their duly authorized representatives at all reasonable times and may be copied at the expense of the Shareholder desiring such copies.

### 5.2   Fiscal Year

The Fiscal Year of the Company and the Company's subsidiaries shall be such **12-month** period as the Board of Directors of the Company may determine from time to time ("**Fiscal Year**"). The Company and/or any subsidiary of the Company may have a short or partial Fiscal Year as and when appropriate by reason of a change of Fiscal Year, a dissolution, or otherwise.

### 5.3   Reports

Within **120 days** after the close of each Fiscal Year of the Company and each subsidiary, the Company or such subsidiary, as applicable, shall furnish to each Person who was a Shareholder at any time during such Fiscal Year all the information relating to the Company or such subsidiary which shall be reasonably requested by such Person for the preparation of such Person's Federal and state income or other tax returns.

### 5.4   Shareholder's Request for Additional Information

The Company and each its subsidiaries shall furnish to any Shareholder, at the reasonable expense of Company or such subsidiary, as applicable, such information regarding the Company's or such subsidiary's operations and condition as may reasonably be requested by any Shareholder.

### 5.5   Accounting

Unless otherwise determined by the Board of Directors, the parties agree that the accountant for any or all financial, accounting, and/or tax purposes of the Company and the Company's subsidiaries shall be such certified public accountant as is designated from time to time by the Board of Directors of the Company (which accountant may, in such Board of Director's sole discretion, be the same certified public accountant who performs services for any Director, Shareholder, or any of their Affiliates, notwithstanding any actual or apparent conflict of interest or other fiduciary duties or standards).

## ARTICLE 6

## BANK AND OTHER DEPOSITORY ACCOUNTS

**6.1    Bank and Other Depository Accounts**

All funds of the Company and each of the Company's subsidiaries shall be deposited into such checking, savings and/or money market accounts, time certificates, or other reasonably liquid and short-term investments as shall be designated by the Board of Directors of the Company or such subsidiary, as applicable. Withdrawals therefrom shall be made upon such signature or signatures as the Board of Directors of the Company or such subsidiary, as applicable, may designate. Only with the prior written consent of a majority-in-number of the Common Directors of the Company or such subsidiary of the Company, as applicable, then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company or such subsidiary of the Company, as applicable, then in office, acting as a separate group (which consents shall not be unreasonably withheld or delayed) may the funds of the Company or any of the Company's subsidiaries be commingled or co-invested with those of any other individual or entity *other than* the Company and/or the Company's subsidiaries.

## ARTICLE 7

## DISTRIBUTIONS

**7.1    Distributions of Net Cash Flow and Net Proceeds From Liquidity Events**

**(a)**    The Net Cash Flow for each Fiscal Quarter with respect to the Company and the Company's subsidiaries *(i)* shall be distributed, with respect to the first three Fiscal Quarters of each Fiscal Year, within **30 days** after the end of such Fiscal Quarter, and with respect to the last Fiscal Quarter of every Fiscal Year, **30 days** following the finalization of the Company's audited consolidated statements with respect to such Fiscal Year *and (ii)* shall be distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries, as applicable, then held by each of them.

**(b)**    The Net Proceeds from Liquidity Events with respect to the Company and/or any subsidiary of the Company *(i)* shall be distributed within **120 days** following the receipt of such Net Proceeds by the Company or the Company's subsidiary, as applicable, *and (ii)* shall be authorized, if necessary, and distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries then held by each of them.

## ARTICLE 8

## MANAGEMENT

**8.1    Management In General**

**(a)**    *Except* to the extent otherwise specifically provided under this Agreement, all rights, powers and authority of the Company and each subsidiary of the Company shall be exercised by or under the authority of, and the business and affairs of the Company or such subsidiary, as well as any liquidation or dissolution of the Company or such subsidiary, as applicable, shall be controlled and managed by or under the authority of, a Board of Directors for the Company or such subsidiary, as applicable, established as provided under Section F of the Initial Portion of this Agreement (the **"Board of Directors"**), each of the members of which may be referred to as a Director.

**(b)**    Any *(i)* officer of the Company or any subsidiary of the Company expressly authorized and empowered by law, under this Agreement, or under a resolution of, or acting upon or at the express written direction of, the Board of Directors of the Company or such subsidiary of the Company, as applicable, *(ii)* Director of the Company or such subsidiary, *or (iii)* other Person who is specifically authorized and empowered under a resolution of, or acting upon the express written direction of, the Board of Directors of the Company or such subsidiary, as the case may be, may execute any document or take any action on behalf of the Company or such subsidiary, as applicable, and such action shall be binding upon the Company or such subsidiary, as applicable; *provided, however,* that unless already expressly and specifically or categorically authorized as a part of an Approved Budget, any material contracts or commitments which any officer, employee, or agent of the Company or any subsidiary of the Company wishes to cause the Company or such subsidiary to enter into shall be first presented to, and specifically authorized by, the Board of Directors, Chairman, or Vice Chairman of the Company or such subsidiary, as applicable, acting reasonably and in good faith. In this regard, a material contract or commitment shall mean any oral or written contract or other agreement or understanding requiring *(i)* the expenditure or the incurrence of any liability by the Company and/or any subsidiary, in one or a series of related transactions, exceeding **$10,000.00** in the aggregate, *and/or (ii)* a continuing obligation or liability on the part of the Company and/or any subsidiary of the Company (*including, but not limited to,* employment or compensation agreements or arrangements) which cannot be cancelled without penalty or premium upon **90 or fewer days** prior notice. Notwithstanding any of the foregoing which might be

construed to the contrary, without the prior consent of the Board of Directors, Chairman, or Vice Chairman of the Company or subsidiary of the Company, as applicable, such variance from the Approved Budget for any period, none of the officers, employees, or agents of the Company and/or any subsidiary shall direct or authorize the incurrence or payment by the Company or such subsidiary of any amount or liability during such period which would, when added to all other amounts and/or liabilities previously paid or incurred by the Company and/or the Company's subsidiaries during such period, cause the total amount and/or liabilities paid or incurred by the Company and/or the Company's subsidiaries during such period to exceed by more than **10%** the total amount of budgeted expenses under the Approved Budget for such period.

(c)     The Approved Budgets are intended to apply with respect to the operations of the business of the Company and the Company's subsidiaries in the ordinary course and shall not be construed as imposing any limitation on the power of the Board of Directors of the Company or any subsidiary of the Company to authorize a sale, exchange, or other such transaction by the Company or such subsidiary, as applicable, which is not in the ordinary course of such entity's business.

(d)     The Board of Directors, by written consent of both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group, may fix and change the compensation, if any, of the Directors (in their capacities as such) at any time, and no Director shall be prevented from receiving any such compensation by reason of the fact that such Director is also an officer, employee, or Shareholder of the Company and/or any subsidiary of the Company.

**8.2     Number, Election and Term of Directors**

(a)     The number of Directors of the Company and each of the Company's subsidiaries, and classes thereof, shall be such number and classes as are set forth in, and the initial Directors of the Company and each of the Company's subsidiaries and the class of each such Director shall be as set forth in, Section F(1) of the Initial Portion of this Agreement. Each Class A Preferred Director (*other than* the initial Class A Preferred Directors) shall be elected or appointed by vote or consent of a Majority-in-Interest of the Class A Preferred Shareholders and each Common Director (*other than* the initial Common Directors) shall be elected or appointed by vote or consent of Cool Corp. A Person need not be a Shareholder in order to be a Director.

(b)     The term of each Director shall continue until such Director dies, resigns, becomes Disabled, (as defined below) or is removed pursuant to Section 8.3(a) below. For purposes of this Agreement, the term **"Disabled"** shall mean that a Director is physically or mentally incapacitated so as to render such Director incapable of performing the essential functions of his or her job as a Director and such incapacity cannot be reasonably accommodated without undue hardship as determined either by *(i)* such Director and the Board of Directors or *(ii)* if such Director and the Board of Directors cannot agree, by a panel of three doctors, one appointed by such Director, one by the Board of Directors and the third by the first two doctors so appointed. The determination of the panel shall be final and binding upon the parties with the costs of the panel to be paid by the Company.

**8.3     Removal and Resignation of Directors; Vacancies**

(a)     A Director may be removed at any time, with or without cause *(i)* in the case of a Class A Preferred Director, by a vote of a Majority-in-Interest of the Class A Preferred Shareholders and *(ii)* in the case of a Common Director, by a vote of a Cool Corp. A successor to a Director shall be elected *(1)* in the case of a Class A Preferred Director, by a vote of a Majority-in-Interest of the Class A Preferred Shareholders *and (2)* in the case of a Common Director, by Cool Corp.

(b)     Any Director may resign from the Board of Directors of the Company and/or any subsidiary of the Company at any time by giving written notice to *(i)* all of the other Directors on such Board of Directors, *(ii)* the Chairperson or Chairpersons of such Board of Directors, if there shall be any Chairperson or Chairpersons then acting, *(iii)* the Chief Executive Officer(s) of the Company or such subsidiary, as applicable, if there shall be any Chief Executive Officer(s) then acting, *or (iv)* all of the Shareholders, and unless otherwise specified in such notice of resignation, the acceptance of such resignation shall not be necessary to make it effective.

(c)     Any vacant Director position (arising by reason of removal, resignation or for any other reason) shall remain vacant unless and until such successor is elected or the position is eliminated *(i)* in the case of a Class A Preferred Director, by a vote of a Majority-in-Interest of the Class A Preferred Shareholders and *(ii)* in the case of a Common Director, by Cool Corp.

**8.4     Meetings of the Board of Directors; Quorum and Voting Requirements**

(a)     The Board of Directors of the Company and each subsidiary of the Company may provide by resolution the time and place, either within or outside of Jamaica, for the holding of regular meetings of the Board of Directors without other notice than such resolution.

(b)     Special meetings of the Board of Directors of the Company and/or any subsidiary of the Company may be called by, or at the request of, the Chairman, Vice Chairman, Chief Executive Officer, or any Director of the Company or such subsidiary, as applicable. *Unless* otherwise agreed in writing by all of the applicable Directors, all special meetings of the Board of Directors of the Company and/or any subsidiary of the Company shall be held at the principal office of the Company or at such other place in Jamaica, Miami, Florida, or Louisville, Kentucky, metropolitan areas as may be specified in the notice of the meeting.

(c)     Notice of any special meeting of the Board of Directors of the Company and/or any subsidiary of the Company shall be given at least **seven (7)** days prior thereto by written notice to all of the applicable Directors. Any Director may waive notice

of any such meeting. The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, *except* where such Director attends such meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

(d)     The business to be transacted at, and/or the purpose of, any special meeting of the Board of Directors of the Company and/or any subsidiary of the Company shall be generally specified in the notice or wavier of notice of such meeting.

(e)     The presence of any Director at a duly called meeting of the Board of Directors of the Company and/or any subsidiary of the Company shall constitute a quorum, but, notwithstanding the presence of a quorum, no action (other than adjournment of a meeting) may be taken by the Board of Directors except in strict accordance with the voting requirements and provisions set forth in Section F(1) of the Initial Portion of this Agreement.

(f)     The voting requirements with respect to acts of the Board of Directors of the Company and each subsidiary of the Company shall be as set forth in Section F(1) of the Initial Portion of this Agreement. The parties acknowledge that the provisions of Section F(1) of the Initial Portion of this Agreement may provide for unequal voting power and authority as to the various Directors and/or classes of Directors with respect to the Company and/or any subsidiary of the Company.

(g)     A Director who is present at a meeting of the Board of Directors of the Company and/or any subsidiary of the Company when action is taken shall be deemed to have assented to the action taken *unless (i)* such Director objects at the beginning of the meeting (or promptly upon such Director's arrival) to holding the meeting or transacting business at the meeting, *(ii)* such Director dissents or abstains from the action taken and the chairman of the meeting expressly acknowledges at such meeting the dissention or abstention of the Director, *or (iii)* such Director delivers written notice of such Director's dissent or abstention to the presiding officer of the meeting before the meeting's adjournment or to the Company or subsidiary of the Company, as applicable, promptly after adjournment of the meeting. The right of dissent or abstention with respect to any action shall *not* be available to any Director who votes in favor of the action taken.

8.5     **Committees**

(a)     The Board of Directors of the Company or any subsidiary of the Company may, by written resolution, create one or more committees for the Company or such subsidiary, as applicable, and appoint Directors and/or other Persons to serve on them. Each committee shall have two or more members, who shall serve at the pleasure of the applicable Board of Directors.

(b)     The provisions of Section 8.4 above, which govern meetings, quorum requirements, and voting requirements with respect to the Board of Directors, shall apply to committees and their members as well.

(c)     The Board of Directors of the Company or any subsidiary of the Company may, by written resolution, delegate to any committee of the Company or such subsidiary, as applicable, such of the applicable Board of Directors' duties, powers, and authority under this Agreement as such Board of Directors may deem advisable, *subject to* such terms and conditions as such Board of Directors may deem advisable *and subject to* change, modification, or amendment at any time by such Board of Directors.

8.6     **Approved Budgets**

(a)     No later than **60 days** prior to the beginning of each Fiscal Year of the Company, the Chief Executive Officer and other applicable officers and employees of the Company shall cooperate and coordinate with the Board of Directors of the Company, Issa, Blue Equity, LLC, as a contract administrator, and such outside accountants and/or consultants to the Company as Blue Equity, LLC and/or the Board of Directors of the Company may determine to be necessary or appropriate (collectively, the **"Budgeting Team"**) in such reasonable manner as will enable them to understand the business and operational plans and expectations of the Chief Executive Officer's and the Company's Board of Directors for the upcoming Fiscal Year. The Budgeting Team shall then prepare *(i)* a **"Proposed Financial Budget"**), *and (ii)* a proposed reasonably comprehensive business and marketing plan for the Company and the Company's subsidiaries with respect to the upcoming Fiscal Year (with respect to each Fiscal Year, the **"Proposed Business Plan"**) (the Proposed Financial Budget and the Proposed Business Plan with respect to each Fiscal Year are hereinafter sometimes referred to collectively as the **"Proposed Budget"** with respect to such Fiscal Year) which Proposed Budget shall then be submitted for consideration by the Company's Board of Directors. *Unless and until* changed by the Company's Board of Directors, the proforma or projection of the performance and projected business and marketing plans of the Company and the Company's subsidiaries which is attached as **EXHIBIT 8.6(a)** shall serve as the Approved Budget of the Company and the Company's subsidiaries for the Fiscal Years and portions thereof following the Effective Date of this Agreement which are reflected therein.

(b)     The Proposed Financial Budget with respect to each Fiscal Year, as approved by the Chief Executive Officer of the Company and submitted for consideration by the Company's Board of Directors in accordance with the provisions of Section 8.6(a) above, shall be a detailed line-item budget reflecting both monthly amounts and a total annual amount with respect to each line item, and the entries therein shall be supported by appropriate supplemental schedules and information. At a minimum, *except* to the extent, if any, permitted by the Company's Board of Directors, the Proposed Financial Budget with respect to each Fiscal Year shall contain *(i)* a budgeted income statement (statement of earnings), *(ii)* a budgeted balance sheet (statement of financial position), *(iii)* a budgeted statement of cash flows (statement of sources and uses of funds), *including, but not limited to,* a projection of all disbursements of principal which are anticipated to be needed during such Fiscal Year under any loans and/or lines of credit available to the Company and/or the Company's subsidiaries and a proposed cash reserve (the **"Budgeted Cash Reserve"**) to be maintained by the Company and the Company's subsidiaries, as applicable, during such Fiscal Year, *and (iv)* one or more

schedules comparing the budgeted amounts to actual amounts earned or incurred with respect to each line item during the first nine months of the immediately preceding Fiscal Year and amounts then estimated to be earned or incurred with respect to each line item during the last three months of such immediately preceding Fiscal Year. No contingency for the payment of unforeseen expenses of the Company or any subsidiary of the Company shall be included as a separate line item of the Proposed Financial Budget with respect to any Fiscal Year, it being understood and agreed by the parties that each separate line item of the Proposed Financial Budget will reflect any amount for contingency applicable to such line item which the Budgeting Team may deem advisable, as detailed in the supplemental information included as a part of the Proposed Financial Budget with respect to such line item.

(c)     Within **45 days** after the date on which the Chairman of the Company shall have been given a copy of the Proposed Budget with respect to any Fiscal Year, the Board of Directors of the Company shall endeavor to agree upon and instruct the Chairman or any Director or officer of the Company to deliver to the Chief Executive Officer of the Company a notice *either (i)* approving and adopting the Proposed Budget as submitted, *or (ii)* rejecting such Proposed Budget as submitted by giving written notice (a **"Rejection Notice"**) to the Chief Executive Officer stating the specific reasons for such rejection and/or the specific or general modifications, amendments, or other changes to the Proposed Budget deemed advisable by the Board of Directors. Upon receipt of a Rejection Notice, the Chief Executive Officer shall have **20 days** to submit, with such assistance of the Budgeting Team as the Chief Executive Officer may request, to the Board of Directors an amended Proposed Budget addressing such reasons for rejection and taking into account such modifications, amendments or other changes, if any, specified in the Rejection Notice (the **"Amended Proposed Budget"**). Upon receipt of an Amended Proposed Budget, the Board of Directors of the Company shall within **20 days** either *(i)* adopt such Amended Proposed Budget if the Board of Directors reasonably determines that such Amended Proposed Budget materially addresses the reasons for rejection set forth in, and otherwise incorporates the modifications, amendments, or other changes, if any, specified in, the Rejection Notice *or (ii)* reject such Amended Proposed Budget if the Board of Directors reasonably determines that such Amended Proposed Budget does not materially address the reasons for rejection set forth in, or otherwise incorporate the modifications, amendments, or other changes specified in, the Rejection Notice. If the Board of Directors rejects an Amended Proposed Budget or if no Amended Proposed Budget is delivered to the Board of Directors within the **20-day** period, then the Board of Directors of the Company may adopt such other financial budget and business plan for the next Fiscal Year as it may in good faith determine. For purposes of this Agreement any Proposed Budget, Amended Proposed Budget, or other financial budget and business plan, as the case may be, approved and adopted with respect to any Fiscal Year shall constitute the **"Approved Budget"** with respect to such Fiscal Year. Upon adoption of any Approved Budget, the Company's Board of Directors shall promptly notify the Chief Executive Officer in writing. If no such notice is delivered to the Chief Executive Officer within the **45-day** period established herein for Board of Directors' consideration of a Proposed Budget or within the **20-day** period established herein for Board of Directors' consideration of an Amended Proposed Budget, then such Proposed Budget or Amended Proposed Budget, as the case may be, shall be deemed to have been approved by the Company's Board of Directors as the Approved Budget for the applicable Fiscal Year.

(d)     If no Approved Budget with respect to a Fiscal Year is approved and adopted by the Company's Board of Directors on a timely basis pursuant to the procedures provided for above, then the Approved Budget for the immediately preceding Fiscal Year shall automatically become the temporary Approved Budget for such Fiscal Year until such time, if any, as the Company's Board of Directors issues a replacement Approved Budget for such Fiscal Year.

(e)     The Company's Board of Directors may subsequently reconsider, modify, amend, and/or make any other changes to any Approved Budget at any time, if and when deemed advisable in good faith by such Board of Directors.

**8.7     Meetings of the Shareholders**

(a)     A special full meeting of the Shareholders or a special meeting of any Class of Shareholders may be called by, or at the request of, any Director or the holders of at least **20%** of the then issued and outstanding Shares of the Class of Shares in respect of which Class of Shareholders the meeting is to be called (*for example, but not by way of limitation, (i)* the holders of **20%** of the then issued and outstanding Common Shares could call a meeting of the Common Shareholders or a joint meeting of the Common Shareholders and Class A Preferred Shareholders (*that is,* a full meeting of the Shareholders), *but not* a meeting of just the Class A Preferred Shareholders, *or (ii)* the holders of **20%** of the then issued and outstanding Class A Preferred Shares could call a meeting of the Class A Preferred Shareholders or a joint meeting of the Common Shareholders and Class A Preferred Shareholders (*that is,* a full meeting of the Shareholders), *but not* a meeting of just the Common Shareholders).

(b)     Notice of any special full meeting of the Shareholders or any Class of Shareholders shall be given at least **seven (7) days** prior thereto by written notice to all of the applicable Shareholders. Any Shareholder may waive notice of any meeting. The attendance of a Shareholder at any meeting shall constitute a waiver of notice of such meeting, *except* where such Shareholder attends such meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

(c)     The business to be transacted at, and/or the purpose of, any special full meeting of the Shareholders shall be generally specified in the notice or wavier of notice of such meeting.

(d)     A quorum of the Common Shareholders at any meeting of just the Common Shareholders or a quorum of the Class A Preferred Shareholders at any meeting of just the Class A Preferred Shareholders, as the case may be, shall consist of a Majority-in-Interest of such Class of Shareholders, and no action may be taken at any such meeting (other than adjournment) without the affirmative vote of a Majority-in-Interest of the Shareholders of such Class of Shareholders (as opposed to merely a

majority of the Shareholders attending such meeting). A quorum of the Common Shareholders and Class A Preferred Shareholders at any joint meeting of the Common Shareholders and Class A Preferred Shareholders (*that is,* a full meeting of the Shareholders) shall consist of a Majority-in-Interest of the Shareholders (regardless of the Class of Shareholders) then entitled to vote, and no action may be taken at such meeting (other than adjournment) without the affirmative vote of a Majority-in-Interest of such Shareholders (regardless of the Class of Shareholders) as opposed to merely a majority of that number of Shares held or represented by the Shareholders attending such meeting.

(e)     The affirmative vote of a Majority-in-Interest of the Common Shareholders (in the case of a meeting of just the Common Shareholders), a Majority-in-Interest of the Class A Preferred Shareholders (in the case of a meeting of just the Class A Preferred Shareholders while any of the Class A Preferred Shares are outstanding), or a Majority-in-Interest of the Shareholders (in the case of a joint meeting of both the Common Shareholders and, if any of the Class A Preferred Shares are then outstanding, the Class A Preferred Shareholders)(sometimes referred to in this Agreement as a **"full meeting of the Shareholders"**), as the case may be, shall constitute the act of such Class of Shareholders or the act of the Shareholders, as applicable, with respect to any matter.

(f)     A Common Shareholder or Class A Preferred Shareholder who is present at a full meeting of the Shareholders, or at a meeting of the Class of Shareholders to which such Shareholder belongs, when action is taken, shall be deemed to have assented to the action taken *unless (i)* such Shareholder objects at the beginning of the meeting (or promptly upon such Shareholder's arrival) to holding the meeting or transacting business at the meeting, *(ii)* such Shareholder dissents or abstains from the action taken and the chairman of the meeting expressly acknowledges at such meeting the dissention or abstention of the Shareholder, *or (iii)* such Shareholder delivers written notice of such Shareholder's dissent or abstention to the presiding officer of the meeting before the meeting's adjournment or to the Company promptly after adjournment of the meeting. The right of dissent or abstention with respect to any action shall *not* be available to any Shareholder who votes in favor of the action taken.

### 8.8    Participation in Meetings Through Electronic Means; Proxies

Any Director may participate in a meeting of the Board of Directors of the Company and/or any subsidiary of the Company, and any Shareholder may participate in a full meeting of the Shareholders or any Class of Shareholders, as the case may be, through the use of any means of communication (*including, but not limited to,* telephone conferencing, video conferencing, and/or internet, intranet, or other computer communications) by which all participants may simultaneously hear or otherwise fully communicate with each other during the meeting, and a meeting may be exclusively held through the use of such means of communication. A Director or Shareholder, as the case may be, participating in a meeting by such means shall be deemed to be present in person at such meeting. Whenever in this Agreement any Director or Shareholder shall have the right to vote, such Director or Shareholder shall be entitled to vote by proxy.

### 8.9    Action by Written Consent

Any vote and/or any action required or permitted to be taken at a meeting by the Board of Directors of the Company and/or any subsidiary of the Company may be taken without a meeting so long as *(i)* a written consent specifying the resolutions and/or actions to which such Board of Directors is requested to assent is provided on a contemporaneous basis to each of the Directors on such Board of Directors pursuant to the notice provisions hereof and *(ii)* such written consent shall be signed by the number of Directors of either or both classes of Directors, as applicable, who would have been required to approve such action at a meeting of the Board of Directors. Any vote and/or any action required or permitted to be taken at a meeting by the Shareholders or any Class of Shareholders may be taken without a vote or meeting if a consent in writing, setting forth the action so taken, shall be signed by a Majority-in-Interest of all of the voting Shareholders (in the case of a joint meeting of the Shareholders) or by a Majority-in-Interest of the particular Class of Shareholders (in the case of a meeting of just one Class of Shareholders), as may be applicable.

### 8.10    Officers and Chairperson(s) of the Board

(a)     To the extent deemed advisable by them at any time and from time to time, the Board of Directors of the Company or any subsidiary of the Company may designate one or more Persons to act as officers or assistant officers of the Company or such subsidiary, *including, but not limited to (i)* a Chairman or Co-Chairmen, *(ii)* a Vice Chairman or co-Vice Chairmen, *(iii)* a President or Co-Presidents, *(iv)* one or more Group Chief Financial Officers, Managing Directors, Executive Vice Presidents, Senior Vice Presidents and Vice Presidents, *(v)* a Secretary, *(vi)* a Chief Executive Officer or Co-Chief Executive Officers, *(vii)* a Chief Operating Officer or Co-Chief Operating Officers, *(viii)* a Chief Financial Officer or Co-Chief Financial Officers, *(ix)* a Chief Marketing Officer or Co-Chief Marketing Officers, and/or *(x)* a Chief Administrative Officer or Co-Chief Administrative Officers. Any two or more offices may be held by the same Person, and a Person need not be a Shareholder in order to be an officer.

(b)     Unless and until changed by the applicable Board of Directors, the Persons designated as officers in Section F(4) of the Initial Portion of this Agreement shall be the duly authorized officers of the Company and/or one or more of the subsidiaries of the Company, as applicable.

(c)     Subject to any written employment, management, engagement, development, or other agreement between such officer with the Company and/or any subsidiary of the Company, each officer shall serve at the pleasure of the Board of Directors of the Company or such subsidiary, and, *except* as otherwise provided in such written agreement, may be removed and/or replaced at any time by the applicable Board of Directors with or without reason; *provided, however,* that any such removal or replacement shall

be without prejudice to the written contract rights, if any, of the Person removed or replaced. Election or appointment of an officer or agent shall not in and of itself create any contract rights, and, in order to be effective and enforceable, any contract rights must be set forth in a specific separate written employment, engagement, or other agreement executed by the Company and/or a subsidiary of the Company, as applicable, with the knowledge and written approval of the applicable Board of Directors. *Except* as otherwise provided under any employment, engagement, or other separate agreement with such officer, any officer of the Company and/or any subsidiary of the Company may resign at any time by giving written notice of such resignation to any Director of the Company or such subsidiary, who shall inform the other Directors of the Company and/or the subsidiaries, if any, of such resignation as soon as reasonably practicable thereafter. In such event, *unless* a later date is specified in such notice and approved by the applicable Board of Directors, an officer's resignation shall be effective upon delivery of the notice of resignation, without any action or acceptance by any Board of Directors being necessary.

(d)    *Except* to the extent, if any, otherwise provided in Section F(4) of the Initial Portion of this Agreement or otherwise provided by the Board of Directors at any time and from time to time, each officer shall have such powers, authority, duties, and obligations as are hereinafter provided under this Agreement. Notwithstanding any other provision of this Agreement which might be construed to the contrary, each officer shall be subject to the legal direction and control of the applicable Board of Directors at all times and no officer shall take any action on behalf of the Company or any subsidiary of the Company which is contrary to any Approved Budget or resolution of the Board of Directors of the Company or the applicable subsidiary (*unless* such action is contemporaneously or subsequently ratified by the applicable Board of Directors, in such Board of Directors' sole discretion).

(e)    The Chairman, if that office be created and filled, shall be the highest officer of the Company and each subsidiary of the Company and, as such, shall have the power and authority, subject to the applicable Board of Directors, to supervise and direct the President, Chief Executive Officer, and other officers of the Company and/or such subsidiary. The Chairman shall preside at all meetings of the shareholders and Board of Directors of the Company and each subsidiary of the Company. If no President is appointed, the Chairman shall have all of the rights, duties, and privileges of the President.

(f)    The Vice Chairman, if that office be created and filled, shall be the second highest officer of the Company and each subsidiary of the Company and, as such, shall have the power and authority, subject to the applicable Board of Directors and the Chairman, to supervise and direct the President, Chief Executive Officer, and other officers of the Company and/or such subsidiary. In the absence of the Chairman, the Vice Chairman shall preside at all meetings of the shareholders and Board of Directors of the Company and each subsidiary of the Company. Except as otherwise provided by the Board of Directors and/or the Chairman, the Vice Chairman shall have all the rights and powers of, and be subject to all the restrictions upon, the Chairman. The Vice Chairman shall also perform such other duties as from time to time may be assigned to the Vice Chairman by the Chairman and/or the Board of Directors.

(g)    The President of the Company and/or any subsidiary of the Company, *unless* a separate Chief Executive Officer is appointed, shall be the chief executive officer of the Company or such subsidiary, as applicable. If no Chairman has been appointed or, in the absence of the Chairman and any Vice Chairman, the President shall preside at all meetings of the shareholders and of the Board of Directors. Subject to the provisions of the Governing Instruments of the Company, the applicable subsidiary of the Company, and this Agreement and except as otherwise provided or directed by the Chairman or the Board of Directors, the President may sign certificates for shares of the Company or the applicable subsidiary, and any deeds, mortgages, bonds, contracts or other instruments. Subject to the power and authority of the Chairman, if any, the President shall, in general, perform all duties commonly incident to the office of president of corporations and such other duties as may be prescribed by the Board of Directors and/or the Chairman from time to time. Unless otherwise ordered by the Board of Directors and/or the Chairman, and subject to the power and authority of the Board of Directors and the Chairman, the President of the Company and/or any subsidiary shall have full power and authority on behalf of the Company or such subsidiary, as applicable, to attend, act and vote at any meetings of shareholders of any corporation in which the Company or such subsidiary, as applicable, may hold stock, and at any such meeting shall hold and may exercise all rights incident to the ownership of such stock which the Company, as owner, would have had and exercised if present. The Board of Directors and/or the Chairman may confer like powers on any other person or persons. If a Chairman and/or Vice Chairman is then serving, the President shall report to, and be subject to the direction and control of, such Chairman and/or Vice Chairman, and the Chairman and/or Vice Chairman may, in the Chairman's or Vice Chairman's sole discretion (unless otherwise provided by the Board of Directors) directly exercise any power and authority of, and directly take any actions which could be taken by, the President with respect to the Company.

(h)    In the absence of the President, or in the event of the inability or refusal of the President to act, the Vice-President (or, in the event there be more than one Vice-President, the Vice-Presidents in order designated at the time of their election, or in the absence of any designation, then in the order of their election), if that office be created and filled, shall, subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, and the Board of Directors, perform the duties of the President and when so acting shall have all the powers of and be subject to all the restrictions upon the President. The Vice-Presidents shall also perform such other duties as from time to time may be assigned to such Vice-President by the President, the Chairman, the Vice Chairman and/or the Board of Directors. Unless otherwise determined by the Chairman, any Group Chief Financial Officer or Managing Director of the Company and/or any subsidiary of the Company shall constitute an Executive Vice President of the Company and/or such subsidiary.

(i)    Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, and the Board of Directors, the Treasurer shall have charge and custody of and be responsible for all funds and securities of the Company; receive and give receipts for monies due and payable to the Company from any source whatsoever, and deposit all such monies in

the name of the Company in such banks, trust companies and other depositories as shall be selected by the applicable Board of Directors; and, in general, perform all the duties commonly incident to the office of treasurer and such other duties as from time to time may be assigned to the treasurer by the Chairman, the Vice Chairman, the President, or the applicable Board of Directors. If required by the Board of Directors, the Treasurer shall give a bond for the faithful discharge of the Treasurer's duties in such sum and with such surety or sureties as the Board of Directors shall determine.

(j)      Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, and the Board of Directors, the Secretary shall **(a)** keep the minutes of the shareholders' meetings and of the Board of Directors' meetings in one or more books provided for that purpose; **(b)** see that all notices are duly given in accordance with the provisions of these By-Laws or as required by law; **(c)** be custodian of the corporate records and of the seal, if any, of the Company; **(d)** keep a register of the mailing address of each shareholder; **(e)** sign with the President or Vice-President certificates for shares of stock of the Company; **(f)** have general charge of the stock transfer books of the Company; and, in general, perform all duties commonly incident to the office of Secretary and such other duties as from time to time may be assigned to the Secretary by the Chairman, the Vice Chairman, the President, or by the applicable Board of Directors.

(k)      Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, the Treasurer and the Board of Directors, and in the absence of the Treasurer or in the event of the inability or refusal of the Treasurer to act, the Assistant Treasurers, if any, shall perform the duties of the Treasurer and when so acting shall have all the powers of and be subject to all the restrictions upon the Treasurer. Each Assistant Treasurer shall also perform such other duties as from time to time may be assigned to such Assistant Treasurer by the Chairman, the Vice Chairman, the President, the Treasurer, and/or the applicable Board of Directors. The Assistant Treasurer, if that office be created and filled, shall, if required by the Board of Directors, give bond for the faithful discharge of his duty in such sum and with such surety as the Board of Directors shall determine.

(l)      Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, the Chief Executive Officer, the Secretary and the Board of Directors, and in the absence of the Secretary or in the event of the inability or refusal of the Secretary to act, the Assistant Secretaries, if any, shall perform the duties of the Secretary and when so acting shall have all the powers of and be subject to all the restrictions upon the Secretary. Each Assistant Secretary shall also perform such other duties as from time to time may be assigned to such Assistant Secretary by the Chairman, the Vice Chairman, the President, the Secretary, and/or the applicable Board of Directors.

(m)      The compensation of the officers of the Company and/or any subsidiary may be fixed and changed at any time by the Board of Directors of the Company or such subsidiary, as applicable (subject, however, to any contract rights of such officer under any written employment, engagement, management, engagement, development, or other separate agreement executed by the Company or such subsidiary, as applicable), and no officer shall be prevented from receiving such compensation by reason of the fact that such officer is also a Director or Shareholder of the Company and/or any subsidiary of the Company.

**8.11    Standard of Care of Directors and Officers; Disclaimers and Exculpations**

(a)      **The provisions of this Section 8.11 are intended to define the standard of conduct and fiduciary duties (including, but not limited to, any duty of loyalty to the Company, the Company's subsidiaries, and/or their Shareholders and other equityholders) of the Directors, officers, Shareholders and other equityholders of the Company and/or the Company's subsidiaries in a manner to reflect the understandings and agreements of the Shareholders. The Shareholders agree that the provisions of this Section 8.11 are reasonable. Furthermore, the Shareholders acknowledge and agree that the provisions of this Section 8.11 shall eliminate or materially limit the personal liability of a Director, officer, Shareholder, or other equityholders to the Company, the Company's subsidiaries, and/or their Shareholders or other equityholders for monetary damages for breach of fiduciary duties and/or other duties to the extent provided herein.**

(b)      Except as may be provided under any written employment, engagement, management, or other separate agreement between such Person and the Company and/or any subsidiary of the Company, no Director, officer, and/or Shareholder or other equityholder of the Company and/or any subsidiary of the Company shall be liable, responsible or accountable in damages to the Company, the Company's subsidiaries, and/or any Shareholder or other equityholder of the Company for any act or omission on behalf of the Company and/or any subsidiary of the Company performed or omitted by such Director, officer, Shareholder, or other equityholder in good faith and in a manner reasonably believed by such Director, officer, and/or Shareholder or other equityholder to be within the scope of the authority granted to such Director, officer, Shareholder, or other Shareholder by this Agreement, unless such Director, officer, and/or Shareholder or other equityholder has been guilty of gross negligence, intentional misconduct, or a knowing violation of law and/or the provisions of this Agreement with respect to such acts or omissions. A Director, officer, and/or Shareholder or other equityholder of the Company and/or any of the Company's subsidiaries who takes, or omits to take, any act on behalf of the Company and/or any subsidiary of the Company upon a written opinion of the Company's legal counsel shall be conclusively deemed to have been acting, or refraining to act, in such regard, in good faith, in a manner reasonably believed by such Director, officer, and/or Shareholder or other equityholder to be within the scope of the authority granted to such Director, officer, Shareholder or other equityholder by this Agreement, and not in a manner which constitutes gross negligence, intentional misconduct or a knowing violation of law.

(c)      Except to the extent limited by any written employment, engagement, management, or other agreement between such Person and the Company and/or a subsidiary of the Company, each Director, officer, Shareholder, or other equityholder of the Company and/or the Company's subsidiaries shall devote such amount of his, her or its business time and attention as such Director, officer, Shareholder or other equityholder, in his, her or its sole discretion, deems necessary.

(d)      *Except* to the extent limited by any written employment, engagement, management, or other agreement between such Person and the Company or otherwise provided under Section 8.13 or any other provision under this Agreement, any Director, officer, and/or Shareholder or other equityholder of the Company and/or any of the Company's subsidiaries, and/or any Affiliate of any of such Persons, may engage in, or possess an interest in, other business ventures or activities (collectively, **"Businesses/Activities"**) of any nature and description, independently or with others, whether or not such Businesses/Activities are competitive with those of the Company. None of the Company, any of the subsidiaries of the Company, or any Shareholder or equityholder of the Company or any subsidiary shall have any rights by virtue of this Agreement in and to such independent ventures, or to the income or profits derived therefrom. *Except* to the extent limited by any written employment, engagement, management, or other agreement between such Person and the Company or otherwise provided under this Agreement, no Director, officer, Shareholder or other equityholder of the Company and/or any subsidiary, or any Affiliate of any such Person shall be obligated to disclose or present any particular business opportunity of a character which, if disclosed or presented to the Company and/or any subsidiary of the Company, could be taken by the Company and/or any subsidiary of the Company and each such Director, officer, Shareholder, equityholder, and/or Affiliate shall have the right to take for his, her, or its own account, or to recommend to others, any such particular business opportunity to the exclusion of the Company, the Company's subsidiaries, and/or the Shareholders or other equityholders of the Company and/or the Company's subsidiaries. Notwithstanding the foregoing, Issa, Davis, Hendrick, Kennedy, Blue, Roth, and each Common Shareholder shall be obligated to present to the Company and/or the subsidiaries of the Company each Germane Opportunity (as hereinafter defined) which becomes available to Issa, Davis, Hendrick, Kennedy, Blue, Roth, or such Common Shareholder and/or any Affiliate of Issa, Davis, Hendrick, Kennedy, Blue, Roth, or such Common Shareholder, as the case may be, and, if desired by the Company and/or one or more of the Company's subsidiaries, Issa, Davis, Hendrick, Kennedy, Blue, Roth, or such Common Shareholder and/or Issa's, Davis', Hendrick's, Kennedy's, Blue's, Roth's, or such Common Shareholder's Affiliates shall, in good faith, endeavor to cause such Germane Opportunity to be made available to the Company and/or the Company's subsidiaries (but nothing herein shall be construed *(i)* as requiring that the Company or any subsidiary of the Company actually negotiate, accept, take, invest in, or otherwise deal in or with respect to any such Germane Opportunity *or (ii)* as requiring any Director, Shareholder, any of their Affiliates, or any other Person to contribute, loan, invest, or otherwise make any funds or financing available to the Company or any subsidiary of the Company for purposes of funding, enabling, or facilitating any such Germane Opportunity). For purposes of this agreement, the term **"Germane Opportunity"** shall mean any opportunity to acquire, undertake, engage in, or otherwise deal in or with respect to any Businesses/Activities that are the same or similar to, or otherwise competitive with, the Business (*other than and excluding* as opportunities the current business operations of Cool Oasis, *but not excluding* in such regard any new opportunities which constitute Germane Opportunities and become available to, or which may be consummated by, Cool Oasis after the Effective Date).

(e)      The fact that any Director, officer, Shareholder or other equityholder of the Company and/or any subsidiary of the Company, and/or any Affiliate of such Person, constitutes, or is directly or indirectly interested in or connected with, an individual, firm or corporation employed or engaged by the Company and/or any one or more subsidiaries of the Company (each a **"Related Party"**) to render or perform a service, or to or from whom the Company and/or any one or more subsidiaries of the Company, may purchase, sell or lease any tangible or intangible, real or personal property, shall not prohibit the Company and/or any of the Company's subsidiaries, with the consent of the Board of Directors of the Company, from employing such individual, firm or corporation or from otherwise dealing with him, her or it, and none of the Company, the subsidiaries of the Company, or any of the other Directors, officers, Shareholders, or other equityholders, shall have any rights in or to any income or profits derived therefrom by the contracting party. *Unless* otherwise provided under this Agreement or with the written consent of both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group (regardless whether any such Director or any Affiliate of any such Director may be interested parties as to such dealings), all such dealings of the Company and/or any subsidiary of the Company with any Related Party shall be at arms' length and on terms which are reasonably competitive and comparable in general with amounts which would be charged by independent third parties for similar services or goods; *provided, however,* that no actual bidding or open competition shall be necessary in determining the applicable pricing.

### 8.12   Indemnification of Directors, Officers, and Shareholders

(a)      To the fullest extent permitted by, and in accordance with the provisions of, applicable law, the Company and the Company's subsidiaries shall indemnify each Director, officer, and Shareholder against reasonable expenses (including reasonable attorneys' fees and disbursements), judgments, taxes, penalties, fines (including any excise tax assessed with respect to an employee benefit plan) and amounts paid in settlement (collectively **"Liability"**), incurred by such Person in connection with defending or participating as a witness with respect to any threatened, pending or completed action, suit or proceeding (whether civil, criminal, administrative or investigative, and whether formal or informal) rising from or related to, the Company and/or any subsidiary of the Company or any act or omission of the Director, officer, or Shareholder on behalf of the Company and/or any subsidiary of the Company (*other than* an action, suit or proceeding by the Company, any subsidiary of the Company, and/or any Shareholder of the Company) to which such Person is, or is threatened to be made, a party because such Person is or was a Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, or is or was serving at the request of the Company and/or any subsidiary of the Company as a director, officer, partner, member, manager, governor, employee or agent of any other domestic or foreign corporation, partnership, joint venture, limited liability company, trust, or other enterprise, *including, but not limited to,* service with respect to employee benefit plans. A Director, officer, or Shareholder shall be considered to be serving an employee benefit plan at the request of the Company or a subsidiary of the Company if such Person's duties to the Company and/or any subsidiary of the Company also impose duties on, or otherwise involve services by, such Person to the plan or to participants in or beneficiaries of the plan. To the fullest extent authorized or permitted by, and in accordance with the provisions of, the Act, the Company and/or the Company's subsidiaries shall, at such indemnified Person's request, pay or reimburse

reasonable expenses (including reasonable attorneys' fees and disbursements) incurred by such indemnified Person who is a party to such a proceeding in advance of final disposition of such proceeding.

**(b)** The indemnification against Liability and advancement of expenses provided by, or granted pursuant to, this Section 8.12 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement may be entitled under any agreement, action of disinterested Shareholders or other Shareholders, equityholders or Directors, or otherwise, both as to action in their official capacity and as to action in another capacity while holding such office of the Company and/or any subsidiary of the Company, shall continue as to a Person who has ceased to be a Director, officer, or Shareholder of the Company, and shall inure to the benefit of the heirs, executors and administrators of such a Person.

**(c)** Notwithstanding any other provision of this Agreement which might be construed to the contrary and without indemnity from the Company or any subsidiary of the company pursuant to the other provisions of this Section 8.12 or otherwise, each Class of Shareholders shall be responsible for and shall each indemnify each of the Company, the subsidiaries of the Company, and the other Directors, officers, and employees of the Company and/or the subsidiaries of the Company against any claim by any Director appointed by such Class of Shareholders for loss of office, unfair or wrongful dismissal, or other compensation or liability as a result of such Director's replacement or removal from office; *provided, however,* that the foregoing provisions of this Section 8.12 shall not extend or apply to any claims made by a Director against the Company, any subsidiary of the Company, and/or any other Director, officer, or employee of the Company and/or any subsidiary of the Company in such Director's capacity as an employee and/or officer of the Company and/or any subsidiary of the Company rather than in such Director's capacity as a Director.

**(d)** Any repeal or modification of this Section 8.12 shall not adversely affect any right or protection of a Director, officer, or Shareholder of the Company and/or any subsidiary of the Company under this Section 8.12 with respect to any act or omission occurring prior to the time of such repeal or modification.

### 8.13  Confidentiality and Nondisparagement Covenants

**(a)** At no time during or after termination of such Person's capacity as such shall any of the Directors, officers, or Shareholders of the Company and/or any of the subsidiaries, or any of such Person's Affiliates, communicate, divulge or use for the benefit of such Person, any Affiliate of such Person, and/or any other Person *other than* the Company or any Affiliate of the Company, any business secrets, manuals of instructions, franchise or system manuals, reports, data, business plans, business strategies, customer, or client lists or information, vendor or supplier lists or information, budgets, records, financial or accounting information, systems coding or passwords, personnel information, account records, product plans, software, or any other confidential or proprietary information or trade secrets of the Company or any Affiliate of the Company, or of any customer, or client of the Company or any Affiliate, of any type or description, whether written or not (**"Confidential Information"**); *provided, however,* that the provisions of this Section 8.13(a) shall not apply to *(i)* any Confidential Information which is in the public domain for a reason *other than* the negligence, omission or willful misconduct of such Person or such Person's Affiliates, *(ii)* any disclosures which are required by law, subpoena, court order, or administrative order (*provided, however,* that such Person or such Person's Affiliate, as applicable, shall, prior to any such disclosure, immediately notify the Board of Directors of the Company of such required disclosure and provide the Company and/or its Affiliates with the opportunity, prior to any such disclosure by such Person or such Person's Affiliates and at the expense of the Company and/or its Affiliates, to object to such disclosure and/or seek confidential treatment or other protections with respect to the Confidential Information to be so disclosed, as the Company and/or its Affiliates may deem advisable), *(iii)* the inclusion of information on Tax Returns that is required by law to be reported thereon, *or (iv)* any disclosure to such Person's legal counsel and accountants to the extent necessary in connection with such Person's Tax and legal affairs, if such recipients of the Confidential Information shall agree to maintain the confidentiality of such Confidential Information.

**(b)** Each Director, officer, and Shareholder of the Company and/or any of the subsidiaries of the Company, and his, her, or its Affiliates, shall fully comply with the provisions of which such Person has knowledge under any confidentiality agreements entered into by the Company or any of its Affiliates in the course of their business dealings with any Persons.

**(c)** Upon termination of a Director's, officer's, or Shareholder's status as such, such Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, and the Affiliates of such Director, officer, or Shareholder, as may be applicable, shall immediately deliver to the Company all lists, records, manuals, reports, operating plans, business plans, product plans, data, software and other documents, information, and materials in such Person's possession which constitute or contain Confidential Information, *including, but not limited to,* all copies, reproductions, and/or excerpts of any such Confidential Information whether held, stored, or maintained in written form, photographic form, by means of any electronic, magnetic, laser or other computer or data processing media (*including, but not limited to,* storage on a computer network, hard drive, flash drive, CD, DVD, disk, or diskette), or otherwise.

**(d)** At no time during or after termination of such Person's capacity as such shall any Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, or any Affiliate of such Director, officer, or Shareholder, issue or circulate publicly, to any customers or suppliers of the Company and/or any of the Company's subsidiaries, in any marketing materials or to the media, any false or disparaging statements, remarks or rumors about the Company and/or any of the Company's subsidiaries (*including, but not limited to,* any such statements, remarks, or rumors about the business, clients, customers, Directors, officers, Shareholders, or employees of the Company and/or any of the Company's subsidiaries).

(e)    Should any Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, or any Affiliate of such Director, officer, or Shareholder, violate the provisions of this Section 8.13 in addition to any other rights or remedies available to the other parties hereto, such other parties shall each have the right to enjoin such activities and obtain any other equitable relief which a court of competent jurisdiction may grant.

## 8.14   Key Man Life and Disability Insurance

Each of Issa, Davis, Hendrick, and the other Shareholders who are individuals recognize that *(i)* the direct and/or indirect services and involvement of such Person is important to the Company and the subsidiaries of the Company and *(ii)* the Company, the Company's subsidiaries, and the Shareholders, *including, but not limited to,* the Blue Equity, subsequent Class A Preferred Shareholders, and their Affiliates, as Shareholders of the Company and/or any subsidiaries of the Company and, if applicable, as the guarantor(s) of any indebtedness or obligations of the Company and/or any of the subsidiaries of the Company, would be materially and adversely affected by the loss of any of such services or involvement. Therefore, each of Issa, Davis, Hendrick, and the other Shareholders who are individuals agree that any one or more of *(i)* the Company, *(iii)* the subsidiaries of the Company, *or (iii)* the Shareholders (but only at sole cost of such Shareholder(s) and without reimbursement from the Company and/or any of the Company's subsidiaries), as the case may be, may seek to obtain such key man life and/or disability insurance policies with respect to any one or more of such Persons, and providing for such levels of benefit payable to the Company and/or the Company's subsidiaries (in the case of any such insurance paid for by the Company and/or any of the Company's subsidiaries) or to such Shareholder(s) who pay for such insurance (or to the designee(s) of the Company, any subsidiary of the Company, or such Shareholder(s)), as the Board of Directors (in the case of any such insurance paid for by the Company and/or any subsidiary of the Company) or the paying Shareholder(s), as applicable, determine to be advisable and financially feasible initially and from time to time thereafter. In such regard, each of Issa, Davis, Hendrick, and the other Shareholders who are individuals hereby agrees to promptly complete and execute such applications and other documents, and submit to such normal insurance-related physical examinations, as may be reasonably required by any potential insurer selected by the Board of Directors (in the case of any such insurance paid for by the Company and/or any of the subsidiaries) or by the paying Shareholder(s), as applicable.

## 8.15   Effect of Equity Issuances Pursuant to Section 4.4

Any and all of the provisions of Article 8 shall be subject to amendment, change, or modification to such extent as the Board of Directors of the Company may reasonably deem necessary to implement the terms and conditions of any new issuance of equity interests pursuant to Section 4.4 hereof; *provided, however,* that such amendments, changes, or modifications may only be with respect to management controls if such new equity interests authorized pursuant to Section 4.4 hereof are only issued to Persons who are not already then Shareholders of the Company.

## 8.16   Restricted Competition and Restricted Solicitation Covenants

(a)    **Restricted Competition and Solicitation Covenants Applicable to the Cool Corp Restricted Parties**

Each of the Cool Corp Restricted Parties (as defined in Section I(1) of the Initial Portion of this Agreement) hereby jointly and severally agrees, warrants, represents and covenants with the Company and the other Parties hereto as follows:

(i)    During the Cool Corp Restricted Competition Period (as defined in Section I(3) of the Initial Portion of this Agreement) and *except and excluding* the Cool Corp Permitted Activities (as defined in Section I(6) of the Initial Portion of this Agreement), none of Cool Corp or any of the other Cool Corp Restricted Parties shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, *(i)* own, *(ii)* operate, *(iii)* manage, *(iv)* join, *(v)* control, *(vi)* advise, *(vii)* consult with, *(viii)* provide any marketing, advertising, or sales services for, *(ix)* participate in the ownership, management, operation, or control of, *(x)* furnish any capital or financing to, *(xi)* permit Cool Corp's or any other Cool Corp Restricted Party's name or goodwill to be used in connection with, *(xii)* be connected in any manner with, *(xiii)* provide services to or for the benefit of, *(xiv)* have any interest in the profits of, *or (xv)* permit any real or personal property owned or controlled by Cool Corp or any other Cool Corp Restricted Party to be used for less than full fair market value or full fair rental value, as applicable, by or for, any business or enterprise engaged in all or any part of the Business, or in connection with any activity which is the same as similar to any of those activities carried on with respect to the Business, anywhere within the Restricted Area (as defined in Section I(4) of the Initial Portion of this Agreement). For the avoidance of doubt, nothing in this Section 8.16(a)(i) shall be construed as restricting in any way the right of any Party or any Party's Related Party or Affiliate to sell, distribute, market, export, import, and otherwise deal with respect to grocery, convenience, sundry, and/or other consumer products through any retail, wholesale, commercial, and/or other channel (but, in such regard, the term "grocery, convenience, sundry, and/or other consumer products" shall not be construed as including any Petro Products or Shared LPG Activities),

(ii)    During the Cool Corp Restricted Solicitation Period (as defined in Section I(3) of the Initial Portion of this Agreement), none of Cool Corp or any of the other Cool Corp Restricted Parties shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the

shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit or entice away, or assist any other Person in soliciting or enticing away, from the employment of, or from the engagement as a commission agent or other independent contractor by, the Company or any of the Company's Affiliates, or hire, engage as a commission agent or other independent contractor, or assist any other Person in hiring or engaging as a commission agent or other independent contractor, any Person who is currently, or who becomes at any time during the Cool Corp Restricted Solicitation Period, an employee, commission agent, or other independent contractor of the Company or any of the Company's Affiliates.

(iii)    During the Cool Corp Restricted Solicitation Period, *other than* as an employee, shareholder, officer, consultant, member, or other interest holder of, and for the benefit of, the Company and/or the Company's Affiliates at such time and *except and excluding* the Cool Corp Permitted Activities (as defined in Section I(6) of the Initial Portion of this Agreement), none of Cool Corp or any of the other Cool Corp Restricted Parties shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit, request, or entice, or assist or encourage any other Person in soliciting, requesting, or enticing, any Person who is currently, or who becomes at any time during the Cool Corp Restricted Solicitation Period, a Client of the Company and/or any Affiliate of the Company, or with whom the Company and/or any Affiliate of the Company had more than *de minimis* discussions at any time during the 12 month period prior to the Cool Corp Restricted Solicitation Period regarding the possibility of such Person becoming a Client of the Company and/or any Affiliate of the Company, *(i)* to curtail or cancel its business with the Company and/or any Affiliate of the Company *or (ii)* to not engage the Company and/or any Affiliate of the Company, as the case may be. Discussions with a Person shall be deemed to be more than *de minimis* if they consist of more than a mere introduction or introductory meeting, conversation, or correspondence without proposal or discussion of any potential terms of engagement.

(b)    **Restricted Competition and Solicitation Covenants Applicable to Blue Petroholdings Restricted Parties**

(i)    During the Purchaser Restricted Competition Period (as defined in Section I(4) of the Initial Portion of this Agreement) and *except and excluding* the Blue Petroholdings Permitted Activities (as defined in Section I(7) of the Initial Portion of this Agreement), none of the Blue Petroholdings Restricted Parties (so long as they are Blue Petroholdings Restricted Parties under this Agreement) shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, *(i)* own, *(ii)* operate, *(iii)* manage, *(iv)* join, *(v)* control, *(vi)* advise, *(vii)* consult with, *(viii)* provide any marketing, advertising, or sales services for, *(ix)* participate in the ownership, management, operation, or control of, *(x)* furnish any capital or financing to (other than loans in the ordinary course of a commercial banking business owned or controlled by any one or more of the Blue Petroholdings Restricted Parties), *(xi)* permit any Blue Petroholdings Restricted Party's name or goodwill to be used in connection with, *(xii)* be connected in any manner with, *(xiii)* provide services to or for the benefit of (other than in the ordinary course of the ice business or any other business owned or controlled by any one or more of the Blue Petroholdings Restricted Parties that is not competitive with the petroleum business), *(xiv)* have any interest in the profits of, *or (xv)* permit any real or personal property owned or controlled by Blue Petroholdings or any other Blue Petroholdings Restricted Party (other than in the ordinary course of the ice business or any other business owned or controlled by any one or more of the Blue Petroholdings Restricted Parties that is not competitive with the petroleum business) to be used for less than full fair market value or full fair rental value, as applicable, by or for, any business or enterprise engaged in all or any part of the Business, or in connection with any activity which is the same or similar to any of those activities carried on with respect to the Business, anywhere within the Restricted Area (as defined in Section I(4) of the Initial Portion of this Agreement).

(ii)    During the Blue Petroholdings Restricted Solicitation Period (as defined in Section I(4) of the Initial Portion of this Agreement), none of the Blue Petroholdings Restricted Parties (so long as they are Blue Petroholdings Restricted Parties under this Agreement) shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit or entice away, or assist any other Person in soliciting or enticing away, from the employment of, or from the engagement as a commission agent or other independent contractor by, the Company or any of the Company's Affiliates, or hire, engage as a commission agent or other independent contractor, or assist any other Person in hiring or engaging as a commission agent or other independent contractor, any Person who is currently, or who becomes at any time during the Blue Petroholdings Restricted Solicitation Period, an employee, commission agent, or other independent contractor of the Company or any of the Company's Affiliates; *provided, however,* that the foregoing shall not apply with respect to **Steven Whittingham, Mauricio Gojman**, or any other Person who has a pre-existing relationship with any of the Blue Petroholdings Restricted Parties.

(iii)    During the Blue Petroholdings Restricted Solicitation Period, *other than* as an employee, shareholder, officer, consultant, member, or other interest holder of, and for the benefit of, the Company and/or the Company's Affiliates at such

time and *except and excluding* the Blue Petroholdings Permitted Activities (as defined in Section I(7) of the Initial Portion of this Agreement), none of the Blue Petroholdings Restricted Parties (so long as they are Blue Petroholdings Restricted Parties under this Agreement) shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit, request, or entice, or assist or encourage any other Person in soliciting, requesting, or enticing, any Person who is currently, or who becomes at any time during the Blue Petroholdings Restricted Solicitation Period, a Client of the Company and/or any Affiliate of the Company, or with whom the Company and/or any Affiliate of the Company had more than *de minimis* discussions at any time during the 12 month period prior to the Blue Petroholdings Restricted Solicitation Period regarding the possibility of such Person becoming a Client of the Company and/or any Affiliate of the Company, *(i)* to curtail or cancel its business with the Company and/or any Affiliate of the Company *or (ii)* to not engage the Company and/or any Affiliate of the Company, as the case may be. Discussions with a Person shall be deemed to be more than *de minimis* if they consist of more than a mere introduction or introductory meeting, conversation, or correspondence without proposal or discussion of any potential terms of engagement.

**(c)     Reasonability of Restrictions; Severability**

**(i)**     Each of the Cool Corp Restricted Parties and the Blue Petroholdings Restricted Parties, acknowledges and agrees that the scope of the foregoing restricted competition and restricted solicitation covenants, *including, but not limited to,* the scope of the business and activities which are restricted, the geographic area (Restricted Area) in which Cool Corp, Blue Petroholdings, and the other Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties are restricted from competing pursuant to the foregoing restricted competition covenants, and the period of time (Cool Corp Restricted Competition Period, Cool Corp Restricted Solicitation Period, Blue Petroholdings Restricted Competition Period and Blue Petroholdings Restricted Solicitation Period) during which Cool Corp, Blue Petroholdings, and the other Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties are restricted from competing or soliciting pursuant to the foregoing restricted competition and restricted solicitation covenants, are reasonable restrictions with respect to scope, area, and time.

**(ii)**     The running of the Cool Corp Restricted Competition Period and the Cool Corp Restricted Solicitation Period with respect to Cool Corp and each of the other Cool Corp Restricted Parties shall be tolled for any period during which Cool Corp and/or any of the other Cool Corp Restricted Parties is in breach of any of the covenants and agreements contained in Section 8.16(a) for any reason whatsoever. The running of the Blue Petroholdings Restricted Competition Period and Blue Petroholdings Restricted Solicitation Period with respect to Blue Petroholdings and each of the other Blue Petroholdings Restricted Parties shall be tolled for any period during which any of the Blue Petroholdings Restricted Parties is in breach of any of the covenants and agreements contained in Section 8.16(b) for any reason whatsoever.

**(iii)**     If any court of competent jurisdiction or arbitrator or arbitration panel pursuant to the Alternative Dispute Resolution Provisions set forth in Section 10.4 below should finally adjudicate that the restrictions provided under this Section 8.16 are too broad as to scope, geographic area, or time, said scope, geographic area or time shall be reduced to such extent as the court may deem reasonable, and the restriction shall be enforced as to such reduced scope, geographic area, and/or time. The court may sever any invalid covenant or language contained in this Section 8.16 and, upon such severance, the terms of this Section 8.16 shall be interpreted as if such invalid covenants or language were not contained herein.

**(d)     Specific Performance**

Each of Cool Corp, Blue Petroholdings, and the other Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties hereby agrees and acknowledges that none of the Company or the other Parties hereto or their Affiliates would have any adequate remedy at law for the breach or threatened breach by such Cool Corp Restricted Party or Blue Petroholdings Restricted Party, as the case may be, of the covenants and agreements set forth in this Section 8.16 applicable to such Cool Corp Restricted Party or Blue Petroholdings Restricted Party and, accordingly, each of the Parties further *(i)* agree that the Company, the other Parties, and/or their Affiliates, as applicable, may, in addition to the other remedies which may be available to it or them hereunder or otherwise at law or in equity, seek through the Alternative Dispute Resolution Provisions set forth in Section 10.4 below to enjoin, or file suit in equity to enjoin, any of the others of them, as applicable, from such breach or threatened breach *and (ii)* consent to the issuance of injunctive relief hereunder. Each of the Cool Corp Restricted Parties and the Blue Petroholdings Restricted Parties understands and agrees that the act of the Parties in entering into this Agreement, and Parties' covenants hereunder, shall and do constitute sufficient consideration for the restrictive covenants set out in this Section 8.16. Furthermore, each of the Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties acknowledges and agrees that its agreement to the restrictive covenants set out in this Section 8.16 (directly or through an Affiliate who is a Party hereto on their behalf) constitutes a material inducement for the Parties to enter into this Agreement. The covenants provided for under this Section 8.16 are intended to be enforceable separately from, and without affecting, any other restrictions on competition or solicitation that may be applicable to any of the Parties under the Share Purchase Agreement or any other agreement.

## ARTICLE 9

### WITHDRAWAL, ASSIGNMENT AND ADDITION OF SHAREHOLDERS

### 9.1   Assignment of Shares

*Except* as otherwise provided and permitted under this Article 9, no Shareholder may sell, assign, transfer, pledge, hypothecate, encumber, withdraw or otherwise dispose of (each of which actions constitutes a **"Transfer"** for all purposes of this Agreement) all or any portion of such Shareholder's Shares to any Person. Any purported Transfer which is not in compliance with the provisions of this Article 9 shall be null and void *ab initio* and of no force or effect, and the Shareholder purporting to make such Transfer shall, for all purposes hereof, remain a Shareholder.

### 9.2   Tag Along and Drag Along Rights

If, *other than* in a Transfer permitted under Section 9.5 below, any one or more of Blue Equity and/or any Affiliates of Blue Equity which are Shareholders (collectively, the **"Selling Shareholder(s)"**) desire to sell or exchange, in any single Transfer or group of related Transfers, a number of Shares owned by such Selling Shareholder(s) which constitute more than **50%** in voting power of all of the voting Shares of the Company then owned by Blue Equity and Blue Equity's Affiliates, in the aggregate (collectively, the **"Shares To Be Transferred"**), such Selling Shareholder(s) may consummate such sale or exchange of the Shares To Be Transferred, *but if and only if* such Selling Shareholder(s):

(a)   Cause the proposed purchaser of such Shares To Be Transferred to offer in writing to similarly purchase or exchange, in a sale or exchange to be consummated at the same time as the purchase or exchange of the Shares To Be Transferred is consummated, from each of the other Shareholders (each a **"Tag-Drag Shareholder"**) a number of the Shares of the Company then owned by such Tag-Drag Shareholder (collectively, the **"Tag-Drag Shares"** of such Tag-Drag Shareholder) *which bears the same ratio to* the total number of Shares (regardless of the Class of Shares) then owned by such Tag-Drag Shareholder, in the aggregate, *as* the total number of Shares To Be Transferred *bears* to the total number of Shares (regardless of the Class of Shares) then owned by all of the Selling Shareholder(s), in the aggregate, at the same price or exchange value per Share, and on the same payment or exchange terms, as is applicable with respect to the Shares To Be Transferred; *and*

(b)   Either, in the sole discretion of the Board of Directors of the Company (*that is,* the Board of Directors must select one of the following two rights to apply),

(i)   Require each of the Tag-Drag Shareholders to sell or exchange all of the Tag-Drag Shares of such Tag-Drag Shareholder to the Purchaser, at the same price or exchange value per Share, and on the same payment or exchange terms, as applicable with respect to the Shares To Be Transferred, in which case each of such Tag-Drag Shareholders and the purchaser must comply with such required sale or exchange (**"Drag-Along Rights"**); *or*

(ii)   Allow each of the Tag-Drag Shareholders to accept or reject such offer, in such Tag-Drag Shareholder's sole discretion, in which case, and if such offer is accepted by such Shareholder, the proposed purchaser must purchase or acquire in exchange, and such Tag-Drag Shareholder must sell or exchange, the Tag-Drag Shares of such Tag-Drag Shareholder at the same price or exchange value per Share and on the same payment or exchange terms as applicable with respect to the Shares To Be Transferred (**"Tag-Along Rights"**).

(c)   At the closing of the purchase and sale of the Shares To Be Transferred, the Tag-Drag Shareholder whose Shares are required to be sold pursuant to the Drag-Along Rights or who elects to sell any Tag-Drag Shares pursuant to the Tag-Along Rights, as the case may be, shall execute such instruments of assignment as shall be reasonably requested by the purchaser and/or the Board of Directors of the Company. If such Tag-Drag Shareholder fails to execute any such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Agreement or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 9.2(c) with respect to such Tag-Drag Shareholder's applicable Tag-Drag Shares if such Tag-Drag Shareholder fails to do so on a timely basis. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it.

### 9.3   Voluntary Transfers By Certain Minority Common Shareholders

(a)   If, at any time after *the first to occur of (x)* the **third anniversary** of the Effective Date of this Agreement, *or (y)* the date on which Class A Base Payback is achieved, any Common Shareholder who, together with all Related Parties and Affiliates of such Common Shareholder, then owns or controls, in the aggregate, less than **5%** of the then issued and outstanding Common Shares of the Company (a **"Selling Minority Shareholder"**) receives a bona fide written offer (**"Offer"**) by any Person, other than with respect to a Transfer permitted under Section 9.5 below or pursuant to the provisions of Section 9.2 above, to

purchase all or any portion of such Selling Minority Shareholder's Common Shares and if the Selling Minority Shareholder desires to accept such Offer, then such Common Shares shall be subject to the following right of first refusal options:

(i)    The Selling Minority Shareholder shall give, or cause to be given, written notice of the options set forth below to the Company and to all of the other Common Shareholders, which notice shall contain a true and correct copy of the Offer (the **"Sales Notice"**). An election to exercise an option granted under this Section 9.3 shall be made by written notice given to the Selling Minority Shareholder within the time period permitted for exercise of such option. Unless otherwise specified in the notice of exercise, any exercise of an option under this Section 9.3 shall be deemed to be effective as to the maximum number of Common Shares of the Selling Minority Shareholder which such option holder is eligible to purchase pursuant to exercise of such option (which could be all of the Common Shares of the Selling Minority Shareholder then subject to the options granted under this Section 9.3 if no other option holder exercises such option holder's option with respect to such Common Shares). Any exercise of an option granted under this Section 9.3 shall be irrevocable once made (*subject, however,* to the provisions of Section 9.3(d) below).

(ii)    The Sales Notice shall constitute a first offer by the Selling Minority Shareholder to sell all of the Common Shares covered by the Offer to the other Common Shareholders (the **"Other Common Shareholders "**), and such Other Common Shareholders shall have the first option to purchase any or all of the Common Shares subject to the Offer, at the price and upon the other terms and conditions set forth below. If more than one of the Other Common Shareholders exercise the option granted under this Section 9.3(a)(ii), then such exercising Other Common Shareholders shall have the right to purchase the subject Common Shares on a prorata basis in accordance with their respective Common Share holdings, or in such other percentages as they may unanimously agree. The option granted each Other Common Shareholder under this Section 9.3(a)(ii) shall expire and no longer be exercisable if not exercised by such Other Common Shareholder within **30 days** following the date of delivery of the Sales Notice to such Other Common Shareholder.

(iii)    In the event, and to the extent, that the Other Common Shareholders shall fail or neglect to timely exercise their options as to all of the Common Shares which are subject to the Offer, then the Company shall have the second option to purchase any or all of such remaining Common Shares, at the price and upon the other terms and conditions set forth below. The option granted the Company under this Section 9.3(a)(iii) shall expire and no longer be exercisable if not exercised by the Company within **60 days** following the date of delivery of the Sales Notice to the Company.

(b)    The options of the Other Common Shareholders with respect to the Common Shares which are subject to the Offer and the option of the Company with respect to such Common Shares, as set forth above, shall be exercisable at a price for each such Common Share equal to the purchase price for such Common Share set forth in, or calculable under, the Offer. Such purchase price shall be payable in accordance with the payment terms set forth in the Offer; *provided, however,* that, unless otherwise agreed by the Selling Minority Shareholder and the purchasing Shareholder(s) and/or Company, as applicable, the closing of any such purchase and sale of Common Shares pursuant to this section shall take place at the general offices of the Company no later than **90 days** after the latest date of delivery of the Sale Notice to any of the Other Common Shareholders or the Company. At the option closing, the Selling Minority Shareholder shall transfer and assign all of the Common Shares which are being sold to such other Common Shareholder(s) and/or the Company, as applicable, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee, other than the Company, shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased.

(c)    Upon the failure or neglect of the other Common Shareholders and the Company, in the aggregate, to purchase all of the Common Shares offered to them pursuant to the foregoing options, the Selling Minority Shareholder shall have, for a period of **60 days** following the date on which the last such option to purchase expires, the right to sell the Common Shares described in the Offer to the Person making the Offer at exactly the same price and upon exactly the same other terms and conditions set forth in the Offer; *provided, however,* that the Person making the Offer, or such Person's Affiliates, do not directly or indirectly compete with the Company or any of the Company's subsidiaries. In the event of such sale pursuant to the Offer, the transferee of the subject Common Shares shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the Person making the Offer and purchasing the subject Common Shares shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased. If the Selling Minority Shareholder fails or neglects to sell such Common Shares within such **60 day** period in accordance with the foregoing, or if any material term of the Offer is changed, modified or supplemented, then such Common Shares shall continue to be owned by the Selling Minority Shareholder, shall continue to be subject to the terms and conditions of this Agreement, and may not be sold without first again giving the other Common Shareholders and the Company the options to purchase such Units as provided in this Agreement.

(d)    *Notwithstanding anything herein which might be construed to the contrary,* if the other Common Shareholders and the Company, pursuant to their options under this Agreement, shall fail to exercise their options, in the aggregate, to purchase

---

*all* of the Common Shares covered by the Offer, then none of the option exercises as to any of such Common Shares shall be valid or recognized and the Selling Minority Shareholder may sell the applicable Common Shares as provided under Section 9.3(c) above.

(e)    *Notwithstanding the foregoing,* if Luminus is the Selling Minority Shareholder and Luminus is then a party to another shareholders agreement with Blue Equity and/or any Affiliates of Blue Equity providing for a right of first refusal option in favor of Blue Equity and/or any Affiliates of Blue Equity in the case of a voluntary Transfer of the type described above, then such right of first refusal option in favor of Blue Equity and/or Blue Equity's Affiliates shall be primary and only to the extent that such right of first refusal option is not exercised and consummated shall the right of first refusal options provided under this Section 9.3 then be triggered.

**9.4    Involuntary Transfers**

(a)    In the event that any Shares of any Shareholder ("**Transferring Shareholder**") are sought to be Transferred by any involuntary means (*other than* any Transfer by reason of the death or adjudication of incompetency of any Shareholder, *but including, but not limited to,* any Transfer by reason of attachment, garnishment, execution, levy, bankruptcy, or seizure or by reason of a transfer or division of interests as a result of, or in connection with, a divorce, marital dissolution, or other marital property settlement), then such Shares shall be subject to the following options:

(i)    The other Shareholders (the "**Other Shareholders**") shall have the first option to purchase any or all of the Shares sought to be involuntarily Transferred at the price and upon the other terms and conditions set forth below. Each of the Other Shareholders shall have the right to purchase the applicable Shares in accordance with their Percentage Interests of Common Shares, among themselves, or in such other percentages as they may unanimously agree. If not all of the Other Shareholders exercise their options with respect to the applicable Shares, then those Other Shareholders exercising their options shall be entitled to purchase the balance in accordance with their Percentage Interests among themselves, or in such other percentages as they may unanimously agree.

(ii)    In the event that the Other Shareholders shall fail to exercise their options as to all of the Shares which are sought to be so involuntarily Transferred, then the Company shall have the second option to purchase any or all of such remaining Shares of the applicable Class of Shares, at the price and upon the other terms and conditions set forth below. If the Company purchases any of such Shares pursuant to this option, all of such purchased Shares shall be immediately distributed and reissued to the Other Shareholders on a prorata basis in accordance with their respective Percentage Interests.

(iii)    Whenever a Transferring Shareholder's Shares shall be subject to an option under this Section 9.4, substantially simultaneous notice of the option shall be given in writing by the Transferring Shareholder (or by the Transferring Shareholder's personal representative, heir, or other representative) to the Company and to each of the Other Shareholders; *provided, however,* that if there is an attempted (or assertedly completed) involuntary Transfer and the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable), fails to give the foregoing notice of the option within **five (5) days** after written demand therefor by the Company or any Shareholder, then the Company or any Shareholder may give such notice on behalf of, and in the name of, the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable). Such notice shall state the number and Class of Shares which is are subject to the attempted (or assertedly completed) involuntary Transfer. The option period with respect to the option given the Other Shareholders shall commence upon the last date of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **30 days** thereafter, unless sooner terminated by written refusal of all of the Other Shareholders to exercise such option. The option period with respect to the option given the Company shall commence upon the last day of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **60 days** thereafter. An election to exercise any option shall be made in a written instrument delivered to the Transferring Shareholder (or to such Transferring Shareholder's personal representative, heir, or other representative). Unless otherwise specified in the notice of exercise, **(A)** any exercise of an option under this Section 9.4 shall be deemed to be effective as to the maximum number of Shares of the Transferring Shareholder which such holder is eligible to purchase pursuant to exercise of such option (which could be all of the Shares of the Transferring Shareholder then subject to the options granted under this Section 9.4 if no other option holder exercises such holder's option with respect to such Shares), *and* **(B)** the exercise of any option by the Company shall only be effective as to any Shares sought to be involuntarily Transferred as to which none of the Other Shareholders has exercised its option under this Section 9.4,. Any exercise of an option granted under this Section 9.4 shall be irrevocable once made *unless* revocation of such option is permitted by written consent of the Board of Directors.

(iv)    If, notwithstanding the provisions of this Agreement, any Shares are Transferred by involuntary means without compliance with the foregoing provisions of this Section 9.4, then the options referred to in this Section 9.4 shall be to purchase such Shares from the transferee(s).

(b)    For purposes of this Section 9.4, the option purchase price for the Shares of a Transferring Shareholder to be purchased pursuant to the options shall be an amount equal to the Applicable Amount (as hereinafter defined) determined using the date of the notice of the attempted (or assertedly completed) involuntary Transfer as the Determination Date.

(c)    The option purchase price for the portion of the applicable Shares of a Transferring Shareholder to be purchased by each purchasing Shareholder or the Company, as applicable, shall, at the option of such purchasing party, be paid either *(i)* in immediately available funds on the option closing date, *or (ii)* at least **20%** in immediately available funds on the option closing date,

with the balance represented by a promissory note of such purchasing Shareholder or the Company, as applicable with respect to such Share(s), bearing interest at the Prime Rate (as hereinafter defined) *minus* **2%** and payable in not more than ten equal semi-annual installments of principal together with accrued interest.

(d)     The option closing date with respect to the purchase of any Shares pursuant to the exercise of any option under this Section 9.4 shall occur on such date designated by the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, but in any event within **30 days** following the end of the option period during which such option could be exercised. At the option closing on the option closing date, the Transferring Shareholder (or other seller) shall transfer and assign to the purchaser(s) all of the Shares which are then required to be sold pursuant to exercise of the applicable option, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee (other than the Company) shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares or their subsequent Transfer. At the option closing, the Transferring Shareholder (or other seller) shall execute such instruments of assignment as shall be reasonably requested by each purchaser. If the Transferring Shareholder (or other seller) fails to execute such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Agreement or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 9.4(d) if such party is a Transferring Shareholder (or other seller) under this Section 9.4 and fails to do so. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it.

(e)     Upon the failure of the Other Shareholders and/or the Company to purchase all of the Shares sought to be involuntarily Transferred in accordance with this Section 9.4, the unpurchased Shares may be involuntarily Transferred. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a "Shareholder" for purposes thereof.

(f)     For all purposes of this Agreement, **"Applicable Amount"** as of any Determination Date with respect to the applicable Shares of the applicable Shares of the Transferring Shareholder to be purchased and sold pursuant to the options shall mean an amount determined as follows:

(i)     If the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 9.4 shall agree upon an amount to constitute the Applicable Amount with respect to such purchase and sale of Shares, such agreed price shall constitute the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares (the **"Contemporaneously Agreed Price"**).

(ii)     If the purchasing and selling parties with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 9.4 shall fail or neglect to agree upon a Contemporaneously Agreed Price with respect to such purchase and sale of Shares within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a Contemporaneously Agreed Price be agreed upon, then the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares shall be an amount equal to the Appraised Value (as hereinafter defined) of such Shares as of the applicable Determination Date (the applicable **"Determination Date"**.

(g)     For all purposes of this Section 9.4, the term **"Appraised Value" "** with respect to any Shares as of any Determination Date shall mean an amount determined in the following manner:

(i)     Whenever the Appraised Value of any Shares of a Transferring Shareholder as of any Determination Date is required to be determined with respect to a purchase or sale of Shares pursuant to this Section 9.4, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall attempt to mutually agree upon a single appraiser to appoint to determine the fair market value of the applicable Shares of the Transferring Shareholder to be so purchased and sold. If such purchasing and selling parties fail or neglect to agree upon a single appraiser within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a single appraiser be agreed upon, then, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall each appoint a qualified appraiser within **15 days** thereafter to determine the fair market value as of such Determination Date of the applicable Shares of the Transferring Shareholder to be purchased and sold.

(ii)     If a single appraiser is agreed upon by the purchasing and selling parties, such appraiser shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder with **30 days** following the date of such appraiser's engagement to render such appraisal (or within such reasonably longer period as may be required by such appraiser, and the Appraised Value of such Shares shall conclusively be deemed to be the value determined by such appraiser.

(iii)    If two appraisers are appointed, each of the two appraisers shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder to be purchased and sold within **30 days** following the close of the **15-day** period referred to in Section 9.4(g)(i) above (or within such reasonably longer period as may be agreed upon by the two appraisers), each of which determinations shall be delivered to the purchasing and selling parties. If the two appraisals differ by **10% or less** of the higher appraisal, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the average of such two appraisals. If the two appraisals differ by **more than 10%** of the higher appraisal, the two appraisers shall, within **10 days** after delivery to the purchasing and selling parties of the second to be delivered of the two appraisals, appoint a third qualified appraiser who shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder within **30 days** following such third appraiser's appointment. In such event, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the middle appraisal of the three appraisals. If the first two appraisers are unable to agree upon a third appraiser within such **10 day** period, then any party may petition any court of competent jurisdiction to appoint the third appraiser (the first such valid petition filed to be the one effective for such purpose).

(iv)    If either the purchasing party or parties, on the one hand, *or* the selling party, on the other hand, shall fail to timely appoint its appraiser, or if the appraisal prepared by either party's designated appraiser shall not be provided to the other party within the applicable time period set forth in Section 9.4(g)(iii) above, then such defaulting party or parties shall be deemed to have forfeited its or their right to an appraisal and the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the appraisal of the appraiser appointed by the other party or parties, as the case may be.

(h)    For all purposes of this Agreement, the term **"Prime Rate"** with respect to any period shall mean the average base rate on corporate loans posted by at least **75%** of the **30** largest banks in the United States as being in effect during such period, as published in *The Wall Street Journal* or reported by any reliable internet-based service (or such reasonably comparable average interest rate as may be readily available if such average interest rate is not readily available in *The Wall Street Journal* or on any such internet-based service), as such average interest rate may change from time to time during such period.

(i)    *Notwithstanding the foregoing,* if Luminus is the Transferring Shareholder and Luminus is then a party to another shareholders agreement with Blue Equity and/or any Affiliates of Blue Equity providing for any purchase option in favor of Blue Equity and/or any Affiliates of Blue Equity in the case of an involuntary Transfer of the type described above, then such purchase options in favor of Blue Equity and/or Blue Equity's Affiliates shall be primary and only to the extent that such purchase options are not exercised and consummated shall purchase options provided under this Section 9.4 then be triggered.

(j)    *Notwithstanding the foregoing,* although the Transfer any of the equity interests in CIHL to a Person other than Issa, Davis Hendrick, Kennedy, or their Affiliates will constitute a Transfer of a prorata portion of the Shares of CPHL owned by CIHL, a Transfer of any equity interests in CIHL between or among Issa, Davis, Hendrick, Kennedy, or their Affiliates will not constitute a transfer of any of the Shares of CPHL owned by CIHL.

### 9.5    Death, Incompetency, Etc. of a Shareholder; Gifts; Transfers To Affiliates

(a)    In the event of the death, bankruptcy or adjudication of incapacity or incompetence of a Shareholder, the personal representative, heirs, legatees and devisees of the Shareholder, as the case may be, shall have all of the rights of an assignee and Shareholder with respect to the Shares transferred thereby to such successor-in-interest (*subject, however,* to the Share purchase provisions of any applicable employment or engagement agreement, if any, between the Shareholder and the Company and/or any of the Company's subsidiaries). In all of the above cases, the successor-in-interest to the Shareholder shall not have any right to demand any payment or compensation with respect to the Shares by reason of any diminution or asserted diminution in value, or other damages or losses, by reason of any loss of voting rights or restrictions on Transfer with respect to such Shares. In such event, such successor-in-interest of any such Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares. In such event, the successor-in-interest shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the successor-in-interest of the provisions of this Agreement as a "Shareholder" for purposes thereof.

(b)    With the prior consent of the Board of Directors, which consent shall not be unreasonably withheld, conditioned, or delayed, any Shareholder may Transfer all or any part of such Shareholder's Shares to the Company and/or any subsidiary of the Company, to another Shareholder of the Company and/or any subsidiary of the Company at such time, or to an Affiliate of the transferring Shareholder if the proposed transferee is willing to accept such Transfer. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a "Shareholder" for purposes thereof.

**9.6    Admission of New Shareholder**

In connection with the issuance of Shares by the Board of Directors, the Board may cause new Shareholders to be admitted to the Company, provided that such new Shareholders agree in writing to be bound by the terms of this Agreement to the extent reasonably applicable.

**ARTICLE 10**

**DURATION, TERMINATION, ARBITRATION, AND REMEDIES**

**10.1    Duration and Termination**

This Agreement shall have unlimited duration unless, until, and to the extent terminated pursuant to Section 10.2 below and/or by order of an arbitrator/panel pursuant to the provisions of Section 10.4 below.

**10.2    Automatic Termination**

**(a)**    This Agreement shall terminate automatically upon the first to occur of any of the following events:

**(i)**    On the date on which the Company completes its dissolution and winding-up procedures.

**(ii)**    On such date as is stated to be the effective date of termination of this Agreement in a written resolution to such effect signed by all of the Shareholders (which such termination of this Agreement may be limited in effect to only one or more of the Company and/or the subsidiaries of the Company to the extent stated in such written resolution).

**(iii)**    On such date occurring on or after the effective date of an initial public offering or subsequent public offering of securities by the Company, or on or after the effective date of any sale or exchange of more than **50%** in voting power of all of the voting Shares of the Company then issued and outstanding, in the aggregate, as is stated to be the effective date of termination of this Agreement in a written resolution adopted by the Board of Directors of the Company (which such termination of this Agreement may be limited in effect to only one or more of the Company and/or the subsidiaries of the Company to the extent stated in such written resolution).

**(b)**    Any termination of this Agreement shall be without prejudice to any obligations or rights of any of the Parties which have accrued prior to such termination and shall not terminate or otherwise affect any provision of this Agreement which is expressly or by implication provided to come into effect upon, or continue in effect after, such termination of this Agreement, *including, but not limited to,* the confidentiality and nondisparagement provisions set forth in Section 8.13 of this Agreement.

**10.3    Rights and Remedies**

**(a)**    If any Party is in default or breach of any provision of this Agreement which is applicable to such Person, the nondefaulting or nonbreaching Party or Parties shall be entitled to all rights and remedies available at law, in equity, in bankruptcy or otherwise, including, but not limited to, a full right of offset. All such rights and remedies shall be cumulative to the fullest extent provided by law, and the exercise by any Party of any right or remedy under this Agreement shall not affect the right of such party or any other Party to exercise any other right or remedy at law or in equity, to recover damages, or to obtain equitable or other relief.

**(b)**    Should any nonbreaching or nondefaulting party or parties seek recourse to equity to enforce any of its or their rights under this Agreement by specific performance, injunction, or other equitable relief, each breaching or defaulting party agrees to, and hereby does waive any defense or defenses which it might otherwise have that there is any adequate remedy at law.

**(c)**    Upon a default or breach of any provision of this Agreement by any Party, the Company and/or any subsidiary of the Company shall be permitted to demand immediate repayment of any or all loans and/or other amounts due to the Company and/or such subsidiary of the Company from the defaulting or breaching Party and/or any Affiliate of such defaulting or breaching Person, regardless of any maturity date or other provisions contained in the loan documents or any other documents regarding such obligations and the defaulting or breaching Party shall then promptly repay, and/or cause its Affiliates, as applicable, to promptly repay, such loans or other amounts due.

**10.4    Alternative Dispute Resolution Procedures**

**(a)**    In the event of any deadlock by the Board of Directors or the Shareholders as to a Joint Consent Matter or any dispute, controversy, claim, or assertion (as applicable, a **"Dispute"**) by, between, or among any Shareholder(s) and/or the Company arising out of or relating to this Agreement and/or any of the Governing Instruments of the Company and/or any subsidiary of the Company and/or any of the transactions and/or relationships contemplated herein or therein (in each case, an **"Arbitratable Matter"**), *including, but not limited to,* any breach by any Party of the provisions of this Agreement and/or any dispute, controversy, claim, or assertion as to the interpretation of any provision of this Agreement and/or any of the Governing Instruments of the Company and/or any subsidiary of the Company or as to the arbitrability of any issue or asserted issue arising hereunder or thereunder, the alternative dispute resolution provisions set forth in this Section 10.4 (the **"Alternative Dispute Resolution Provisions"**) shall apply.

(b)    Unless the disputing parties as to an Arbitratable Matter otherwise agree to a different mutually acceptable alternative dispute resolution ("**ADR**") mechanism for resolving the Dispute of such Arbitratable Matter within **10 days** from the date of the initial proposal from any party with respect thereto, then the Dispute as to such Arbitratable Matter shall be resolved solely by binding arbitration pursuant to the **United States Arbitration Act**, 9 U.S.C. Section 1 *et seq.* Either party may commence arbitration proceedings at any time after the **10th day** after notice from one disputing party to the other of the inability of the disputing parties to agree upon a mutually acceptable ADR mechanism as set forth above.

(c)    Any arbitration shall be conducted in the Miami, Florida, metropolitan area (or such other area mutually agreeable to all disputing parties) before a single arbitrator mutually selected by the parties thereto or, in the event the parties shall fail to agree, by a three-person panel acting pursuant to the Commercial Arbitration Rules and, if applicable at such time, the Streamlined Arbitration Rules and Procedures then in effect, of the American Arbitration Association. The three person arbitration panel shall consist of one arbitrator selected by each disputing party (or group of disputing parties with common interests) and a third arbitrator selected by the first two arbitrators. All matters of discovery, the presentation of evidence, and procedure shall be governed and controlled in all respects by the arbitrator/panel, in the arbitrator/panel's sole discretion. At any time and from time to time during the arbitration proceeding, the arbitrator/panel may issue interim orders with respect to any matter. Such interim orders shall be immediately binding upon and enforceable against the parties without waiting for the issuance of any final award or order with respect to the arbitration.

(d)    Unless the disputing parties with respect to such arbitration otherwise specifically agree in writing, the arbitration award and/or order with respect to such arbitration:

(i)    Shall be reduced to writing and, if requested by any party, set forth the arbitrator/panel's findings of fact and conclusions of law;

(ii)    Shall specify any damages in U.S. dollars and shall afford any other remedy, legal or equitable, as is deemed advisable by the arbitrator/panel, *including, but not limited, to (A)* an order terminating this Agreement, or any provision of this Agreement, in whole or in part and/or as to any one or more Persons to any extent, *and/or (B)* an award ordering the sale or other Transfer of any or all Shares of a defaulting or breaching Party under this Agreement to any one or more of the Company and/or any non-defaulting or non-breaching Party under this Agreement at all or any portion of such fair market value for such Shares as is determined by the arbitrator/panel or, if and to the extent so directed by the arbitrator/panel, by one or more appraisers under such procedures as are directed by the arbitrator/panel (against which fair market value, any damages awarded by the arbitrator/panel shall, to the extent possible, be deducted, offset, and/or paid to the claiming Party or Parties and/or any other applicable Persons);

(iii)    Shall be made on an expedited basis to the extent deemed feasible by the arbitrator/panel;

(iv)    Shall be final and binding upon the parties, without any right of further appeal absent fraud or intentional malfeasance by the arbitrator/panel, and may be entered for enforcement in any court of competent jurisdiction, or an application may be made to any such court for a judicial acceptance of such award and an order of enforcement, as the case may be;

(v)    Shall include a determination by the arbitrator/panel as to the whether any one or more of the disputing parties shall be responsible for *(A)* paying the arbitrator/panel's fees and expenses and any charge by the American Arbitration Association or other organization with respect to the arbitration, and if so, the amount or percentage of such fees, expenses, and charges to be paid by each, and *(B)* paying the fees and expenses (*including, but not limited to,* reasonable attorneys', accountants', and other professionals' fees and disbursements) incurred or paid by any one or more other disputing parties with respect to the arbitration and any preceding procedures pursuant to the Alternative Dispute Resolution Procedures provided for under this Section 10.4, and, if so, the amount or percentage of such fees and expenses to be paid by each;

(vi)    Shall include a determination whether any disputing party required to pay any amount to any other disputing party shall also pay interest to the payee on such amount until paid in full, and, if so, *(A)* the date from which interest shall accrue (which starting date could be the date of breach or violation by the disputing party obligated to make such payment, the date of the award or order, or such other date as the arbitrator/panel may deem advisable, in the arbitrator/panel's sole discretion) *and (B)* the rate of interest which shall apply (which applicable interest rate shall, *unless* otherwise specified by the arbitrator/panel, be the Federal post-judgment rate then in effect during the period interest is computed, as the same may change from time to time during such period); *and*

(vii)    Shall include such other terms, conditions, and provisions as the arbitrator/panel may deem advisable, in the arbitrator/panel's sole discretion.

(e)    *Unless and except to the extent that* the arbitration award or order specifies otherwise in accordance with the provisions of Section 10.4(d)(v) above, *(i)* the two disputing parties (or two groups of similarly interested disputing parties) shall each pay **50%** of the arbitrator/panel's fees and expenses and any charge by the American Arbitration Association or other organization with respect to the arbitration, *and (ii)* each disputing party shall pay its own fees and expenses (*including, but not limited to,* attorneys', accountants', and other professionals' fees and disbursements) incurred with respect to the arbitration and any preceding procedures pursuant to the Alternative Dispute Resolution Procedures provided for under this Section 10.4.

(f)    Each party will participate in any such arbitration in good faith and will (and will cause its representatives, employees and Affiliates to, and will request each participant in any ADR mechanism and each arbitrator to) hold the existence,

content and result of any dispute in confidence *except* to the extent that disclosure of any such information is required by law, reasonably necessary or advisable from a business or financial standpoint with respect to the party making the disclosure (or any of such party's Affiliates), or required under any loan or other applicable third party contract requirements with respect to the party making the disclosure (or any of such party's Affiliates).

(g)     The arbitration shall proceed in the absence of a disputing party who fails to answer or appear after notice in accordance with the notice provisions of this Agreement or such other notice procedures, if any, as the arbitrator/panel may order, in such arbitrator/panel's sole discretion. An award or order shall not be made solely by reason of the default of any such party to appear, but the arbitrator/panel shall issue an award or order after receiving evidence from any other disputing party in the arbitration proceeding.

(h)     If an arbitrator, whether sole or part of a panel, should die, withdraw or otherwise become incapable of serving, or should such arbitrator refuse to serve, a successor arbitrator shall be selected and appointed in the same manner as the original arbitrator and the arbitration shall then continue.

(i)     This Section 10.4 shall be a complete defense to any suit, action or proceeding instituted before any court or agency with respect to any Arbitratable Matter resolvable under these Alternative Dispute Resolution Provisions, *provided, however,* that, notwithstanding these Alternative Dispute Resolution Provisions, any party may seek judicial relief (legal or equitable) in aid of an ADR mechanism or arbitration in order to prevent a violation of this Agreement pending the implementation of such ADR mechanism or arbitration or to enforce any award or order issued pursuant to such ADR mechanism or arbitration (and the prevailing party in any such enforcement action shall be entitled to recover any fees or costs incurred or paid by such party, *including, but not limited to,* any reasonable attorneys' fees and costs, from the party against whom such enforcement is sought).

(j)     The disputing parties shall promptly pay all amounts required to be paid by them under, and otherwise fully comply with all terms, conditions, and other provisions of, any agreed resolution or any award or order issued pursuant to an ADR mechanism or arbitration implemented pursuant to these Alternative Dispute Resolution Provisions.

## ARTICLE 11

## GENERAL

### 11.1   Ratification and Incorporation By Reference of ROFO/ROFR Options

The Parties hereby ratify and affirm, and incorporate by reference as if fully set forth herein, all of the terms, conditions, and provisions of Section I of that certain **Share Purchase Agreement** entered into as of **September 29, 2011**, by and among all of the initial Parties hereto except Luminus, CIHL, and Davis, *as amended by* that certain **First Amendment to Share Purchase Agreement** dated **December 12, 2011** (*as amended,* the **"Share Purchase Agreement"**).

### 11.2   Notices

(a)     All notices, demands, requests, consents, approvals, offers, option exercises, counteroffers or other communications (hereinafter referred to collectively as **"Notices"** and each individually as a **"Notice"**) required or permitted under this Agreement shall be in writing and *(i)* delivered by personal delivery to such intended recipient, which personal delivery shall be evidenced by a written receipt therefor signed by such recipient, *(ii)* sent by certified, registered or express mail, return receipt requested, postage prepaid, or by reputable express delivery service (such as Federal Express, UPS, Airborne, Purolator, or DHL), fees prepaid, addressed to the intended recipient thereof, at the postal address or street address set forth in this Agreement as a part of the Initial Address for such intended recipient (or at such other postal address or street address as such intended recipient shall have furnished in writing to the other parties to this Agreement), *(iii)* transmitted by email to such intended recipient at the email address set forth in this Agreement as a part of the Initial Address for such intended recipient (or such other email address as such intended recipient shall have furnished in writing to the other parties to this Agreement), receipt of which transmission shall be confirmed by such intended recipient, *or (iv)* transmitted by fax to such intended recipient at the fax number set forth in this Agreement as a part of the Initial Address for such intended recipient (or such other fax number as such intended recipient shall have furnished in writing to the other parties to this Agreement), receipt of which transmission shall be confirmed by such recipient. The copies provided for as part of the Initial Address for any intended recipient (or as subsequently required by any intended recipient by written notice to the other parties to this Agreement) shall be considered a material part and condition of any valid notice unless the party to whom such copy is required to be given is no longer available at the specified address.

(b)     All such Notices shall be effective upon being personally delivered and properly receipted, **two (2) days** after being properly addressed and deposited in the mail or with a reputable express delivery service or upon being transmitted by fax or email and properly receipted, as set forth above. However, the time period in which a response to any such Notice must be given shall commence to run from the date of receipt of personal delivery, the date on the return receipt or express delivery receipt, or the date of confirmation of receipt of the fax or email, as the case may be, of the Notice by the addressee thereof; *provided, however,* that if any Person rejects delivery of any such Notice properly sent by mail or express delivery service, or fails or neglects to accept delivery after **two (2) attempts** to so deliver by postal or express delivery authorities, as the case may be, the time period for a response shall commence **two (2) days** following the proper mailing or depositing with the express delivery service, as the case may be, of such Notice.

**11.3    Amendment and Termination**

(a)    *Except* as provided in Section 11.3(b) below, this Agreement may be modified or amended from time to time only in accordance with the terms and conditions set forth in a written resolution adopted by the holders of at least **80%** of the voting Common Shares of the Company at such time (*and, thus, excluding* the Class B Nonvoting Preferred Shares).

(b)    In the event that the Company and/or any subsidiary of the Company shall issue additional Shares or other equity interests (**"New Shares"**) for the reasons set forth in Section 4.4(a) (whether or not such New Shares will be sold and issued to a Person who is already then a Shareholder of the Company and/or any subsidiary of the Company, or to any Affiliate of any such Person), the Board of Directors of the Company may, in good faith and without the vote of any of the Shareholders, amend this Agreement and the Governing Instruments of the Company and/or any of the Subsidiaries to such extent as is reasonably necessary or appropriate *(i)* to facilitate and provide for the issuance of such New Shares and the implementation of the rights and privileges to which the holders of such New Shares are entitled, *(ii)* to provide for the inclusion of such New Shares and their holders in the various definitions, descriptions, and concepts regarding Shares, Shareholders, Shareholders, Classes of Shares, Classes of Shareholders, Percentage Interests, meetings, management, and similarly general definitions, descriptions, and concepts, *and/or (iii)* to provide for the adoption and execution of this Agreement (as amended) by the holders of such New Shares; *provided, however,* any other provision of this Agreement which might be construed to the contrary, any amendment of the provisions of Section F(1)(b) of this Agreement pursuant to this Section 11.3(b) will only be permitted if such amendment still empowers any Shareholder who holds **15%** or more of the issued and outstanding Shares of the Company in the aggregate (*other than and excluding* any Class B Nonvoting Preferred Shares) to elect or appoint at least one Director of the Company *unless and until* a Liquidity Event occurs.

(c)    This Agreement shall terminate upon the consummation of any IPO and/or other Liquidity Event resulting in the achievement of Class B Base Payback, Class A Base Payback, Class A Return Payback, and Class B Return Payback, the conversion of the Class A Preferred Shares, and significant amounts or other valuable consideration being received by the Shareholders.

**11.4    Governing Law; Jurisdiction**

This Agreement shall be construed in accordance with the laws of the State of Delaware without regard to any conflicts of law provisions. However, *subject to* the arbitration provisions hereinafter provided, each Party to this Agreement hereby irrevocably consents to, and agrees to submit to, personal jurisdiction and venue in any Federal or state court located in Miami, Florida, for all purposes and as to any and all claims. In such regard, as an alternative to personal service, each Shareholder residing outside of Miami, Florida, hereby irrevocably consents to service of any and all process in any such action or proceeding by the mailing of copies to such Shareholder at the address for such Shareholder then reflected in the records of the Company. The parties agree that any final judgment in any such action or proceeding, or any final award in arbitration, may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Shareholder hereby waives any objection to venue in Miami, Florida, and any objection to any action or proceeding there on the basis of forum non-convenience. Each Shareholder further agrees that, *subject to* the arbitration provisions hereinafter provided, any action or proceeding brought against the Company, any subsidiary of the Company, or any other Shareholder shall be brought only in a Federal or state court sitting in Miami, Florida. Nothing in this section shall affect the right of the Company, any subsidiary of the Company, or any Shareholder, *subject, however, to* the arbitration provisions hereinafter provided, to serve legal process in any other manner permitted by law.

**11.5    Entire Agreement**

It is expressly understood and agreed by and among the Parties hereto that, *except* for any written employment, sharing, or other separate agreement entered into between any Party and the Company contemporaneously herewith or pursuant to the terms and conditions set forth in this Agreement and *except* for the Share Purchase Agreement, which shall continue in full force and effect in accordance with its terms, *(i)* this Agreement sets forth all of the promises, agreements, representations, warranties, conditions and understandings among the parties with respect to the subject matter hereof, *(ii)* this Agreement supersedes all prior and/or other contemporaneous promises, agreements, representations, warranties, conditions, and understandings, oral or written, of the parties (*including, but not limited to,* any letter of intent, letter of mutual understandings in principle, and/or term sheet), *and (iii)* there are no other promises, agreements, representations, warranties, conditions or understandings, either oral or written, among them other than as are set forth in this Agreement.

**11.6    Controlling Agreement**

In the event of any ambiguity, inconsistency, or discrepancy between the provisions of this Agreement and the Governing Instruments of the Company and/or any subsidiary of the Company, it is the intention that the provisions of this Agreement shall prevail and, accordingly, each of the Shareholders hereby agrees that such Shareholder shall exercise all voting and other rights and powers available to such Shareholder, and will cause such Shareholder's Affiliates to exercise all voting and other rights and powers available to such Shareholder's Affiliates, so as *(i)* to give effect to the provisions of this Agreement to the fullest extent possible, *and (ii)* to procure any amendment or change to the Governing Instruments of the Company and/or the subsidiaries of the Company necessary or appropriate in connection with the provisions of this Agreement.

**11.7   No Partnership or Agency**

Nothing in this Agreement shall be construed as creating or constituting any partnership or joint venture between or among any or all of the Parties and/or any Affiliates of any of the Parties.

**11.8   No Waiver**

No waiver by any Party of any provisions of this Agreement, nor any default by any Party, shall affect the rights of the waiving or non-defaulting Party thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether similar or dissimilar. No waiver shall be binding unless executed in writing by the Party making the waiver, nor shall any waiver constitute a continuing waiver.

**11.9   Binding Agreement; Successors and Assigns**

This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, and their respective heirs, personal representatives, successors and permitted assigns. Any purported assignment not in accordance herewith shall be null and void *ab initio.*

**11.10 Execution in Counterparts; Photocopies or Faxed, Scanned, or Emailed Copies**

This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. It shall not be necessary that the signature of, or on behalf of, each Party, or that the signatures of all parties, be affixed to each counterpart. The signature pages of the counterparts may be detached from them and be reattached to any other counterpart identical in form hereto, but having attached to it one or more additional signature pages, and it shall not be necessary in making proof of this Agreement to produce or account for any particular number of counterparts so long as one or more counterparts collectively shall contain the respective signatures of, or on behalf of, all of the parties hereto. A photocopy or faxed, scanned, or emailed copy of this Agreement or any signed signature page to this Agreement shall have the same validity and enforceability as an originally signed copy.

**11.11 Severability**

If any provision of this Agreement, or the application thereof to any individual, entity or circumstances, shall be invalid or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to other individuals, entities or circumstances, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**11.12 Further Assurances**

**(a)**    Each of the Parties hereby agrees *(i)* to execute and deliver all of the agreements, documents and instruments required to be executed and delivered by such Party under this Agreement *and (ii)* without further consideration, to execute and deliver such additional instruments and documents and to take such additional actions as may reasonably be requested by any of the Parties at any time and from time to time in order to effectuate the transactions and arrangements contemplated by this Agreement.

**(b)**    Without limiting the generality of the provision set forth in Section 11.12(a):

**(i)**    Each of the Shareholders hereby agrees to vote, and/or cause each of such Shareholder's Affiliates to vote, as applicable, any and all shares of the Company in such manner as will facilitate the transactions and arrangements provided for under this Agreement.

**(ii)**    Each of the Parties hereby agrees that, to the extent possible, such Party shall take all actions and enter into all agreements, documents, and arrangements, and cause such Party's Affiliates to take all actions and enter into all agreements, documents, and arrangements, necessary or appropriate *(i)* to give effect to the provisions of this Agreement to the fullest extent possible, *and (ii)* to procure any amendment or change to the Governing Instruments of the Company and/or the subsidiaries of the Company necessary or appropriate in connection with the provisions of this Agreement.

**(iii)**    Each of the Parties hereby agrees that, to the extent possible, such Party shall refrain from taking any action, and cause such Party's Affiliates to refrain from taking any action, which would be contrary or adverse to, or in violation of, the provisions of this Agreement.

**11.13 Rules of Usage**

The following rules of usage shall apply to this Agreement, unless otherwise required by the context or unless otherwise defined therein:

**(a)**    Except as otherwise expressly provided, the use of any gender in this Agreement shall include all other genders, the singular shall include the plural, and the plural shall include the singular, as the context may require.

**(b)**      Except as otherwise expressly provided, references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits in or to this Agreement. Any annexes, appendices, schedules, and exhibits to this Agreement are incorporated into this Agreement by reference at the point where first mentioned and are expressly made a part of this Agreement, and any or all of such annexes, appendices, schedules, attachments, and exhibits to this Agreement may be bound separate from, or otherwise separated from, the other portions of this Agreement for reasons of convenience or otherwise without affecting the validity of this Agreement or the treatment of any such annexes, appendices, schedules, attachments, or exhibits as being a part of this Agreement.

**(c)**      The captions, headings, subheadings, indices, and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement or affect in any way the meaning, interpretation, construction or effect of any provision of this Agreement.

**(d)**      Except as otherwise expressly provided, reference to any agreement means such agreement as amended, modified, extended or supplemented from time to time in accordance with the applicable provisions thereof.

**(e)**      Except as otherwise expressly provided, references to any law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement thereof.

**(f)**      When used in this Agreement, words such as "hereunder", "hereto", "hereof" and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Agreement and not to any particular article, section, subsection, paragraph or clause hereof.

**(g)**      References to "including" means including without limiting the generality of any description preceding such term and, thus, the rule of *ejusdem generis* shall not be applicable with respect to this Agreement.

**(h)**      Except as otherwise expressly provided or clearly indicated by context, reference herein to "days," "months," "quarters," or "years" means calendar days, calendar months, calendar quarters, or calendar years.

**(i)**      Each of the parties to this Agreement and their counsel have reviewed and revised, or requested revisions to, this Agreement, and the usual rule of construction that any ambiguities are to be resolved against the drafting Party shall be inapplicable in the construing and interpretation of this Agreement and any amendments or exhibits thereto.

**11.14 Waiver of Right of Partition**

The Shareholders agree that the Company's assets are not and will not be suitable for partition. Accordingly, each of the Shareholders hereby irrevocably waives any and all right, if any, which such Shareholder may have to maintain an action for partition of any of the Company's assets. No Shareholder shall have any right to any specific assets of the Company upon the liquidation of, or any distribution from, the Company.

**11.15 Legend on Stock Certificates**

All Shares of the Company now or hereafter owned by any of the Shareholders shall be subject to the provisions of this Agreement and the certificates representing such Shares shall bear the following legend or such other legend as the Company's St. Lucia legal counsel may reasonably deem advisable:

> "The Shares represented by this certificate are subject to, and are transferrable only in compliance with, and the voting, dividend and other rights of the shareholder with respect to these Shares are subject to and limited by, a Shareholders Agreement dated as of December 30, 2011, by and among Cool Petroleum Holdings Limited, Blue Jamaica Petroholdings, Ltd., Cool Corp. Limited, Joseph Issa, Colin Hendrick, Gwen Kennedy, Luminus Capital Partners Limited, Caribbean Property Managers International Corp, Rodney Davis, and Cool International Holdings Limited, a copy of which Agreement is on file in the office of the Secretary of the Company."

**ARTICLE
12**

**REPRESENTATIONS, WARRANTIES AND COVENANTS
OF THE PARTIES**

**12.1   Representations, Warranties and Covenants of the Shareholders**

**Each of the Parties represents and warrants to the other Parties as follows:**

**(a)**      Such Party or representative acting for such Party with respect to this Agreement has full capacity, right, power and authority to execute and deliver this Agreement and to perform such Party's obligations under this Agreement. This Agreement constitutes the valid and legally binding obligation of such Party and is enforceable against such Party in accordance with its terms.

The execution and delivery of this Agreement has been approved by all necessary action of such Party under applicable laws governing such Party and, if applicable, any Governing Instruments of such Party.

(b)     The execution and delivery of this Agreement, the consummation of the transactions contemplated in this Agreement, and such Party's performance and fulfillment of the obligations and undertakings under this Agreement which are applicable to such Party *will not: (i)* violate any provision of, result in the breach of, or accelerate or permit the acceleration of, any performance required by the terms of *(A)* such Party's Governing Instruments, if applicable, *(B)* any contract, agreement, arrangement or undertaking to which such Party is a party or by which such Party is bound, provided approval from the Bondholders is duly obtained prior to the transfer of the Shares in the Company, *(C)* any judgment, decree, writ, injunction, order or award of any arbitration panel, court, or governmental authority, *or (D)* any applicable law, ordinance, rule, or regulation of any governmental body, *or (ii)* result in the creation of any claim, lien, charge, or encumbrance upon any properties of the Company and/or any subsidiary of the Company.

(c)     There are no claims of any kind or any actions, suits, proceedings, arbitrations, or investigations pending or, to the knowledge of such Party, threatened in any court or before any governmental agency or instrumentality or arbitration panel, or otherwise relating to such Party that adversely affects, or could adversely affect, the ability of such Party to enter into and perform such Party's obligations under this Agreement.

(d)     No consents, approvals, authorizations, releases, or orders, other than those obtained at the time of or prior to the execution of this Agreement by such Party, are required of or by such Party for the authorization, execution and delivery of, and for the performance and consummation of the transactions contemplated by, this Agreement.

(e)     In connection with such Party's acquisition of any Shares, such Party has been fully informed by such Party's independent counselors and advisors as to the applicability of the requirements of all applicable securities and/or "blue sky" laws.

*[End of General Terms and Conditions]*

**SIGNATURE PAGE**

*Shareholders Agreement of Cool Petroleum Holdings Limited*

By signing below, each of the undersigned hereby agrees, effective as of the Effective Date *(i)* to all of the terms and conditions set forth in Sections A through H above (which constitute the Initial Portion of this Agreement), *(ii) except* as otherwise specifically and expressly provided in Sections A through H above, to all of the terms and conditions set forth in Articles 1 through 17 above (which constitute the General Terms and Conditions of this Agreement), *and (iii)* to each and all of the schedules, attachments, and exhibits, if any, attached to this Agreement.

COMPANY:

COOL PETROLEUM HOLDINGS LIMITED

By: ➤

Name:

Title:


COOL CORP:

COOL CORP. LIMITED

By: ➤

~~Frederick March~~ JOSEPH ISSA

Director


ISSA:

➤

Joseph Issa


LUMINUS:

LUMINUS CAPITAL PARTNERS LIMITED

By: ➤

Mauricio Gojman, Director


By: ➤

Steven Whittingham, Director

DAVIS:

➤

Rodney Davis


BLUE EQUITY:

BLUE EQUITY PETROHOLDINGS, LTD.

By: ➤

David M. Roth

Vice Chairman and Director


HENDRICK:

➤

Colin Hendrick


KENNEDY:

➤

Gwen Kennedy


CPMIC:

CARIBBEAN PROPERTY MANAGERS INTERNATIONAL CORP

By: ➤

Joseph Issa

Director


CIHL:

COOL INTERNATIONAL HOLDINGS LIMITED

By: ➤

Joseph Issa, Director

By: ➤

Rodney Davis, Director

By: ➤

Colin Hendrick, Director

By: ➤

Gwen Kennedy, Director

# SIGNATURE PAGE

*Shareholders Agreement of Cool Petroleum Holdings Limited*

By signing below, each of the undersigned hereby agrees, effective as of the Effective Date *(i)* to all of the terms and conditions set forth in Sections A through H above (which constitute the Initial Portion of this Agreement), *(ii) except* as otherwise specifically and expressly provided in Sections A through H above, to all of the terms and conditions set forth in Articles 1 through 17 above (which constitute the General Terms and Conditions of this Agreement), *and (iii)* to each and all of the schedules, attachments, and exhibits, if any, attached to this Agreement.

COMPANY:

COOL PETROLEUM HOLDINGS LIMITED

By:➤

Name:

Title:

COOL CORP:

COOL CORP. LIMITED

By:➤

~~Frederick March~~ JOSEPH ISSA

Director

ISSA:

➤

Joseph Issa

LUMINUS:

LUMINUS CAPITAL PARTNERS LIMITED

By: ➤

Mauricio Gojman, Director

By: ➤

Steven Whittingham, Director

DAVIS:

➤

Rodney Davis

BLUE EQUITY:

BLUE EQUITY PETROHOLDINGS, LTD.

By:➤

David M. Roth

Vice Chairman and Director

HENDRICK:

➤

Colin Hendrick

KENNEDY:

➤

Gwen Kennedy

CPMIC:

CARIBBEAN PROPERTY MANAGERS INTERNATIONAL CORP

By:➤

Joseph Issa

Director

CIHL:

COOL INTERNATIONAL HOLDINGS LIMITED

By:➤

Joseph Issa, Director

By:➤

Rodney Davis, Director

By:➤

Colin Hendrick, Director

By:➤

Gwen Kennedy, Director

## SIGNATURE PAGE

*Shareholders Agreement of Cool Petroleum Holdings Limited*

By signing below, each of the undersigned hereby agrees, effective as of the Effective Date *(i)* to all of the terms and conditions set forth in Sections A through H above (which constitute the Initial Portion of this Agreement), *(ii) except* as otherwise specifically and expressly provided in Sections A through H above, to all of the terms and conditions set forth in Articles 1 through 17 above (which constitute the General Terms and Conditions of this Agreement), *and (iii)* to each and all of the schedules, attachments, and exhibits, if any, attached to this Agreement.

COMPANY:
COOL PETROLEUM HOLDINGS LIMITED

By:➤ _____
Name: _____
Title: _____

COOL CORP:
COOL CORP. LIMITED

By:➤ _____
Frederick March
Director

ISSA:

➤ _____
Joseph Issa

LUMINUS:
LUMINUS CAPITAL PARTNERS LIMITED

By:➤ _____
Mauricio Gojman, Director

By:➤ _____
Steven Whittingham, Director

DAVIS:

➤ _____
Rodney Davis

BLUE EQUITY:
BLUE EQUITY PETROHOLDINGS, LTD.

By:➤ _____
David M. Roth
Vice Chairman and Director

HENDRICK:

➤ _____
Colin Hendrick

KENNEDY:

➤ _____
Gwen Kennedy

CPMIC:
CARIBBEAN PROPERTY MANAGERS INTERNATIONAL CORP

By:➤ _____
Joseph Issa
Director

CIHL:
COOL INTERNATIONAL HOLDINGS LIMITED

By:➤ _____
Joseph Issa, Director

By:➤ _____
Rodney Davis, Director

By:➤ _____
Colin Hendrick, Director

By:➤ _____
Gwen Kennedy, Director

**EXHIBIT 8.6(a)**

*Approved Budget for Initial Period*

*[Approved Budget For Initial Period Follows]*

IN THE 11TH JUDICIAL CIRCUIT IN
AND FOR MIAMI-DADE COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

COOL INTERNATIONAL HOLDINGS
LTD-COOL PETROLEUM, a British Virgin
Islands incorporated company, individually
and derivatively in the right and for
the benefit of BE TAG HOLDINGS LIMITED,
a St. Lucia International Business Company,

    *Plaintiff*

                 ***EX PARTE* MOTION FOR
                 TEMPORARY INJUNCTION**

v.

BLUE EQUITY PETROHOLDINGS, LTD.,
a St. Lucia International Business Company;
BLUE EQUITY LLC; JONATHAN BLUE,
an individual;  DAVID ROTH, an individual;
and MAUREEN SMITH, an individual,

    *Defendants.*

_____/

## <u>VERIFIED *EX PARTE* MOTION FOR TEMPORARY INJUNCTION</u>

The plaintiff Cool International Holdings ("CIHL"), individually and derivatively on

behalf of BE TAG Holdings Limited ("BE TAG"), files this verified *ex parte* motion for

temporary injunction.

Through the undersigned attorneys, plaintiff has sued the defendants, BLUE EQUITY

PETROHOLDINGS, LTD., a St. Lucia International Business Company ("BEP"), BLUE

EQUITY, LLC ("Blue Equity"), a Delaware Business company, JONATHAN BLUE ("Jonathan

Blue"), a resident of Kentucky, DAVID ROTH ("Roth"), a resident of Kentucky, (collectively

referred to herein as the "Blue Equity Defendants"), and MAUREEN SMITH ("Ms. Smith"), a

resident of Kingston, Jamaica., W.I., (together, the Blue Equity Defendants and Ms. Smith shall be referred to collectively as "the Defendants") and other unknown co-conspirators for damages resulting from a breach of their collective and individual fiduciary responsibilities to CIHL, for breach of contract, unjust enrichment, conversion, fraud, declaratory relief and for temporary an permanent injunctive relief.  In support of its motion, CIHL states as follows:

1.      On June 7, 2013, CIHL filed a Verified Complaint in Miami-Dade County Circuit Court against the Defendants and unknown co-conspirators, seeking equitable and injunctive relief as well as compensatory damages.  A copy of the Verified Complaint (without exhibits) is attached hereto as "Exhibit A."

2.      The Verified Complaint demonstrates that through a web of half-truths, fraudulent misrepresentations, financial manipulation, omissions and carefully planned deception, the Blue Equity Defendants fraudulently induced plaintiff, CIHL, and its shareholders to enter into an arrangement to jointly acquire the shares of Cool Petroleum Limited Jamaica, later re-named by the Blue Equity Defendants as The Antilles Group ("TAG").[1]

3.      Through a carefully planned campaign of fraud, deception and omission, the Defendants all conspired to conceal material information from the Plaintiff, CIHL and other minority shareholders, resulting in significant losses to CIHL and its shareholders in the form of loss of the company to an imprudent sale, loss of share equity and the equivalent monetary value of that interest and loss of future revenue.

4.      The Blue Equity Defendants' fraudulent conduct—including, but not limited to failing to provide the required working capital financing and financial operations of the business as promised—and their illicit and improper efforts to acquire and retain additional equity

---

[1] The names "TAG" and "CPL" shall be used interchangeably throughout these papers to refer to the same company. In early 2012, the name of the company formerly known as "CPL" was changed to "TAG" but for all relevant purposes, there is no difference between the two entities.

interests belonging to the minority shareholders through a fraudulent capital call, has placed CIHL and its shareholders at significant risk of irreparable loss through illegal dilution, loss of ongoing revenue, loss of equity and immediate waste and dissipation of significant corporate assets.

5.       Upon information and belief, the Blue Equity Defendants have also improperly converted funds, rightfully belonging to the minority shareholders, or otherwise failed to properly account for the distribution of funds from the sale of the CPL/TAG business to a third party.

### A.      CIHL Has Established Sufficient Grounds Against The Defendants To Warrant Temporary Injunctive Relief

6.       Florida law requires that to support an order granting temporary injunctive relief, the moving party must demonstrate: (a) that it faces irreparable harm; (b) that it has a substantial likelihood of success on the merits; (c) that the harm to the non-moving party if the injunction is granted, will not outweigh the harm to the moving party if the injunction is not granted; and (d) that the injunction will not disserve the public interest.[2]

7.       The Verified Complaint shows that the plaintiff, CIHL faces imminent and irreparable injury from the likely irreversible dissipation and waste of the only remaining corporate assets from the sale of the company's shares if a temporary injunction is not immediately entered.  The Verified Complaint also establishes that CIHL has a substantial likelihood of success on the merits of its allegations in the Verified Complaint, that there is no adequate remedy at law (a fact agreed to in advance by the parties), and that the balance of harms weigh heavily in favor of granting the temporary injunction and do not disserve the public

---

[2]  *See e.g. Wilson v. Sandstrom,* 317 So. 2d 732, 736 (Fla. 1975);  *Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So. 2d 1371, 1372 (Fla. 4th DCA 1987);  *Cordis Corp. v. Prooslin*, 482 So. 2d 486, 489-490 (Fla. 3d DCA 1986).

interest.

### *The facts supporting injunctive relief*

8.      On or about 2006, Cool Corp Limited ("Cool Corp"), along with Neal and Massy Holdings, Ltd. ("Neal and Massy"), formed Cool Petroleum Holdings Ltd., ("CPHL") to acquire and hold all the business assets then owned by Shell Jamaica.  Through its subsidiary CPL and other subsidiaries, the new company's assets included among other things, 54 owned and/or branded service stations; a commercial fuels and lubricants business; a chemicals business; two petrol tank farms; and, by virtue of a call option entered into with Shell Jamaica, the beneficial rights to a shared interest in a sea-port located in Montego Bay, Jamaica.

9.      The CPHL assets were held in a series of wholly-owned subsidiaries and sub-subsidiaries including Cool Petroleum Limited (Jamaica) ("CPL"), which held the majority of the assets and performed the greater portion of the group's day-to-day business operations.

10.      In or about 2010, Neal and Massy expressed an interest in being bought out of the partnership with Cool Corp and the search for a new equity investor to replace Neal and Massy began in earnest.

*CPL Meets Blue Equity and Jonathan Blue*

11.      In or about late August 2010, CPL was introduced to Blue Equity and Jonathan Blue by Mayberry Investments in Jamaica and in particular by Stephen Whittingham ("Whittingham").

12.      The parties met on several different occasions in Miami, Jamaica and Trinidad and discussed among other things, the fact that the CPL business survived (despite having high debt obligations,) primarily because of its reliable access to working capital financing through a Letter of Credit ("LC") facility guaranteed by Neal and Massy.

13.     At the initial meeting with Blue Equity, CPL informed Jonathan Blue and Blue Equity that any prospective replacement partner would be required, at a minimum, to provide a guarantee for a Letter of Credit (LC) primarily for the purpose of acquiring imported petroleum products—which was an integral part of the CPL financial and operations model—or, alternatively, would be required to provide other forms of working capital financing for said purpose.

14.     This point (regarding the working capital financing), was raised and reiterated at every subsequent meeting between CPL, Jonathan Blue and Blue Equity in Miami, Jamaica and Trinidad, respectively.

15.     Blue Equity and in particular Jonathan Blue accepted this condition and repeated that access to working capital financing and in particular a Letter of Credit facility, would not be a problem or an issue for Blue Equity.  Jonathan Blue represented that his and Blue Equity's existing relationship with JP Morgan Chase bank in Louisville, Kentucky was such that the necessary working capital Letter of Credit would be "easily" obtained by Blue Equity.

16.     Based on the continued representations made by Jonathan Blue and Blue Equity regarding their ability and intention to access working capital financing for CPL's operations, all parties agreed that Blue Equity was a suitable potential replacement equity partner.

17.     Based in large part upon these several repeated misrepresentations from the Blue Equity Defendants regarding "easy" access to working capital financing, CPL, its shareholders and bond holders eventually decided to proceed in the relationship with Blue Equity as a replacement equity partner.

18.     The original terms agreed to by the parties, anticipated that Blue Equity was to acquire 48.5% of the CPL business in exchange for payment of approximately $10 million in

cash, plus a $6 million Letter of Credit to secure the debt to the bondholders and further access to working capital of an additional $10 to $16 million in readily accessible working capital financing.

19.     Under the initial terms discussed by the parties, the $10 million cash payment was to be disbursed with approximately $8,000,000 going directly to the business.

20.     In about April 2011 it became obvious that notwithstanding the initially contemplated May 2011 closing, Blue Equity was doing nothing to move the transaction along, but seemed instead to be stalling the transaction.

21.     Blue Equity continued to insist, despite its unexplained delays, that it was still willing and able to secure the required LC and any needed working capital financing and blamed its delay on a number of "new" factors including an alleged "Environmental Report" that it claimed—in June 2011, despite not having raised this as an issue prior—was necessary for closing.

22.     Jonathan Blue, David Roth and Blue Equity continued to insist to CPL, Cool Corp and other stakeholders that securing the required LC was not an issue as it had a strong relationship and "preapproval" from J.P. Morgan Chase.

23.     Based upon the continued misrepresentations from Blue Equity and Jonathan Blue, CPL prepared and sent communications to its bondholders urging them to conclude a previously initiated Bond Holder Approval process.

24.     Based upon these same representations, CPL and the minority shareholders also agreed to an early pay down of a significant portion of the existing bondholder debt, utilizing the bulk of the injected capital funds to be obtained from Blue Equity to fund the pay down.

25.     This early pay down was orchestrated by Blue Equity to improve its recovery

position in a planned, secret, short-term "flip" of the business as they had no intention of honoring their several continued misrepresentations regarding working capital financing.

26.    By the end of May 2011, the Bondholders had signed off on the CPL-Blue Equity joint venture transaction and had given their approval for Blue Equity to replace Neil and Massy as a new CPL equity partner.

27.    With the Bond Holders' approval secured and CPL and Cool Corp "locked" into the transaction with Blue Equity for all practical purposes, including the early pay down of bond holder debt, Blue Equity started to change key terms of the agreed-upon transaction.

28.    Blue Equity continued to insist, however, that securing the required LC was not a problem due to its existing relationship with J.P. Morgan and its alleged "preapproval" for the required LC.

29.    The Blue Equity Defendants' continued insistence on their ability to secure the required LC—despite trying to change several other terms of the transaction—was tacit acknowledgment of the importance of the required LC and the fact that without the ability or agreement to secure the LC, neither CPL, the Bondholders nor Cool Corp would be interested in, or would need to do the transaction with Jonathan Blue and Blue Equity.

30.    The Blue Equity Defendants' continued misrepresentations regarding their intention to provide working capital financing induced the bond holders' and minority shareholders' to agree to the early debt pay-down as neither group would have agreed to an early—unnecessary—debt pay-down at the expense of the much more critical working capital component of the transaction.

31.    While the early debt pay down made Blue Equity's capital injection more secure, the resulting lack of working capital severely impacted the company's day to day operations and

forced the company into a compromised financial position and paving the way for the fraudulent capital call.

32.     In or about April 2011 and towards the end of the initial due diligence exercise, Blue Equity disclosed the key terms of the pending CPL/Blue Equity transaction to persons at Neal and Massy and upon information and belief, determined based upon those conversations, to try and secure a larger equity position relative to the other shareholders in exchange for its agreed-upon investment as a CPL equity partner.

33.     The Blue Equity Defendants then set upon a concerted effort to fraudulently wrest as much additional equity or cash as they could from CPL, Cool Corp and the other minority shareholders in exchange for Blue Equity's agreed upon investment.

34.     First, Blue Equity demanded an annual "management fee" of $600,000, insisting that this was a fee to which they were entitled since they would be handling all matters financial, legal, and/or related to their "management expertise."

35.     This "management fee" was nothing more than an improper super-dividend payment as Blue Equity ultimately provided none of the services it claimed it was going to provide.

36.     Blue Equity and Jonathan Blue's insistence on a $600,000 "management fee" was purposefully inserted into the transaction <u>after</u> the parties had secured the bond holders' approval for the transaction as Jonathan Blue and Blue Equity were well aware that the bond holders would have demanded more accountability and transparency for such a large recurring expenditure.

_Blue Charges Improper Expenses to CPL_

37.     Immediately leading up to the closing of the CPL-Blue Equity transaction, The

Blue Equity Defendants suggested that they had incurred approximately US$1 million in "costs" to complete the transaction and sought to have reimbursement or other equity consideration for those alleged expenses.  This request was rejected by Cool Corp.

38.     In the months following closing, however, the CPL treasurer was ordered by Jonathan Blue and Blue Equity on different occasions, to process invoices received from Blue Equity going as far back as October 2011—well before the January 2012 closing date.  These funds have not been recovered from Blue Equity and remain as a part of the corpus of the corporate assets.

39.     Jonathan Blue and Blue Equity attempted to justify these questionable expenses by referring back to the same alleged $1 million in transaction costs that they allegedly incurred to close the CPL-Blue Equity transaction and which request had already been rejected by the minority shareholders.

40.     Blue Equity was able to provide no documentation or other justification for these alleged costs and expenses.

41.     Subsequently, Jonathan Blue as representative of the majority shareholder, and the new minority shareholder, CIHL, agree that all Blue Equity related expenses to be paid by CPL were to be disclosed to and approved by CIHL and all CIHL expenses to be paid by CPL were to be disclosed to and approved by Blue Equity.

42.     Notwithstanding the parties' agreement, Jonathan Blue and Blue Equity continued to try and push through, and in many cases succeeded in pushing through improper expenses on the CPL accounts.

43.     These improper expenses constituted other "preferential" or "super" dividends to the Blue Equity Defendants which were not made available to the other shareholders.  These

sums have not been recovered and are at risk of immediate dissipation as a part of the corpus of the remaining corporate assets.

44.    Jonathan Blue and the Blue Equity Defendants continued however to run expenses through the CPL accounts without the knowledge and approval of the minority shareholders and in particular CIHL.  For example, travel expenses for Blue Equity executives travelling to Jamaica and elsewhere on business (unrelated to CPL), were routinely charged to CPL.

45.    From January to November 2012 alone, CPL/TAG's expense reports reflect in excess of $20 million Jamaican dollars attributed to Jonathan Blue for "travel expenses" for himself and at least one other Blue Equity Director.  This was the equivalent of over U.S. $230,000.

46.    During this same period, other uncategorized expenses in excess of $2.5 million Jamaican dollars (U.S. $30,000) are reflected on the CPL accounts again attributed to Jonathan Blue, individually.

47.    The management fees during this period for Blue Equity were in excess of $58 million Jamaican dollars (U.S. $674, 000).

48.    Blue charged over $156,000.00 in interest charges payable to J.P. Morgan, to CPL/TAG.

49.    In addition to the management fees, charged during this period, the Blue Equity Defendants also charged in excess of $5 million Jamaican dollars – almost U.S. $60,000 – for "expenses" for the consulting firm of Brockman Arbuckle Stapp, where Blue Equity's Chief Financial Advisor also served as that firm's Managing Partner.

50.    In or about November 2012, Blue Equity disclosed that it had been negotiating a

potential sale of the business.  During the month of the surprise sale, December 2012, CIHL became aware that Jonathan Blue had granted to himself, without consultation or without advising the minority shareholders, a "bonus" in the amount of approximately U.S. $70,000.00. This sum has not been recovered and is at risk of immediate dissipation as a part of the remaining corpus of the corporate assets.

**The Fraudulent Capital Call**

51.     In or about February 2012, Jonathan Blue and Mr. Roth raised what they described as the "urgent" cash needs of CPL/TAG with the CFO, Rodney Davis.

52.     Mr. Davis suggested, as he had several times before, that the company could obtain a cash-backed LC, even if secured against the shares of the minority shareholder CIHL. Mr. Davis suggested that by adopting this option, an unnecessary and imprudent capital call would be avoided and the relative equity position of the shareholders would be preserved.

53.     In or about May 2012, Jonathan Blue and his Vice President and Chief Legal Officer Mr. Roth, as members of the Board of Directors of TAG/CPL, insisted that the company needed to have an immediate Capital Call because the company was in a desperate financial condition.

54.     The decision to issue a capital call was made over the strenuous objections of the minority shareholders and in particular, CIHL.  The fraudulent capital call was issued in June 2012.

55.     Jonathan Blue, Mr. Roth and Blue Equity insisted that the company needed to have a capital call because of a constrained revenue stream and immediate overdue payment obligations to TAG's (CPL's) vendors and suppliers—the very reasons the parties had insisted on a working capital facility as a part of the original discussions and agreement with Blue

11

Equity.

56.     The terms of the fraudulent capital call required that any shareholder who wished to exercise the option to purchase additional shares—dubbed "Class C" shares—would be required within 30 days of the capital call notice, to deposit funds equivalent to their pro-rata share of the full $10 million dollar share issue.

57.     For CIHL, this amounted to approximately U.S. $4.8 million dollars.  For Blue Equity, this amounted to approximately U.S. $5.2 million or U.S. $10 million if Blue Equity ultimately chose to exercise the option to purchase all outstanding Class C shares.

58.     Specific instructions were set forth in the Notice of Capital Call which detailed the instructions for deposit and the deadline to deposit payment for the Class C shares issued per the capital call.  To wit:

> **Such capital contribution amount should be remitted either by wire transfer to the following bank account for the benefit of, and for further direction by, the Company (per the wire transfer instructions set forth below), or by delivery to the Company of a valid check, for such amount on or before July 20, 2012. The instructions for remitting funds as a contribution to the capital of, and for the benefit of, the Company by wire transfer are as follows:**
>
> **Bank .............................................PNC Bank**
> **Louisville, Kentucky**
> **ABA Routing Number ................083000108**
> **For Credit To .............................David M. Roth PSC Attorney Trust Company**
> **Account Number .........................3021▮▮▮▮▮▮▮**
>
> **For Benefit Of: ............................Cool Petroleum Holdings Limited**
>
> *Excerpted from Notice to Shareholders dated June 18, 2012 at p. 3. (redacted)*

59.     Contrary to their representations to the minority shareholders, Blue Equity likely never made the required deposit within the time or in the manner prescribed, to allow them to exercise purchase rights for ***any*** shares under the forced capital call—let alone all the outstanding Class C shares.

60.     As confirmed by David Roth in several subsequent emails to CIHL, Blue Equity

never deposited the funds in the time and manner provided by the terms of the forced capital call.

61.     Additionally, upon information and belief, not only did Blue Equity fail to make the capital call deposit as required, but Blue Equity never provided a lump sum capital injection at all, but rather arranged to make funds available on an as needed basis.  This arrangement defeated the purpose of the capital call and did not accrue to the company's benefit or to the benefit of the minority shareholders.

62.     Rather, Blue simply adopted the very suggestion that was made by CIHL and instead of providing cash "capital" as required—in full paid up funds—Blue simply secured an LC and drew down funds on an as needed basis.

63.     To add insult to injury, Blue charged all fees and costs associated with this credit facility to CPL/TAG—to Blue Equity's sole benefit and to the detriment of the minority shareholder, CIHL.

64.     For several months leading up to the fraudulent Capital Call, however, Jonathan Blue, Blue Equity and several of its officers and affiliated Directors, engaged in a series of acts designed to manipulate the company (TAG), and the minority shareholders, in particular CIHL, into a compromising financial condition.

65.     These acts of financial manipulation included among others things:

a.     Severely restricting access to working capital contrary to their initial assurances and promises leading up to the closing of the CPL-Blue Equity transaction, thereby resulting in underperforming revenue numbers and compromising the company and the minority shareholders;

b.     Forcing unnecessary and unilateral purchasing and expense decisions either over the CFO's objection or without consulting top executives in the company, that

severely limited the company's working capital reserves, thereby compromising the company and the minority shareholders;

      c.     Overstocking slow moving inventory and refusing to purchase other types of inventory which resulted in CPL having petroleum inventory that was well in excess of what it could (historically) sell within the time required for payment or not having inventory which upon sale would result in needed working capital to the company.

66.     Contrary to the requirements of the fraudulent capital call, Blue Equity never deposited the $10 million dollars it claims that it deposited on account for TAG (formerly CPL) and which was the alleged basis for its allocation—to itself—of all 10 Class C shares or the equivalent of five thousand seven hundred and forty additional common shares.

67.     The Blue Equity Defendants refused, and were in fact unable to provide any bank statements proving their "deposit" of the funds pursuant to the forced capital call because they never made the deposit.

68.     Instead, Blue Equity used the very same LC concept it had promised to put in place at the beginning of the transaction—or a portion thereof—and attempted to fraudulently secure for itself additional shares for providing this facility.

69.     To support Blue Equity's claim of a "deposit", Jonathan Blue and his Vice Chairman, David Roth, an attorney in Kentucky, caused Blue Equity to create and provide a "Statement of Account" fraudulently reflecting "deposits" and "withdrawals" from a capital call "Escrow Account".

70.     The only explanation received from Blue Equity and Jonathan Blue through David Roth as reflected below, was that the monies were placed into an "escrow account" where money allegedly belonging to CPL as a result of the capital call was co-mingled with funds from

"others" as well:

> Dear Rodney,
>
> As previously explained, ***the escrow is being held within a bank account which contains funds held for others as well***. Therefore, the bank statements contain confidential information which is not relevant to TAG. For purposes of facilitating the SBLC's that have been issued by JPMorgan Chase, we have been serving as an escrow agent as to the funds being held for TAG, all as reflected in the spreadsheet provided.

(Excerpted from email from D. Roth to R. Davis dated Nov. 26, 2012.) (Emphasis added).

> Dear Rodney,
>
> Please see my prior email. As you know, I have always referred to the funds as being held by us in an escrow account for TAG and not in a separate bank account. As you know through the prior emails, because of the Atlantic Supply and initial Shell Trinidad timing issues, we were not able to get JPMorgan Chase to clear TAG under the Know Your Customer rules quick enough to use a new account for TAG's purposes.
>
> Best,
>
> David

(Excerpted from email from D. Roth to R. Davis dated Nov. 26, 2012.)

71.     By Blue Equity's own admission through Mr. Roth, the "capital call" funds were never deposited in the designated account as required but were allegedly placed into an "escrow account" and comingled with "funds held for others as well."

72.     The proceeds from the sale of the company's shares may have already been improperly distributed by Blue Equity without advice or consultation with the minority shareholders.  If not already distributed, distribution of the sums allocated for the preferred "Class C" shares is imminent and will result in signification dissipation and waste of corporate assets and significant losses to the company and its minority shareholders who are at the whim of Blue Equity and the majority shareholders who have failed or otherwise refused to be transparent with the accounting and distribution of funds from the surprise sale.

**The Surprise Sale To Rubis**

73.     On or about November 13, 2012, less than four (4) months after the fraudulent capital call, Blue Equity finally disclosed that it had been in "talks" to sell the shares of the company to a third party, which was eventually identified as Rubis.

74.     These secret "talks" and negotiations were in progress and ongoing before the fraudulent capital call and were not disclosed to CIHL or its shareholders or any CPHL/BE TAG minority shareholder.

75.     Upon information and belief, the eventual disclosure of the pending sale was forced only because Rubis and Blue Equity had agreed to terms and the buyer, Rubis, was poised to make its own public announcement of the sale.

76.     Further, in order to finalize the sale, Blue Equity was compelled to seek a vote of the Board of Directors and the necessary corporate resolutions as a part of their due diligence and pre-closing obligations.

77.     At a TAG board meeting on or about November 13, 2012, when the fact of a potential sale was first formally disclosed, only minimal details of the sale were disclosed to the minority shareholders—which details among other things did not include the final sales price nor did it include the name of the prospective buyer.

78.     The November 13 Board meeting was temporarily suspended "to allow" for the minority shareholders to review such minimal sales documents and financial models regarding the putative sales alternatives as Blue Equity chose to disclose.

79.     Blue Equity provided only minimal documentation regarding the potential transactions, severely restricting, if not prohibiting entirely, any meaningful analysis or ability of the minority shareholders to object or question the proposed sales alternatives.

80.     Seven days later, at the continuation of the board meeting on November 20, 2012, Blue still refused to disclose the details of the pending sales proposals and refused to provide sufficient information to the minority shareholders to review and analyze the terms of the proposed alternatives.

81.     Despite demand for the information, the Blue Equity Defendants provided only such information as it deemed—in its sole capacity—as "relevant" to the minority shareholders' analysis of the deal.

82.     Over the continued objection of CIHL, the Blue Equity Defendants forced a vote of the Board to secure for itself, *carte blanche* rights to negotiate, accept and execute a sale of the shares of CPL (now known as TAG) to a third party.

83.     The Blue Equity Defendants provided the minority shareholders with no meaningful analysis of the transaction, including for example, no information regarding the ultimate disbursements to the shareholders; no information regarding any associated fees and expenses associated with the transaction; no information regarding associated transactions which may have affected the terms of the transaction; and, no information regarding how the share price was ultimately determined.

84.     Excerpts of some closing documents were ultimately made available for review and comment by CIHL—on a restricted basis for a period of less than 48 hours—shortly before the date of the proposed closing.

85.     Indeed, up until December 31, 2012—the day of closing—no closing statement or other document detailing the manner or amount of disbursement to the shareholders was provided to the minority shareholders and in particular CIHL.

86.     Since the closing, up to and including May 2013, little if any information regarding revenue, adjustments or distribution have been provided to the full Board of Directors of CPHL/BE TAG or to the Minority Shareholders at CIHL.

87.     Rather, Blue Equity, Jonathan Blue and David Roth have thus far, only provided such minimal information as they deemed necessary in their sole discretion and for their own purposes.

88.     For example, through information and belief, the purchaser, Rubis required (prior to closing) the resignation of the existing Directors of CPL/TAG, the company being sold. Rather than providing a basic resignation document, Blue Equity attempted to force the Directors to execute a "Resignation Release and Waiver" of all claims that the Directors may have.

89.     Similarly, resolutions purporting to authorize Blue Equity to "represent" the Shareholders and Directors in negotiations, also attempted to grant unrestricted rights to receive and distribute in their sole discretion any and all sums ultimately received from the sale.

90.     These same resolutions also purported to release Blue Equity and its agents from any and all claims held by the minority shareholders against the majority shareholders.

91.     Notwithstanding their failure to provide any meaningful information to the minority shareholders, Blue Equity forced a vote of the Board of Directors purporting to grant to them alone, *carte blanche* and unfettered rights to negotiate, accept or reject any proposal for sale of all shares of the company—including those of the minority shareholders.

92.     This vote was a farce and meaningless as the Blue Equity Defendants had been conducting these negotiations for months before the vote as upon information and belief, the sale discussions with this and possibly other third party purchasers had been already pending for several months.

93.     Upon information and belief, the sale discussions with Rubis and maybe even other parties had been ongoing even well before the fraudulent capital call.

94.     Armed with unique knowledge of the pending sale, Blue Equity, Jonathan Blue and David. Roth and their affiliated officers and Directors fraudulently induced the capital call in an effort to steal approximately 16% equity share from CIHL and the other minority shareholders.

95.     The ultimate value of these misappropriated shares has not been disclosed post closing and is at significant risk of dissipation and waste by the majority shareholders without immediate court intervention in the form of temporary injunctive relief.

96.     Pursuant to the Shareholder Agreement, CIHL and Blue Equity agreed to the following provision:

> **(b)**     Should any nonbreaching or nondefaulting party or parties seek recourse to equity to enforce any of its or their rights under this Agreement by specific performance, injunction, or other equitable relief, each breaching or defaulting party agrees to, and hereby does waive any defense or defenses which it might otherwise have that there is any adequate remedy at law.

*Shareholder Agreement at p. 38.*

## B.     The Plaintiff Has Suffered And Will Continue To Suffer Irreparable Injury Unless a Temporary Injunction Is Issued

97.     Without immediate court intervention, CIHL will suffer immediate and irreparable harm in the form of:

a.     Irreversible loss of its equity position and subsequent revenue from the sale appurtenant thereto:

b.     Improper and secret distribution of sales funds to unknown and possibly foreign Blue Equity and Jonathan Blue accounts and out of BE TAG Holdings accounts.

c.      Fraudulent and permanent dilution pursuant to the fraudulent capital call which in all likelihood did not actually occur pursuant to its own terms;

d.      Continuing dissipation of corporate assets, waste, loss of, or damage to any equipment or asset currently on the company's asset ledger;

98.    Upon information and belief, the Blue Equity Defendants have "doctored" the books and records of CPL/TAG—and in particular the alleged statements of the capital call account(s)—to their sole and illicit benefit and will continue to do so absent immediate court intervention to secure and preserve these records in their present condition.

99.    The documents and accounts being tampered with will present proof of the Defendants' past and ongoing diversion of corporate funds and dissipation of corporate assets and theft of shareholder equity and will be necessary to a finder of fact's determine the current state of TAG's and the minority shareholder's financial affairs and the facts regarding the alleged capital call investments, and will provide invaluable information regarding the true ownership of the company's current remaining assets and other revenue from the sale.

100.    Defendants first advised CIHL and the other minority shareholders of the pending sale a mere 5 weeks before the closing on the transaction.  The Defendants, and in particular the Blue Equity Defendants were aware of the sale well before the fraudulent capital call.

101.    Since the closing—almost six (6) months ago—there has been little disclosure regarding the financial terms of the transaction beyond the total sales price and the amount to be distributed to pay off existing bonds.  There has been no disclosure regarding any accounting or distribution of revenue to the minority shareholders.

102.    Defendants have refused to disclose any proposed distribution to CIHL and the other minority shareholders or to disclose the amounts and justifications for any subsequent or planned distributions for fees and "expenses" or intended set-offs.

103.    Upon information and belief, even though there has been no disclosure or approval sought from the minority shareholders, CIHL believes that the Blue Equity Defendants have taken distributions unto themselves—directly and indirectly—either in whole or in part.

104.    CIHL fears the continued illicit and improper distribution of revenue from the sale and the continued waste of corporate assets and the waste and dissipation of CIHL assets by the Defendants who have bestowed unto themselves full, autonomous and dictatorial control of the pre and post closing process.

105.    Despite the fact that CIHL owned between 35-49% of the outstanding shares, they were excluded from the closing and denied access to the details of the anticipated flow of funds from the sale of the company shares.

106.    If the fraudulent capital call is deemed a nullity, Blue Equity, Jonathan Blue and David Roth will have to return share value in excess of 15 percent of the value of the company—which amounts are presently at substantial risk of dissipation and disbursement as Blue Equity Jonathan Blue and David Roth continue to operate, post-closing, without any transparency or disclosures to the minority shareholders.

107.    Plaintiffs are convinced that the Blue Equity Defendants will be unwilling or unable to voluntarily satisfy their financial obligations to the CIHL shareholders and will be less able or willing to meet these obligations if they are allowed to distribute additional funds in secret to unknown accounts without supervision or transparency.

108.    Any efforts to get meaningful information regarding the distribution of post-closing funds or an accounting of the revenue from the December 2012 closing, have all proven futile.

109.    Without immediate court intervention to secure and preserve the company's remaining assets and accounts, CIHL, TAG/CPL and the other minority shareholders will collectively and individually suffer immediate and irreparable harm in the form of:

a.    Possible exposure to litigation with third parties for failure to meet contractual obligations;

b.    corporate dissolution, waste and significant dissipation of assets;

c.    loss of equity and revenue from the sale.

110.    Upon information and belief, the Blue Equity Defendants have already "doctored" the books and records of TAG/CPL and will continue to do so absent immediate court intervention.  The documents being tampered with may be proof of the Blue Equity Defendants' fraud regarding the alleged capital call transaction, their ongoing diversion of corporate funds and dissipation of corporate assets as well as documents necessary to determine the current state of TAG's proceeds of sale.

### C.    Plaintiff Has No Adequate Remedy at Law

111.    Monetary damages will not adequately compensate the plaintiff, CIHL, for the injuries it has suffered and continues to suffer at the hands of the Blue Equity Defendants.

112.    At bottom, the facts in the Verified Complaint, as well as those outlined in this motion, *supra*, indicate that without immediate intervention by this Court, TAG, BE TAG and its minority shareholders, including all of CIHL's interests, equity and investments, will face *immediate* risk of dissipation, waste and diversion of corporate assets by the controlling shareholders.

113.     The parties to the Shareholder Agreement have also specifically agreed that remedies at law for breach of the shareholder agreement would be inadequate—all parties conceding and agreeing in advance that the balance of harms weigh in favor of the party seeking injunctive relief.

114.     This Court has the inherent power to enjoin the actual or threatened misappropriation, waste or dissipation of the corporate assets held by the Defendants which upon information and belief was obtained as a result of the sale of the TAG/CPL shares.

**D.      Plaintiff's Claims Have a Substantial Likelihood Of Success On the Merits**

115.     As officers and controlling shareholders of TAG/CPL and BE TAG Holdings Limited, the Blue Equity Defendants have and owe an ongoing fiduciary duty to BE TAG and to CIHL.  As a part of that duty, the Defendants were required to exercise the utmost good faith in the exercise of their powers in the interest of the corporation and CIHL.[3]

116.     As outlined in the Verified Complaint, the Blue Equity Defendants have, upon information and belief, systematically been dissipating corporate assets and have siphoned away hundreds of thousands of dollars from TAG/CPL in the form of preferential dividends labeled as "expenses";

117.     As outlined here and in the Verified Complaint, the Blue Equity Defendants have forced – through pretext – a fraudulent "capital call" resulting in the theft or misappropriation of over 15% of the share value of the company and have failed to comply with the terms thereof, while at the same time doing nothing whatsoever to grow or operate the business and repay its creditors despite their assurances and agreements to the contrary.

118.     At the very minimum, the Blue Equity Defendants, after granting unto

---

[3] *See e.g. Flight Equipment & Engineering Corp. v. Shelton*, 103 So. 2d 615, 626 (Fla. 1958)

themselves, *carte blanche* rights to negotiate, act and execute a sale of the company's entire schedule of assets, have done so in secret and in the six months post-closing, have yet to account to the Board of Directors and the minority shareholders for *any* of the revenues realized from the sale.

### E.        A Temporary Injunction Will Greatly Serve The Public Interest

119.    Intervention by this Court in the form of an emergency temporary injunction is necessary to prevent any continued injury to BE TAG Holdings Limited and to CIHL, its minority shareholder.  Immediate court intervention will further allow CIHL to properly litigate and resolve the issues surrounding the fraudulent capital call while preserving the necessary proof and company property, including proceeds of sale, while not unjustly enriching the Blue Equity Defendants in the interim.

### F.        The Balance of Harms Weigh in Favor of the Plaintiff

120.    An order granting temporary injunctive relief will result in no harm to the Defendants.   Indeed, because the plaintiff seeks only to enjoin the defendants from prematurely—or improperly—disbursing monies that are clearly in dispute, the Blue Equity Defendants, who are majority shareholders will still—presumably—be entitled to partial disbursement of funds that are not in dispute and would not be subject to disgorgement or return.

121.    Further, as named shareholders themselves, any action taken to preserve and maintain the assets of the company, will theoretically also inure to the benefit of the Blue Equity Defendants and/or their agents and assigns.

### G.        The Plaintiff Will Be Irreparably Harmed if Prior Notice
### is Given to The Defendants

122.    The Plaintiff seeks an *ex parte* injunction—without prior notice to the defendants—because they believe that the Defendants, and in particular Jonathan Blue and the

Blue Equity Defendants, will attempt to further dissipate, transfer, secret or hide away assets that are properly owned by CIHL and/or other minority shareholders.  This would result in immediate and irreparable harm to the plaintiff before the Court is able to enter an order on this motion.

123.    As is indicated in the body of the motion, the Defendants have indicated that they have or are keeping monies belonging to the company in "co-mingled" accounts.  At a minimum, this admission justifies an immediate hold on all accounts containing funds belonging or related to CPL and/or the sale transaction.

124.    The plaintiff further believes that the Defendants have and will likely continue to manipulate or modify any and all accounting records of TAG/CPL in their possession and may also destroy or otherwise fail to preserve incriminating records and documents if prior notice is given to them of the instant *ex parte* motion.

**WHEREFORE**, the plaintiff respectfully moves the Court to enter an expedited *ex parte* temporary injunction as follows:

a.    Providing immediate access to all TAG/CPL related accounting books and records in Blue Equity's Possession or control, including but not limited to its capital call accounts and any accounts that held "capital call" related funds;

b.    Providing access to all records of closing and post-closing accounting and documentation including any records of disbursements;

c.    general ledger, profit and loss statements and tax returns,  as well as access to all of TAG/CPL's bank accounts, signatory rights and information regarding the location of all funds being held for or on behalf of  TAG/CPL;

d.    Providing immediate access to all of TAG/CPL's business records and corporate documents held by or on behalf of Blue Equity;

    e.      Restricting the Blue Equity Defendants and or their agents and assigns, from writing any checks, transferring or spending any monies on behalf of TAG/CPL or BE TAG over the amount of $5,000.00 without written consent from CIHL or its designated agent(s) or representatives;

    f.      Freezing all bank accounts belonging to or held for the benefit of BE TAG Holdings Limited, BEP, David Roth, David M. Roth PSC Attorney Trust Company or Jonathan Blue at the following financial institutions;

    i.      JP Morgan/Chase Bank
ABA Rtg. # 083000137
416 West Jefferson Street
Louisville, Kentucky 40202

    ii.      PNC Bank,
ABA Rtg. # 083000108
Louisville, Kentucky

    iii.      Citibank New York
111 Wall Street
New York, NY 10043
DDA #:           1099███████
Routing #:       021000089
Beneficiary Name:    Citibank Jamaica branch
Beneficiary Address:  19 Hillcrest Avenue
                       Kingston 6, Jamaica
For credit to account #:  0022███████
Name on account:     BE TAG Holdings Limited

    g.      Enjoining the Defendants from selling or in any way transferring or encumbering any remaining ownership interests in any assets of or held on behalf of  BE TAG or BEP;

    h.      Enjoining the Defendants from further dissipating in any way BE TAG's corporate assets or BEP's corporate assets wherever and however located;

        h.      Enjoining the defendants from unilaterally effecting any further distributions on the behalf of BE TAG either directly or indirectly;

Dated June 10, 2013.

Respectfully submitted,

Kim Vaughan Lerner LLP
*Attorneys for Plaintiffs*
One Financial Plaza, Suite 2001
Fort Lauderdale, FL  33394
Telephone:     (954) 527-1115
Facsimile:      (954) 527-1116
Primary E-mail: rvaughan@kvllaw.com
Primary E-mail: blerner@kvllaw.com
Secondary E-mail: rbaggett@kvllaw.com

By: /s/ Robert C.L. Vaughan
    Robert C. L. Vaughan, P.A.
    Fla. Bar No. 130095
    Brian Lerner
    Fla. Bar No.  177202
    Cherine Smith Valbrun, Esq.
    Fla. Bar No. 27046

# Exhibit A

(Verified Complaint w/ exhibits)

IN THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

COOL INTERNATIONAL HOLDINGS
LTD, a British Virgin Islands
incorporated company, individually
and derivatively in the right and for
the benefit of BE TAG HOLDINGS LIMITED,
a St. Lucia International Business Company,

        *Plaintiff*

CASE NO. _____

v.

BLUE EQUITY PETROHOLDINGS, LTD.,
a St. Lucia International Business Company;
BLUE EQUITY LLC; JONATHAN BLUE,
an individual; DAVID ROTH an individual;
and MAUREEN SMITH an individual.

        *Defendants*.

_____/

## VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

The plaintiff Cool International Holdings, Limited ("CIHL"), individually and derivatively on behalf of BE TAG Holdings Limited ("BE TAG"), brings this civil action against the defendants, Blue Equity LLC, ("Blue Equity") Blue Equity Petroholdings Ltd. ("BEP"), Jonathan Blue, David Roth and Maureen Smith.  Together, BE TAG, BEP, Jonathan Blue and David Roth are sometimes referred to as the "Blue Equity Defendants."   In support of its complaint, plaintiff states as follows:

## NATURE OF THE CASE

This is an action by CIHL arising from the defendants' breaches of a shareholder agreement and several fraudulent acts designed to steal shares from the minority shareholders for

CASE NO. _____

the benefit of the majority shareholders, the Blue Equity Defendants.   After fraudulently misrepresenting its ability or intention to support the business' ongoing working capital requirements, Blue Equity and its agents and affiliates including Jonathan Blue and David Roth, designed a secret plan to acquire shares in a Jamaican company called Cool Petroleum Limited ("CPL") and then flip that share interest for a quick profit at the sole expense of the minority shareholders.   On the road to achieving that secret objective, Blue Equity, Jonathan Blue, and David Roth in concert with Maureen Smith and other unnamed persons, committed fraudulent acts designed to maximize Blue Equity's "dividend" opportunities at the expense of the minority shareholders and to maximize Blue Equity's potential recovery from a secret sale orchestrated by Blue Equity—also at the sole expense of the minority shareholders.   These improper acts included, but were not limited to, fraudulently inducing the shareholders and bond holders to agree to an early debt payment at the expense of preserving working capital reserves—which decision inured solely to the benefit of Blue Equity and further, falsely concocting a "capital call" designed solely to shift shares from the minority shareholders to the Blue Equity Defendants as well as several fraudulent acts designed to cover up the fraudulent "capital call." CIHL also seeks damages for Blue Equity, Jonathan Blue, David Roth and Maureen Smith's continuous and repeated breaches of their fiduciary obligations to the minority shareholders. CIHL seeks a trial by jury of all issues so triable.

## **THE PARTIES**

1.       The plaintiff, CIHL, is a British Virgin Islands Business Company with its principal place of business in Jamaica.   CIHL is a minority shareholder of BE TAG which owned a 100 per interest in CPL, later known as The Antilles Group ("TAG").

CASE NO. _____

2.       The defendant, BEP, is a St. Lucia International Business Company with its principal place of business in Saint Lucia 1st Floor Financial Center, No. 1 Bridge Street, Castries, St. Lucia W.I.  Upon information and belief, BEP is the single purpose entity used by Blue Equity to hold its share holdings in BE TAG.  BE TAG was also formerly known as Cool Petroleum Holdings Limited ("CPHL").

3.       Upon information and belief, the defendant Blue Equity is a Delaware Business Company with its principal place of business in Louisville, Kentucky.  Blue Equity is represented by its principals to be an independent, private equity firm.

4.       The defendant Jonathan Blue is a resident of Louisville, Kentucky.  Jonathan Blue is the Chairman, Chief Executive Officer, and upon information and belief is also the Treasurer of Blue Equity, BE TAG and each of its subsidiaries.

5.       The defendant David Roth is a resident of Louisville, Kentucky.  David Roth is the Vice Chairman and a Director of BE TAG and upon information and belief is also a Director and shareholder of BEP and the Vice Chairman and Chief Legal Officer of Blue Equity.

6.       The defendant Maureen Smith is a resident of Kingston, Jamaica.  Maureen Smith was the Corporate Secretary and primary in-house legal officer of The Antilles Group ("TAG"), formerly CPL, a Jamaican Limited Company which shares were 100 percent owned by BE TAG.[1]

---

[1] Before its name was changed, TAG was known as CPL.  Before its name was changed, BE TAG was known as CPHL.  The names TAG/CPL and BE TAG/CPHL are used interchangeably throughout the complaint and unless otherwise stated, are only a rough indicator of the period of time relevant to a particular allegation or other factual reference.

CASE NO. _____

## JURISDICTION AND VENUE

7.      This is an action for temporary and permanent injunctive relief and for damages totaling more than $15,000, exclusive of interest, attorney's fees and costs.

8.      This Court has jurisdiction pursuant to Fla. Stat. §§ 26.012 and 48.193 and pursuant to written agreement of the parties.

9.      By virtue of the parties' agreement, the Court has jurisdiction and venue is proper in Miami-Dade County.

10.      Venue and jurisdiction are proper in Miami-Dade County by virtue of the clause in the parties' shareholder agreement, which stipulates that each party to the Shareholder Agreement irrevocably consents to and agrees to submit to personal jurisdiction and venue in any federal or state court in Miami, Florida, for all purposes and as to any and all claims.

11.      All conditions precedent to bringing this action have been waived, excused, or otherwise have occurred or have been performed.

12.      Plaintiffs have agreed to pay the undersigned counsel their attorneys' fees and costs in this action.

## COMMON ALLEGATIONS OF FACT

13.      On or about 2005, Cool Corp Limited ("Cool Corp"), along with Neal and Massy Holdings, Ltd. ("Neal & Massy"), formed CPHL to acquire and hold all the assets then owned by The Shell Company (W.I.) Limited "Shell Jamaica."   Through its subsidiary CPL and other subsidiaries, the new company's assets included among other things, 54 owned and/or branded service stations; a commercial fuels and lubricants business; a chemicals business; two petrol tank farms; and, by virtue of a call option entered into with Shell Jamaica, the beneficial rights to a shared interest in a sea-port located in Montego Bay, Jamaica.

CASE NO. _____

14.     In or about 2010, Neal and Massy expressed an interest in selling their share interest in CPHL and subsequently, Cool Corp began the search for a new equity investor in CPHL.

15.     Cool Corp approached Mayberry Investments Limited, Jamaica ("Mayberry"), a Jamaican finance and investment company and retained them to identify and secure a suitable replacement partner to acquire the equity interest held by Neal and Massy.

**Cool Corp Meets Blue Equity and Jonathan Blue**

16.     In or about late August 2010, Cool Corp was introduced to Blue Equity by Mayberry in Jamaica and in particular by Stephen Whittingham ("Whittingham") who was introduced to Cool Corp as the Mayberry representative, working on behalf of Cool Corp to identify and secure a new equity investor for CPHL.

17.     Cool Corp later learned that Whittingham was not merely the Mayberry representative who had found Blue Equity as a potential investor, but in fact, he was also a business partner and employee of Blue Equity and Jonathan Blue, its principal.

18.     Representatives of Cool Corp and Blue Equity met on several occasions in Miami, Jamaica and Trinidad and discussed among other things, the fact that the CPL business— the subsidiary through which the bulk of the CPHL operations were handled—survived and was successful despite having high existing debt obligations, primarily because of its reliable access to working capital financing through its relationship with Neal and Massy

        a.      Specifically, the Cool Corp and Blue Equity representatives met on several occasions between October 2010 and June 2011;

        b.      Cool Corp described how, for the past six years, CPL had managed to meet all of its current cash obligations;

CASE NO. _____

    c.      Cool Corp described the importance of seeking and obtaining capital funding to replace the Neal and Massy working capital facilities to support CPL's day to day and operations and import purchases;

    d.      Cool Corp also described the negative impact that would accrue to the business without adequate working capital financing;

    e.      Cool Corp explained that Neal and Massy had ensured the existence of working capital through its support of an LC[2] facility at Citibank.

19.     In addition to the financial security that this working capital facility provided to CPL's existing bond-holders, the working capital financing and in particular, the existing LC supported and guaranteed by Neal and Massy was an integral component of CPL's existing purchasing and operations model which relied heavily on importing a significant portion of CPL's total petroleum products for sale into the local market:

    a.      Cool Corp explained to Blue Equity that the petroleum import practice could not be supported without adequate working capital financing and that the domestic or local purchases of petroleum, by themselves, were insufficient to sustain, let alone grow the CPL business.

    b.      Further, Cool Corp explained to Blue Equity's representatives that any acquirer of the Neal and Massy share interests would have to ensure adequate LC support for working capital needs or provide alternate sources of working capital support if the business was to continue to maintain or improve its earnings levels.

---

[2] Throughout the Complaint, the term "LC" refers to Letter of Credit.  The term "SBLC" refers to Stand By Letter of Credit.

CASE NO. _____

20.     CPL's particular purchasing and operations model was possible in large part, because of CPL's beneficial ownership interest, through Shell Jamaica, in the largest privately held petroleum "tank farm" facility in the island.

21.     Cool Corp explained to Blue Equity that the combination of the access to the tank farm and adequate working capital financing allowed CPL to take advantage of periodic adjustments in the market cost of acquiring imported fuel as compared to the market cost of local fuel purchases.

22.     At the initial meetings with Blue Equity, Cool Corp and its representatives specifically informed Jonathan Blue, David Roth and Terry Stapp (introduced to Cool Corp as Blue Equity's Chief Financial Officer), that any prospective or future equity partners would be required, at a minimum, to satisfy the LC considerations if the CPL earnings forecasts were to be achieved or, alternatively, would be required to provide other forms of working capital financing to replace the existing Neal and Massy LC facility.

23.     These points, in particular, were raised at every meeting between Cool Corp, Jonathan Blue and Blue Equity in Miami, Jamaica and Trinidad, respectively.

24.     It was repeatedly made clear to Blue Equity and to Jonathan Blue that the CPL business derived a considerable portion of its earnings by having access to sufficient quantities of imported petroleum product in addition to its domestic purchases to allow CPL to take advantage of the differences in the domestic and import market prices of petroleum and petroleum products.

25.     It was also repeatedly emphasized to Blue Equity that any agreement with a potential or future equity partner would be predicated upon the equity partner's ability to access and make available, adequate working capital financing to replace the Neal and Massy LC facility.

CASE NO. _____

26.     Blue Equity and in particular Jonathan Blue and David Roth repeated that access to working capital financing and in particular a Letter of Credit facility, would not be a problem or an issue for Blue Equity.

27.     To support these misrepresentations, Jonathan Blue and David Roth specifically asserted that Jonathan Blue and Blue Equity's relationship with JP Morgan bank in Louisville, Kentucky was such that the necessary working capital LC would be "easily" obtained by Blue Equity at minimal cost and effort.

28.     Based upon these several, repeated misrepresentations regarding Blue Equity's "easy" access to working capital financing, Cool Corp was induced to proceed to contract with Blue Equity and to support Blue Equity's purchase of an equity interest in CPHL.

29.     The original terms agreed to by the parties, anticipated that Blue Equity was to acquire an aggregated 48.5% of CPHL in exchange for an aggregated consideration of approximately $10 million in cash, plus a LC to serve as the replacement of the Neal and Massy LC on terms to be agreed upon and approved by CPL's bondholders.  Blue Equity also initially agreed to provide access to working capital of an additional $10 to $16 million.

30.     Under the original terms, the $10 million in cash from the Blue Equity investment was to be disbursed with approximately $8,000,000 going directly into the CPL business.

31.     All parties to the transaction agreed that there were key conditions precedent that needed to occur before the CPL-Blue Equity closing, which was initially scheduled for February 2011.

32.     The parties all agreed and understood that the material terms of the proposed transaction, all needed to be approved by the bondholders before the parties could proceed further with the proposed transaction.

CASE NO. _____

33.     Based on the continued misrepresentations made by Jonathan Blue, David Roth, Blue Equity and its representatives to Cool Corp and the bondholders regarding Blue Equity's ability to access working capital financing, all parties to the transaction agreed that Blue Equity was a suitable potential equity partner to replace Neal and Massy in CPHL.

34.     Based upon the continued misrepresentations from Blue Equity, David Roth and Jonathan Blue, Cool Corp prepared and sent communication to the CPL bondholders urging them to expedite a previously arranged 21 day Bondholder Approval process to approve the CPL-Blue Equity transaction.

35.     Based upon the continued misrepresentations from Blue Equity, Jonathan Blue and David Roth regarding Blue Equity's ability and intention to secure replacement LC facility, Cool Corp agreed to allow Blue Equity to pay down existing bondholder debt without any change in existing debt service payments, using the bulk of Blue Equity's capital injection

36.     At the January 2011 meeting with bondholders, Blue Equity was made aware that their financial information would be required to obtain bondholder approval for the proposed transactions.  Despite this, Blue Equity did not provide this information during the bondholder review period and for some months afterwards.

37.     Cool Corp and CIHL subsequently discovered that although Blue Equity undertook to pursue discussions with Citibank about continuing or replacing the LC facility which was previously guaranteed by Neal and Massy, Blue Equity had failed to timely and completely provide financial information to Citibank to facilitate a prompt and complete review of their application for a replacement LC.   According to representatives from Citibank, this was a key consideration in their decision to decline to provide financing facilities to a Blue Equity led CPL.

CASE NO. _____

38.     It later became clear that Blue Equity had no intention of securing the promised LC which was the reason for their inexplicable delays.

39.     Upon information and belief, despite the several misrepresentations about closing as early as February 2011, Blue Equity did not even contact Citibank about continuing the LC facility until late May 2011 and failed to provide proper financial information to Citibank.

40.     As the re-scheduled May 31 closing date approached, it became obvious that notwithstanding the impending closing, Blue Equity was still not doing anything to move the transaction forward, but seemed instead to be further stalling the proposed transaction by delaying the process at every opportunity.

41.     Blue Equity continued to insist, despite its unexplained delays, that it was still in a position to "easily" secure the required LC and any needed additional working capital financing and blamed the closing delays on a number of "new" factors including an alleged "Environmental Report" that it claimed—in June 2011, despite not having raised this as an issue prior—was necessary for closing.

42.     Blue Equity, Jonathan Blue and David Roth continued to persist in their misrepresentations that securing the required LC was not an issue as they had a strong relationship with J.P. Morgan Chase such that the required LC would "take $1 and 1 day" to be acquired from them.

43.     By the end of May 2011, as anticipated, the Bondholders had signed off on the CPL-Blue Equity transaction and had given their approval for Blue Equity to purchase the equity interests then held by Neal and Massy.

44.     Blue Equity, Jonathan Blue and David Roth negotiated a pay down of the bondholder debt against their continued fraudulent misrepresentations to both the bondholders

and Cool Corp that they would provide working capital support in the form of an LC from JP Morgan Chase.

45.     Had Cool Corp and the other minority shareholders known that Blue Equity, Jonathan Blue and David Roth had no ability or intention to provide a replacement LC, there would never have been an agreement to allow Blue Equity to replace Neal and Massy as a shareholder and even worse, to use all of Blue Equity's initial capital injection to pay down the bondholder debt at the expense of working capital financing.

46.     The decision to pay down bond holder debt at the expense of working capital financing inured solely to the benefit of Blue Equity, Jonathan Blue and David Roth and to the immediate and long term disadvantage of Cool Corp and the minority shareholders specifically and the company in general.

47.     With the Bondholders' approval secured and CPL and Cool Corp "locked" into the transaction for all practical purposes, Blue Equity aggressively started to change key terms of the agreed-upon transaction.

**The Blue Equity Defendants Change the Deal**

48.     Upon information and belief, in or about April 2011 and towards the end of the initial due diligence exercise, Blue Equity and Jonathan Blue discussed key terms of the pending CPL-Blue Equity transaction with persons at Neal and Massy and determined, based upon those conversations, that there was an opportunity for Blue Equity to have secured a larger equity position in exchange for their investment as a CPL equity partner.

49.     Blue Equity in concert with Jonathan Blue, David Roth and others set upon a concerted effort to try and wrest—by any means possible—as much additional equity or cash as they could from CPL and Cool Corp for Blue Equity's agreed upon investment.

CASE NO. _____

50.     Blue Equity was well aware—and counted on the fact that—since the proposed transaction had already been publicly announced, any perceived uncertainty with respect to completing the transaction and in particular any perceived uncertainty in the eyes of CPL's existing suppliers, would have resulted in a tightening of the existing working capital and "credit" available to CPL with significant negative impact to the business and the existing shareholders.

51.     Contrary to the original understanding, Blue Equity insisted that Cool Corp would not be allowed to take any cash out at the closing of the pending transaction, but rather was required to inject additional capital and was to be issued "Class B" preferred shares instead.  This was a material change from the terms discussed before bondholder approval was secured.

52.     Next, also by way of example of the Blue Equity Defendants' escalating bad faith, Blue Equity insisted that although the Class B preferred shares were to be treated *pari pasu* (at an 8% coupon rate) with certain Class A preferred shares (all held by Blue Equity), the Class B shares would ***not*** be treated on a first pay basis as would the Class A shares, in the event of a sale or other liquidity event.

53.     Throughout all of these post-bondholder-approval-changes, however, Blue Equity, Jonathan Blue and David Roth continued to misrepresent to Cool Corp that securing the required LC to replace the Neal and Massy LC was not a problem for Blue Equity and would be "easy" due to their existing relationship with J.P. Morgan Chase and its alleged "preapproval" of the required LC.

54.     Blue Equity's continued and persistent misrepresentations regarding its ability to secure the required LC despite trying to change several other terms of the transaction—was a tacit acknowledgment of the importance of the LC facility and the fact that without their stated

CASE NO. _____

ability and agreement to secure the LC, neither CPL, the Bondholders nor Cool Corp would have been interested in pursuing a transaction with Blue Equity and Jonathan Blue.

55.     Upon information and belief, Blue Equity, Jonathan Blue and David Roth made the calculated decision not to attempt to change the LC requirement because they were well aware that any attempt to back away from the LC obligation while the parties were free to halt the transaction would have resulted in an end to the transaction.

56.     Throughout the entire due diligence process, however, Blue Equity refused to disclose any audited financial statements to Cool Corp; to Citibank; to the two trustees for the bondholders; or to representatives of Shell (the company under whose brand CPL operated).

57.     Upon information and belief, following—and likely as a result of their review of Blue Equity's unaudited financial statements—Citibank (though it did not veto the CPL-Blue Equity transaction) declined to do business directly with Blue Equity by way of providing working capital through a continued LC facility or other financing.

58.     In yet another surprise move, Blue Equity and Jonathan Blue demanded an annual "management" fee of $600,000, insisting that since they would be responsible for all matters financial, legal, and related to their "management expertise", this was a fee to which they were entitled.

59.     This "management fee" turned out to be nothing more than an additional, preferential dividend payment to Jonathan Blue as Blue Equity ultimately provided none of the legal, financial or management services and expertise it claimed it was going to provide.

60.     Jonathan Blue's insistence on a $600,000 "management fee" was inserted into the transaction after the parties had secured bondholders' approval for the transaction.  Blue Equity,

CASE NO. _____

Jonathan Blue and David Roth intentionally did not disclose their intention to seek a "management fee" to the bondholders prior to obtaining their approval for the transaction.

61.     The CPL-Blue Equity transaction eventually closed on January 6, 2012—almost a full year behind the initially contemplated schedule and seven (7) months after the revised May 31, 2011 deadline.

62.     After the closing, Cool International Holdings Limited ("CIHL")—a new group of minority shareholders—replaced Cool Corp, becoming the largest minority shareholder in CPL.  Blue Equity replaced Neal and Massy as a stakeholder and, through BEP, became the new majority shareholder.

**Blue Charges Improper Expenses to CPL**

63.     Immediately leading up to closing the CPL-Blue Equity transaction, Jonathan Blue and David Roth represented that Blue Equity had incurred approximately US$1 million in "costs" to complete the CPL-Blue Equity transaction for which they were entitled to "reimbursement" or other equity consideration from CPL.  This notion was soundly ejected by CIHL and the matter seemed to have been resolved pre-closing.

64.     In the months immediately following closing, the CPL treasurer was improperly ordered by Jonathan Blue to process several invoices received from Jonathan Blue and Blue Equity for "reimbursements" going as far back as October 2011—well before the January 2012 closing date.  The CPL treasurer was instructed to hide these requests from CIHL.

65.     Jonathan Blue, David Roth and Blue Equity attempted to justify these questionable expenses by referring back to the $1 million in transaction "costs" that they allegedly incurred to close the CPL-Blue Equity deal.

CASE NO. _____

66.     Despite repeated demand, no documentation was ever provided by Jonathan Blue, David Roth or Blue Equity to support these alleged "transaction costs" and claimed reimbursed expenses.

67.     These improper "reimbursements" were a preferential dividend to Blue Equity and were secured over objection and at the expense of the minority shareholders who were fraudulently made to bear a disproportionate share of Blue Equity's unrelated expenses.

68.     Subsequently, Jonathan Blue as representative of the majority shareholder, and CIHL, the new minority shareholder, "agreed" that all Blue Equity expenses to be paid by CPL were to be disclosed to and preapproved by CIHL and all CIHL expenses to be paid by CPL or its parent company were to be disclosed to and preapproved by Jonathan Blue himself.

69.     Notwithstanding the parties' agreement, Jonathan Blue continued to try and push through, and in many cases succeeded in pushing through improper expenses on the CPL accounts without CIHL's knowledge or preapproval.

70.     In or about February 2012, Jonathan Blue attempted to purchase a customized armor plated SUV for his personal use, using funds from the CPL accounts.

71.     Despite receiving a quote for this vehicle which was well in excess of US$250,000, Jonathan Blue nevertheless instructed the CPL treasurer and Human Resources executive to purchase the vehicle for his exclusive personal use while in the island.

72.     Upon information and belief, only after the matter of the armor plated SUV was brought to the attention of the CFO of CPL/TAG was the matter shelved by Jonathan Blue.

73.     Jonathan Blue and the Blue Equity team continued, however, to improperly run expenses through the CPL accounts without the knowledge and approval of the minority shareholders and in particular CIHL.  For example, upon information and belief,  travel expenses

CASE NO. _____

for Blue Equity executives traveling to Jamaica and elsewhere on unrelated Blue Equity business were routinely and improperly charged to CPL.

74.     From January to November 2012 alone, CPL/TAG's expense reports reflect in excess of $20 million Jamaican dollars attributed to Jonathan Blue for "travel expenses" for himself and at least one other Blue Equity Director.  Upon information and belief, these expenses included among other things the charter of a private jet for expenses unrelated to CPL business.

75.     During this same period, other uncategorized and unexplained expenses in excess of $2.5 million Jamaica dollars are reflected on the CPL accounts—again attributed solely to Jonathan Blue—without required documentary support or proper approval.

76.     The "management fees" alone during this period for Blue Equity and Jonathan Blue were in excess of $58 million Jamaica dollars.

77.     Upon information and belief, Blue Equity, Jonathan Blue and David Roth also improperly charged over $156,000.00 in interest charges believed to be owed by Blue Equity to J.P. Morgan, to the CPL/TAG accounts.

78.     In addition to the management fees, Blue also fraudulently charged in excess of $5 million Jamaican dollars for additional "expenses" for the consulting firm of Brockman Arbuckle Stapp, where Blue's Chief Financial Advisor, Terry Stapp, also served as that firm's Managing Partner.

79.     Mr. Stapp was represented to Cool Corp as, and—as far as the Blue Equity-CPL deal was concerned—always functioned as Blue Equity's Chief Financial Advisor.  In this capacity, his "cost" was initially misrepresented as a part of the surprise $600,000 "management fee" demanded by Blue Equity as a part of the transaction for Blue Equity's legal, financial and management services and expertise.

CASE NO. _____

80.     Additionally, lower level employees who were on Blue Equity's local Jamaica payroll and who were employed to do unrelated Blue Equity business before the CPL-Blue Equity transaction, were shifted (post-transaction) and without approval from CIHL to CPL's payroll with no financial offset made for work that they were doing which was unrelated to CPL business.

81.     By doing so, Blue Equity, Jonathan Blue and David Roth impermissibly passed a portion of these unrelated expenses on to the CPL/TAG minority shareholders and in particular to CIHL and created for themselves a super-dividend or unfair benefit at the expense of the minority shareholders.

82.     Upon information and belief, on at least one occasion, Jonathan Blue individually, or in concert with David Roth and others at Blue Equity and CPL, arranged to make improper and fraudulent salary adjustments and payments to certain "chosen" CPL employees.  Jonathan Blue specifically instructed CPL personnel to hide the information from the company CFO and the minority shareholders at CIHL.  These secret compensation agreements were a violation of company policy and in direct contrast to Jonathan Blue's usual insistence on the CFO's "sign-off" on approved salary adjustments.

83.     These actions were taken to secure a unique and individual super benefit to Blue Equity and Jonathan Blue for their sole benefit and to the detriment and expense of the minority shareholders of CPL/TAG and in particular CIHL.

84.     Despite their assurances and initial agreement that they would not do so, Jonathan Blue and Blue Equity eventually arranged and pushed to change the name of the company from CPL to TAG ("The Antilles Group") and changed the name of the parent company from Cool Petroleum Holdings Limited ("CPHL") to BE TAG Holdings Limited ("BE TAG").

CASE NO. _____

85.     In or about February 2012, when it was clear that Jonathan Blue and Blue Equity had no intention of putting in place the agreed-upon LC, the minority shareholders and in particular CIHL, suggested that Blue Equity consider making arrangements for a cash backed LC secured by the shares held by CIHL with terms to be agreed upon between Blue Equity and CIHL.

86.     CIHL suggested that under this scenario, even in the event of a default or late payment on the new LC, the only negative impact would be to the CIHL minority shareholders whose shares would have been put up as security for the cash backed LC.

87.     The suggestion was rejected outright by Jonathan Blue, Blue Equity and David Roth despite a clear warning from the CIHL shareholders that prolonged failure to replace the Neal and Massy LC was jeopardizing the company's operations and jeopardizing the company's revenue position.

**The Forced Capital Call**

88.     In February 2012, less than two months after closing, Jonathan Blue and David Roth raised with the CPL/TAG CFO Rodney Davis, the issue of the immediate cash needs of CPL which they represented to be "urgent" in the event of failed financing efforts then being undertaken by CPL.

89.     Mr. Davis was the person who on behalf of CIHL, had earlier suggested that the company should secure a cash-backed LC, even if secured against the shares of the minority shareholder CIHL.  Mr. Davis again suggested that by revisiting and adopting this option, an unnecessary and imprudent capital call would be avoided and company's short-term capital needs would be met.

CASE NO. _____

90.     In or about May 2012, less than five (5) full months after closing, Jonathan Blue and his Vice Chairman and Chief Legal Officer David Roth, also a member of the Board of Directors of CPL/TAG, began to aggressively insist that the company needed to have an immediate Capital Call because the company was in a "desperate" financial condition.

91.     The decision to proceed with a capital call was taken over the objections of the minority shareholders and in particular, CIHL which continued to insist that the working capital needs of the company were "short-term" needs which did not require the permanence of a capital call solution.

92.     Jonathan Blue, David Roth and Blue Equity insisted that the company needed to have a lump sum $10 million dollar capital call because of a constrained revenue stream and immediate overdue payment obligations to TAG's (formerly CPL's) existing vendors and suppliers.

93.     The terms of the fraudulent capital call required that any existing shareholder that wished to exercise the option to purchase additional shares—dubbed "Class C" shares—would be required to timely deposit funds equivalent to their pro-rata share of the full $10 million dollar capital call share issue.

94.     Specific instructions were issued to the existing shareholders detailing the instructions and deadlines for deposits for payments for the new Class C shares.  A copy of the June 18, 2012 Notice of Determination To Seek Additional Capital addressed to CIHL is attached hereto as Exhibit "A".

95.     Contrary to their representations and the specific requirements of the forced Capital Call, Blue Equity and Jonathan Blue never made the required deposit in the time required to allow them to exercise purchase rights for any shares under the forced capital call.

CASE NO. _____

96.     Contrary to their subsequent misrepresentations and the requirements of the Capital Call, Blue Equity and Jonathan Blue never made the required deposit in the manner required to allow them to exercise purchase rights for any shares under the forced Capital Call.

97.     As confirmed by David Roth in subsequent emails to Rodney Davis, Blue Equity never deposited their pro-rata share of the capital call funds as required by the terms of the forced Capital Call.

98.     Additionally, upon information and belief, not only did Blue Equity fail to make the deposit in the time and manner required, but Blue Equity never intended to make the lump sum capital injection required by the capital call.

99.     Rather, Blue Equity in concert with Jonathan Blue, David Roth and others, fraudulently adopted the very suggestion that was initially made by CIHL in February 2012 and instead of providing "capital" as required—in full, timely paid up funds—Blue Equity made the funds available outside of the company to secure an LC and then only made those funds available to the company on an as needed basis as determined at the sole discretion of Blue Equity and without any consultation to CIHL or local management.  This approach worked against the initial represented purpose of the capital call and left the company no better off following the capital call and arguably harmed the company in the longer term.

100.    Despite having failed to meet the requirements of the fraudulent capital call, Blue Equity, Jonathan Blue and David Roth nevertheless issued to themselves all 10 Class C preferred shares.

101.    To cover up their fraudulent conduct, Blue Equity, Jonathan Blue and David Roth caused Blue Equity to create a false statement of accounts showing deposits and withdrawals from a "capital call account".

CASE NO. _____

102.    This fraudulent statement was in truth and in fact, not a statement of a capital call account as represented by Blue Equity, Jonathan Blue and David Roth but rather was merely an internal "accounting" of monies that the Blue Equity Defendants allegedly accessed to meet CPL's demands for draws against the "capital call account."

103.    To add insult to injury, Blue Equity and Jonathan Blue, upon information and belief, charged all fees and costs associated with this secret credit facility to CPL/TAG—to its benefit and to the detriment of the minority shareholder, CIHL.

104.    Blue Equity, Jonathan Blue and David Roth fraudulently took measures to cover up the fact that they never made the lump sum capital call deposits as required and took measures to hide the fact that the monies "drawn" from the capital call account were never placed in a TAG/CPL account.

105.    In order to facilitate the forced capital call, Jonathan Blue, David Roth, Blue Equity and several of its officers—for the several months leading up to the forced Capital Call— engaged in a series of acts designed to fraudulently manipulate the company (TAG), and the minority shareholders, into a compromised financial condition.

106.    Blue Equity, Jonathan Blue and David Roth had concluded that by compromising the company through manipulation of its finances—i.e., restricting revenue and limiting access to working capital—they would be able to force a capital call and secure for themselves a significant portion of the minority shareholders' existing shares through the fraudulently contrived "capital call".

107.    Through this fraudulent capital call, Jonathan Blue, David Roth and Blue Equity were able to improperly effect a transfer of approximately sixteen (16%) percent share value in the company away from the minority shareholders and to themselves.

CASE NO. _____

108.    The manipulation of the company's finances and the plan to secure additional shares were important to allow Blue Equity and Jonathan Blue to secure their target recovery in a sale of the company that Blue Equity, Jonathan Blue and David Roth were negotiating in secret and without any disclosure to CIHL or the other minority shareholders.

109.    These acts of financial manipulation included among other things:

a.    Improperly and with fraudulent purpose, restricting access to working capital contrary to their initial assurances and promises leading up to the closing of the CPL-Blue Equity transaction, thereby resulting in underperforming revenue numbers and compromising the company and the minority shareholders;

b.    Forcing unnecessary and unilateral purchasing and expense decisions either over objection or without consulting top executives in the company, that severely limited the company's working capital reserves, thereby compromising the company and the minority shareholders;

c.    Making decisions regarding overstocking slow moving inventory and refusing to purchase other types of faster selling inventory which resulted in CPL having inventory well in excess of what it could historically sell within the time required for payments to creditors or not having inventory which upon sale would result in additional working capital;

d.    Improperly and fraudulently forcing improper and inflated expenses through the CPL/TAG company accounts resulting in a super-dividend to Blue Equity and reduction in working capital reserves for the company.

110.    Contrary to the requirements of the fraudulent capital call, Blue Equity never deposited the $10 million dollars it claims to have deposited into an account for TAG (formerly

CASE NO. _____

CPL) and which was the alleged basis for its allocation—to itself—of 10 Class C preferred shares or the equivalent of thousands of additional common shares.

111.    Blue Equity, Jonathan Blue and David Roth refused, and were in fact unable to provide any bank statements or other independent proof of Blue Equity's "deposit" of the required funds pursuant to the forced capital call because, upon information and belief, Blue Equity never made the required lump sum Capital Call deposit.

112.    Instead, upon information and belief, Jonathan Blue, David Roth and others caused Blue Equity to use the very same LC they had promised to put in place at the beginning of the transaction—or a portion thereof—and attempted to fraudulently secure for themselves additional preferred shares despite using this facility.

113.    To support their fraudulent claim of a "lump sum deposit", Jonathan Blue and his Vice Chairman, David Roth, an attorney in Kentucky, caused Blue Equity to create and provide to the minority shareholders a fraudulent "Statement of Account" reflecting deposits and withdrawals from a fictional "Trust Account".

114.    As reflected below, the only explanation received from Blue Equity through David Roth was that the monies were placed into an attorney "bank account" or other "escrow account" where it was co-mingled with funds from other projects and other "clients":

> Dear Rodney,
> As previously explained, the escrow is being held within a bank account which contains funds held for others as well.  Therefore, the bank statements contain confidential information which is not relevant to TAG. For purposes of facilitating the SBLC's that have been issued by JPMorgan Chase, we have been serving as an escrow agent as to the funds being held for TAG, all as reflected in the spreadsheet provided.

(Excerpted from email from D. Roth to R. Davis dated Nov. 26, 2012.)

CASE NO. _____

Dear Rodney,

Please see my prior email. As you know, I have always referred to the funds as being held by us in an escrow account for TAG and not in a separate bank account.  As you know through the prior emails, because of the Atlantic Supply and initial Shell Trinidad timing issues, we were not able to get JPMorgan Chase to clear TAG under the Know Your Customer rules quick enough to use a new account for TAG's purposes.

Best,

David

(Excerpted from email from D. Roth to R. Davis dated Nov. 26, 2012.)

115.    By Blue Equity's own admissions through its Director, Vice Chairman and Chief Legal Officer David Roth, the "capital call" funds were never deposited as required by the terms of the fraudulent capital call but rather, these funds were allegedly in an "escrow account" and comingled with "funds held for others as well."

116.    Pursuant to the terms of the fraudulent capital call, any monies paid in by the shareholders for Class C shares were to be timely deposited into a specific account set up on the behalf of and for the sole benefit of CPHL by David Roth or at his instruction.  See Exhibit "A".

117.    The minority shareholders did not know of, let alone authorize any circumstance which would have or could have resulted in the co-mingling of CPL/TAG corporate funds with the funds of any unrelated entity or other "Blue Equity clients."

**The Surprise Sale To Rubis**

118.    On November 13, 2012, less than four (4) months after the fraudulent capital call, Blue Equity finally disclosed that it had been in "talks" to sell the shares of the company to a third party, eventually identified to the minority shareholders as "Rubis".

119.    Upon information and belief, this late disclosure was forced because Rubis and Blue Equity had agreed to terms of sale and were poised to make a public announcement in that regard.

CASE NO. _____

120.    Upon information and belief, in order to finalize the sale to Rubis, Blue was compelled to seek a vote of the CPL/TAG Board of Directors and obtain the necessary corporate resolutions as a part of their due diligence and pre-closing obligations.

121.    At a TAG board meeting on November 13, 2012, only minimal details of the proposed sale were disclosed to the minority shareholders—which details among other things did not include the final sales price nor did they include the names of the prospective buyers.

122.    The November 13 Board meeting was temporarily suspended to allow for the minority shareholders to review "excerpts" of the sales documents presented to them by Blue Equity and to review "excerpts" of the various models supporting the proposed sales prices also presented to them by Blue Equity.  These "excerpts" were created and selected at Blue Equity, Jonathan Blue and David Roth's sole discretion.

123.    Only minimal information was provided by Blue Equity to the minority shareholders to allow them to "review" the proposed sales alternatives before a vote was forced to approve Blue Equity to "pursue" the various alleged sales alternatives.

124.    At the continued board meeting on November 20, 2012, Blue Equity, Jonathan Blue and David Roth continued to refuse to disclose the details of the pending sale and refused to provide sufficient information to the minority shareholders to review and analyze the terms of the proposed sales alternatives.

125.    Despite demand for the information by certain minority shareholders, Blue Equity, Jonathan Blue and David Roth provided only such information as they deemed in their sole discretion as "relevant" to the minority shareholder's analysis of the proposed sales alternatives.

CASE NO. _____

126.    Over objection of CIHL, Blue forced a vote to secure for itself *carte blanche* right to negotiate, accept and execute a sale of the shares of CPL (now known as TAG) to an (as yet undisclosed) third party.

127.    Blue provided the minority shareholders with no meaningful opportunity to analyze the proposed sales transaction, including for example:

        a.    no information regarding the ultimate disbursements to the shareholders;

        b.    no information regarding any associated fees and expenses associated with the transaction;

        c.    no information regarding associated transactions which may have affected the terms of the transaction;

        d.    and, no information regarding how the share price was ultimately arrived at.

128.    Indeed, up until December 31, 2012—the day of the proposed closing—no closing statement or other document detailing the manner or amount of disbursement to the minority shareholders was provided.

129.    In fact, as late as mid-May 2013, some five (5) months after the reported December 2012 closing, the minority shareholders had yet to have been advised about the details of the closing, the proceeds of the sale or the distribution of any such proceeds of sale.

130.    Through to and including May 2013, no documents from the sale or other pertinent information had been provided by Blue Equity, Jonathan Blue and David Roth to the minority shareholders or to the full Board of TAG/CPL regarding the CPL/Rubis transaction.

131.    Rather, Blue Equity, Jonathan Blue and David Roth provided only such documents and information (pre-closing) as they selected in their sole discretion.

CASE NO. _____

132.    For example, through information and belief, the purchaser, Rubis required the resignation of the existing Directors of TAG, the company being sold.  Rather than provide a basic resignation document meeting that minimal objective, Blue Equity, Jonathan Blue and David Roth attempted to have the Directors execute a Resignation, Release and Waiver of "all claims" that the Directors may have after the sale.

133.    Similarly, resolutions purporting to authorize Blue Equity and Jonathan Blue to "represent" the Shareholders and Directors in negotiations, also attempted to grant Blue Equity and Jonathan Blue unrestricted rights to receive and distribute—in their sole discretion—any and all sums received from the sale.

134.    These same resolutions also purported to release Blue Equity, Jonathan Blue and David Roth from "any and all claims" held by the minority shareholders against the majority shareholders.

135.    Notwithstanding their failure to provide any meaningful information to the minority shareholders despite demand, Blue Equity, Jonathan Blue and David Roth forced a vote of the Board of Directors purporting to grant to them alone, *carte blanche* and unfettered rights to negotiate, accept or reject any proposal for sale of all shares of the company—including those of the minority shareholders.

136.    This vote was a farce and meaningless as Blue Equity, Jonathan Blue and David Roth had been conducting these negotiations for months before the vote and upon information and belief the sale discussions with Rubis and possibly other third party purchasers had also been pending for several months.

137.    Upon information and belief, the secret sale discussions—possibly even with Rubis—had been ongoing even before the forced capital call and may have been a driving factor

CASE NO. _____

for Blue Equity, Jonathan Blue and David Roth to force the fraudulent Capital Call in the first place.

138.    Despite having knowledge which they were obligated to disclose to all the shareholders and to the full Board of Directors, neither Blue Equity, Jonathan Blue, David Roth nor Maureen Smith nor any of the majority shareholder representatives nor any of the majority appointed directors disclosed the fact of the potential sale at the time of the fraudulent capital call.

**Blue Equity Buys the Loyalty of the TAG/CPL Corporate Secretary**

139.    Upon information and belief, the Corporate Secretary, Maureen Smith, was fully aware of the pending sale and the associated discussions before the capital call and also failed to disclose the information to the minority shareholders and minority Board representatives.

140.    In the months prior to the fraudulent capital call, there were discussions regarding Maureen Smith's employment future with the Company—with an imminent decision to be made about whether or when she was to be terminated from TAG/CPL.

141.    In fact, prior to the fraudulent Capital Call there were a number of complaints made about Maureen Smith's performance and in each circumstance, Blue Equity, through David Roth, intervened on her behalf or deflected the complaints to avoid negative company action.

142.    Without consultation or notice to the minority shareholder CIHL, Jonathan Blue made a unilateral decision to keep Maureen Smith employed despite the pending unresolved complaints and impending company action against her.

143.    The minority shareholders also subsequently learned that not only did Blue Equity, Jonathan Blue and David Roth unilaterally decide to retain Maureen Smith's continued

CASE NO. _____

employment at TAG/CPL, but they also unilaterally decided to increase her salary by almost 100 percent without disclosure to the Group CFO or to the minority shareholders.

144.    After being advised that his order to increase Maureen Smith's compensation would violate the company's existing salary structure and would require the approval of the Company's CFO, Rodney Davis, Jonathan Blue specifically instructed that the company salary structure be ignored and that no one was to make the CFO, Mr. Davis, aware of the extraordinary increase to Maureen Smith's salary.

145.    Blue Equity, Jonathan Blue and David Roth deliberately concealed the decision to increase Maureen Smith's compensation in breach of the shareholder agreement and in violation of their fiduciary obligations to the minority shareholders, and in particular, CIHL.

146.    The decision to conceal Maureen Smith's extraordinary increase in compensation and benefits was specifically to facilitate her secret work on behalf of Blue Equity and Jonathan Blue and to the disadvantage of the minority shareholders and to reward her for her silence and complicity in Blue Equity, Jonathan Blue and David Roth's scheme to transfer additional shares from the minority shareholders.

147.    While she was still employed to CPL/TAG, Maureen Smith upon information and belief, worked on the proposed sales transaction providing services either as a consultant, or employee or both.

148.    All of Maureen Smith's secret work on the CPL/Rubis transaction was performed without disclosing to the minority shareholders and in particular to CIHL the fact and nature of her activities and services regarding the pending sales transaction(s).

149.    Maureen Smith had been serving as Corporate Secretary, Legal Officer and an employee of CPL/TAG and had a duty and an obligation to disclose to the minority shareholders,

CASE NO. _____

the full Board of Directors and to CPL/TAG her services on behalf of, and to the unique advantage of the majority shareholders Blue Equity, Jonathan Blue and David Roth and to the detriment of the minority shareholder CIHL to whom she also owed a fiduciary obligation.

150.    Upon information and belief, Maureen Smith was also richly compensated with other benefits separately, and in secret, either as a consultant or as an employee, without disclosure to the minority shareholders.

151.    Upon information and belief, these payments to Maureen Smith and her secret working relationship with Blue Equity Jonathan Blue and David Roth compromised her service and fiduciary obligation to the company in several respects including but not limited to:

a.    Withholding important information regarding the potential sale from the minority shareholders which she was obligated to disclose in her capacity as Corporate Secretary and Legal Officer;

b.    Withholding information regarding the CPL/Rubis transaction due diligence process and her activities on behalf of Blue Equity, Jonathan Blue and David Roth with regard to the pending sale;

c.    Purposefully failing to properly record the discussions, decisions and agreements during Board Meetings where she acted as the Company recording secretary and purposefully misrepresenting the record of those meetings and associated discussions.

**The MZ Holdings' (Third Party) Debt**

152.    After disclosure of the pending sale, Blue Equity, Jonathan Blue and David Roth disclosed their unilateral intention to set off against any potential disbursements to CIHL,

CASE NO. _____

amounts allegedly owing by MZ Holdings Limited ("MZ Holdings") a third party company that was related to certain of the CIHL shareholders and that did business with CPL /TAG.

153.    The CIHL minority shareholders subsequently learned that without consulting or advising CIHL, Blue Equity, Jonathan Blue and David Roth had misrepresented to the third party purchaser Rubis, that there was an "agreement" that the alleged MZ Holdings receivable would be cleared in full before closing—the intention being a full and total set-off against the CIHL minority shareholders' potential distribution without their approval or consent.

154.    This self-serving agreement was not disclosed by either Blue Equity, Jonathan Blue or David Roth to the Minority Shareholders, and in particular CIHL, prior to being consummated with the third party purchaser.

155.    This unilateral attempt to wipe out company debt against the equity interest of the minority shareholder CIHL was a further attempt to secure a super dividend by Blue Equity, David Roth and Jonathan Blue at the expense and to the disadvantage of the minority shareholder CIHL.

## COUNT I
## BREACH OF CONTRACT
### (Against BEP)

156.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

157.    There existed a written contract, a Shareholders Agreement, which was intended to govern the parties' operation and management of BE TAG and its subsidiaries.  A copy of that Shareholder Agreement is attached hereto as Exhibit "B".

158.    BEP breached the Shareholders Agreement by among other things:

       a.    failing to disclose the fact of the pending sale;

CASE NO. _____

b.      running improper expenditures through BE TAG's subsidiary's accounts;

c.      misappropriating BE TAG's funds to pay expenses incurred by BEP and is agents and affiliates, including but not limited to expenses going as far back as October 2011—well before the January 2012 closing date;

d.      failing to deposit capital as required under the capital call;, and/or

e.      otherwise acting against the best interests of CIHL and BE TAG and for its own unique and singular benefit.

159.    As a result of BEP's material breach of the Shareholder Agreement, CIHL has been materially and significantly damaged.

WHEREFORE, CIHL demands judgment against BEP for breach of the Shareholders Agreement and seeks;

a.      temporary and permanent injunctive relief;

b.      all appropriate damages;

c.      pre and post-judgment interest;

d.      attorneys' fees and costs as permitted under Fla. Stat. § 608.601; and

e.      any other relief that this Court deems just and proper.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against BEP)

160.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

161.    A valid and enforceable agreement existed between CIHL and BEP.

162.    BEP breached the agreement as more fully set forth in Count I above.

CASE NO. _____

163.    BEP has also breached the covenant of good faith and fair dealing implied in the Shareholder Agreement by taking actions that were detrimental and destructive to Plaintiffs' rights under the Shareholder's Agreement.

164.    BEP unreasonably took actions to dilute CIHL's shareholdings in BE TAG in an effort to unreasonably deny CIHL the benefits and rights due to it as a shareholder.

165.    BEP took these improper actions, among others, in a bad faith effort to impose a financial hardship on CIHL and for BEP's own interest in an effort to improperly acquire shares from CIHL.

166.    As a result of BEP's breach of the implied covenant of good faith and fair dealing, CIHL has suffered damages.

WHEREFORE, CIHL demands judgment against BEP for breach of the covenant of good faith and fair dealing and for the following relief:

    a.    all damages;

    b.    pre and post-judgment interest;

    c.    costs and attorneys' fees; and

    d.    any other relief that this Court deems just and proper.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(Against BEP)**

167.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

168.    As a majority shareholder, Defendant, BEP, owed to Plaintiff and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the Plaintiff and BE TAG with the utmost good faith.

CASE NO. _____

169.    Defendant, BEP, breached its fiduciary duty to Plaintiff and BE TAG by, among other things:

a.    Fraudulently and improperly running expenses through the CPL accounts without the knowledge and approval of the minority shareholders and in particular CIHL;

b.    shifting lower level employees who were on Blue Equity's local Jamaica payroll and doing unrelated Blue Equity business to CPL's payroll, without making any financial offset for work that they were doing which was unrelated to CPL business;

c.    manipulating the company finances as outlined in the general allegations above;

d.    misappropriating some of BE TAG's funds to pay expenses incurred by BEP;

e.    unreasonably and fraudulently forcing a capital call for its own interest and against the interest of CIHL;

f.    failing to disclose material information to the minority shareholders to the detriment of the shareholders and to the unique advantage of BEP;

g.    failing to provide complete and accurate disclosures to CIHL and BE TAG regarding the financial condition of BE TAG and its subsidiaries; and

h.    failing to provide full and timely disclosure regarding BEP's intent and plans to sell the shares of TAG to secure a unique and disproportionate benefit to itself at the expense of the minority shareholders.

170.    BEP's wrongful conduct in connection with its breach of fiduciary duty has caused CIHL and BE TAG to suffer significant damages.

WHEREFORE, plaintiff demands judgment against BEP and the following relief:

CASE NO. _____

      a.      temporary and permanent injunctive relief;

      b.      all damages;

      c.      pre and post-judgment interest;

      d.      alternatively, for restitution; or

      e.      the imposition of a constructive trust to hold for the benefit of the plaintiff its 47.5 % ownership interest in the company, or any portion thereof;

      f.      costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

      g.      any other relief that this Court deems just and proper.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(Against Jonathan Blue and David Roth)**

171.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

172.    There is the existence of a fiduciary duty owed by Jonathan Blue to CIHL and BE TAG.

173.    As the Chairman, Chief Executive Officer, and Treasurer of BE TAG and each of its subsidiaries, Defendant, Jonathan Blue, owes to CIHL and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the plaintiff with the utmost good faith

174.    As the Vice Chairman and Chief Legal Officer of Blue Equity and BE TAG and each of its subsidiaries, Defendant, David Roth, owes to CIHL and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the plaintiff with the utmost good faith.

CASE NO. _____

175.    Jonathan Blue and David Roth were in a position of trust and confidence with CIHL and BE TAG.

176.    Given their respective roles, Jonathan Blue and David Roth were under a duty to act for or to give advice for the benefit of and the best interest of BE TAG and its shareholders, including CIHL.

177.    Given their roles, Jonathan Blue and David Roth were precluded from receiving any personal advantage without the fullest disclosure to, and assent of, all shareholders concerned, which would include CIHL.

178.    Defendants, Jonathan Blue and David Roth, breached their fiduciary duties to Plaintiff by, among other things:

a.    failing to provide CIHL and the board of directors of BE TAG with all relevant and necessary information needed to determine whether it was appropriate to demand a capital call and whether it was appropriate for CIHL to make a capital contribution;

b.    manipulating the company finances as outlined in the general allegations above;

c.    misappropriating some of BE TAG's funds to pay expenses incurred by BEP and Jonathan Blue;

d.    providing misleading information to shareholders regarding deposits and withdrawals from a fictional "trust account";

e.    failing to provide complete and accurate disclosures to CIHL and BE TAG regarding the financial condition of BE TAG and its subsidiaries;

CASE NO. _____

       f.      failure to provide full and timely disclosure regarding intent to sell the shares of TAG; and

       g.      fraudulently or improperly arranging to make salary adjustments and payments to CPL employees, for the defendants' ultimate benefit, without the knowledge, approval or advice of the CFO or the minority shareholders, and in particular CIHL.

179.    Jonathan Blue and David Roth's wrongful conduct in connection with their breach of fiduciary duty has caused CIHL and BE TAG significant damages.

WHEREFORE, CIHL demands judgment against Jonathan Blue and the following relief:

       a.      temporary and permanent injunctive relief;

       b.      all appropriate damages;

       c.      pre and post-judgment interest;

       d.      alternatively, for restitution; or

       e.      the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

       f.      costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

       g.      any other relief that this Court deems just and proper.

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (Against Maureen Smith)

180.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

CASE NO. _____

181.    There is the existence of a fiduciary duty owed by Maureen Smith to CIHL and BE TAG.

182.    As the Corporate Secretary, Legal Officer and an employee of BE TAG and each of its subsidiaries including CPL/TAG, Defendant, Maureen Smith, owed to CIHL and BE TAG a fiduciary duty of candor, of the highest degree of loyalty and the duty to deal with the plaintiff with the utmost good faith.

183.    Maureen Smith was in a position of trust and confidence with CIHL and BE TAG.

184.    Given her role, Maureen Smith was under a duty to act for or to give advice for the benefit of BE TAG and CIHL.

185.    Given her role, Maureen Smith was precluded from receiving any personal advantage without the fullest disclosure to, and assent of, all concerned, which would include the minority shareholder CIHL.

186.    Defendant, Maureen Smith, breached her fiduciary duty to CIHL and BE TAG by, among other things:

        a.      failing to provide CIHL and the full Board of Directors of BE TAG and CPL/TAG with all relevant and necessary information needed to determine whether it was appropriate to demand a capital call and whether it was appropriate for CIHL to make a capital contribution;

        b.      failing to provide complete and accurate disclosures to CIHL and BE TAG regarding the financial condition of BE TAG and its subsidiaries;

        c.      failing to disclose to the minority shareholders and in particular CIHL her secret activities and services for Blue Equity, Jonathan Blue and David Roth

CASE NO. _____

regarding the pending sale of TAG to Rubis, while she was still employed to CPL ("TAG"); and

       d.      receiving compensation separately, and in secret, either as a consultant or as an employee, without disclosure to the minority shareholders and in particular CIHL.

187.    Maureen Smith's wrongful conduct in connection with her breach of fiduciary duty has caused CIHL and BE TAG significant damages.

      WHEREFORE, plaintiff demands judgment against Maureen Smith and the following relief:

       a.      temporary and permanent injunctive relief;

       b.      all damages;

       c.      pre and post-judgment interest;

       d.      alternatively, for restitution; or

       e.      costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

       f.      any other relief that this Court deems just and proper.

## COUNT VI
## FRAUDULENT INDUCEMENT
### (Against Blue Equity, Jonathan Blue & David Roth)

188.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

189.    Defendants, Jonathan Blue, Blue Equity and David Roth made false statements of material fact regarding their ability, willingness and intention to provide ready access to working capital financing if selected as replacement equity partners in CPHL.

CASE NO. _____

190.    Defendants, Jonathan Blue, Blue Equity and Roth falsely represented that:

    a.    they had access to working capital of an additional $10 million to $16 million; and

    b.    that securing the required LC was not an issue as Blue Equity had a strong relationship and "preapproval" from J.P. Morgan Chase for the required LC;

191.    Jonathan Blue, Blue Equity and Roth knew that these statements that they made were false at the time that they were made, and they never intended to act on these representations.

192.    Defendants made these false statements and misrepresentations with the intent of inducing Cool Corp, CIHL and the other minority shareholders to rely on them to enter into the Shareholders Agreement and to agree to an imprudent and unreasonable reduction in the existing bondholder debt at the expense of necessary working capital financing.

193.    CIHL, Cool Corp and the minority shareholders reasonably relied, to their detriment, upon these material misrepresentations of fact by Blue Equity, Jonathan Blue and Roth.

194.    CIHL has been directly and proximately damaged by Jonathan Blue, Blue Equity and David Roth's unlawful and fraudulent conduct.

    WHEREFORE, CIHL demands judgment against Jonathan Blue, Blue Equity and David Roth and the following relief:

    a.    temporary and permanent injunctive relief;

    b.    all damages;

    c.    pre and post-judgment interest;

CASE NO. _____

d.      alternatively, for restitution; or

e.      the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

f.      costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

g.      any other relief that this Court deems just and proper.

**COUNT VII**
**UNJUST ENRICHMENT**
**(the Blue Equity, Jonathan Blue & David Roth)**

195.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

196.    CIHL and/or BE TAG conferred a significant benefit to Jonathan Blue, Blue Equity and David Roth in the form of additional shares in TAG/CPL which are the property of CIHL and the other minority shareholders.

197.    Jonathan Blue, Blue Equity and David Roth have knowledge of the benefits conferred and have voluntarily accepted the benefits conferred and have been unjustly enriched by receiving those benefits.

198.    It would work an injustice for the Defendants to retain the benefits obtained without paying their full value to CIHL and/or BE TAG.

199.    An adequate remedy at law does not exist for CIHL and/or BE TAG's claims against the Defendants.

WHEREFORE, CIHL demands judgment against Jonathan Blue, Blue Equity and David Roth and the following relief:

a.      temporary and permanent injunctive relief;

CASE NO. _____

b. all damages;

c. pre and post-judgment interest;

d. alternatively, for restitution; or

e. the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

f. costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

g. any other relief that this Court deems just and proper.

<u>COUNT VIII</u>
<u>CONVERSION</u>
**(Derivatively and individually against Jonathan Blue, Blue Equity and David Roth)**

200. Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

201. CIHL and/or BE TAG conferred a significant benefit to Jonathan Blue, Blue Equity and David Roth in the form of BE TAG shares.

202. Jonathan Blue, Blue Equity and David Roth, without authorization, have converted to their own use shares or their equivalent value that were the property of CIHL and/or BE TAG.

203. Jonathan Blue, Blue Equity and David Roth's acts have wrongfully deprived CIHL and/or BE TAG of property with the intent that this deprivation be permanent.

204. The deprivation is inconsistent with CIHL's and/or BE TAG's ownership interest in the converted share interests.

205. CIHL and/or BE TAG have been damaged by the conduct of Jonathan Blue, Blue Equity and David Roth.

CASE NO. _____

206.    CIHL and/or BE TAG have demanded the return of the property, but such demand has been refused or rendered otherwise futile by the actions of Blue Equity, Jonathan Blue and David Roth.

207.    WHEREFORE, CIHL demands judgment against Jonathan Blue, Blue Equity and David Roth and the following relief:

        a.    temporary and permanent injunctive relief;

        b.    all damages;

        c.    pre and post-judgment interest;

        d.    alternatively, for restitution; or

        e.    the imposition of a constructive trust to hold for the benefit of the plaintiffs their 47.5 % ownership interest in the company, or any portion thereof;

        f.    costs and attorneys' fees as permitted under Fla. Stat. § 608.601; and

        g.    any other relief that this Court deems just and proper.

## COUNT IX
## DECLARATORY JUDGMENT
### (Against All Defendants)

208.    Plaintiffs restate and re-allege the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

209.    Plaintiffs contend that there is a bona fide, actual, present practical need for the declaration.

210.    The declaration sought deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

CASE NO. _____

211.    A bona fide, actual, present and continuing controversy exists between the plaintiff and the defendants in regards to the required procedure to obtain Class C Shares in the Company by contribution of capital in response to the Notice of Determination To Seek Additional Capital, dated June 18, 2012.

212.    Some immunity, power, privilege or right of Plaintiff's is dependent upon the facts or the law applicable to the facts.  Plaintiff's rights as shareholders and entitlement to certain proceeds are dependent upon this Court's interpretation of the terms and provisions regarding the requirements for any shareholder to acquire Class C Shares by capital contributions in response to the Notice of Determination To Seek Additional Capital, dated June 18, 2012.

213.    Specifically, Plaintiff seeks a declaration that strict compliance with Section 4.4 of the Shareholders Agreement and the procedures outlined in the June 18, 2012 Notice was required for any shareholder to purchase Class C Shares and failure to comply would result in forfeiture of any such right to purchase Class C Shares.

214.    Unless the Court grants declaratory relief, the plaintiffs will continue to suffer immediate and irreparable harm now and into the future.

215.    Plaintiffs are not merely seeking legal advice or an advisory opinion.

WHEREFORE, the plaintiffs respectfully seek a declaratory judgment against the defendants that:

a.    establishes the required procedures for any shareholder to purchase Class C Shares;

b.    establishes that strict compliance with the procedures is required for any shareholder to purchase Class C Shares;

c.    awards costs of bringing this claim for declaratory relief; and

CASE NO. _____

    d.    any other relief that this Court deems just and proper.

## **REQUEST FOR IMPOSITION OF CONSTRUCTIVE TRUST**

216.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

217.    BEP, Jonathan Blue, Blue Equity and David Roth made promises, express or implied, to CIHL, including that they would be responsible for the financial, legal and "management" affairs of BE TAG.

218.    Based on these promises, CIHL entrusted and reposed confidence in BEP, Jonathan Blue, Blue Equity and David Roth to handle BE TAG's financial, legal and management affairs.

219.    In reliance on BEP, Jonathan Blue, Blue Equity and David Roth's promises and omissions, CIHL entered into a Shareholders Agreement and were induced to agree to the fraudulent capital call.

220.    As a result of BEP, Jonathan Blue, Blue Equity and David Roth's misrepresentations and omissions, the Defendants were able to secure a capital call for TAG which was specifically designed and did subsequently cause BEP, Jonathan Blue, Blue Equity and David Roth to obtain additional shares in TAG, which allowed BEP and its shareholders and affiliates to improperly obtain a significant portion of shares belonging to CIHL and other minority shareholders.

221.    Upon information and belief, BEP, Blue Equity, Jonathan Blue and David Roth obtained proceeds from the sale of TAG shares and are now in possession of the property or its value and have been unjustly enriched by retaining the property.

CASE NO. _____

WHEREFORE, CIHL demands the entry of a preliminary injunction imposing a constructive trust over the funds or property which are the proceeds of the sale, and requiring BEP, Jonathan Blue, Blue Equity and David Roth to transfer the funds of or other property of TAG into an escrow account, which will be held in said escrow account until such time as this Court issues an order regarding the proper disbursement of the funds and the propriety of the fraudulent capital call.

## **REQUEST FOR ENTRY OF PERMANENT INJUNCTION**

222.    Plaintiff restates and re-alleges the allegations contained in paragraphs 1 through 155 above as if fully set forth herein.

223.    This is a request for permanent injunction and for equitable relief.

224.    CIHL and BE TAG have been and continue to be irreparably harmed by BEP's, Jonathan Blue's, Blue Equity's, David Roth's and Maureen Smith's past and continuing breaches of their fiduciary duties.

225.    The Defendants' actions continue to enrich Jonathan Blue, Blue Equity and David Roth and continue to injure CIHL and BE TAG.

226.    CIHL and BE TAG have no adequate remedy at law for the ongoing injury caused by Defendants' past and continuing breaches.

WHEREFORE, CIHL demands an order enjoining BEP, Jonathan Blue, Blue Equity, David Roth and Maureen Smith from further breaching their fiduciary duties, including transferring any assets to themselves, or using any BE TAG resources to benefit themselves; an order enjoining Jonathan Blue, David Roth and Maureen Smith from operating BE TAG's business in furtherance of the breach of their fiduciary duties, and any other relief that this Court deems just and proper.

CASE NO. _____

## DEMAND FOR TRIAL BY JURY

227.     Pursuant to Fla. R. Civ. P. 1.430, CIHL demands a trial by jury on all issues so

triable.


Dated: June 10, 2013.


                                        Respectfully submitted,

                                        Kim Vaughan Lerner LLP
                                        *Attorneys for Plaintiffs*
                                        One Financial Plaza, Suite 2001
                                        Fort Lauderdale, FL  33394
                                        Telephone:     (954) 527-1115
                                        Facsimile:     (954) 527-1116
                                        Primary E-mail: rvaughan@kvllaw.com
                                        Primary E-mail: blerner@kvllaw.com
                                        Secondary E-mail: rbaggett@kvllaw.com


                                        By: /s/ Robert C.L. Vaughan
                                             Robert C. L. Vaughan, P.A.
                                             Fla. Bar No. 130095
                                             Brian Lerner
                                             Fla. Bar No.  177202
                                             Cherine Smith Valbrun, Esq.
                                             Fla. Bar No. 27046

## <u>VERIFICATION</u>

I, **JOSEPH JOHN ISSA**, have personally appeared before the undersigned Notary Public, and do on my oath, depose and state that:

1.    I am a **Director** of Cool International Holdings, Limited ("CIHL"), the plaintiff in the above-referenced action and have been authorized to execute this affidavit on behalf of CIHL.

2.    I have read the allegations of the foregoing Verified Complaint and I hereby declare that they are true and correct.

Signature (on behalf of CIHL)

JOSEPH ISSA

Print name

The foregoing instrument was acknowledged before me this 10ᵗʰ day of June, 2013, by JOSEPH ISSA, and (s)he presented such proof of such verification by being personally known to me or by providing _____ as identification, and (s)he acknowledged before me that (s)he executed the same freely and voluntarily.

Notary Public,

My Commission Expires:

**RICHARD DONALDSON
NOTARY PUBLIC**
St. Ann, Jamaica W.I.
**my commission is for life**

# Exhibit A

("June 18 Capital Call Notice")



# THE ANTILLES GROUP HOLDINGS LIMITED

c/o The Antilles Group Limited, 236 Windward Road, Rockfort, Kingston 2, Jamaica

**June 18, 2012**

**VIA EMAIL & EXPRESS DELIVERY**
**RETURN RECEIPT REQUESTED**

| |
|---|
| **NOTICE OF DETERMINATION TO SEEK ADDITIONAL CAPITAL, ISSUANCE OF NEW CLASS C NONVOTING CONVERTIBLE PREFERRED SHARES, AND OPTION TO PURCHASE CLASS C NONVOTING CONVERTIBLE PREFERRED SHARES** |

**Cool International Holdings Limited**
**c/o Trident Trust Company (BVI) Limited**
**Trident Chambers**
**PO Box 146**
**Road Town, Tortola, BVI**

**Gentlemen/Ladies,**

This notice (**"Notice"**) is being given to you pursuant to, and in accordance with, the terms and conditions of Regulation 17 of the **Amended and Restated Articles of Association of Cool Petroleum Holdings Limited** (the **"Articles of Association"**) and Sections D(3) and 4.4 of that certain **Shareholders Agreement**, *as amended through the date hereof* (the **"Shareholders Agreement"**), regarding **Cool Petroleum Holdings Limited**, a St. Lucia International Business Company (the **"Company"**), to which Shareholders Agreement you are a party.

Please be advised, as you already know from your approval of such action at the **Extraordinary General Meeting of the Shareholders** held on **June 14, 2012,** the Board of Directors of the Company, at a **Special Meeting of the Board of Directors** held on **June 14, 2012,** determined, reasonably and in good faith, that it is advisable for the Company to seek additional capital beyond that already contributed, or required to be contributed, to date by the Shareholders of the Company, for the purpose of *(i)* providing working capital reasonably necessary in the ordinary course of the business of the Company and/or the Company's subsidiaries, *and/or (ii)* providing funds to repay some of the debts, obligations, and/or other liabilities of the Company and/or the Company's subsidiaries that the Company and/or such subsidiaries are unable to pay as they have become due. The Board of Directors further determined that, in order to avoid hardship to the Company or any subsidiary of the Company, it is reasonably necessary to establish a period of **30 days** as the **"Capital Raise Notice Period"** (as such term is defined in the Articles of Association and Shareholders Agreement) for purposes permitting the current Shareholders of the Company a first opportunity to purchase the Class C Shares being issued.

The total additional capital contribution currently being sought from all of the Shareholders of the Company, in the aggregate, pursuant to such determination of need by the Board of Directors and approval by the Shareholders, is **US$10,000,000.00.** The Company will be issuing, in the aggregate, a total of **10** newly created equity interests in the Company, to be called **Class C Nonvoting Convertible Shares** (collectively, the **"Class C Shares"**), **US$1,000,000.00 par value per Share**, in exchange for such additional **$10,000,000.00** total additional capital contribution. The issuance of fractional Class C Shares is allowable. Thus, by way of illustration and not by way of limitation, the acquisition of each new Class C Share will require a cash contribution of **US$1,000,000.00** to be made to the Company, the acquisition of one-half of a new Class C Share will require a cash contribution of **US$500,000.00** to be made to the Company, etc. If the current Shareholders of the Company do not purchase all of such Class C Shares, the Board of Directors may, during a specified period, cause the Company to issue any remaining Class C Shares available to any other Person.

**Cool International Holdings Limited**
**June 18, 2012**
**Page 2**

The rights, preferences, and other characteristics of such new Class C Shares are detailed in that certain **Amended and Restated Rights Resolution** attached hereto and made a part hereof as **EXHIBIT A** to this Notice (the **"Rights Resolution"**).

Please note that the Class C Shares will have certain dividend, distribution, and liquidation preferences vis-à-vis the existing Class A Preferred Shares, Class B Nonvoting Preferred Shares, and Common Shares of the Company, all of which preferences are detailed in the Rights Resolution attached as **EXHIBIT A** to this Notice.

Please be advised that, pursuant to Regulation 17 of the Articles of Association and Sections D(3) and 4.4 of the Shareholders Agreement, you have the right and option to acquire a prorata portion of the Class C Shares by contributing in cash to the capital of the Company, *on or before* **July 20, 2012,** a prorata portion of the **US$10,000,000.00** total additional capital contribution currently being sought in the aggregate., in accordance with your respective Percentage Interest with respect to all of the Shareholders of the Company (regardless of the Class of Shares held by any Shareholder). According to the Company's records, the prorata portion of the Class C Shares which you are currently entitled to acquire, and the prorata capital contribution required in connection with such acquisition by you, is as follows:

**Shares Currently Held By You** ....................................................................... **5,000 Common Shares**

**Percentage Interest Vis-à-vis All Shares of the Company Currently Outstanding (Regardless of Class)**.............................................................................**47.574%**

**Prorata Number of New Class C Shares You Are Entitled To Acquire** ...............................................................**4.7574**
**Class C Shares**

**Capital Contribution Required To Purchase Each New Class C Share (Full Share)**...................................................**US$1,000,000.00**
**Per Class C Share**

**Total Cash Capital Contribution Required If You Wish To Purchase Your Entire Prorata Portion of New Class C Shares** ...............................................**$4,757,373.90**

**In order to exercise your right to purchase your prorata portion of new Class C Shares, or any fewer number of new Class C Shares (or any fractional Class C Share) as you may deem advisable, you must remit to the Company, *on or before* July 20, 2012, an amount equal to *the product of***

> *(i)* **US$1,000,000.00 (the required capital contribution amount per full Class C Share), *multiplied by***

> *(ii)* **The number of Class C Shares you wish to purchase (*limited, however,* to the prorata number of Class C Shares you are entitled to purchase, as set forth above).**

**Thus, if you wish to purchase your entire prorata portion of the new Class C Shares (*that is, 4.7574* Class C Shares), you must remit to the Company the total amount of $4,757,373.90 *on or before* July 20, 2012.**

**Cool International Holdings Limited**
**June 18, 2012**
**Page 3**

---

**Such capital contribution amount should be remitted either by wire transfer to the following bank account for the benefit of, and for further direction by, the Company (per the wire transfer instructions set forth below), or by delivery to the Company of a valid check, for such amount on or before July 20, 2012. The instructions for remitting funds as a contribution to the capital of, and for the benefit of, the Company by wire transfer are as follows:**

Bank ............................................. PNC Bank
                                        Louisville, Kentucky
ABA Routing Number ................ 083000108
For Credit To .............................. David M. Roth PSC Attorney Trust Company
Account Number ......................... 302███████

For Benefit Of: ............................ Cool Petroleum Holdings Limited

---

If you or any other Shareholder of the Company fails or neglects to contribute such Shareholder's prorata portion of such additional contribution on or before **July 20, 2012**, then the Shareholders who have contributed their prorata portions of such additional capital contribution within such period shall have the right (but not the obligation), during an additional period of **10 days** thereafter, to make the additional capital contribution which such Shareholder failed or neglected to make, in accordance with their relative and respective Percentage Interests among themselves as a group, or in such other percentages as those Shareholders wishing to make all or any part of such additional capital contribution may otherwise agree. In such event, the remaining available Class C Shares shall be issued to those Shareholders who actually make such additional capital contribution in accordance with the percentage of the total additional capital contribution contributed by each (*that is,* based on a contribution of **US$1,000,000.00** per full Class C Share).

If you fail or neglect to fully exercise on a timely basis your right to purchase the entire prorata portion of the Class C Shares available to you pursuant to Regulation 17 of the Articles of Association and Sections D(3) and 4.4 of the Shareholders Agreement, you will continue to own the same number and class of Shares that you currently own, but your relative percentage of ownership of the Company will be significantly diluted. Furthermore, your rights to receive dividends, distributions of Net Cash Flow, distributions of Net Proceeds From Sales or Other Capital Transactions, and liquidation proceeds as a holder of Class A Preferred Shares, Class B Nonvoting Preferred Shares, and/or Common Shares, as applicable, will be subordinated to the preferential rights to which the holders of the Class C Shares are entitled. Accordingly, upon any subsequent sale of the assets and/or equity interests of the Company, you will be entitled to a smaller percentage of the net sales proceeds. Although neither the Company, nor any Affiliate of the Company, has currently received any offer to purchase its equity interests or assets, various expressions of general interest continue to be received and/or discussed from time to time and it is always possible that a sales transaction in such regard could be negotiated and implemented at any time. Furthermore, it is possible that any such sales transaction could be based on a valuation of the Company which is significantly greater or less than the valuation at which the Class C Shares are being issued. If you exercise your option to purchase your entire prorata portion of the Class C Shares, you will continue to maintain your same relative Percentage Interest in the Company by virtue of the combination of the Class A Preferred Shares, Class B Nonvoting Preferred Shares, Common Shares, and Class C Shares then owned by you.

All capitalized terms used in this Notice and not otherwise defined shall have the same meaning as are ascribed to such capitalized terms in the Articles of Association and/or Shareholders Agreement

**Cool International Holdings Limited**
**June 18, 2012**
**Page 4**

(and in the case of any conflict between such documents, the terms and conditions of the Shareholders Agreement shall control).

*Before exercising, or failing or neglecting to timely exercise, your option rights with respect to the purchase of any or all of the Class C Shares which are available for purchase by you pursuant to the provisions of Regulation 17 of the Articles of Association and Sections D(3) and 4.4 of the Shareholders Agreement, you should carefully review the terms, conditions, and other provisions and statements of the Rights Resolution, the Articles of Association, the Shareholders Agreement, and this Notice carefully and consult with competent legal and financial advisors to such extent as you may deem such consultation to be advisable.*

If you have any questions about this matter or the procedures for exercising your option to purchase Class C Shares, please do not hesitate to contact **David M. Roth, Vice Chairman and Director** of the Company, by telephone at **(502) 451-7765** or by email at **droth@blueequity.com**.

**Very truly yours,**

**David M. Roth**
**Vice Chairman and Director**

**ATTACHMENT:**

**EXHIBIT A..................**Amended and Restated Rights Resolution

**Copy:**
**Joseph Issa**
**2 Graham Street**
**Guardian Building, 2nd Floor**
**Ocho Rios, St Ann, Jamaica WI**

**Joseph Issa (By Email)**

**Rodney Davis (By Email)**

**Colin Hendrick (By Email)**

**Gwen Kennedy**

██████████████

**Gwen Kennedy (By Email)**

**EXHIBIT A**

*Amended and Restated Rights Designation Resolution*

| | | |
|---|---|---|
| **A.  THIS AGREEMENT** | | |

| **(1)** | RESOLUTION; EFFECTIVE DATE | This **Amended and Restated Rights Designation Resolution** (**"Resolution"**) is an exhibit to, and is being adopted as an integral party of, resolutions of the Board of Directors and Shareholders of **Cool Petroleum Holdings Limited** (the **"Company"**) dated as of **June 14, 2012**. This Resolution supersedes on a prospective basis any and all prior resolutions providing for the designations, powers, preferences, rights, qualifications, limitations and restrictions of Shares of the Company. |
|---|---|---|
| **(2)** | TWO PORTIONS OF RESOLUTION | The text of this Resolution is divided into two parts: *(a)* this initial portion (Pages **Error! Bookmark not defined.** through **Error! Bookmark not defined.**) which contains sections designated initially with letters (A, B, C, etc.)(the **"Initial Portion"**), *and (b)* the portion of this Resolution immediately following this Initial Portion, entitled and referred to as the **"General Terms and Conditions"** (Pages **Error! Bookmark not defined.** Through **Error! Bookmark not defined.**), which contains Sections thereof initially designated with numbers (1, 2, 3, etc.). In the event of a conflict between any of the terms and conditions set forth in this Initial Portion of this Resolution and any of the General Terms and Conditions, the terms and conditions set forth in this Initial Portion of this Resolution shall govern. |

| | | |
|---|---|---|
| **B.  BUSINESS** | | |

| **(1)** | BUSINESS | The **"Business"** is the business carried on by the Company and/or the Company's subsidiaries of *(i)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to petroleum (excluding liquid petroleum gases (**"LPG"**), fuels, bio-fuels, lubricants, and related products and activities (collectively, **"Petro Products"**) within, to, in, or from Jamaica, through retail, wholesale, commercial, and/or any other channels, *(ii)* selling, distributing, marketing, and/or exchanging from retail outlets located at or adjacent to the retail fuel stations owned, operated, controlled, licensed, or franchised by the Company and/or its Affiliates, empty, partially empty, or already filled LPG cylinders, canisters, bottles, and/or other such small LPG containers and/or selling from retail outlets LPG motor vehicle conversion kits and related equipment (collectively, the **"Shared LPG Activities"**, and *(iii)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to grocery, convenience, sundry, and/or other consumer products to and through the gas station and/or convenience store retail channels owned, controlled, or otherwise managed or affiliated as a franchisee or otherwise by or with, the Company and/or the Company's subsidiaries, or to or through the wholesale, commercial, or other channels generally used by the Company and/or the Company's subsidiaries, *and (iv)* internet activities and other activities reasonably related to the foregoing. For the avoidance of doubt, nothing in clause (iii) or clause (iv) of the foregoing definition of the term "Business" shall be construed as restricting in any way the right of any Party or any Party's Related Party or Affiliate to sell, distribute, market, export, import, and otherwise deal in and with respect to grocery, convenience, sundry, and/or other consumer products through any retail, wholesale, commercial, and/or other channel (but, in such regard, the term "grocery, convenience, sundry, and/or other consumer products" shall not be construed as including any Petro Products or Shared LPG Activities). |
|---|---|---|

| | | |
|---|---|---|
| **C.  CURRENT SHARES OF THE COMPANY** | | |

| **(1)** | CLASSES OF | The issued and outstanding equity interests of the Company are divided into shares and |
|---|---|---|

---

| | | |
|---|---|---|
| | **SHARES** | currently consist of **four (4)** classes of shares (collectively, the **"Shares"**) as follows: |

**(a)      Class A Preferred Shares** (collectively, the **"Class A Preferred Shares"** and each individually a **"Class A Preferred Share"**). The Class A Preferred Shares are convertible into Common Shares upon a Liquidity Event as more fully set out in Section D below and under the Governing Instruments of the Company. The Class A Preferred Shares are voting shares of the Company and the holders thereof shall have the right to designate a majority of the Directors of the Company. The holders of the Class A Preferred Shares are sometimes referred to herein as the **"Class A Preferred Shareholders."**

**(b)      Class B Nonvoting Preferred Shares** (collectively, the **"Class B Nonvoting Preferred Shares"** and each individually a **"Class B Nonvoting Preferred Share"**). The Class B Nonvoting Preferred Shares are nonvoting shares of the Company and are not convertible into Common Shares. The holders of the Class B Nonvoting Preferred Shares are sometimes referred to herein as the **"Class B Preferred Shareholders."**

**(c)      Class C Nonvoting Convertible Preferred Shares** (collectively, the **"Class C Nonvoting Preferred Shares"** and each individually a **"Class C Nonvoting Preferred Share"**). The Class C Nonvoting Preferred Shares are convertible into Common Shares upon a Liquidity Event as more fully set out in Section D below and under the Governing Instruments of the Company. The Class C Nonvoting Preferred Shares are nonvoting shares of the Company. The holders of the Class C Nonvoting Preferred Shares are sometimes referred to herein as the **"Class C Preferred Shareholders."**

**(d)      Common Shares** (collectively, the **"Common Shares"** and each individually a **"Common Share"**). The Common Shares are voting shares of the Company. The holders of the Common Shares are sometimes referred to herein as the **"Common Shareholders."**

The Class A Preferred Shareholders, Class B Preferred Shareholders, Class C Preferred Shareholders, and Common Shareholders are sometimes referred to herein collectively as the **"Shareholders"** and each individually as a **"Shareholder."**

| | | |
|---|---|---|
| **(2)** | **RESTRICTIONS ON TRANSFER** | The Class A Preferred Shares, Class B Nonvoting Preferred Shares, Class C Nonvoting Preferred Shares, and Common Shares are subject to various options and restrictions on transfer as set forth in Article 5. |
| **(3)** | **ADDITIONAL CAPITAL** | Subject to the preemptive rights and other restrictions and limitations provided for under Section 2.3 of the General Terms and Conditions, additional capital may be raised by the Board of Directors at any time in exchange for the issuance of such additional Shares or other equity interests as the Board of Directors may deem advisable. Except as required pursuant to any Shareholder's exercise of such Shareholder's preemptive rights under Section 2.3 of the General Terms and Conditions, or required under any separate written agreement entered into by such Shareholder, no Shareholder of the Company shall be obligated to contribute to the Company any additional capital at any time, nor shall any Shareholder be obligated to loan the Company any funds at any time. |

## D.   DISTRIBUTIONS

| | | |
|---|---|---|
| **(1)** | **DISTRIBUTIONS OF NET CASH FLOW UNTIL CLASS C BASE PAYBACK IS** | Until Class C Base Payback (as hereinafter defined) is achieved, **100%** of the Net Cash Flow (as hereinafter defined) of the Company for each Fiscal Year of the Company shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each) in |

| | | |
|---|---|---|
| | **ACHIEVED** | quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter). Once Class C Base Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(1) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(2)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS C BASE PAYBACK IS ACHIEVED AND UNTIL CLASS B BASE PAYBACK IS ACHIEVED** | After Class C Base Payback is achieved and until Class B Base Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Section D(1) above in order to achieve Class C Base Payback during such Fiscal Year, if applicable)shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each) in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter). Once Class B Base Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(2) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(3)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS C BASE PAYBACK AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS A BASE PAYBACK IS ACHIEVED** | After both Class C Base Payback and Class B Base Payback are achieved and until Class A Base Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1) and D(2) above in order to achieve Class C Payback and/or Class B Payback during such Fiscal Year, if applicable) (the **"Class A Preferential Remaining Net Cash Flow"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and in the following order of priority. Should Class A Base Payback be achieved due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter, no further distributions of Net Cash Flow pursuant to this Section D(3) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| | | **(a)**     *First,* **85.9091%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **4.0909%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **10%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(a) with respect to such Fiscal Year equal to *the lesser of (x)* **$1,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter. |
| | | **(b)**     *Second,* **81.1364%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **3.8636%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in |

accordance with the number of Class B Nonvoting Preferred Shares held by each), and **15%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(b) and Section D(3)(a) above with respect to such Fiscal Year equal to *the lesser of (x)* **$2,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(c)**     *Third,* **76.3637%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **3.6363%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **20%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(c) and Sections D(3)(a) and D(3)(b)above with respect to such Fiscal Year equal to *the lesser of (x)* **$3,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(d)**     *Fourth,* **66.8182%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **3.1818%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **30%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section D(3)(d) and Sections D(3)(a), D(3)(b), and D(3)(c) above with respect to such Fiscal Year equal to *the lesser of (x)* **$4,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(e)**     *Fifth,* **62.0455%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), **2.9545%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), and **35%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), until a cumulative aggregate amount has been distributed pursuant to this Section D(3)(e) and Sections D(3)(a), D(3)(b), D(3)(c), and D(3)(d) above with respect to such Fiscal Year equal to *the lesser of (x)* the amount necessary to achieve Class A Base Payback, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(4)** **DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS C BASE PAYBACK, CLASS B BASE PAYBACK, AND CLASS A BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS C RETURN PAYBACK**

After Class C Base Payback, Class B Base Payback, and Class A Base Payback are achieved and until Class C Return Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1), D(2), and D(3) above in order to achieve Class C Base Payback, Class B Base Payback, and/or Class A Base Payback as applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each) in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash

| | | |
|---|---|---|
| | **IS ACHIEVED** | Flow of the Company, if any, for each Fiscal Quarter). Once Class C Return Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(4) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(5)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS C BASE PAYBACK, CLASS B BASE PAYBACK, CLASS A BASE PAYBACK, AND CLASS C RETURN PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class B Base Payback and Class A Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (each as hereinafter defined) are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1), D(2). D(3), and D(4) above in order to achieve Class C Base Payback, Class B Base Payback, Class A Base Payback, and/or Class C Return Payback during such Fiscal Year, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: *(i)* with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares held by each) and **4.5454%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once Class A Return Payback and Class B Return Payback have both been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section D(5) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year. |
| **(6)** | **DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class B Base Payback, Class A Base Payback, Class C Return Payback, Class A Return Payback, and Class B Return Payback are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections D(1), D(2), D(3), D(4), and D(5) above in order to achieve Class C Base Payback, Class B Base Payback, Class A Base Payback, Class C Return Payback, Class A Return Payback, and Class B Return Payback during such Fiscal Year, if applicable) (the **"Ultimate Remaining Net Cash Flow"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within **30 days** following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter), in the following manner, as applicable: |
| | | **(a)** Unless and until the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, *(A)* the Applicable Class C Portion (as hereinafter defined) of the Ultimate Remaining Net Cash Flow shall be distributed to the holders of the Class C Nonvoting Preferred Shares (on a prorata basis in accordance with the |

number of Class C Nonvoting Preferred Shares held by each), *and* **(B)** the remaining balance of the Ultimate Remaining Net Cash Flow shall be distributed **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each).

**(b)**     After the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, **100%** of the Ultimate Remaining Net Cash Flow shall be distributed to the holders of the Common Shares (on a prorata basis in accordance with the number of of Common Shares held by each), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares Class C Nonvoting Preferred Shares as provided under Sections D(24) and D(25) below.

| | | |
|---|---|---|
| **(7)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT UNTIL CLASS C BASE PAYBACK IS ACHIEVED** | Until Class C Base Payback is achieved, the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with *(i)* a sale or exchange of all or substantially all of the operating assets of the Company and/or the Company's subsidiaries, *(ii)* a merger or consolidation of the Company, *(iii)* an initial public offering ("**IPO**") by the Company of any equity interests, *(iv)* any sale or exchange of equity interests in the Company in any transaction as to which the Tag-Along Rights *or* Drag-Along Rights (as such terms are hereinafter defined) apply, *or (v)* any other liquidating, recapitalization, or other liquidity transaction with respect to the Company which results in payments or distributions of significant cash, notes, tradable securities (without regard to any Rule 144 or other temporary restrictions imposed on the sale of such securities) and/or other readily marketable tangible or intangible property to all Shareholders of the Company (without regard to any temporary restrictions imposed on the sale of such property) (any such transaction described in clauses (i), (ii), (iii), (iv), or (v), as applicable, being hereinafter sometimes referred to as a "**Liquidity Event,**" shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, **100%** to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Preferred Shares held by each). For the purposes of clarity, a Liquidity Event does not include a refinacing of the Bonds existing as of **December 30, 2012,** and/or the issuance of Preference Shares, but any excess proceeds, if any, from any such refinancing shall be taken into account in computing the Net Cash Flow for the Company. Once Class C Base Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this Section D(7) shall be required or made. |
| **(8)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS C BASE PAYBACK IS ACHIEVED AND UNTIL CLASS A BASE PAYBACK IS ACHIEVED** | After Class C Base Payback is achieved and until Class A Base Payback is achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Section D(7) above in order to achieve Class C Base Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, **95.4546%** to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares held by each), *and* **4.5454%** to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once Class A Base Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds |

pursuant to this Section D(8) shall be required or made.

| | | |
|---|---|---|
| **(9)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS C BASE PAYBACK AND CLASS A BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS B BASE PAYBACK IS ACHIEVED** | After both Class C Base Payback and Class A Base Payback are achieved and until Class B Base Payback is achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7) and D(8) above in order to achieve Class C Base Payback and Class A Base Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once Class B Base Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this Section D(9) shall be required or made. |
| **(10)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS C BASE PAYBACK, CLASS A BASE PAYBACK, AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL CLASS C RETURN PAYBACK IS ACHIEVED** | After Class C Base Payback, Class A Base Payback, and Class B Base Payback are achieved and until Class C Return Payback is achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7), D(8), and D(9) above in order to achieve Class C Base Payback, Class A Base Payback, and/or Class B Base Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, to the holders of the Class C Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each). Once Class C Return Payback has been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this Section D(10) shall be required or made. |
| **(11)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS C BASE PAYBACK, CLASS A BASE PAYBACK, AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class A Base Payback, and Class B Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (as such terms as hereinafter defined) are achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7), D(8), D(9), and D(10) above in order to achieve Class C Base Payback, Class A Base Payback, Class B Base Payback, and/or Class C Return Payback, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: *(i)* with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares held by each) and **4.5454%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares held by each). Once both Class A Return Payback and Class B Return Payback have been achieved (which may occur due to a partial distribution of Net Proceeds at any time), no further distributions of Net Proceeds pursuant to this |

Section D(11) shall be required or made.

| | | |
|---|---|---|
| **(12)** | **DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED** | After Class C Base Payback, Class A Base Payback, Class B Base Payback, Class C Return Payback, Class A Return Payback and Class B Return Payback are achieved, the remaining balance, if any, of the Net Proceeds from any Liquidity Event (after satisfaction of the amounts, if any, required to be distributed under Sections D(7), D(8), D(9), D(10), and D(11) above in order to achieve Class C Base Payback, Class A Base Payback, Class B Base Payback, Class C Return Payback, Class A Return Payback, and Class B Return Payback, if applicable) (the **"Ultimate Remaining Net Proceeds"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in the following manner, as applicable: |

**(a)**       Unless and until the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, *(A)* the Applicable Class C Portion (as hereinafter defined) of the Ultimate Remaining Net Proceeds shall be distributed to the holders of the Class C Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class C Nonvoting Preferred Shares held by each), *and (B)* the remaining balance of the Ultimate Remaining Net Proceeds shall be distributed **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares held by each).

**(b)**       After the Class A Preferred Shares and the Class C Nonvoting Preferred Shares are eligible to be converted into Common Shares as provided under Sections D(24) and D(25) below, **100%** of the Ultimate Remaining Net Proceeds shall be distributed to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares held by each), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares and Class C Nonvoting Preferred Shares as provided under Sections D(24) and D(25) below.

| | | |
|---|---|---|
| **(13)** | **DEFINITION OF CLASS A BASE PAYBACK** | For all purposes of this Resolution, **"Class A Base Payback"** shall be achieved when both *(A)* the holders of the Class A Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(3) and/or D(8) above, equal to *the sum of (i)* **$9,500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class A Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (A)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class A Preferred Shares the amounts provided for under the foregoing clauses (A)(i) and (A)(ii) on a Tax-free basis, *and (B)* the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(3) and/or D(8) above, equal to *the sum of (i)* **$500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (B)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (B)(i) and (B)(ii) on a Tax-free basis; *provided,* |

|  |  | *however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class A Preferred Shares and the Class B Nonvoting Preferred Shares). The amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(i) and/or (B)(i) above (but not the amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(ii) and/or (B)(ii) above) are hereinafter referred to, collectively, as the **"Class A Return of Investment Amounts"**). |
|---|---|---|
| **(14)** | **DEFINITION OF CLASS B BASE PAYBACK** | For all purposes of this Resolution, **"Class B Base Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(2) and/or D(9) above, equal to *the sum of (i)* **$2,000,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (i) and (ii) on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class B Nonvoting Preferred Shares). The amounts received by the Class B Preferred Shareholders pursuant to clause (i) above (but not the amounts received by the Class B Preferred Shareholders pursuant to clause (ii) above) are hereinafter referred to, collectively, as the **"Class B Return of Investment Amounts"**). |
| **(15)** | **DEFINITION OF CLASS C BASE PAYBACK** | For all purposes of this Resolution, **"Class C Base Payback"** shall be achieved when the holders of the Class C Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections D(1) and/or D(7) above, equal to *the sum of (A) the product of (i)* **$1,000,000.00 USD**, *multiplied by (ii)* the number of Class C Nonvoting Preferred Shares ever issued and outstanding, in the aggregate, *plus (B)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class C Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (i) and any gross-up thereon (the intention being to effectively return to the holders of the Class C Nonvoting Preferred Shares the amounts provided for under the foregoing clause (A) on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class C Nonvoting Preferred Shares). The amounts received by the Class C Preferred Shareholders pursuant to clause (A) above (but not the amounts received by the Class C Preferred Shareholders pursuant to clause (B) above) are hereinafter referred to, collectively, as the **"Class C Return of Investment Amounts"**). |
| **(16)** | **DEFINITION OF CLASS A RETURN PAYBACK** | For all purposes of this Resolution, **"Class A Return Payback"** shall be achieved when the holders of the Class A Preferred Shares and Class B Nonvoting Preferred Shares, collectively, shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections D(5) and/or D(11) above, an amount (the **"Class A Return** |

Component") equal to an **8%** annual percentage rate of return, compounded annually, on the Class A Outstanding Balance (as hereinafter defined), as the Class A Outstanding Balance may change from time to time. For purposes of computing whether Class A Return Payback has been achieved, only the allocable portion of distributions made pursuant to the provisions of Sections D(5) and D(11) above which are stated to be in respect of the Class A Return Component shall be taken into account (and not the allocable portion of such distributions which are stated to be in respect of the Class B Return Component).

| | | |
|---|---|---|
| **(17)** | **DEFINITION OF CLASS A OUTSTANDING BALANCE** | For all purposes of this Resolution, the term **"Class A Outstanding Balance"** as of any time shall mean *the sum of (i)* **$10,000,000.00 USD**, *minus (ii)* the total of all Class A Return of Investment Amounts received by the holders of the Class A Preferred Shares and/or the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections D(3) and/or D(8) above through such time. |
| **(18)** | **DEFINITION OF CLASS B RETURN PAYBACK** | For all purposes of this Resolution, **"Class B Return Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections D(5) and/or D(11) above, an amount (the **"Class B Return Component"**) equal to an **8%** annual percentage rate of return, compounded annually, on the Class B Outstanding Balance (as hereinafter defined), as the Class B Outstanding Balance may change from time to time. |
| **(19)** | **DEFINITION OF CLASS B OUTSTANDING BALANCE** | For all purposes of this Resolution, the term **"Class B Outstanding Balance"** as of any time shall mean *the sum of (i)* **$2,000,000.00 USD**, *minus (ii)* the total of all Return of Class B Investment Amounts received by the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections D(2) and/or D(9) above through such time. |
| **(20)** | **DEFINITION OF CLASS C RETURN PAYBACK** | For all purposes of this Resolution, **"Class C Return Payback"** shall be achieved when the holders of the Class C Nonvoting Preferred Shares shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections D(4) and D(10) above, an amount equal to an **8%** annual percentage rate of return, compounded annually, on the Class C Outstanding Balance (as hereinafter defined), as the Class C Outstanding Balance may change from time to time. |
| **(21)** | **DEFINITION OF CLASS C OUTSTANDING BALANCE** | For all purposes of these Articles, the term **"Class C Outstanding Balance"** as of any time shall mean *the sum of (A) the product of (i)* **$1,000,000.00 USD**, *multiplied by (ii)* the number of Class C Nonvoting Preferred Shares ever issued and outstanding, in the aggregate, *minus (B)* the total of all Return of Class C Investment Amounts received by the holders of the Class C Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections D(1) and D(7) above through such time. |
| **(22)** | **DEFINITION OF APPLICABLE CLASS C PORTION** | For all purposes of these Articles, the term **"Applicable Class C Portion"** shall mean *(A)* with respect to the Ultimate Remaining Net Cash Flow available for distribution at any time, a portion of such Ultimate Remaining Net Cash Flow which bears the same ratio to the total of such Ultimate Remaining Net Cash Flow then available for distribution as the Total Class C Conversion Number (as hereinafter defined) at such time bears to a number which is equal to *the sum of (x)* the total number of Common Shares then issued and outstanding (without including any Common Shares to be issued by reason of the conversion of any of the Class A Preferred Shares or the Class C Nonvoting Preferred Shares), *plus (y)* **936.84**, *and plus (z)* the Total Class C Conversion Number at such time, *and (B)* with respect to the Ultimate Remaining Net Proceeds |

available for distribution at any time, a portion of such Ultimate Remaining Net Proceeds which bears the same ratio to the total of such Ultimate Remaining Net Proceeds then available for distribution as the Total Class C Conversion Number at such time bears to a number which is equal to *the sum of (x)* the total number of Common Shares then issued and outstanding (without including any Common Shares to be issued by reason of the conversion of any of the Class A Preferred Shares or the Class C Nonvoting Preferred Shares), *plus (y)* **936.84,** *and plus (z)* the Total Class C Conversion Number at such time.

| | | |
|---|---|---|
| **(23)** | **DEFINITION OF TOTAL CLASS C CONVERSION NUMBER** | For all purposes of these Articles, the term **"Total Class C Conversion Number"** at any time shall mean a number equal to *the product of (A)* the number of then issued and outstanding Class C Nonvoting Preferred Shares (*including, but not limited to,* any fractional Class C Nonvoting Preferred Shares which are then issued and outstanding), *multiplied by (B)* the number **574;** *provided, however,* that if *on or before* **August 31, 2012,** *(x)* the Subject Financing (as hereinafter defined) has been consummated and the funding or credit thereof made available to the Company and/or the Company's Affiliates as applicable, *(y)* Class C Base Payback has occurred, *and (z)* Class C Return Payback has occurred, then the number **574** in the immediately preceding clause (B) shall be changed to the number **300** instead**.** For such purposes, the term **"Subject Financing"** shall mean *either (i)* that certain loan and credit facility from **National Commercial Bank Jamaica Limited** consisting of a **J$3.7 billion Term Loan** and a **US$25 million** General Banking Facility financing substantially as reflected in that certain **Indicative Term Sheet** dated **February 15, 2012,** a copy of which is attached hereto as **EXHIBIT C-1,** *or (ii)* that certain **US$40 million** maximum amount secured revolving letter of credit facility substantially as reflected in that certain draft **Indicative Summary of Terms and Conditions** dated **June 2012**, a copy of which is attached hereto as **EXHIBIT C-2.** |
| **(24)** | **CONVERSION OF CLASS A PREFERRED SHARES TO COMMON SHARES UPON A LIQUIDITY EVENT** | Upon *the later to occur of (x)* a Liquidity Event at any time after the achievement of Class A Return Payback or *(y)* the achievement of Class A Return Payback by reason of the receipt by the holders of the Class A Preferred Shares, in the aggregate on a cumulative basis, of Net Proceeds as a result of a Liquidity Event, the Class A Preferred Shares, as a class, shall automatically be converted into **936.84** Common Shares of the Company. |
| **(25)** | **CONVERSION OF CLASS C NONVOTING PREFERRED SHARES TO COMMON SHARES UPON A LIQUIDITY EVENT** | Upon *the later to occur of (x)* a Liquidity Event at any time after the achievement of Class A Return Payback or *(y)* the achievement of Class A Return Payback by reason of the receipt by the holders of the Class A Preferred Shares, in the aggregate on a cumulative basis, of Net Proceeds as a result of a Liquidity Event, the Class A Preferred Shares, as a class, shall automatically be converted into **936.84** Common Shares of the Company. |
| **(26)** | **GENERAL PROVISIONS REGARDING DISTRIBUTIONS** | **(a)** In determining the moment at which Class A Base Payback, Class B Base Payback, Class C Base Payback, Class A Return Payback, Class B Return Payback, or Class C Return Payback is achieved, distributions of Net Cash Flow available to be made at any time shall be made and taken into account before making and taking into account any distributions of Net Proceeds from Liquidity Events then available to be made. |
| | | **(b)** If the equity interests distributable as Net Proceeds to the equityholders of the Company as a result of any Liquidity Event involve both control or super-voting shares and non-control, non-voting, or lesser voting shares, then the equity interests receivable |

in respect of any Common Shares, Class A Preferred Shares, and/or Class C Preferred Shares then held by Blue Equity (or Blue Equity's successors or assigns) shall first be comprised of the control or super-voting shares to the extent possible before being comprised of any non-control, non-voting, or lesser voting shares.

**(c)**     When Class B Return Payback is achieved, **(x)** all of the Class B Nonvoting Preferred Shares of the Company shall be conclusively deemed redeemed and retired by the Company, without requirement of any further payment by the Company, **(y)** the share certificate(s) and such instruments of transfer as the Company shall reasonably request shall be promptly executed and delivered to the Company by the holders of the Class B Nonvoting Preferred Shares, *and* **(z)** no further distributions of Net Cash Flow or other amounts shall be required to be made to the holders of the Class B Nonvoting Preferred Shares of the Company in such capacity.

## E.  MANAGEMENT

**(1)   BOARD OF DIRECTORS**

Unless and until changed in accordance with the terms, conditions, and limitations of this Resolution or changed in connection with a Liquidity Event, in accordance with and subject to the terms and conditions of Article 4 and other applicable provisions of this Resolution:

**(a)**     The Company and each of its subsidiaries shall be managed by a Board of Directors.

**(b)**     The Board of Directors of the Company and each of its subsidiaries shall consist of **(i)** up to **three (3)** Directors (the "**Common Directors**") who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, **Cool Corp. Limited** (the "**Common Directors**"), a Cayman Islands incorporated company ("**Cool Corp**"), *and* **(ii)** up to **five (5)** Directors (the "**Class A Preferred Directors**") who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, **Blue Equity Petroholdings, Ltd.,** a St. Lucia International Business Company ("**Blue Equity**"). The Class A Preferred Directors and the Common Directors of the Company and each subsidiary of the Company are hereinafter sometimes referred to collectively as the "**Directors**" and each individually as a "**Director**" of the Company or such subsidiary, as applicable. In addition, the Board of Directors may authorize other persons at any time and from time to time **(i)** to attend and participate, without any voting rights, in meetings of the Board of Directors, **(ii)** to receive any or all notices of meetings or proposed consent resolutions which are sent to the Directors, without any right to consent, approve, or otherwise act with respect to any such proposed consent resolution, *and/or* **(iii)** to have any or all of the same access to information about the Company and the Company's subsidiaries as the Directors are entitled to have, and the Board of Directors may and revoke or change any such authorization at any time. Such persons shall not be considered to be Directors of the Company or any subsidiary, shall have not voting or consent rights, and shall not be taken into account for purposes of determining any quorum.

**(c)**     *Except* with respect to a Joint Consent Matter or as otherwise provided under Section E(1)(d) below, the affirmative vote or written consent of a majority-in-number of the Directors of the Company or any subsidiary of the Company, as the case may be, then in office shall govern with respect to any matter and shall be the act of the Board of Directors and the Company or such subsidiary of the Company, as applicable. With respect to any **Joint Consent Matter** as to the Company or any subsidiary of the Company, the written consent of both a minimum of the holders of **80%** of the of the Common Shares of the Company or such subsidiary, as applicable, and a majority-in-

number of the Class A Preferred Directors of the Company or such subsidiary, as applicable, then in office, acting as a separate group, shall govern and be the act of the Board of Directors and the Company or such subsidiary, as applicable.

**(d)**     Notwithstanding any other provision hereof which might be construed to the contrary, any Class A Preferred Director of the Company or any subsidiary of the Company may require at any time that a matter or issue be submitted to the Shareholders of the Company for decision, in which case the Board of Directors of the Company or such subsidiary, as the case may be, shall not be authorized to decide such matter or issue and any prior decision by such Board of Directors as to such matter or issue shall be rendered null and void *ab initio*. In such event, *except* with respect to a Joint Consent Matter, the affirmative vote or written consent of the holders of a majority of the then issued and outstanding Common Shares and Class A Preferred Shares, in the aggregate (but excluding any and all of the Class B Nonvoting Shares) of the Company or such subsidiary, as the case may be, shall govern with respect to any matter and be the act of the Company or such subsidiary of the Company, as applicable. With respect to any Joint Consent Matter as to the Company or any subsidiary of the Company which is submitted to the Shareholders of the Company or such subsidiary, as the case may be, the written consent of both the holders of no less than 80% of the then issued and outstanding Common Shares, voting as a separate group, and the holders of a majority of the Class A Preferred Shares of the Company, voting as a separate group, shall govern and be the act of the Company or such subsidiary, as applicable. The holders of the Class B Nonvoting Preferred Shares of the Company, in such capacity, shall not have a right to vote on any such matters.

**(e)**     Unless stated to the contrary in this Resolution, any and all actions taken by the Board of Directors and each class of Directors of the Company and each subsidiary of the Company shall be made in good faith and in a manner reasonably intended by them to enhance equityholder value with respect to the Company.

**(f)**     For all purposes hereof, each of the following matters shall constitute a **"Joint Consent Matter"** as to the Company or any subsidiary of the Company, as applicable:

**(i)** The commingling or co-investing of the funds of the Company or any subsidiary of the Company with those of any other individual or entity other than the Company and/or the Company's subsidiaries.

**(ii)**     The fixing or changing of the compensation, if any, to be paid the Directors of the Company or any subsidiary of the Company in such Directors' capacities as such.

**(iii)**     Permitting any deviation from the limitations on Related Party transactions which are required under any Shareholders Agreement executed by all of the Shareholders of the Company.

**(iv)**     The Company or any subsidiary of the Company engaging in any business activity outside the scope of the Business.

**(v)**     The issuance to employees, contractors, or other Persons, in consideration of services rendered, of any Shares and/or other equity interests, or options, warrants, or securities convertible by the Company and/or any of the Company's subsidiaries and/or the establishment of any employee stock ownership plan or similar employee benefit plan (*provided, however,* that none of **Joseph Issa ("Issa")**, **Jonathan Blue**, or **David Roth** may be a participant in such "phantom stock" plan or other such employee benefit plan *and provided further, however,* that if any such plan is

established by the Company, Cool Corp on the one hand, and the Class A Directors acting as a separate group, on the other hand, shall each have the right to name the participants as to one-half of the interests authorized under such plan).

(vi)       Any prepayment of the bond indebtedness of the Company and/or the Company's subsidiaries that is not required under the terms and conditions of such bond indebtedness, *other than (A)* by use of the net proceeds received by the Company and/or any of the Company's subsidiaries in respect of a sale of the Rockfort pier, in respect of the issuance of the Class A Preferred Shares, and/or in respect of the issuance of the Class B Nonvoting Preferred Shares, *(B)* in connection with the refinancing or replacement of such bond indebtedness, *and/or (C)* in connection with a Liquidity Event.

(vii)       Any other matter or issue as to which the written consent of both a majority-in-number of the Common Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, is specifically and expressly required under this Resolution.

(viii)       The approval of any termination of, reduction or increase in, the Blue Equity Fees and/or the CPMIC Fees (as such terms are defined in Section 1.1(f)) payable by the Company.

(ix)       The change of the name of the Company to any name which contains the word "Blue".

(x)       The change in the definition of "Business."

(xi)       Payment of compensation in excess of **$180,000.00 per** year to any Chief Executive Officer who is not totally independent of, and unaffiliated with, Blue Equity prior to his or her appointment; *provided, however,* that if Blue is the Chief Executive Officer, the payment of *any* compensation to him therefor (other than indirectly by reason of the Blue Equity Fees for the Blue Back-Office Services) shall constitute a Joint Consent Matter. In such regard, the term "compensation" shall not be construed as including any reimbursements or indemnity payments.

(xii)       Any decision not to exercise the Company's right of first refusal under that certain **Share Purchase Agreement** entered into effective as of **September 29, 2011** *by and among* the Company, Blue Equity, Cool Corp, Issa, **Colin Hendrick**, **Gwen Kennedy**, and **Caribbean Property Managers International Corp.**, a Panamanian corporation (**"CPMIC"**), as amended by a **First Amendment to Share Purchase Agreement** entered into effective as of **December 12, 2011** (as so amended and as the same may be subsequently amended in accordance with its terms, the **"Share Purchase Agreement"**) with respect to any new Business Opportunity (as defined in the Share Purchase Agreement) as to which a Purchaser Restricted Party (as defined in the Share Purchase Agreement) gives a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company as required under the Share Purchase Agreement, but such decision shall only constitute a Joint Consent Matter if after considering, in good faith, all of the relevant facts and circumstances at the time, it is reasonably ascertained that the Company would have the financial capability to take and consummate such Business Opportunity without depending on raising additional outside equity funds or incurring any level of additional debt which requires any personal guarantees or which the Board of Directors reasonably determines, in good faith, would be at a level that is not prudent for the Company to incur.

| (2) | **SUBSIDIARY BOARD OF DIRECTORS** | *Except* to the extent, if any, otherwise agreed to by both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group, the Board of Directors of each subsidiary of the Company, *including, but not limited to,* Cool Petroleum (St. Lucia) Limited, a St. Lucia international business company, and Cool Bio Diesel Limited, a Jamaican limited company, shall be automatically identical in its composition to the composition of the Board of Directors of the Company, as the same may change at any time and from time to time. The Company and its shareholders, Directors, and officers, as applicable, shall cause the Governing Instruments of each subsidiary of the Company to contain such provisions as are necessary to implement the foregoing requirement and as are necessary to require that each subsidiary of the Company operates in a manner subject to the Approved Budgets and otherwise substantially in accordance with the same governing and operating checks, balances, and internal controls as are provided for under this Resolution with respect to the Company (*other than* reflecting the Company as the sole shareholder and/or equityholder of each subsidiary other than any subsidiary which is not 100% owned by the Company or another subsidiary of the Company). If necessary for legal reasons, the Company and its shareholders, Directors, and officers, as applicable, shall cause each subsidiary of the Company to adopt and agree to the terms, conditions, and provisions of this Resolution in writing. |
| (3) | **NO AUTHORITY FOR SHAREHOLDERS TO MANAGE** | Except indirectly through the power of certain Shareholders to elect, remove, and/or replace certain Directors as set forth above, none of the Shareholders, in their capacity as Shareholders, shall have the power or authority to control the actions of, or act on behalf of, the Company and/or any subsidiary of the Company. |

*[Only General Terms and Conditions Follow]*

**GENERAL TERMS AND CONDITIONS**

*Rights Designation Resolution*

# ARTICLE 1

## DEFINITIONS

### 1.1    Certain Definitions

As used in this Resolution, and *unless* the context requires a different meaning:

(a)    The term **"Affiliate"** with respect to any Person shall mean *(i)* any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, *(ii)* any shareholder (*except* that if the subject Person is a publicly traded company, only a shareholder who owns more than 5% of the outstanding voting securities of such subject Person), partner, director, board of directors, governor, member, trustee, beneficiary, employee, agent, or relative by blood or marriage, as applicable, of such Person or of any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, *and/or (iii)* any personal representative, receiver, trustee in bankruptcy, guardian, curator, or conservator with respect to such Person. In such regard, the term **"control"** (including the terms **"controlled by"** and **"under common control with"**) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise, applying the same principles, interpretations and definitions as are applicable in defining the term "affiliate" for purposes of Rule 144 promulgated pursuant to the United States Securities Act of 1933, as amended.

(b)    The Common Shareholders, as a group, the Class A Preferred Shareholders, as a group, and the Class C Preferred Shareholders, as a group, are sometimes referred to in this Resolution collectively as the **"Classes of Shareholders"** and each individually as a **"Class of Shareholders."**

(c)    The Class A Preferred Shares, as a group, the Class B Nonvoting Preferred Shares, as a group, the Class C Nonvoting Preferred Shares, as a group, and the Common Shares, as a group, are hereinafter sometimes referred to collectively as the **"Classes of Shares"** and each group individually as a **"Class of Shares."**

(d)    The term **"Governing Instruments"** with respect to any Person other than an individual shall mean the Articles of Incorporation, Articles of Organization, Articles of Association, Certificate of Formation, Certificate of Incorporation, Certificate of Association, Certificate of Organization, By-Laws, Limited Liability Company Agreement, Operating Agreement, Memorandum of Incorporation, Memorandum of Association, Partnership Agreement, Certificate of Partnership, and/or any and all other governing and/or organizational documents with respect to such Person, as applicable.

(e)    The term **"Majority-in-Interest"** *(i)* shall mean, with respect to any single Class of Shareholders, at any time, those Shareholders of such Class of Shareholders holding more than **50%** of the Shares of the Class of Shares upon which such Class of Shareholders is based (*i.e.,* Common Shares with respect to Common Shareholders, Class A Preferred Shares with respect to Class A Preferred Shareholders, Class B Nonvoting Preferred Shares with respect to Class B Preferred Shareholders, and Class C Nonvoting Preferred Shares with respect to Class C Preferred Shareholders) which are owned by all of the Shareholders of such Class of Shareholders at such time, *or (ii)* shall mean, with respect to all of the Shareholders as a whole (regardless of the Class of Shares held by any Shareholder), at any time, those Shareholders (regardless of the Class of Shares held by any such Shareholder), holding more than **50%** of the total Shares then issued and outstanding (regardless of the Class of Shares) and entitled to vote (thus, without taking into account for any such calculation any Class B Nonvoting Preferred Shares or any Class C Nonvoting Preferred Shares).

(f)    The term **"Net Cash Flow"** with respect to the Company and/or any one or more of the Company's subsidiaries for any period shall mean, subject to and computed in accordance with applicable rules of consolidation, *the excess, if any, of (A) the sum of (i)* all gross receipts of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from any sources for such period, other than from Liquidity Events, *plus (ii)* any funds released by the Board of Directors of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from previously established reserves (referred to in *(B)(iv)(y)* below), *over (B) the sum of (i)* all cash expenses paid by the Company and/or such subsidiary or subsidiaries during such period during the course of business (*including, but not limited to,* salaries, bonuses (*including, but not limited to,* any bonuses or earn-out payments attributable with respect to such period, even if payable after such period), taxes, rent and occupancy costs, interest on any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, insurance premiums, supplies, guaranteed payments and fees), *(ii)* all capital expenditures paid in cash by the Company and/or such subsidiary or subsidiaries, as applicable, during such period, *(iii)* all payments during such period of the principal of any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, *and (iv)* unless the Board of Directors, in its sole discretion, determines that a lesser amount is advisable, a cash reserve in an amount equal to *the sum of (x) the greater of* **$3,000,000.00 USD** *or* an amount equal to *the excess, if any, of* **$5,000,000.00 USD** *over* the Net Working Capital of the Company and the Company's subsidiaries with respect to such period (computed, however, without including any cash or cash equivalents of the Company and/or the Company's subsidiaries), *plus (y)* such additional amount, if any, that the Board of Directors reasonably and in good faith determines is

necessary to meet the future business, working capital, capital expenditure, tax, environmental, litigation, and/or expansion needs of the Company and/or the Company's subsidiaries; *provided, however,* that any payments referred to in *(B)(i), (ii), (iii), or (iv)* that are paid from previously established reserves or that are taken into account in determining Net Proceeds from a Liquidity Event shall not be taken into account in determining Net Cash Flow. In computing Net Cash Flow for any period, all costs, expenses and expenditures of the Company and the applicable subsidiary or subsidiaries of the Company shall be taken into account, *including, but not limited to, (a)* a fee to Blue Equity, LLC or its nominee (the **"Blue Equity Fee"**) of **$600,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such in-house legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"Blue Back-Office Services"**) as are provided by **Blue Equity, LLC**, a Nevada limited liability company (**"Blue Equity, LLC"**), and/or any of its Affiliates to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of Blue Equity, LLC, or other Persons, it being understood and agreed that the Blue Equity Fee does not include *(x)* any compensation, benefits, and other amounts paid to or for the benefit of the Chief Executive Officer of the Company *or (y)* any out-of-pocket expenditures to third parties for travel, lodging, international telephone calls, and other legitimate business expenses incurred by Blue Equity, LLC, its Affiliates, or their personnel, in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries, which amounts shall be reimbursable by the Company or an Affiliate of the Company, as applicable, to the extent that they are within the applicable Approved Budgets of the Company and the Subsidiaries and they are properly incurred, reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries generally applicable to employees of the Company and/or such Affiliate of the Company, *and (b)* a fee to CPMIC (the **"CPMIC Fee"**) of **$575,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"CPMIC Back-Office Services "**) provided by **Cool International Holdings Limited**, a British Virgin Islands corporation, Cool Corp, **MZ Holdings Limited**, a Jamaican company (**"MZ Holdings"**), **Cool Oasis Limited**, a Jamaican company, CPMIC, and/or any of their nominees or Affiliates (collectively and individually as applicable, the **"CPMIC Group"**) to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of the CPMIC Group or other Persons, it being understood and agreed that *(X)* the CPMIC Fee includes *(i)* the portion of the compensation, benefits, and other amounts allocable and chargeable to the Company and/or the Company's subsidiaries for the provision by the CPMIC Group, as applicable, of the financial, accounting, and supervisory services of Davis in his capacity as the Group CFO of the Company and the Company's subsidiaries (in which capacity Davis shall report directly to the Chairman and Vice Chairman of the Company and the Company's subsidiaries (subject, however, to the general supervision and control of the Board of Directors)) and of the political liaison and other consulting services of Issa as may be reasonably requested by the Company and/or the Company's subsidiaries (which services by Issa shall be only part-time and shall not require Issa to work any particular minimum of hours or provide any particular quantity of services), in each case on a shared basis between the CPMIC Group and its subsidiaries, on the one hand, and the Company and its subsidiaries, on the other hand, *(ii)* the compensation, benefits (including, but not limited to, other amounts paid by the CPMIC Group to or with respect to Colin Hendrick with respect to his serving, on a full time basis as the Director of Operations for the Company and the Company's subsidiaries, *and (iii)* the services provided for under that certain Agreement entered into as of March 1, 2006, *by and between* Cool Petroleum Limited and MZ Holdings regarding the provision of certain services by MZ Holdings to the Company and the Company's subsidiaries (the **"MZ Shared Services Agreement"**), *and (Y)* the CPMIC Fee does not include *(i)* any costs for the Company, the Company's subsidiaries, and/or their Affiliates or invitees to use or direct the use of the airplane owned by Cool Corp and/or its Affiliates when deemed advisable or authorized by the Board of Directors of the Company, *or (ii)* any out-of-pocket expenditures of the types currently paid to third parties by the Company and/or the Company's subsidiaries or paid to third parties by the CPMIC Group and reimbursed by the Company and/or the Company's subsidiaries for any travel (including car or car allowances and including gas), lodging, international telephone calls, and other legitimate business expenses incurred in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries by Hendrick, Davis, and/or Issa, or by Cool Corp with respect to such individuals, which are within the applicable Approved Budgets of the Company and the Subsidiaries and which are properly reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries, *or (iii)* the costs incurred by the Company and/or the Subsidiaries in providing BUPA Family Medical Insurance and corporate protection insurance for Hendrick and Issa at current coverage levels, which the Company shall continue to pay, or *(iv)* any costs incurred by Cool Corp and/or its Affiliates associated with providing intellectual, human or other capital resources to or for the benefit of the Company and/or any of the Company's subsidiaries to the extent that *(A)* such intellectual, human, or other capital resources are not already required to be so provided pursuant to currently existing agreements with the Company and/or any of the Company's subsidiaries (or any amendments, extensions, renewals, or novations thereof), *(B)* such intellectual, human, or other capital resources have not otherwise been generally provided by Cool Corp and/or its Affiliates to or for the benefit of the Company prior to the Effective Date of this Resolution, *(C)* such intellectual, human, or other capital resources are not specifically included in the CPMIC Back-Office Services set forth above, *and (D)* the provision of such intellectual, human, or other capital resources is undertaken, and the costs therefor incurred, pursuant to and in accordance with the terms and conditions of a written agreement entered into by and between one or more of Cool Corp and/or Cool Corp's Affiliates, on the one hand, and one or more of the Company and/or the Company's subsidiaries, on the other hand. The CPMIC Fee shall supersede *inter alia* the fee provided for under the MZ Shared Services Agreement, which fee provided for under the MZ Shared Services Agreement shall therefore no longer be separately due and payable by the Company or any of its subsidiaries to MZ Holdings.

(g)   The term **"Net Proceeds"** with respect to any Liquidity Event shall mean the gross proceeds derived by the Company and/or the Shareholders directly from such Liquidity Event *reduced by (i)* payment of all reasonable expenses incurred by the Company or the Shareholders, as the case may be, in furtherance of implementing such Liquidity Transaction, *including, but not by way of limitation,* any brokerage commissions, fees, and costs payable by the Company or, with the Company's consent, to or by the Shareholders, in connection with such Liquidity Event (*provided, however,* that any commission or fee payable to Blue Equity, Cool Corp, or any other Related Party or Shareholder for arranging such Liquidity Event may not, when added to the brokerage commissions and/or fees payable by the Company to Persons other than Related Parties in connection with such Liquidity Event, exceed an amount equal to 5% of the value of the total consideration from such Liquidity Event), *(ii)* payment of the amount of any indebtedness of the Company (*including* principal, interest, prepayment fees, and/or other fees, costs, or charges) made with such gross proceeds, *(iii)* capital expenditures or other expenditures required to made from the gross proceeds of such Liquidity Event under the applicable agreements with respect to such Liquidity Agreement, *and (iv)* any reasonable reserve established by the Board of Directors of the Company for satisfaction of any of the foregoing, any indemnities, escrow, or contingencies therefor. In determining the gross proceeds and Net Proceeds with respect to any Liquidity Event, any equity interests, bonds, and/or other tangible or intangible property (other than cash and cash equivalents) received with respect to a Liquidity Event shall be valued at the same amount as such equity interests, bonds, and/or other tangible or intangible property are valued for purposes of the Liquidity Event.

(h)   The term **"Person"** means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, syndicate, joint stock company, limited liability company, governmental authority, or other entity of any kind.

(i)   The term **"Tax"** or **"Taxes"** with respect to any Person shall mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental taxes, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated basis, or unitary basis or in any other manner which are required to be paid, withheld or collected by such Person.

(j)   The term **"Tax Return"** shall mean any return, declaration, reports and forms, claim for refund, or information return or statement relating to Taxes, including any necessary schedule or attachment thereto, and including any necessary amendment thereof.

## 1.2   Accounting Terms

All accounting terms which are used in this Resolution and which are not otherwise expressly defined in this Resolution shall have the respective meanings given to them in accordance with generally accepted International Financial Reporting Standards, consistently applied from period to period (**"IFRS"**) and all accounting concepts and principles referred to in this Resolution shall be construed in accordance with IFRS *except* to the extent otherwise specifically and expressly provided in this Resolution.

## ARTICLE 2

### CAPITAL

### 2.1   No Liability of Shareholders

*Except* as otherwise specifically provided under applicable law or specifically provided under a separate written agreement executed by such Shareholder, no Shareholder of the Company shall have any personal liability for the obligations of the Company and/or any subsidiary of the Company. Furthermore, no Shareholder shall be obligated to contribute additional funds or loan money to, or personally guarantee or endorse any debts or obligations of, the Company and/or any subsidiary of the Company *except* to the extent, if any, that such Shareholder specifically agrees under a separate written agreement executed by such Shareholder.

### 2.2   Percentage Interest Definition

(a)   For purposes of this Resolution, the term **"Percentage Interest"** at any time shall have the following meaning, as applicable:

(i)   The term **"Percentage Interest"** as to any Class A Preferred Shareholder, solely with respect to the Class A Preferred Shareholders as a group, shall mean that percentage which the number of Class A Preferred Shares (*including, but not limited to,* any fractional Class A Preferred Shares) then held by such Class A Preferred Shareholder at such time *bears* to

the aggregate of all Class A Preferred Shares (*including, but not limited to,* any fractional Class A Preferred Shares) then issued and outstanding;

 (ii)   The term **"Percentage Interest"** as to any Class B Preferred Shareholder, solely with respect to the Class B Preferred Shareholders as a group, shall mean that percentage which the number of Class B Nonvoting Preferred Shares (including, but not limited to, any fractional Class B Nonvoting Preferred Shares) then held by such Class B Preferred Shareholder at such time bears to the aggregate of all Class B Nonvoting Preferred Shares (including, but not limited to, any fractional Class B Nonvoting Preferred Shares) then issued and outstanding;

 (iii)   The term **"Percentage Interest"** as to any Class C Preferred Shareholder, solely with respect to the Class C Preferred Shareholders as a group, shall mean that percentage which the number of Class C Nonvoting Preferred Shares (including, but not limited to, any fractional Class C Nonvoting Preferred Shares) then held by such Class C Preferred Shareholder at such time bears to the aggregate of all Class C Nonvoting Preferred Shares (including, but not limited to, any fractional Class C Nonvoting Preferred Shares) then issued and outstanding;

 (iv)   The term **"Percentage Interest"** as to any Common Shareholder, solely with respect to the Common Shareholders as a group, shall mean that percentage which the number of Common Shares (*including, but not limited to,* any fractional Common Shares) then held by such Common Shareholder at such time *bears* to the aggregate of all Common Shares (*including, but not limited to,* any fractional Common Shares) then issued and outstanding;

 (v)   The term **"Percentage Interest"** as to any Shareholder with respect to all of the Shareholders as a group, regardless of the Class of Shares held by such Shareholders, shall mean that percentage which the number of Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then issued and outstanding; *and*

 (vi)   The term **"Percentage Interest"** as to any Shareholder with respect to any group of Shareholders consisting of fewer than all of such Shareholders, regardless of the Class of Shares held by such Shareholders (for purposes of Section 2.3 of this Resolution or otherwise) shall mean that percentage which the number of Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares (except as otherwise provided in this Resolution) and *including, but not limited to,* any fractional Shares) then held by all Shareholders of the applicable group, in the aggregate; *provided, however,* that, notwithstanding any other provision of this Resolution which might be construed to the contrary, in determining the Percentage Interest of any Shareholder under Section 2.2(a)(v) above and/or this Section 2.2(a)(vi) for purposes of applying and implementing the provisions of Section 2.3 of this resolution, **(A)** the Class B Preferred Shares shall not be taken into account in the numerator or denominator *and* **(B)** the Class A Preferred Shares and Class C Nonvoting Preferred Shares shall be taken into account in both the numerator and denominator as if they had already all been converted into Common Shares in accordance with the conversion provisions set forth in Sections D(24) and D(25) of the Initial Portion of this Resolution.

 (b)   Except when determining the Percentage Interest of any Shareholder with respect to all or some of the Shareholders, regardless of the Class of Shares held by any such Shareholder, pursuant to Section 2.2(a)(v) or Section 2.2(a)(vi) above, the Percentage Interest of any Shareholder who holds Shares of more than one Class of Shares shall be determined on a Class of Shares-by-Class of Shares basis, taking into account only such Shareholder's holdings of Shares of the Class of Shares in question and disregarding such Shareholder's holdings of the Shares of any other Class of Shares.

 **2.3   Additional Capital Contributions**

 (a)   If at any time the Board of Directors of the Company determines reasonably and in good faith that, in order *(i)* to provide cash for the expansion of the business of the Company and/or the Company's subsidiaries, through acquisition or otherwise *(ii)* to provide working capital reasonably necessary in the ordinary course of the business of the Company and/or the Company's subsidiaries, *and/or (iii)* to provide funds to repay any or all debts, obligations, and/or other liabilities of the Company and/or the Company's subsidiaries if the Company is unable to pay such debts, obligations, and/or other liabilities as they becomes due, it is advisable for the Company and/or any one or more subsidiaries of the Company to seek additional capital beyond that already then contributed, or required to be contributed, by the Shareholders of the Company, the Board of Directors of the Company shall cause notice of such determination to be given to each of the Shareholders (regardless of the Class of Shares held by such Shareholders) at least **90 days** before the last day on which such capital must be contributed or such shorter period of time (but not less than **30 days**) before the last day on which such capital must be contributed as is reasonably necessary to avoid hardship to the Company or any subsidiary of the Company or to avoid the loss of the proposed acquisition or other expansion transaction or opportunity, as the case may be (as applicable, the **"Capital Raise Notice Period"**). Such notice shall set forth the total additional capital contribution then being sought from all of the Shareholders in the aggregate and the number of Shares or other equity interests which will be issued by the Company and/or any subsidiary of the Company in exchange for such additional capital contribution (and the rights, preferences, and other characteristics of any such equity interests other than Shares). Any other equity interests so authorized by resolution of the Board of Directors of the Company may have such other rights, distribution preferences, voting preferences, liquidation preferences, and other characteristics as the Board of Directors may determine in its reasonable discretion and in good faith, *including, but not limited to,* preferences which make such class of equity interests senior in distributions and/or voting to any of the Shares or to any other class of equity interests previously issued; *provided, however,* that any dilution to be caused by the issuance of such new equity interests shall affect all of the then issued and outstanding Common Shares on a

proportionate basis. No vote of the Shareholders, or any Class of Shareholders, shall be required in connection with the issuance of additional Shares or any other class of equity interests, *except* to the extent, if any, provided by resolution of the Board of Directors of the Company in connection with the prior issuance of Shares or other equity interests under this Section 2.3.

**(b)**   Within such Capital Raise Notice Period, if any Shareholder wishes to acquire such Shareholder's pro rata portion of the Shares or other equity interests being offered by the Company and/or any of the Company's subsidiaries, as the case may be, in connection with such additional capital contribution, such Shareholder shall contribute in cash to the capital of the Company or such subsidiary or subsidiaries, as applicable, a pro rata portion of the total additional capital contribution then being sought in the aggregate, in accordance with such Shareholder's respective Percentage Interest with respect to all of the Shareholders of the Company (regardless of the Class of Shares held by any Shareholder) at such time.

**(c)**   If any Shareholder fails to contribute such Shareholder's pro rata portion of such additional capital contribution within the specified Capital Raise Notice Period, then the Shareholders who have contributed their pro rata portions of such additional capital contribution within the specified Capital Raise Notice Period shall have the right (but not the obligation), during a period of **10 days** thereafter, to make the additional capital contribution for which such Shareholder failed (with or without reason) to make, in accordance with their respective Percentage Interests among themselves as a group, or in such other percentages as those Shareholders wishing to make all or any part of such capital contribution may otherwise agree. In such event, the Shares or other equity interests offered with respect to such additional capital contribution shall be issued to those Shareholders who actually make such capital contribution in accordance with the percentage of such capital contribution contributed by each.

**(d)**   If the Shareholders of the Company, in the aggregate, do not timely contribute the full amount of any additional capital contribution sought by the Company and/or the Company's subsidiaries, as applicable, then the Company and/or the Company's subsidiaries, as applicable, shall have an additional **90 day** period to obtain such uncontributed funds from any one or more Shareholders or other Persons on the same terms as offered to the Shareholders in exchange for the issuance to such Person(s) of the Shares or other equity interests which were offered to the Shareholders in connection with such portion of the additional capital contribution.

**(e)**   Notwithstanding anything herein which might be construed to the contrary, the Board of Directors of the Company, acting reasonably and in good faith, may cause the Company and/or any subsidiary of the Company at any time to issue new Shares or other equity interests, or options to acquire new Shares or other equity interests, as an incentive in connection with the employment of any new or existing employee of the Company and/or any subsidiary of the Company, and the foregoing notice and "preemptive rights" as to the Shareholders of the Company shall not apply with respect to such issuances, provided such issuance is within the parameters set forth in Section E(1)(f)(v).

### 2.4   Effect of Equity Issuances Pursuant to Section 2.3

Any and all of the provisions of this Resolution shall be subject to amendment, change, or modification to such extent as the Board of Directors of the Company may reasonably deem necessary to implement the terms and conditions of any new issuance of equity interests pursuant to Section 2.3 hereof; *provided, however,* that such amendments, changes, or modifications may only be with respect to management controls if such new equity interests authorized pursuant to Section 2.3 hereof are only issued to Persons who are not already then Shareholders of the Company.

### 2.5   No Interest on Capital Contributions

No Shareholder shall be entitled to interest on any capital contribution made to the Company and/or any subsidiary of the Company, *except* to the extent otherwise expressly set forth in this Resolution or pursuant to the provisions of Section 2.3 hereof.

## ARTICLE 3

### DISTRIBUTIONS

### 3.1   Distributions of Net Cash Flow and Net Proceeds From Liquidity Events

**(a)**   The Net Cash Flow for each Fiscal Quarter with respect to the Company and the Company's subsidiaries **(i)** shall be distributed, with respect to the first three Fiscal Quarters of each Fiscal Year, within **30 days** after the end of such Fiscal Quarter, and with respect to the last Fiscal Quarter of every Fiscal Year, **30 days** following the finalization of the Company's audited consolidated statements with respect to such Fiscal Year *and (ii)* shall be distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries, as applicable, then held by each of them.

(b)   The Net Proceeds from Liquidity Events with respect to the Company and/or any subsidiary of the Company *(i)* shall be distributed within **120 days** following the receipt of such Net Proceeds by the Company or the Company's subsidiary, as applicable, *and (ii)* shall be authorized, if necessary, and distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries then held by each of them.

**ARTICLE
4**

**MANAGEMENT**

**4.1   Management In General**

(a)   *Except* to the extent otherwise specifically provided under this Resolution, all rights, powers and authority of the Company and each subsidiary of the Company shall be exercised by or under the authority of, and the business and affairs of the Company or such subsidiary, as applicable, as well as any liquidation or dissolution of the Company or such subsidiary, as applicable, shall be controlled and managed by or under the authority of, a Board of Directors for the Company or such subsidiary, as applicable, established as provided under Section E of the Initial Portion of this Resolution (the **"Board of Directors"**), each of the members of which may be referred to as a Director.

**ARTICLE
5**

**WITHDRAWAL, ASSIGNMENT AND
ADDITION OF SHAREHOLDERS**

**5.1   Assignment of Shares**

*Except* as otherwise provided and permitted under this Article 5, no Shareholder may sell, assign, transfer, pledge, hypothecate, encumber, withdraw or otherwise dispose of (each of which actions constitutes a **"Transfer"** for all purposes of this Resolution) all or any portion of such Shareholder's Shares to any Person. Any purported Transfer which is not in compliance with the provisions of this Article 5 shall be null and void *ab initio* and of no force or effect, and the Shareholder purporting to make such Transfer shall, for all purposes hereof, remain a Shareholder.

**5.2   Tag Along and Drag Along Rights**

If, *other than* in a Transfer permitted under Section 5.5 below, any one or more of the Shareholders (collectively, the **"Selling Shareholder(s)"**) desire to sell or exchange, in any single Transfer or group of related Transfers, a number of Shares owned by such Selling Shareholder(s) which constitute more than **50%** in voting power of all of the voting Shares of the Company then issued and outstanding, in the aggregate (collectively, the **"Shares To Be Transferred"**), such Selling Shareholder(s) may consummate such sale or exchange of the Shares To Be Transferred, *but if and only if* such Selling Shareholder(s):

(a)   Cause the proposed purchaser of such Shares To Be Transferred to offer in writing to similarly purchase or exchange, in a sale or exchange to be consummated at the same time as the purchase or exchange of the Shares To Be Transferred is consummated, from each of the other Shareholders (each a "*Tag-Drag Shareholder*") a number of the Shares of the Company then owned by such Tag-Drag Shareholder (collectively, the **"Tag-Drag Shares"** of such Tag-Drag Shareholder) *which bears the same ratio to* the total number of Shares (regardless of the Class of Shares) then owned by such Tag-Drag Shareholder, in the aggregate, *as* the total number of Shares To Be Transferred *bears* to the total number of Shares (regardless of the Class of Shares) then owned by all of the Selling Shareholder(s), in the aggregate, at the same price or exchange value per Share, and on the same payment or exchange terms, as is applicable with respect to the Shares To Be Transferred; *and*

(b)   Either, in the sole discretion of the Board of Directors of the Company (*that is,* the Board of Directors must select one of the following two rights to apply),

(i)   Require each of the Tag-Drag Shareholders to sell or exchange all of the Tag-Drag Shares of such Tag-Drag Shareholder to the Purchaser, at the same price or exchange value per Share, and on the same payment or exchange terms, as applicable with respect to the Shares To Be Transferred, in which case each of such Tag-Drag Shareholders and the purchaser must comply with such required sale or exchange (**"Drag-Along Rights"**); *or*

(ii)   Allow each of the Tag-Drag Shareholders to accept or reject such offer, in such Tag-Drag Shareholder's sole discretion, in which case, and if such offer is accepted by such Shareholder, the proposed purchaser must purchase or acquire in exchange, and such Tag-Drag Shareholder must sell or exchange, the Tag-Drag Shares of such Tag-Drag Shareholder at the

same price or exchange value per Share and on the same payment or exchange terms as applicable with respect to the Shares To Be Transferred ("**Tag-Along Rights**").

(c)    At the closing of the purchase and sale of the Shares To Be Transferred, the Tag-Drag Shareholder whose Shares are required to be sold pursuant to the Drag-Along Rights or who elects to sell any Tag-Drag Shares pursuant to the Tag-Along Rights, as the case may be, shall execute such instruments of assignment as shall be reasonably requested by the purchaser and/or the Board of Directors of the Company. If such Tag-Drag Shareholder fails to execute any such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Resolution or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 5.2(c) with respect to such Tag-Drag Shareholder's applicable Tag-Drag Shares if such Tag-Drag Shareholder fails to do so on a timely basis. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it. Notwithstanding any other provision hereof which might be construed to the contrary, *(i)* pricing and exchange values with respect to the Class A Preferred Shares, the Class B Nonvoting Preferred Shares, and the Class C Nonvoting Preferred Shares for all purposes of this Section 5.2 may differ from other Shares to the extent reasonably necessary to permit the Class A Base Payback, Class B Base Payback, Class C Base Payback, Class A Return Payback, Class B Return Payback, and Class C Return Payback amounts to be first received by the holders thereof (in the order of priority reflected with respect to the distribution of Net Proceeds from Liquidity Events) and then the balance shall be divided among and treated as the purchase price or exchange value for the applicable Common Shares, *and (ii)* for the purpose of such allocation of the remaining balance among the applicable Common Shares, the Class A Preferred Shares and the Class C Nonvoting Preferred Shares shall then be deemed to have been converted into Common Shares as provided for under Sections D(24) and D(25) of the Initial Portion of this Resolution.

**5.3    Voluntary Transfers By Certain Minority Common Shareholders**

(a)    If, at any time after *the first to occur of (x)* the **third anniversary** of the Effective Date of this Resolution, *or (y)* the date on which Class A Base Payback is achieved, any Common Shareholder who, together with all Related Parties and Affiliates of such Common Shareholder, then owns or controls, in the aggregate, less than **5%** of the then issued and outstanding Common Shares of the Company (a "**Selling Minority Shareholder**") receives a bona fide written offer ("**Offer**") by any Person, other than with respect to a Transfer permitted under Section 5.5 below or pursuant to the provisions of Section 5.2 above, to purchase all or any portion of such Selling Minority Shareholder's Common Shares and if the Selling Minority Shareholder desires to accept such Offer, then such Common Shares shall be subject to the following right of first refusal options:

(i)    The Selling Minority Shareholder shall give, or cause to be given, written notice of the options set forth below to the Company and to all of the other Common Shareholders, which notice shall contain a true and correct copy of the Offer (the "**Sales Notice**"). An election to exercise an option granted under this Section 5.3 shall be made by written notice given to the Selling Minority Shareholder within the time period permitted for exercise of such option. Unless otherwise specified in the notice of exercise, any exercise of an option under this Section 5.3 shall be deemed to be effective as to the maximum number of Common Shares of the Selling Minority Shareholder which such option holder is eligible to purchase pursuant to exercise of such option (which could be all of the Common Shares of the Selling Minority Shareholder then subject to the options granted under this Section 5.3 if no other option holder exercises such option holder's option with respect to such Common Shares). Any exercise of an option granted under this Section 5.3 shall be irrevocable once made (*subject, however,* to the provisions of Section 5.3(d) below).

(ii)    The Sales Notice shall constitute a first offer by the Selling Minority Shareholder to sell all of the Common Shares covered by the Offer to the other Common Shareholders (the "**Other Common Shareholders** ") and such Other Common Shareholders shall have the first option to purchase any or all of the Common Shares subject to the Offer, at the price and upon the other terms and conditions set forth below. If more than one of the Other Common Shareholders exercise the option granted under this Section 5.3(a)(ii), then such exercising Other Common Shareholders shall have the right to purchase the subject Common Shares on a prorata basis in accordance with their respective Common Share holdings, or in such other percentages as they may unanimously agree. The option granted each Other Common Shareholder under this Section 5.3(a)(ii) shall expire and no longer be exercisable if not exercised by such Other Common Shareholder within **30 days** following the date of delivery of the Sales Notice to such Other Common Shareholder.

(iii)    In the event, and to the extent, that the Other Common Shareholders shall fail or neglect to timely exercise their options as to all of the Common Shares which are subject to the Offer, then the Company shall have the second option to purchase any or all of such remaining Common Shares, at the price and upon the other terms and conditions set forth below. The option granted the Company under this Section 5.3(a)(iii) shall expire and no longer be exercisable if not exercised by the Company within **60 days** following the date of delivery of the Sales Notice to the Company.

(b)    The options of the Other Common Shareholders with respect to the Common Shares which are subject to the Offer and the option of the Company with respect to such Common Shares, as set forth above, shall be exercisable at a price for each such Common Share equal to the purchase price for such Common Share set forth in, or calculable under, the Offer. Such purchase price shall be payable in accordance with the payment terms set forth in the Offer; *provided, however,* that, unless otherwise agreed by the Selling Minority Shareholder and the purchasing Shareholder(s) and/or Company, as applicable, the closing of any such purchase and sale of Common Shares pursuant to this section shall take place at the general offices of the

Company no later than **90 days** after the latest date of delivery of the Sale Notice to any of the Other Common Shareholders or the Company. At the option closing, the Selling Minority Shareholder shall transfer and assign all of the Common Shares which are being sold to such Other Common Shareholder(s) and/or the Company, as applicable, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee, other than the Company, shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased.

(c)     Upon the failure or neglect of the other Common Shareholders and the Company, in the aggregate, to purchase all of the Common Shares offered to them pursuant to the foregoing options, the Selling Minority Shareholder shall have, for a period of **60 days** following the date on which the last such option to purchase expires, the right to sell the Common Shares described in the Offer to the Person making the Offer at exactly the same price and upon exactly the same other terms and conditions set forth in the Offer; *provided, however,* that the Person making the Offer, or such Person's Affiliates, do not directly or indirectly compete with the Company or any of the Company's subsidiaries. In the event of such sale pursuant to the Offer, the transferee of the subject Common Shares shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the Person making the Offer and purchasing the subject Common Shares shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased. If the Selling Minority Shareholder fails or neglects to sell such Common Shares within such **60 day** period in accordance with the foregoing, or if any material term of the Offer is changed, modified or supplemented, then such Common Shares shall continue to be owned by the Selling Minority Shareholder, shall continue to be subject to the terms and conditions of this Resolution, and may not be sold without first again giving the other Common Shareholders and the Company the options to purchase such Shares as provided in this Resolution.

(d)     *Notwithstanding anything herein which might be construed to the contrary,* if the other Common Shareholders and the Company, pursuant to their options under this Resolution, shall fail to exercise their options, in the aggregate, to purchase *all* of the Common Shares covered by the Offer, then none of the option exercises as to any of such Common Shares shall be valid or recognized and the Selling Minority Shareholder may sell the applicable Common Shares as provided under Section 5.3(c) above.

**5.4     Involuntary Transfers**

(a)     In the event that any Shares of any Shareholder ("**Transferring Shareholder**") are sought to be Transferred by any involuntary means (*other than* any Transfer by reason of the death or adjudication of incompetency of any Shareholder, *but including, but not limited to,* any Transfer by reason of attachment, garnishment, execution, levy, bankruptcy, or seizure or by reason of a transfer or division of interests as a result of, or in connection with, a divorce, marital dissolution, or other marital property settlement), then such Shares shall be subject to the following options:

(i)     The other Shareholders (the "**Other Shareholders**") shall have the first option to purchase any or all of the Shares sought to be involuntarily transferred at the price and upon the other terms and conditions set forth below. Each of the Other Shareholders shall have the right to purchase the applicable Shares in accordance with their Percentage Interests of Common Shares, among themselves, or in such other percentages as they may unanimously agree. If not all of the Other Shareholders exercise their options with respect to the applicable Shares, then those Other Shareholders exercising their options shall be entitled to purchase the balance in accordance with their Percentage Interests among themselves, or in such other percentages as they may unanimously agree.

(ii)     In the event that the Other Shareholders shall fail to exercise their options as to all of the Shares which are sought to be so involuntarily Transferred, then the Company shall have the second option to purchase any or all of such remaining Shares of the applicable Class of Shares, at the price and upon the other terms and conditions set forth below. If the Company purchases any of such Shares pursuant to this option, all of such purchased Shares shall be immediately distributed and reissued to the Other Shareholders on a prorata basis in accordance with their respective Percentage Interests.

(iii)     Whenever a Transferring Shareholder's Shares shall be subject to an option under this Section 5.4, substantially simultaneous notice of the option shall be given in writing by the Transferring Shareholder (or by the Transferring Shareholder's personal representative, heir, or other representative) to the Company and to each of the Other Shareholders; *provided, however,* that if there is an attempted (or assertedly completed) involuntary Transfer and the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable), fails to give the foregoing notice of the option within **five (5) days** after written demand therefor by the Company or any Shareholder, then the Company or any Shareholder may give such notice on behalf of, and in the name of, the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable). Such notice shall state the number and Class of Shares which is are subject to the attempted (or assertedly completed) involuntary transfer. The option period with respect to the

option given the Other Shareholders shall commence upon the last date of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **30 days** thereafter, unless sooner terminated by written refusal of all of the Other Shareholders to exercise such option. The option period with respect to the option given the Company shall commence upon the last day of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **60 days** thereafter. An election to exercise any option shall be made in a written instrument delivered to the Transferring Shareholder (or to such Transferring Shareholder's personal representative, heir, or other representative). Unless otherwise specified in the notice of exercise, **(A)** any exercise of an option under this Section 5.4 shall be deemed to be effective as to the maximum number of Shares of the Transferring Shareholder which such holder is eligible to purchase pursuant to exercise of such option (which could be all of the Shares of the Transferring Shareholder then subject to the options granted under this Section 5.4 if no other option holder exercises such holder's option with respect to such Shares), *and* **(B)** the exercise of any option by the Company shall only be effective as to any Shares sought to be involuntarily Transferred as to which none of the Other Shareholders has exercised its option under this Section 5.4,. Any exercise of an option granted under this Section 5.4 shall be irrevocable once made *unless* revocation of such option is permitted by written consent of the Board of Directors.

       **(iv)**    If, notwithstanding the provisions of this Resolution, any Shares are Transferred by involuntary means without compliance with the foregoing provisions of this Section 5.4, then the options referred to in this Section 5.4 shall be to purchase such Shares from the transferee(s).

    **(b)**    For purposes of this Section 5.4, the option purchase price for the Shares of a Transferring Shareholder to be purchased pursuant to the options shall be an amount equal to the Applicable Amount (as hereinafter defined) determined using the date of the notice of the attempted (or assertedly completed) involuntary Transfer as the Determination Date.

    **(c)**    The option purchase price for the portion of the applicable Shares of a Transferring Shareholder to be purchased by each purchasing Shareholder or the Company, as applicable, shall, at the option of such purchasing party, be paid either **(i)** in immediately available funds on the option closing date, *or* **(ii)** at least **20%** in immediately available funds on the option closing date, with the balance represented by a promissory note of such purchasing Shareholder or the Company, as applicable with respect to such Share(s), bearing interest at the Prime Rate (as hereinafter defined) *minus* **2%** and payable in not more than ten equal semi-annual installments of principal together with accrued interest.

    **(d)**    The option closing date with respect to the purchase of any Shares pursuant to the exercise of any option under this Section 5.4 shall occur on such date designated by the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, but in any event within **30 days** following the end of the option period during which such option could be exercised. On the option closing on the option closing date, the Transferring Shareholder (or other seller) shall transfer and assign to the purchaser(s) all of the Shares which are then required to be sold pursuant to exercise of the applicable option, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee (other than the Company) shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares or their subsequent Transfer. At the option closing, the Transferring Shareholder (or other seller) shall execute such instruments of assignment as shall be reasonably requested by each purchaser. If the Transferring Shareholder (or other seller) fails to execute such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Resolution or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 5.4(d) if such party is a Transferring Shareholder (or other seller) under this Section 5.4 and fails to do so. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it.

    **(e)**    Upon the failure of the Other Shareholders and/or the Company to purchase all of the Shares sought to be involuntarily transferred in accordance with this Section 5.4, the unpurchased Shares may be involuntarily transferred. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a "Shareholder" for purposes thereof.

    **(f)**    For all purposes of this Resolution, **"Applicable Amount"** as of any Determination Date with respect to the applicable Shares of the applicable Shares of the Transferring Shareholder to be purchased and sold pursuant to the options shall mean an amount determined as follows:

       **(i)**    If the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 5.4 shall agree upon an amount to constitute the Applicable Amount with respect to such purchase and sale of Shares, such agreed price shall constitute the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares (the **"Contemporaneously Agreed Price"**).

---

**(ii)**    If the purchasing and selling parties with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 5.4 shall fail or neglect to agree upon a Contemporaneously Agreed Price with respect to such purchase and sale of Shares within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a Contemporaneously Agreed Price be agreed upon, then the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares shall be an amount equal to the Appraised Value (as hereinafter defined) of such Shares as of the applicable Determination Date (the applicable **"Determination Date"**.

**(g)**    For all purposes of this Section 5.4, the term **"Appraised Value"** with respect to any Shares as of any Determination Date shall mean an amount determined in the following manner:

**(i)**    Whenever the Appraised Value of any Shares of a Transferring Shareholder as of any Determination Date is required to be determined with respect to a purchase or sale of Shares pursuant to this Section 5.4, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall attempt to mutually agree upon a single appraiser to appoint to determine the fair market value of the applicable Shares of the Transferring Shareholder to be so purchased and sold. If such purchasing and selling parties fail or neglect to agree upon a single appraiser within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a single appraiser be agreed upon, then, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall each appoint a qualified appraiser within **15 days** thereafter to determine the fair market value as of such Determination Date of the applicable Shares of the Transferring Shareholder to be purchased and sold.

**(ii)**    If a single appraiser is agreed upon by the purchasing and selling parties, such appraiser shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder within **30 days** following the date of such appraiser's engagement to render such appraisal (or within such reasonably longer period as may be required by such appraiser, and the Appraised Value of such Shares shall conclusively be deemed to be the value determined by such appraiser.

**(iii)**    If two appraisers are appointed, each of the two appraisers shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder to be purchased and sold within **30 days** following the close of the **15-day** period referred to in Section 5.4(g)(i) above (or within such reasonably longer period as may be agreed upon by the two appraisers), each of which determinations shall be delivered to the purchasing and selling parties. If the two appraisals differ by **10% or less** of the higher appraisal, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the average of such two appraisals. If the two appraisals differ by **more than 10%** of the higher appraisal, the two appraisers shall, within **10 days** after delivery to the purchasing and selling parties of the second to be delivered of the two appraisals, appoint a third qualified appraiser who shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder within **30 days** following such third appraiser's appointment. In such event, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the middle appraisal of the three appraisals. If the first two appraisers are unable to agree upon a third appraiser within such **10 day** period, then any party may petition any court of competent jurisdiction to appoint the third appraiser (the first such valid petition filed to be the one effective for such purpose).

**(iv)**    If either the purchasing party or parties, on the one hand, *or* the selling party, on the other hand, shall fail to timely appoint its appraiser, or if the appraisal prepared by either party's designated appraiser shall not be provided to the other party within the applicable time period set forth in Section 5.4(g)(iii) above, then such defaulting party or parties shall be deemed to have forfeited its or their right to an appraisal and the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the appraisal of the appraiser appointed by the other party or parties, as the case may be.

**(h)**    For all purposes of this Resolution, the term **"Prime Rate"** with respect to any period shall mean the average base rate on corporate loans posted by at least **75%** of the **30** largest banks in the United States as being in effect during such period, as published in *The Wall Street Journal* or reported by any reliable internet-based service (or such reasonably comparable average interest rate as may be readily available if such average interest rate is not readily available in *The Wall Street Journal* or on any such internet-based service), as such average interest rate may change from time to time during such period.

**5.5    Death, Incompetency, Etc. of a Shareholder; Gifts; Transfers To Affiliates**

**(a)**    In the event of the death, bankruptcy or adjudication of incapacity or incompetence of a Shareholder, the personal representative, heirs, legatees and devisees of the Shareholder, as the case may be, shall have all of the rights of an assignee and Shareholder with respect to the Shares transferred thereby to such successor-in-interest (*subject, however,* to the Share purchase provisions of any applicable employment or engagement agreement, if any, between the Shareholder and the Company and/or any of the Company's subsidiaries). In all of the above cases, the successor-in-interest to the Shareholder shall not have any right to demand any payment or compensation with respect to the Shares by reason of any diminution or asserted diminution in value, or other damages or losses, by reason of any loss of voting rights or restrictions on Transfer with respect to such Shares. In such event, such successor-in-interest of any such Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares. In such event, the successor-in-interest shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the successor-in-interest of the provisions of this Resolution as a "Shareholder" for purposes thereof.

**(b)**   With the prior consent of the Board of Directors, which consent shall not be unreasonably withheld, conditioned, or delayed, any Shareholder may Transfer all or any part of such Shareholder's Shares to the Company and/or any subsidiary of the Company, to another Shareholder of the Company and/or any subsidiary of the Company at such time, or to an Affiliate of the transferring Shareholder if the proposed transferee is willing to accept such Transfer. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Resolution with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Resolution as a "Shareholder" for purposes thereof.

**ARTICLE
6**

**GENERAL**

**6.1    Amendment and Termination**

**(a)**   *Except* as provided in Section 6.1(b) below, this Resolution may be modified or amended from time to time only in accordance with the terms and conditions set forth in a written resolution adopted by the holders of at least **80%** of the voting Common Shares of the Company at such time (*and, thus, excluding* the Class B Nonvoting Preferred Shares).

**(b)**   In the event that the Company and/or any subsidiary of the Company shall issue additional Shares or other equity interests (**"New Shares"**) for the reasons set forth in Section 2.3(a) (whether or not such New Shares will be sold and issued to a Person who is already then a Shareholder of the Company and/or any subsidiary of the Company, or to any Affiliate of any such Person), the Board of Directors of the Company may, in good faith and without the vote of any of the Shareholders, amend this Resolution and the Governing Instruments of the Company and/or any of the Subsidiaries to such extent as is reasonably necessary or appropriate *(i)* to facilitate and provide for the issuance of such New Shares and the implementation of the rights and privileges to which the holders of such New Shares are entitled, *(ii)* to provide for the inclusion of such New Shares and their holders in the various definitions, descriptions, and concepts regarding Shares, Shareholders, Shareholders, Classes of Shares, Classes of Shareholders, Percentage Interests, meetings, management, and similarly general definitions, descriptions, and concepts, *and/or (iii)* to provide for the adoption and execution of this Resolution (as amended) by the holders of such New Shares; *provided, however,* any other provision of this Resolution which might be construed to the contrary, any amendment of the provisions of Section E(1)(b) of this Resolution pursuant to this Section 6.1(b) will only be permitted if such amendment still empowers any Shareholder who holds **15%** or more of the issued and outstanding Shares of the Company in the aggregate (*other than and excluding* any Class B Nonvoting Preferred Shares) to elect or appoint at least one Director of the Company *unless and until* a Liquidity Event occurs.

**6.2    Rules of Usage**

The following rules of usage shall apply to this Resolution, unless otherwise required by the context or unless otherwise defined therein:

**(a)**   Except as otherwise expressly provided, the use of any gender in this Resolution shall include all other genders, the singular shall include the plural, and the plural shall include the singular, as the context may require.

**(b)**   Except as otherwise expressly provided, references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits in or to this Resolution. Any annexes, appendices, schedules, and exhibits to this Resolution are incorporated into this Resolution by reference at the point where first mentioned and are expressly made a part of this Resolution, and any or all of such annexes, appendices, schedules, attachments, and exhibits to this Resolution may be bound separate from, or otherwise separated from, the other portions of this Resolution for reasons of convenience or otherwise without affecting the validity of this Resolution or the treatment of any such annexes, appendices, schedules, attachments, or exhibits as being a part of this Resolution.

**(c)**   The captions, headings, subheadings, indices, and table of contents used in this Resolution are solely for convenience of reference and shall not constitute a part of this Resolution or affect in any way the meaning, interpretation, construction or effect of any provision of this Resolution.

**(d)**   Except as otherwise expressly provided, reference to any agreement means such agreement as amended, modified, extended or supplemented from time to time in accordance with the applicable provisions thereof.

**(e)**   Except as otherwise expressly provided, references to any law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement thereof.

**(f)**    When used in this Resolution, words such as "hereunder", "hereto", "hereof" and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Resolution and not to any particular article, section, subsection, paragraph or clause hereof.

**(g)**    References to "including" means including without limiting the generality of any description preceding such term and, thus, the rule of *ejusdem generis* shall not be applicable with respect to this Resolution.

**(h)**    Except as otherwise expressly provided or clearly indicated by context, reference herein to "days," "months," "quarters," or "years" means calendar days, calendar months, calendar quarters, or calendar years.

*[End of General Terms and Conditions and Rights Designation Resolution]*

CASE NO. _____

# Exhibit B
(Shareholder Agreement)

# SHAREHOLDERS AGREEMENT

*Regarding*

# COOL PETROLEUM HOLDINGS LIMITED

*Effective Date: December 30, 2011*

# TABLE OF CONTENTS

*Shareholders Agreement of Cool Petroleum Holdings Limited*

## INITIAL PORTION TERMS AND CONDITIONS                                    Page

**A.   PARTIES** ....................................................................................................... 1
(1)   The Company ............................................................................................ 1
(2)   Blue Equity ............................................................................................... 1
(3)   Cool Corp. ................................................................................................ 1
(4)   Issa ........................................................................................................... 1
(5)   Hendrick .................................................................................................... 1
(6)   Kennedy .................................................................................................... 1
(7)   Luminus .................................................................................................... 1
(8)   CPMIC ...................................................................................................... 1
(9)   Davis ......................................................................................................... 1
(10)  CIHL ......................................................................................................... 1

**B.   THIS AGREEMENT** ......................................................................................... 2
(1)   Agreement; Effective Date ....................................................................... 2
(2)   Two Portions of Agreement ...................................................................... 2

**C.   BUSINESS** ..................................................................................................... 2
(1)   Business .................................................................................................... 2

**D.   CURRENT SHARES OF THE COMPANY** ...................................................... 2
(1)   Classes of Shares .................................................................................... 2
(2)   Restrictions on Transfer ........................................................................... 3
(3)   Additional Capital ..................................................................................... 3

**E.   DISTRIBUTIONS** ............................................................................................ 3
(1)   Distributions of Net Cash Flow Until Class B Base Payback Is Achieved ............ 3
(2)   Distributions of Net Cash Flow After Class B Base Payback Is Achieved and Until Class A Base Payback Is Achieved ....... 3
(3)   Distributions of Net Cash Flow After Both Class B Base Payback And Class A Base Payback Are Achieved And Until Both Class A Return Payback and Class B Return Payback Are Achieved ................. 4
(4)   Distributions of Net Cash Flow After Both Class A Return Payback and Class B Return Payback Are Achieved ................. 5
(5)   Distributions of Net Proceeds From a Liquidity Event Until Class A Base Payback Is Achieved ............................................. 5
(6)   Distributions of Net Proceeds From a Liquidity Event After Class A Base Payback Is Achieved and Until Class B Base Payback Is Achieved ............................................................ 5
(7)   Distributions of Net Proceeds From a Liquidity Event After Both Class A Base Payback and Class B Base Payback Are Achieved and Until Both Class A Return Payback And Class B Return Payback Are Achieved ........................ 5
(8)   Distributions of Net Proceeds From a Liquidity Event After Both Class A Return Payback and Class B Return Payback Are Achieved ................................................ 6
(9)   Definition of Class A Base Payback ......................................................... 6
(10)  Definition of Class B Base Payback ......................................................... 6
(11)  Definition of Class A Return Payback ...................................................... 7
(12)  Definition of Class A Outstanding Balance .............................................. 7
(13)  Definition of Class B Return Payback ...................................................... 7
(14)  Definition of Class B Outstanding Balance .............................................. 7
(15)  Conversion of Class A Preferred Shares to Common Shares Upon a Liquidity Event ........................ 7
(16)  General Provisions Regarding Distributions ............................................. 7

**F.   MANAGEMENT** .............................................................................................. 7
(1)   Board of Directors .................................................................................... 7
(2)   Subsidiary Board of Directors .................................................................. 10
(3)   No Authority for Shareholders to Manage ................................................ 10
(4)   Officers .................................................................................................... 10
(5)   Management In Accordance With Approved Budgets ............................... 10

**G.   SHARED INFORMATION AND SERVICES** ................................................... 11
(1)   Shared Information ................................................................................... 11
(2)   Shared Services Agreement ..................................................................... 11

H.    INITIAL ADDRESSES FOR NOTICES ................................................................................................... 11

I.    APPLICABILITY AND SCOPE OF RESTRICTED COMPETITION AND RESTRICTED SOLICITATION COVENANTS ........ 13
      (1)   Cool Corp Restricted Parties ......................................................................................................... 13
      (2)   Blue Petroholdings Restricted Parties ........................................................................................... 13
      (3)   Cool Corp Restricted Competition Period and Cool Corp Restricted Solicitation Period ............... 14
      (4)   Blue Petroholdings Restricted Competition Period and Blue Petroholdings Restricted Solicitation Period ........ 14
      (5)   Restricted Area ............................................................................................................................ 14
      (6)   Cool Corp Permitted Activities ...................................................................................................... 14
      (7)   Blue Petroholdings Permitted Activities ........................................................................................ 14

## GENERAL TERMS AND CONDITIONS  Page

1 DEFINITIONS ............................................................................................................................................ 15
      1.1   Certain Definitions ....................................................................................................................... 15
      1.2   Accounting Terms ......................................................................................................................... 17

2 NAME AND OFFICE .................................................................................................................................. 17
      2.1   Name ........................................................................................................................................... 17
      2.2   Assumed Name Certificates .......................................................................................................... 17
      2.3   Registration as a Foreign Limited Liability Company in Other Jurisdictions ................................... 17
      2.4   Principal Office ............................................................................................................................. 17

3 PURPOSES AND TERM ............................................................................................................................. 18
      3.1   Purposes ....................................................................................................................................... 18
      3.2   Company's Power .......................................................................................................................... 18

4 CAPITAL ................................................................................................................................................... 18
      4.1   No Liability of Shareholders .......................................................................................................... 18
      4.2   Loans ........................................................................................................................................... 18
      4.3   Percentage Interest Definition ....................................................................................................... 18
      4.4   Additional Capital Contributions ................................................................................................... 19
      4.5   No Interest on Capital Contributions ............................................................................................. 20

5 ACCOUNTING ........................................................................................................................................... 20
      5.1   Books and Records ....................................................................................................................... 20
      5.2   Fiscal Year ................................................................................................................................... 20
      5.3   Reports ........................................................................................................................................ 20
      5.4   Shareholder's Request for Additional Information .......................................................................... 20
      5.5   Accounting ................................................................................................................................... 20

6 BANK AND OTHER DEPOSITORY ACCOUNTS ............................................................................................ 21
      6.1   Bank and Other Depository Accounts ............................................................................................ 21

7 DISTRIBUTIONS ........................................................................................................................................ 21
      7.1   Distributions of Net Cash Flow and Net Proceeds From Liquidity Events ....................................... 21

8 MANAGEMENT .......................................................................................................................................... 21
      8.1   Management In General ................................................................................................................. 21
      8.2   Number, Election and Term of Directors ....................................................................................... 22
      8.3   Removal and Resignation of Directors; Vacancies ......................................................................... 22
      8.4   Meetings of the Board of Directors; Quorum and Voting Requirements ......................................... 22
      8.5   Committees ................................................................................................................................... 23
      8.6   Approved Budgets ......................................................................................................................... 23
      8.7   Meetings of the Shareholders ........................................................................................................ 24
      8.8   Participation in Meetings Through Electronic Means; Proxies ........................................................ 25
      8.9   Action by Written Consent ............................................................................................................. 25
      8.10  Officers and Chairperson(s) of the Board ...................................................................................... 25
      8.11  Standard of Care of Directors and Officers; Disclaimers and Exculpations ................................... 27
      8.12  Indemnification of Directors, Officers, and Shareholders .............................................................. 28
      8.13  Confidentiality and Nondisparagement Covenants ......................................................................... 29
      8.14  Key Man Life and Disability Insurance .......................................................................................... 30
      8.15  Effect of Equity Issuances Pursuant to Section 4.4 ....................................................................... 30
      8.16  Restricted Competition and Restricted Solicitation Covenants ....................................................... 30

**9 WITHDRAWAL, ASSIGNMENT AND ADDITION OF SHAREHOLDERS** ................................................................ 33
   9.1   Assignment of Shares ................................................................................................................................ 33
   9.2   Tag Along and Drag Along Rights ............................................................................................................ 33
   9.3   Voluntary Transfers By Certain Minority Common Shareholders ............................................................. 33
   9.4   Involuntary Transfers ............................................................................................................................... 35
   9.5   Death, Incompetency, Etc. of a Shareholder; Gifts; Transfers To Affiliates ............................................. 37
   9.6   Admission of New Shareholder ................................................................................................................. 38

**10 DURATION, TERMINATION, ARBITRATION, AND REMEDIES** .................................................................... 38
   10.1   Duration and Termination ....................................................................................................................... 38
   10.2   Automatic Termination ............................................................................................................................ 38
   10.3   Rights and Remedies .............................................................................................................................. 38
   10.4   Alternative Dispute Resolution Procedures ............................................................................................ 38

**11 GENERAL** ...................................................................................................................................................... 40
   11.1   Ratification and Incorporation By Reference of ROFO/ROFR Options ..................................................... 40
   11.2   Notices ................................................................................................................................................... 40
   11.3   Amendment and Termination .................................................................................................................. 41
   11.4   Governing Law; Jurisdiction .................................................................................................................... 41
   11.5   Entire Agreement ................................................................................................................................... 41
   11.6   Controlling Agreement ............................................................................................................................ 41
   11.7   No Partnership or Agency ....................................................................................................................... 42
   11.8   No Waiver ............................................................................................................................................... 42
   11.9   Binding Agreement; Successors and Assigns ......................................................................................... 42
   11.10  Execution in Counterparts; Photocopies or Faxed, Scanned, or Emailed Copies. ................................... 42
   11.11  Severability ........................................................................................................................................... 42
   11.12  Further Assurances ............................................................................................................................... 42
   11.13  Rules of Usage ...................................................................................................................................... 42
   11.14  Waiver of Right of Partition .................................................................................................................... 43
   11.15  Legend on Stock Certificates ................................................................................................................. 43

**12 REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PARTIES** ............................................... 43
   12.1   Representations, Warranties and Covenants of the Shareholders ............................................................ 43

# INDEX OF DEFINED TERMS

*Shareholders Agreement of Cool Petroleum Holdings Limited*

Each of the following terms is defined at the page of this Agreement so indicated:

ADR ...................................................................39
Affiliate ..............................................................15
Agreement ..........................................................2
Alternative Dispute Resolution Provisions..................38
Amended Proposed Budget.....................................24
Applicable Amount ................................................36
Appraised Value ...................................................36
Approved Budget ..................................................24
Arbitratable Matter ...............................................38
Blue .....................................................................7
Blue Back-Office Services .......................................16
Blue Equity ...........................................................1
Blue Equity Fee .....................................................16
Blue Petroholdings Permitted Activities......................14
Blue Petroholdings Restricted Competition Period .......14
Blue Petroholdings Restricted Parties .......................13
Blue Petroholdings Restricted Solicitation Period.........14
Board of Directors .................................................21
Budgeted Cash Reserve..........................................23
Budgeting Team ...................................................23
Business................................................................2
Businesses/Activities.............................................28
CIHL .....................................................................1
Class A Base Payback ..............................................6
Class A Outstanding Balance ....................................7
Class A Preferential Remaining Net Cash Flow .............3
Class A Preferred Directors ......................................7
Class A Preferred Share ...........................................2
Class A Preferred Shareholder ..................................1
Class A Preferred Shareholders .................................1
Class A Preferred Shares ..........................................2
Class A Return Component ........................................7
Class A Return of Investment Amounts .......................6
Class A Return Payback ............................................7
Class B Base Payback ..............................................6
Class B Nonvoting Preferred Share ............................2
Class B Nonvoting Preferred Shares ...........................2
Class B Outstanding Balance ....................................7
Class B Preferred Shareholder ..................................1
Class B Preferred Shareholders .................................1
Class B Return Component ........................................7
Class B Return Payback ............................................7
Class of Shareholders............................................15
Class of Shares ....................................................15
Classes of Shareholders.........................................15
Classes of Shares .................................................15
Common Directors ..................................................7
Common Share ......................................................2
Common Shareholder ..............................................1
Common Shareholders ............................................1
Common Shares .....................................................2
Company ...............................................................1
Confidential Information .........................................29
Contemporaneously Agreed Price ............................36
control ................................................................15
controlled by........................................................15
Cool Corp ..............................................................1
Cool Corp Permitted Activities ................................14
Cool Corp Restricted Competition Period ...................13
Cool Corp Restricted Parties ...................................13
Cool Corp Restricted Solicitation Period ....................13
Cool Oasis .............................................................1
CPMIC ...................................................................1
CPMIC Back-Office Services .....................................16
CPMIC Fee ............................................................16
CPML .....................................................................1
Davis .....................................................................1
Determination Date ...............................................36
Director .................................................................7
Directors ...............................................................7
Disabled ..............................................................22
Dispute ...............................................................38
Drag-Along Rights .................................................33
Effective Date.........................................................2
Fiscal Year ...........................................................20
full meeting of the Shareholders ..............................25
General Terms and Conditions ...................................2
Germane Opportunity ............................................28
Governing Instruments ...........................................15
Hendrick ................................................................1
IFRS ....................................................................17
Initial Address ......................................................11
Initial Portion .........................................................2
IPO .......................................................................5
Issa .......................................................................1
Joint Consent Matter ...............................................7
Kennedy .................................................................1
Liability ...............................................................28
Liquidity Event .......................................................5
LPG .......................................................................2
Luminus .................................................................1
Majority-in-Interest ...............................................15
MZ Holdings ...........................................................1
MZ Shared Services Agreement ...............................16
Net Cash Flow ......................................................15
Net Proceeds ........................................................16
New Shares ..........................................................41
Notice ..................................................................40
Notices ................................................................40
Offer ...................................................................33
Other Common Shareholders ...................................34
Other Shareholders ...............................................35
Parties ...................................................................1
Party .....................................................................1
Percentage Interest ...............................................18
Person .................................................................17
Petro Products ........................................................2
Prime Rate ...........................................................37
Proposed Budget ...................................................23
Proposed Business Plan..........................................23
Proposed Financial Budget......................................23
Reffreger ...............................................................7
Rejection Notice ....................................................24
Related Party ........................................................28
Restricted Area .....................................................14
Roth ......................................................................7
Sales Notice .........................................................34
Selling Minority Shareholder ...................................33

Selling Shareholder(s) .......................................................33
Share Purchase Agreement...............................................40
Shared LPG Activities ........................................................2
Shareholder .........................................................................1
Shareholders .......................................................................1
Shares .................................................................................2
Shares To Be Transferred.................................................33
Significant Contract..........................................................10
Tag-Along Rights .............................................................33

Tag-Drag Shareholder......................................................33
Tag-Drag Shares...............................................................33
Tax ....................................................................................17
Tax Return ........................................................................17
Taxes .................................................................................17
Transfer .............................................................................33
Transferring Shareholder..................................................35
under common control with .............................................15

## SHAREHOLDERS AGREEMENT
## COOL PETROLEUM HOLDINGS LIMITED

**A.   PARTIES**

The parties to this Agreement (collectively, the **"Parties"** and each individually, a **"Party"**) are as follows:

**(1)**   The **"Company"** is:

COOL PETROLEUM HOLDINGS LIMITED
Pointe Seraphine, P.O. Box 195
Castries, St. Lucia
(The Company is a St. Lucia International Business Company)

**(2)**   **"Blue Equity"** is the following or its designee:

BLUE EQUITY PETROHOLDINGS, LTD.
BESPOKE Corporate & Fiduciary Services Ltd.
Saint Lucia 1st Floor Financial Centre
No. 1 Bridge Street
Castries, St. Lucia W.I.
(Blue Equity is a St. Lucia International Business Company)

**(3)**   **"Cool Corp"** is: :

COOL CORP. LIMITED
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
(Cool Corp is a Cayman Islands incorporated company)

**(4)**   **"Issa"** is:

JOSEPH ISSA
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
(Issa is an individual residing in Ocho Rios, Jamaica)

**(5)**   **"Hendrick"** is: :

COLIN HENDRICK

(Hendrick is an individual residing in Kingston, Jamaica)

**(6)**   **"Kennedy"** is:

GWEN KENNEDY

(Kennedy is an individual residing in San Clemente, California)

**(7)**   **"Luminus"** is: :

LUMINUS CAPITAL PARTNERS LIMITED
c/o Financial & Corporate Services Ltd.
1st Floor, Bourbon House
Bourbon Street
P.O. Box 1695
Castries, Saint Lucia
(Luminus is a St. Lucia International Business Company)

**(8)**   **"CPMIC" "** is: :

CARIBBEAN PROPERTY MANAGERS
INTERNATIONAL CORP
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
(CPMIC is a Panamanian corporation)

**(9)**   **"Davis"** is:

RODNEY DAVIS

(Davis is an individual residing in Kingston, Jamaica)

**(10)**   **"CIHL"** is: :

COOL INTERNATIONAL HOLDINGS LIMITED
c/o Trident Trust Company (BVI) Limited
Trident Chambers
PO Box 146
Road Town, Tortola, BVI
(CIHL is a British Virgin Islands incorporated company)

Blue Equity, Luminus, CPMIC, CIHL, and any other Persons subsequently holding Class A Preferred Shares, Class B Nonvoting Preferred Shares, or Common Shares of the Company, are hereinafter sometimes referred to collectively as the **"Shareholders"** and each individually as a **"Shareholder."** Blue Equity, Luminus, CIHL, and any other Persons subsequently holding Common Shares of the Company, are sometimes referred to collectively as the **"Common Shareholders"** and each individually as a **"Common Shareholder."** Blue Equity and any other Persons subsequently holding Class A Preferred Shares of the Company are sometimes referred to collectively as the **"Class A Preferred Shareholders"** and each individually as a **"Class A Preferred Shareholder."** CPMIC and any other Persons subsequently holding Class B Nonvoting Preferred Shares of the Company are sometimes referred to collectively as the **"Class B Preferred Shareholders"** and each individually as a **"Class B Preferred Shareholder."** Issa has beneficial control of Cool Corp, CIHL, CPMIC, **Cool Oasis Limited ("Cool Oasis")**, a Jamaican incorporated company, **MZ Holdings Limited**, a Jamaican company (**"MZ Holdings"**), **Caribbean Property Management Limited**, a Jamaican company (**"CPML"**) each of which directly or indirectly (through one or more Affiliates) engages in the Business (as hereinafter defined). Issa, Davis, Hendrick, and Kennedy are the sole shareholders of CIHL.

## B.  THIS AGREEMENT

**(1)  AGREEMENT; EFFECTIVE DATE**

This **Shareholders Agreement** (**"Agreement"**) is entered into by the Parties, effective as of **December 30, 2011** (the **"Effective Date"**).

**(2)  TWO PORTIONS OF AGREEMENT**

The text of this Agreement is divided into two parts: *(a)* this initial portion (Pages 1 through 14) which contains sections designated initially with letters (A, B, C, etc.)(the **"Initial Portion"**), *and (b)* the portion of this Agreement immediately following this Initial Portion, entitled and referred to as the **"General Terms and Conditions"** (Pages 15 Through 44), which contains Sections thereof initially designated with numbers (1, 2, 3, etc.). In the event of a conflict between any of the terms and conditions set forth in this Initial Portion of this Agreement and any of the General Terms and Conditions, the terms and conditions set forth in this Initial Portion of this Agreement shall govern.

## C.  BUSINESS

**(1)  BUSINESS**

The **"Business"** is the business carried on by the Company and/or the Company's subsidiaries of *(i)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to petroleum (excluding liquid petroleum gases (**"LPG"**), fuels, bio-fuels, lubricants, and related products and activities (collectively, **"Petro Products"**) within, to, in, or from Jamaica, through retail, wholesale, commercial, and/or any other channels, *(ii)* selling, distributing, marketing, and/or exchanging from retail outlets located at or adjacent to the retail fuel stations owned, operated, controlled, licensed, or franchised by the Company and/or its Affiliates, empty, partially empty, or already filled LPG cylinders, canisters, bottles, and/or other such small LPG containers and/or selling from retail outlets LPG motor vehicle conversion kits and related equipment (collectively, the **"Shared LPG Activities",** and *(iii)* selling, distributing, marketing, exporting, importing, and otherwise dealing in and with respect to grocery, convenience, sundry, and/or other consumer products to and through the gas station and/or convenience store retail channels owned, controlled, or otherwise managed or affiliated as a franchisee or otherwise by or with, the Company and/or the Company's subsidiaries, or to or through the wholesale, commercial, or other channels generally used by the Company and/or the Company's subsidiaries, *and (iv)* internet activities and other activities reasonably related to the foregoing. For the avoidance of doubt, nothing in clause (iii) or clause (iv) of the foregoing definition of the term "Business" shall be construed as restricting in any way the right of any Party or any Party's Related Party or Affiliate to sell, distribute, market, export, import, and otherwise deal in and with respect to grocery, convenience, sundry, and/or other consumer products through any retail, wholesale, commercial, and/or other channel (but, in such regard, the term "grocery, convenience, sundry, and/or other consumer products" shall not be construed as including any Petro Products or Shared LPG Activities).

## D.  CURRENT SHARES OF THE COMPANY

**(1)  CLASSES OF SHARES**

The issued and outstanding equity interests of the Company are divided into shares and currently consist of **three (3)** classes of shares (collectively, the **"Shares"**) as follows:

**(a)    10 Class B Nonvoting Preferred Shares** (collectively, the **"Class B Nonvoting Preferred Shares"** and each individually a **"Class B Nonvoting Preferred Share"**), all of which Class B Nonvoting Preferred Shares are currently owned by CPMIC. The Class B Nonvoting Shares are nonvoting shares of the Company and are not convertible into Common Shares.

**(b)    500 Class A Preferred Shares** (collectively, the **"Class A Preferred Shares"** and each individually a **"Class A Preferred Share"**), which Class A Preferred Shares are currently owned by the following persons as follows:

| Class A Preferred Shareholder | Number of Class A Preferred Shares Owned |
|---|---|
| Blue Equity | 500 |

The Class A Preferred Shares are convertible into Common Shares upon a Liquidity Event as more fully set out in Section E below and under the Governing Instruments of the Company. The Class A Preferred Shares shall be voting shares of the Company.

**(c)    10,000 Common Shares** (collectively, the **"Common Shares"** and each individually a **"Common Share"**), which Common Shares are currently owned by the following Persons as

follows:

| Common Shareholder | Number of Common Shares Owned |
|---|---|
| CIHL | 5,195 |
| Blue Equity | 4,355 |
| Luminus | 450 |

In addition, by separate agreement, *(i)* Blue Equity has agreed to transfer up to another 150 Common Shares to Luminus depending upon the satisfaction of certain contingencies, and *(ii)* Blue Equity has control of all voting rights as to the 450 Common Shares initially issued to Luminus and will have voting rights as to any additional Common Shares transferred by Blue Equity to Luminus.

**(2) RESTRICTIONS ON TRANSFER**

The Class A Preferred Shares, Class B Nonvoting Preferred Shares, and Common Shares are subject to various options and restrictions on Transfer as set forth in Article 9.

**(3) ADDITIONAL CAPITAL**

Subject to the preemptive rights and other restrictions and limitations provided for under Section 4.4 of the General Terms and Conditions, additional capital may be raised by the Board of Directors at any time in exchange for the issuance of such additional Shares or other equity interests as the Board of Directors may deem advisable. Except as required pursuant to any Shareholder's exercise of such Shareholder's preemptive rights under Section 4.4 of the General Terms and Conditions, or required under any separate written agreement entered into by such Shareholder, no Shareholder of the Company shall be obligated to contribute to the Company any additional capital at any time, nor shall any Shareholder be obligated to loan the Company any funds at any time.

## E.  DISTRIBUTIONS

**(1) DISTRIBUTIONS OF NET CASH FLOW UNTIL CLASS B BASE PAYBACK IS ACHIEVED**

Until Class B Base Payback (as hereinafter defined) is achieved, 100% of the Net Cash Flow of the Company for each Fiscal Year of the Company shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each holder of the Class B Nonvoting Preferred Shares) in quarterly installments within 30 days following the end of each Fiscal Year during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter). Once Class B Base Payback has been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section E(1) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year.

**(2) DISTRIBUTIONS OF NET CASH FLOW AFTER CLASS B BASE PAYBACK IS ACHIEVED AND UNTIL CLASS A BASE PAYBACK IS ACHIEVED**

After Class B Base Payback is achieved and until Class A Base Payback (as hereinafter defined) is achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Section E(1) above in order to achieve Class B Payback during such Fiscal Year, if applicable) (the **"Class A Preferential Remaining Net Cash Flow"**) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within 30 days following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and in the following order of priority. Should Class A Base Payback be achieved due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter, no further distributions of Net Cash Flow pursuant to this Section E(2) shall be required or made with respect to such Fiscal Quarter or with respect to any subsequent Fiscal Quarter or Fiscal Year.

**(a)**    *First,* 85.9091% to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **4.0909%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **10%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(a) with respect to such Fiscal Year equal to *the lesser of (x)* **$1,000,000** USD, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(b)**    *Second,* **81.1364%** to the holders of the Class A Preferred Shares (on a prorata basis in

accordance with the number of Class A Preferred Shares owned by each), **3.8636%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **15%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(b) and Section E(2)(a) above with respect to such Fiscal Year equal to *the lesser of (x)* **$2,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(c)**     *Third,* **76.3637%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **3.6363%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **20%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(c) and Sections E(2)(a) and E(2)(b)above with respect to such Fiscal Year equal to *the lesser of (x)* **$3,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(d)**     *Fourth,* **66.8182%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **3.1818%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **30%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), *until* a cumulative aggregate amount has been distributed pursuant to this Section E(2)(d) and Sections E(2)(a), E(2)(b), and E(2)(c) above with respect to such Fiscal Year equal to *the lesser of (x)* **$4,000,000 USD**, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(e)**     *Fifth,* **62.0455%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), **2.9545%** to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), and **35%** to the holders of the Common Shares (on a prorata basis in accordance with the number of Common Shares owned by each), until a cumulative aggregate amount has been distributed pursuant to this Section E(2)(e) and Sections E(2)(a), E(2)(b), E(2)(c), and E(2)(d) above with respect to such Fiscal Year equal to *the lesser of (x)* the amount necessary to achieve Class A Base Payback, *or (y)* **100%** of the Class A Preferential Remaining Net Cash Flow of the Company for such Fiscal Year through the end of the subject Fiscal Quarter.

**(3)   DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS B BASE PAYBACK AND CLASS A BASE PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**

After both Class B Base Payback and Class A Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (as hereinafter defined) are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections E(1) and E(2) above in order to achieve Class B Base Payback and/or Class A Base Payback during such Fiscal Year, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within 30 days following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter) and on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: *(i)* with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each) and **4.5454%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each). Once Class A Return Payback and Class B Return Payback have both been achieved (which may occur due to a partial distribution of Net Cash Flow with respect to a particular Fiscal Quarter), no further distributions of Net Cash Flow pursuant to this Section E(3) shall be required or made with respect to such Fiscal Quarter or with respect to any

subsequent Fiscal Quarter or Fiscal Year.

**(4) DISTRIBUTIONS OF NET CASH FLOW AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**

After both Class A Return Payback and Class B Return Payback are achieved, the remaining balance, if any, of the Net Cash Flow of the Company for each Fiscal Year of the Company (after satisfaction of the amounts, if any, required to be distributed under Sections E(1), E(2), and E(3) above in order to achieve Class A Return Payback and Class B Return Payback during such Fiscal Year, if applicable) shall be authorized, if necessary, and paid out, as a dividend, distribution, or otherwise, in quarterly installments within 30 days following the end of each Fiscal Quarter during such Fiscal Year (which installments will vary depending on the amount of Net Cash Flow of the Company, if any, for each Fiscal Quarter), in the following manner, as applicable:

**(a)** If the Class A Preferred Shares _have not been_ converted into Common Shares prior to the time of such distribution, then **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with their relative holdings of Class A Preferred Shares).

**(b)** If the Class A Preferred Shares _have been_ converted into Common Shares prior to the time of such distribution, then **100%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares as provided under Section E(15) below.

**(5) DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT UNTIL CLASS A BASE PAYBACK IS ACHIEVED**

Until Class A Base Payback is achieved, the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with **(i)** a sale or exchange of all or substantially all of the operating assets of the Company and/or the Company's subsidiaries, **(ii)** a merger or consolidation of the Company, **(iii)** an initial public offering (**"IPO"**) by the Company of any equity interests, **(iv)** any sale or exchange of equity interests in the Company in any transaction as to which the Tag-Along Rights _or_ Drag-Along Rights (as such terms are hereinafter defined) apply, _or_ **(v)** any other liquidating, recapitalization, or other liquidity transaction with respect to the Company which results in payments or distributions of significant cash, notes, tradable securities (without regard to any Rule 144 or other temporary restrictions imposed on the sale of such securities) and/or other readily marketable tangible or intangible property to all Shareholders of the Company (without regard to any temporary restrictions imposed on the sale of such property) (any such transaction described in clauses (i), (ii), (iii), (iv), or (v), as applicable, being hereinafter sometimes referred to as a **"Liquidity Event,"** shall be authorized, if necessary, and distributed or paid, as a dividend, distribution, or otherwise, **95.4546%** to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each), and **4.5454%** to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each). For the purposes of clarity, a Liquidity Event does not include a refinancing of the Bonds existing at the time of execution of this Agreement and/or the issuance of Preference Shares, but any excess proceeds, if any, from any such refinancing shall be taken into account in computing the Net Cash Flow for the Company.

**(6) DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER CLASS A BASE PAYBACK IS ACHIEVED AND UNTIL CLASS B BASE PAYBACK IS ACHIEVED**

After Class A Base Payback is achieved and until Class B Base Payback is achieved, **100%** of the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event after the distributions provided for under Section E(5) above are made shall be authorized, if necessary, and distributed or paid, as a dividend, distribution, or otherwise, to the holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each).

**(7) DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS A BASE PAYBACK AND CLASS B BASE PAYBACK ARE ACHIEVED AND UNTIL BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**

After both Class A Base Payback and Class B Base Payback are achieved and until both Class A Return Payback and Class B Return Payback (as such terms as hereinafter defined) are achieved, the remaining balance, if any, of the Net Proceeds payable or distributable to the equityholders of the Company following or in connection with a Liquidity Event after the distributions provided for under Sections E(5) and E(6) above are made shall be authorized, if necessary, and distributed or paid, as a dividend, distribution, or otherwise, on a prorata basis in accordance with the relative outstanding balances of the Class A Return Component and the Class B Return Component (as such terms are hereinafter defined) at the time of each such distribution, in the following manner: **(i)** with respect to the allocable portion of such distribution in respect of the Class A Return Component, **95.4546%** of such allocable portion shall be distributed to the holders of the Class A Preferred Shares of the Company (on a prorata basis in accordance with the number of Class A Preferred Shares owned by each) and **4.5454%** of such allocable portion shall be distributed to the

holders of the Class B Nonvoting Preferred Shares of the Company (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each), *and (ii)* with respect to the allocable portion of such distribution in respect of the Class B Return Component, **100%** of such allocable portion shall be distributed to the holders of the Class B Nonvoting Preferred Shares (on a prorata basis in accordance with the number of Class B Nonvoting Preferred Shares owned by each).

**(8) DISTRIBUTIONS OF NET PROCEEDS FROM A LIQUIDITY EVENT AFTER BOTH CLASS A RETURN PAYBACK AND CLASS B RETURN PAYBACK ARE ACHIEVED**

After both Class A Return Payback and Class B Return Payback are achieved, then the remaining balance, if any, of the Net Proceeds from any Liquidity Event after the distributions provided for under Sections E(5), E(6), and E(7) above are made shall be distributed in the following manner, as applicable:

**(a)** If the Class A Preferred Shares *have not been* converted into Common Shares prior to the time of such distribution, then **91.434%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), and **8.566%** to the holders of the Class A Preferred Shares (on a prorata basis in accordance with their relative holdings of Class A Preferred Shares).

**(b)** If the Class A Preferred Shares *have been* converted into Common Shares prior to the time of such distribution, then **100%** to the holders of the Common Shares (on a prorata basis in accordance with their relative holdings of Common Shares), determined after taking into account the issuances of Common Shares by the Company upon such conversion of the Class A Preferred Shares as provided under Section E(15) below.

**(9) DEFINITION OF CLASS A BASE PAYBACK**

For all purposes of this Agreement, **"Class A Base Payback"** shall be achieved when both *(A)* the holders of the Class A Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections E(2) and/or E(5) above, equal to *the sum of (i)* **$9,500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class A Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (A)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class A Preferred Shares the amounts provided for under the foregoing clauses (A)(i) and (A)(ii)on a Tax-free basis, *and (B)* the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections E(2) and/or E(5) above, equal to *the sum of (i)* **$500,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (B)(i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (B)(i) and (B)(ii)on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class A Preferred Shares and the Class B Nonvoting Preferred Shares). The amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(i) and/or (B)(i) above (but not the amounts received by the Class A Preferred Shareholders and/or Class B Preferred Shareholders pursuant to clauses (A)(iii) and/or (B)(iii) above) are hereinafter referred to, collectively, as the **"Class A Return of Investment Amounts"**).

**(10) DEFINITION OF CLASS B BASE PAYBACK**

For all purposes of this Agreement, **"Class B Base Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares, collectively, have received a total amount of dividends and/or other distributions of Net Cash Flow from the Company and/or Net Proceeds from a Liquidity Event, in the aggregate on a cumulative basis, pursuant to the provisions of Sections E(1) and/or E(6) above, equal to *the sum of (i)* **$2,000,000.00 USD**, *plus (ii)* such "gross-up" amount equal to the amount of Taxes payable by the holders of the Class B Nonvoting Preferred Shares in respect of the foregoing dividend and other distribution amounts provided for under the preceding clause (i) and any gross-up thereon (the intention being to effectively return to the holders of the Class B Nonvoting Preferred Shares the amounts provided for under the foregoing clauses (i) and (ii) on a Tax-free basis; *provided, however,* that it is the intention of the Parties to reasonably cooperate with each other in attempting to structure arrangements in the most tax efficient manner with respect to the contributions to the capital of the Company by the holders of the Class B Nonvoting Preferred Shares).

| (11) DEFINITION OF CLASS A RETURN PAYBACK | For all purposes of this Agreement, **"Class A Return Payback"** shall be achieved when the holders of the Class A Preferred Shares and Class B Nonvoting Preferred Shares, collectively, shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections E(3) and/or E(7) above, an amount (the **"Class A Return Component"**) equal to an **8%** annual percentage rate of return, compounded annually, on the Class A Outstanding Balance (as hereinafter defined), as the Class A Outstanding Balance may change from time to time. For purposes of computing whether Class A Return Payback has been achieved, only the allocable portion of distributions made pursuant to the provisions of Sections E(3) and E(7) above which are stated to be in respect of the Class A Return Component shall be taken into account (and not the allocable portion of such distributions which are stated to be in respect of the Class B Return Component). |
|---|---|
| (12) DEFINITION OF CLASS A OUTSTANDING BALANCE | For all purposes of this Agreement, the term **"Class A Outstanding Balance"** as of any time shall mean *the sum of (i)* **$10,000,000.00 USD**, *minus (ii)* the total amount received by the holders of the Class A Preferred Shares and/or the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections E(2) and/or E(5) above through such time. |
| (13) DEFINITION OF CLASS B RETURN PAYBACK | For all purposes of this Agreement, **"Class B Return Payback"** shall be achieved when the holders of the Class B Nonvoting Preferred Shares shall have received, in the aggregate on a cumulative basis pursuant to the provisions of Sections E(3) and/or E(7) above, an amount (the **"Class B Return Component"**) equal to an **8%** annual percentage rate of return, compounded annually, on the Class B Outstanding Balance (as hereinafter defined), as the Class B Outstanding Balance may change from time to time. |
| (14) DEFINITION OF CLASS B OUTSTANDING BALANCE | For all purposes of this Agreement, the term **"Class B Outstanding Balance"** as of any time shall mean *the sum of (i)* **$2,000,000.00 USD**, *minus (ii)* the total amount received by the holders of the Class B Nonvoting Preferred Shares, in the aggregate and on a cumulative basis, pursuant to the provisions of Sections E(1) and/or E(6) above through such time. |
| (15) CONVERSION OF CLASS A PREFERRED SHARES TO COMMON SHARES UPON A LIQUIDITY EVENT | Upon *the later to occur of (x)* a Liquidity Event at any time after the achievement of Class A Return Payback or *(y)* the achievement of Class A Return Payback by reason of the receipt by the holders of the Class A Preferred Shares, in the aggregate on a cumulative basis, of Net Proceeds as a result of a Liquidity Event, the Class A Preferred Shares, as a class, shall automatically be converted into **936.84** Common Shares of the Company. |
| (16) GENERAL PROVISIONS REGARDING DISTRIBUTIONS | **(a)**    In determining the moment at which Class A Base Payback, Class B Base Payback, Class A Return Payback, or Class B Return Payback is achieved, distributions of Net Cash Flow available to be made at any time shall be made and taken into account before making and taking into account any distributions of Net Proceeds from Liquidity Events then available to be made.<br><br>**(b)**    If the equity interests distributable as Net Proceeds to the equityholders of the Company as a result of any Liquidity Event involve both control or super-voting shares and non-control, non-voting, or lesser voting shares, then the equity interests receivable in respect of any Common Shares or Class A Preferred Shares then held by Blue Equity (or Blue Equity's successors or assigns) shall first be comprised of the control or super-voting shares to the extent possible before being comprised of any non-control, non-voting, or lesser voting shares.<br><br>**(c)**    When Class B Return Payback is achieved, **(x)** all of the Class B Nonvoting Preferred Shares of the Company shall be conclusively deemed redeemed and retired by the Company, without requirement of any further payment by the Company, **(y)** the share certificate(s) and such instruments of transfer as the Company shall reasonably request shall be promptly executed and delivered to the Company by the holders of the Class B Nonvoting Preferred Shares, *and* **(z)** no further distributions of Net Cash Flow or other amounts shall be required to be made to the holders of the Class B Nonvoting Preferred Shares of the Company in such capacity. |

## F.   MANAGEMENT

| (1) BOARD OF DIRECTORS | Unless and until changed in accordance with the terms, conditions, and limitations of this Agreement or changed in connection with a Liquidity Event, in accordance with and subject to the terms and conditions of Article 8 and other applicable provisions of this Agreement:<br><br>**(a)**    The Company and each of its subsidiaries shall be managed by a Board of Directors. |
|---|---|

**(b)**    The Board of Directors of the Company and each of its subsidiaries shall consist of *(i)* up to **three (3)** Directors who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, Cool Corp (the "**Common Directors**"), *and (ii)* up to **five (5)** Directors who shall be individuals and shall be elected by, and who may be removed or replaced at any time by, Blue Equity (the "**Class A Preferred Directors**"). The Class A Preferred Directors and the Common Directors of the Company and each subsidiary of the Company are hereinafter sometimes referred to collectively as the **"Directors"** and each individually as a **"Director"** of the Company or such subsidiary, as applicable. In addition, the Board of Directors may authorize other persons at any time and from time to time *(i)* to attend and participate, without any voting rights, in meetings of the Board of Directors, *(ii)* to receive any or all notices of meetings or proposed consent resolutions which are sent to the Directors, without any right to consent, approve, or otherwise act with respect to any such proposed consent resolution, *and/or (iii)* to have any or all of the same access to information about the Company and the Company's subsidiaries as the Directors are entitled to have, and the Board of Directors may and revoke or change any such authorization at any time. Such persons shall not be considered to be Directors of the Company or any subsidiary, shall have not voting or consent rights, and shall not be taken into account for purposes of determining any quorum.

**(c)**    The initial Common Directors of the Company and each subsidiary of the Company appointed by the Common Shareholders are as follows:

> **Davis,**
> **Hendrick**, *and*
> **Kennedy**

**(d)**    The initial Class A Preferred Directors and each subsidiary of the Company appointed by the Class A Preferred Shareholder(s) are as follows:

> **Jonathan S. Blue ("Blue"),**
> **David M. Roth ("Roth"),**
> **Terry L. Stapp**
> **John Owsley Cordt Huneke**, *and*
> **Juan Ignacio Reffreger ("Reffreger")**

**(e)**    *Except* with respect to a Joint Consent Matter or as otherwise provided under Section F(1)(f) below, the affirmative vote or written consent of a majority-in-number of the Directors of the Company or any subsidiary of the Company, as the case may be, then in office shall govern with respect to any matter and be the act of the Board of Directors and the Company or such subsidiary of the Company, as applicable. With respect to any **Joint Consent Matter** as to the Company or any subsidiary of the Company, the written consent of both a minimum of the holders of **80%** of the of the Common Shares of the Company or such subsidiary, as applicable, and a majority-in-number of the Class A Preferred Directors of the Company or such subsidiary, as applicable, then in office, acting as a separate group, shall govern and be the act of the Board of Directors and the Company or such subsidiary, as applicable.

**(f)**    Notwithstanding any other provision hereof which might be construed to the contrary, any Class A Preferred Director of the Company or any subsidiary of the Company may require at any time that a matter or issue be submitted to the Shareholders of the Company for decision, in which case the Board of Directors of the Company or such subsidiary, as the case may be, shall not be authorized to decide such matter or issue and any prior decision by such Board of Directors as to such matter or issue shall be rendered null and void *ab initio*. In such event, *except* with respect to a Joint Consent Matter, the affirmative vote or written consent of the holders of a majority of the then issued and outstanding Common Shares and Class A Preferred Shares, in the aggregate (but excluding any and all of the Class B Nonvoting Shares) of the Company or such subsidiary, as the case may be, shall govern with respect to any matter and be the act of the Company or such subsidiary of the Company, as applicable. With respect to any Joint Consent Matter as to the Company or any subsidiary of the Company which is submitted to the Shareholders of the Company or such subsidiary, as the case may be, the written consent of both the holders of no less than 80% of the then issued and outstanding Common Shares, voting as a separate group, and the holders of a majority of the Class A Preferred Shares of the Company, voting as a separate group, shall govern and be the act of the Company or such subsidiary, as applicable. The holders of the Class B Nonvoting Preferred Shares of the Company, in such capacity, shall not have a right to vote on any such matters.

**(g)**    Unless stated to the contrary in this Agreement, any and all actions taken by the Board of

Directors and each class of Directors of the Company and each subsidiary of the Company shall be made in good faith and in a manner reasonably intended by them to enhance equityholder value with respect to the Company.

(h)     For all purposes hereof, each of the following matters shall constitute a **"Joint Consent Matter"** as to the Company or any subsidiary of the Company, as applicable:

(i)     The commingling or co-investing of the funds of the Company or any subsidiary of the Company with those of any other individual or entity other than the Company and/or the Company's subsidiaries (*see* Section 6.1 below).

(ii)     The fixing or changing of the compensation, if any, to be paid the Directors of the Company or any subsidiary of the Company in such Directors' capacities as such (*see* Section 8.1(d) below).

(iii)     Permitting any deviation from the limitations on Related Party transactions which are required under Section 8.11(e) below.

(iv)     The Company or any subsidiary of the Company engaging in any business activity outside the scope of the Business.

(v)     The issuance to employees, contractors, or other Persons, in consideration of services rendered, of any Shares and/or other equity interests, or options, warrants, or securities convertible by the Company and/or any of the Company's subsidiaries and/or the establishment of any employee stock ownership plan or similar employee benefit plan (*provided, however,* that none of Issa, Blue, or Roth may be a participant in such "phantom stock" plan or other such employee benefit plan *and provided further, however,* that if any such plan is established by the Company, Cool Corp on the one hand, and the Class A Directors acting as a separate group, on the other hand, shall each have the right to name the participants as to one-half of the interests authorized under such plan).

(vi)     Any prepayment of the bond indebtedness of the Company and/or the Company's subsidiaries that is not required under the terms and conditions of such bond indebtedness, *other than (A)* by use of the net proceeds received by the Company and/or any of the Company's subsidiaries in respect of a sale of the Rockfort pier, in respect of the issuance of the Class A Preferred Shares, and/or in respect of the issuance of the Class B Nonvoting Preferred Shares, *(B)* in connection with the refinancing or replacement of such bond indebtedness, *and/or (C)* in connection with a Liquidity Event.

(vii)     Any other matter or issue as to which the written consent of both a majority-in-number of the Common Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company or any subsidiary of the Company, as applicable, then in office, acting as a separate group, is specifically and expressly required under this Agreement.

(viii)     The approval of any termination of, reduction or increase in, the Blue Equity Fees and/or the CPMIC Fees (as such terms are defined in Section 1.1(f)) payable by the Company.

(ix)     The change of the name of the Company to any name which contains the word "Blue".

(x)     The change in the definition of "Business."

(xi)     Payment of compensation in excess of **$180,000.00 per** year to any Chief Executive Officer who is not totally independent of, and unaffiliated with, Blue Equity prior to his or her appointment; *provided, however,* that if Blue is the Chief Executive Officer, the payment of *any* compensation to him therefor (other than indirectly by reason of the Blue Equity Fees for the Blue Back-Office Services) shall constitute a Joint Consent Matter. In such regard, the term "compensation" shall not be construed as including any reimbursements or indemnity payments.

(xii)     Any decision not to exercise the Company's right of first refusal under the Share Purchase Agreement with respect to any new Business Opportunity (as defined in the Share Purchase Agreement) as to which a Purchaser Restricted Party (as defined in the Share Purchase Agreement) gives a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company as required under the Share Purchase Agreement, but such decision shall only constitute a Joint Consent Matter if after considering, in good faith, all of the relevant facts and

circumstances at the time, it is reasonably ascertained that the Company would have the financial capability to take and consummate such Business Opportunity without depending on raising additional outside equity funds or incurring any level of additional debt which requires any personal guarantees or which the Board of Directors reasonably determines, in good faith, would be at a level that is not prudent for the Company to incur.

**(2) SUBSIDIARY BOARD OF DIRECTORS**

*Except* to the extent, if any, otherwise agreed to by both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group, the Board of Directors of each subsidiary of the Company, *including, but not limited to,* Cool Petroleum (St. Lucia) Limited, a St. Lucia international business company, and Cool Bio Diesel Limited, a Jamaican limited company, shall be automatically identical in its composition to the composition of the Board of Directors of the Company, as the same may change at any time and from time to time. The Company and its shareholders, Directors, and officers, as applicable, shall cause the Governing Instruments of each subsidiary of the Company to contain such provisions as are necessary to implement the foregoing requirement and as are necessary to require that each subsidiary of the Company operates in a manner subject to the Approved Budgets and otherwise substantially in accordance with the same governing and operating checks, balances, and internal controls as are provided for under this Agreement with respect to the Company (*other than* reflecting the Company as the sole shareholder and/or equityholder of each subsidiary other than any subsidiary which is not 100% owned by the Company or another subsidiary of the Company). If necessary for legal reasons, the Company and its shareholders, Directors, and officers, as applicable, shall cause each subsidiary of the Company to adopt and agree to the terms, conditions, and provisions of this Agreement in writing.

**(3) NO AUTHORITY FOR SHAREHOLDERS TO MANAGE**

Except indirectly through the power of certain Shareholders to elect, remove, and/or replace certain Directors as set forth above, none of the Shareholders, in their capacity as Shareholders, shall have the power or authority to control the actions of, or act on behalf of, the Company and/or any subsidiary of the Company.

**(4) OFFICERS**

Unless and until changed by the Board of Directors, the following shall be the duly authorized officers of the Company and each subsidiary of the Company, and, *subject to* the terms and conditions of this Agreement and *except* as otherwise provided under this Agreement, they shall have such powers, authority, duties, and obligations as are set forth in Section 8.10:

| Office(s) | Name of Officer |
|---|---|
| Chairman, Chief Executive Officer, and Treasurer | Blue |
| Vice Chairman, Chief Legal Officer, and Assistant Secretary | Roth |
| President | [Vacant] |
| Managing Director (With Such Portfolio As the Chairman May Determine) | Whittingham |
| Group CFO | Davis |
| Vice President | Gojman |
| Chief Operating Officer | Hendrick |
| General Counsel | Kennedy |

**(5) MANAGEMENT IN ACCORDANCE WITH APPROVED BUDGETS**

**(a)**   The Directors and officers of the Company and each of the Company's subsidiaries shall use their reasonable efforts in good faith to manage the Company and the Company's subsidiaries substantially in accordance with Approved Budgets (as defined in Section 8.6 of the General Terms and Conditions of this Agreement) and any variances therefrom to the extent deemed advisable from time to time by the Company's Board of Directors, Thus, decisions of the Board of Directors and the officers of the Company and each of the Company's subsidiaries, as well as decisions of any mediator, arbitrator, judge, or jury considering any issue with respect to the Company, the Company's subsidiaries, and/or their operations shall be generally guided by the intention of achieving the results set forth in the Approved Budgets to the extent applicable; *provided, however,* that nothing in this Section F(5) shall be construed as a representation, warranty, or guaranty by any Party to this Agreement that the results of the Approved Budgets will, in fact, be achieved by the Company and/or the Company's subsidiaries, and none shall be construed as limiting the discretion of the Board of Directors of the Company and/or any subsidiary of the Company in any way as to decisions regarding whether to increase the borrowings of the Company and/or any subsidiary or whether to seek additional capital contributions for the benefit

of the Company and/or the Company's subsidiaries.

**(b)** Except to the extent already contemplated in an Approved Budget, any proposed Contract which would obligate the Company and/or any subsidiary of the Company to the expenditure of more than **$100,000.00 USD** within any consecutive **12-month period** (each, a **"Significant Contract"**) shall be presented to the Board of Directors, and be subject to the approval of the Board of Directors of the Company and/or such subsidiary of the Company, before being executed by any officer. Furthermore, unless determined by the Chairman not to be reasonably feasible because of timing or logistics, formal or informal notice of any proposed Significant Contract which is already contemplated in an Approved Budget shall be given to all of the Directors at least **seven (7) days** prior to being executed by any officer.

## G.  SHARED INFORMATION AND SERVICES

**(1)  SHARING OF INFORMATION**

To the fullest extent permitted by applicable law, Cool Corp hereby agrees *(i)* to share, and cause its Affiliates to share, on a timely basis, with the Company and the Company's subsidiaries all material information and data any of them have, obtain, or develop regarding the Business, *and (ii)* to coordinate, and cause its Affiliates to coordinate, pricing and other business decisions and strategies with the Company and the Company's subsidiaries so as not to adversely affect the operations of Cool Corp and the Company and/or the Company's subsidiaries.

**(2)  SHARED SERVICES AGREEMENT**

The Company and/or the Company's subsidiaries, as applicable, and Cool Corp and Cool Corp's Affiliates, as applicable, shall attempt in good faith to negotiate and enter into a written shared services agreement under which synergies and cost savings available between them with respect to their respective Business operations may be realized, it being the intention of the parties to thereby enhance equityholder value with respect to the Company upon a future sale, initial public offering, merger, consolidation, or other such transaction.

## H.  INITIAL ADDRESSES FOR NOTICES

Unless and until changed by any Party, the **"Initial Address"** for each Party for purposes of Section 11.2 of this Agreement shall be the postal address set forth for such Party in Section A above and/or, as applicable as to any other permitted method of transmission, such other contact information as is set forth below as to such Party (*including, but not limited to,* any copy requirements provided for below; *provided, however,* satisfying the copy requirement alone with respect to any Party without also satisfying the primary notice requirement as to such Party shall not constitute effective notice for purposes of this Agreement):

*As To the Company:*

Cool Petroleum Holdings Limited
c/o Blue Equity, LLC
333 East Main Street, Suite 200
Louisville, Kentucky 40202
Attention: Jonathan S. Blue, Chairman

Tel: (502) 589-8181
Fax: (502) 588-7150
Email: jblue@blueequity.com

*With a Copy To:*

David M. Roth
David M. Roth, P.S.C.
2225 Douglass Blvd.
Louisville, Kentucky 40205-1903

Tel: (502) 548-1990
Fax: (502) 451-1805
Email: droth@rothworld.net

### As To Blue Equity:

Blue Equity Petroholdings, Ltd.
c/o Blue Equity, LLC
333 E. Main Street, Suite 200
Louisville, Kentucky 40202
Attention: Jonathan S. Blue, Chairman

Tel: (502) 589-8181
Fax: (502) 588-7150
Email: jblue@blueequity.com

### As To Cool Corp:

Cool Corp. Limited
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI
Attention: Joseph Issa

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

### As To Issa:

Joseph Issa
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

### As To Hendrick:

Colin Hendrick



Tel: (876) 433-8866
Fax: (____) _____
Email: colin.hendrick@gmail.com

### As To Kennedy:

Gwen Kennedy



Tel: (949) 481-0112
Fax: (____) _____
Email: wkcantab@cantab.net

**With a Copy To:**

David M. Roth
David M. Roth, P.S.C.
2225 Douglass Blvd.
Louisville, Kentucky 40205-1903

Tel: (502) 548-1990
Fax: (502) 451-1805
Email: droth@rothworld.net

**As To Luminus:**

Luminus Capital Partners Limited
c/o Financial & Corporate Services Ltd.
1st Floor, Bourbon House
Bourbon Street
P.O. Box 1695
Castries, Saint Lucia
Attention: Steven Whittingham and Mauricio
Gojman, Directors

Tel: (305) 794-7933 & (876) 452-9835
Fax: (____) _____
Email: steven.whittingham@gmail.com and
mgojman@gmail.com

**As To CPMIC:**

Caribbean Property Managers
International Corp
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

**With a Copy To:**

Joseph Issa
2 Graham Street
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

**As To Davis:**

Rodney Davis
████████████████

Tel: (____) _____
Fax: (____) _____
Email: _____

**As To CIHL:**

Cool International Holdings Limited
2 Graham Street,
Guardian Building, 2nd Floor
Ocho Rios, St Ann, Jamaica WI

Tel: (876) 974-8411
Fax: (876) 795-1520
Email: jissa@coolcorp.com

**With a Copy To:**

Gwen Kennedy
████████████████████

Tel: (949) 481-0112
Fax: (____) _____
Email: wkcantab@cantab.net

## I. APPLICABILITY AND SCOPE OF RESTRICTED COMPETITION AND RESTRICTED SOLICITATION COVENANTS

| | | |
|---|---|---|
| **(1)** | **COOL CORP RESTRICTED PARTIES** | For all purposes of this Agreement, the term **"Cool Corp Restricted Parties"** shall mean each and every one of the following Persons: *(i)* Cool Corp, *(ii)* CPMIC, *(iii)* Issa, *(iv)* Hendrick, *(v)* Davis, *(vi)* Kennedy, *(vii)* CIHL, *and (viii)* any Affiliates of any of the foregoing. |
| **(2)** | **BLUE PETROHOLDINGS RESTRICTED PARTIES** | For all purposes of this Agreement, the term **"Blue Petroholdings Restricted Parties"** shall mean each and every one of the following Persons: *(i)* Blue Equity, *(ii)* Luminus, and *(iii)* any Affiliates of any of the foregoing, but only while Blue Equity or an Affiliate of Blue Equity owns an interest in the Company. |
| **(3)** | **COOL CORP RESTRICTED COMPETITION PERIOD AND COOL** | For all purposes of this Agreement, the terms **"Cool Corp Restricted Competition Period"** and **"Cool Corp Restricted Solicitation Period"** shall each mean the period beginning on |

| | | |
|---|---|---|
| | **CORP RESTRICTED SOLICITATION PERIOD** | the Effective Date and ending on *the later of (i)* the **fifth (5th) anniversary** of the Effective Date of this Agreement, or *(ii)* the first date on which none of the Cool Corp Restricted Parties beneficially owns or controls any shares or other securities of the Company. |
| **(4)** | **BLUE PETROHOLDINGS RESTRICTED COMPETITION PERIOD AND BLUE PETROHOLDINGS RESTRICTED SOLICITATION PERIOD** | For all purposes of this Agreement, the terms **"Blue Petroholdings Restricted Competition Period"** and **"Blue Petroholdings Restricted Solicitation Period"** shall each mean the period beginning on the Effective Date and ending on *the later of (i)* the **fifth (5th) anniversary** of the Effective Date of this Agreement, or *(ii)* the first date on which none of the Blue Petroholdings Restricted Parties beneficially owns or controls any shares or other securities of the Company. |
| **(5)** | **RESTRICTED AREA** | For all purposes of this Agreement, the term **"Restricted Area"** shall mean anywhere within Jamaica. |
| **(6)** | **COOL CORP PERMITTED ACTIVITIES** | For all purposes of this Agreement, the term **"Cool Corp Permitted Activities"** shall mean the current activities and operations of Cool Corp and its Affiliates as of the Effective Date of this Agreement; *provided, however,* that any expansion of, or opportunity to expand, the number of stations and/or other facilities owned, licensed, leased, or otherwise operated and/or otherwise dealt in or with respect to by Cool Corp and/or its Affiliates, by acquisition, exchange, lease, license, or otherwise, and any other new Business Opportunity (as defined in the Share Purchase Agreement) with respect to the Jamaica Business (as defined in the Share Purchase Agreement) as to which a Cool Corp Restricted Party is required to give a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company, shall, pursuant to the terms and conditions set forth in Section I(1) of the Share Purchase Agreement, be subject to a right of first refusal option by the Company which, if not exercised by the Company, may be taken by Cool Corp and/or its Affiliates and, if so taken, shall constitute part of the Cool Corp Permitted Activities. |
| **(7)** | **BLUE PETROHOLDINGS PERMITTED ACTIVITIES** | For all purposes of this Agreement, the term **"Blue Petroholdings Permitted Activities"** shall mean any new Business Opportunity (as defined in the Share Purchase Agreement) with respect to the Jamaica Business (as defined in the Share Purchase Agreement) *(i)* as to which a Blue Petroholdings Restricted Party is required to give a Business Opportunity Notice (as defined in the Share Purchase Agreement) to the Company, *(ii)* as to which the right of refusal option provided for under the Share Purchase Agreement is not exercised by the Company, *and (iii)* which is taken by the Blue Petroholdings Restricted Party and/or any of the Affiliates of such Blue Petroholdings Restricted Party. |

*Only General Terms and Conditions, Signature Page, Schedules, Attachments, and Exhibits Follow]*

## GENERAL TERMS AND CONDITIONS

*Shareholders Agreement of Cool Petroleum Holdings Limited*

ARTICLE
1

DEFINITIONS

**1.1    Certain Definitions**

As used in this Agreement, and *unless* the context requires a different meaning:

**(a)**    The term **"Affiliate"** with respect to any Person shall mean *(i)* any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, *(ii)* any shareholder (*except* that if the subject Person is a publicly traded company, only a shareholder who owns more than 5% of the outstanding voting securities of such subject Person), partner, director, board of directors, governor, member, trustee, beneficiary, employee, agent, or relative by blood or marriage, as applicable, of such Person or of any individual, corporation, partnership, limited liability company, trust, or other entity directly, or indirectly through one or more intermediaries or otherwise, controlling, controlled by, or under common control with, such Person, *and/or (iii)* any personal representative, receiver, trustee in bankruptcy, guardian, curator, or conservator with respect to such Person. In such regard, the term **"control"** (including the terms **"controlled by"** and **"under common control with"**) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise, applying the same principles, interpretations and definitions as are applicable in defining the term "affiliate" for purposes of Rule 144 promulgated pursuant to the United States Securities Act of 1933, as amended.

**(b)**    The Common Shareholders, as a group, and the Class A Preferred Shareholders, as a group, are sometimes referred to in this Agreement collectively as the **"Classes of Shareholders"** and each individually as a **"Class of Shareholders."**

**(c)**    The Class A Preferred Shares, as a group, and the Common Shares, as a group, are hereinafter sometimes referred to collectively as the **"Classes of Shares"** and each group individually as a **"Class of Shares."**

**(d)**    The term **"Governing Instruments"** with respect to any Person other than an individual shall mean the Articles of Incorporation, Articles of Organization, Articles of Association, Certificate of Formation, Certificate of Incorporation, Certificate of Association, Certificate of Organization, By-Laws, Limited Liability Company Agreement, Operating Agreement, Memorandum of Incorporation, Memorandum of Association, Partnership Agreement, Certificate of Partnership, and/or any and all other governing and/or organizational documents with respect to such Person, as applicable.

**(e)**    The term **"Majority-in-Interest"** *(i)* shall mean, with respect to any single Class of Shareholders, at any time, those Shareholders of such Class of Shareholders holding more than **50%** of the Shares of the Class of Shares upon which such Class of Shareholders is based (*i.e.,* Common Shares with respect to Common Shareholders, and Class A Preferred Shares with respect to Class A Preferred Shareholders) which are owned by all of the Shareholders of such Class of Shareholders at such time, *or (ii)* shall mean, with respect to all of the Shareholders as a whole (regardless of the Class of Shares held by any Shareholder), at any time, those Shareholders (regardless of the Class of Shares held by any such Shareholder), holding more than **50%** of the total Shares then issued and outstanding (regardless of the Class of Shares) and entitled to vote.

**(f)**    The term **"Net Cash Flow"** with respect to the Company and/or any one or more of the Company's subsidiaries for any period shall mean, subject to and computed in accordance with applicable rules of consolidation, *the excess, if any, of (A)* the sum of (i) all gross receipts of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from any sources for such period, other than from  and/or Liquidity Events, *plus (ii)* any funds released by the Board of Directors of the Company and/or such subsidiary or subsidiaries of the Company, as applicable, from previously established reserves (referred to in *(B)(iv)(y)* below), *over (B)* the sum of (i) all cash expenses paid by the Company and/or such subsidiary or subsidiaries during such period during the course of business (*including, but not limited to,* salaries, bonuses (*including, but not limited to,* any bonuses or earn-out payments attributable with respect to such period, even if payable after such period), taxes, rent and occupancy costs, interest on any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, insurance premiums, supplies, guaranteed payments and fees), *(ii)* all capital expenditures paid in cash by the Company and/or such subsidiary or subsidiaries, as applicable, during such period, *(iii)* all payments during such period of the principal of any debts or liabilities of the Company and/or such subsidiary or subsidiaries, as applicable, *and (iv)* unless the Board of Directors, in its sole discretion, determines that a lesser amount is advisable, a cash reserve in an amount equal to *the sum of (x) the greater of* **$3,000,000.00 USD,** *or* an amount equal to *the excess, if any, of* **$5,000,000.00 USD** *over* the Net Working Capital of the Company and the Company's subsidiaries with respect to such period (computed, however, without including any cash or cash equivalents of the Company and/or the Company's subsidiaries), *plus (y)* such additional amount, if any, that the Board of Directors reasonably and in good faith determines is necessary to meet the future business, working capital, capital expenditure, tax, environmental, litigation, and/or expansion needs of the Company and/or the Company's subsidiaries; *provided, however,* that any payments referred to in *(B)(i), (ii), (iii), or (iv)* that are paid from previously established reserves or that are taken into account in determining Net Proceeds from a Liquidity Event shall not be taken into account in determining Net Cash Flow. In computing Net Cash Flow for any period, all costs, expenses and expenditures of the Company and the applicable subsidiary or subsidiaries of the Company shall be taken into

account, *including, but not limited to, (a)* a fee to Blue Equity, LLC or its nominee (the **"Blue Equity Fee"**) of **$600,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such in-house legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"Blue Back-Office Services"**) as are provided by **Blue Equity, LLC**, a Nevada limited liability company, and/or any of its Affiliates to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of Blue Equity, LLC, or other Persons, it being understood and agreed that the Blue Equity Fee does not include *(x)* any compensation, benefits, and other amounts paid to or for the benefit of the Chief Executive Officer of the Company *or (y)* any out-of-pocket expenditures to third parties for travel, lodging, international telephone calls, and other legitimate business expenses incurred by Blue Equity, LLC, its Affiliates, or their personnel, in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries, which amounts shall be reimbursable by the Company or an Affiliate of the Company, as applicable, to the extent that they are within the applicable Approved Budgets of the Company and the Subsidiaries and they are properly incurred, reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries generally applicable to employees of the Company and/or such Affiliate of the Company, *and (b)* a fee to **CPMIC** (the **"CPMIC Fee"**) of **$575,000.00 USD** per year plus GCT, if applicable, payable in substantially equal monthly installments beginning within **one (1) month** after the Effective Date, which the Parties agree constitutes a fair, reasonable, and equitable charge for such legal, accounting, marketing, consulting, supervisory, and/or other in-house services (**"CPMIC Back-Office Services "**) provided by CPML, Cool Corp, MZ Holdings, Cool Oasis, CPMIC, and/or any of their nominees or Affiliates (collectively and individually as applicable, the **"CPMIC Group"**) to or for the benefit of the Lubricant and Chemical business of the Company and/or the Company's subsidiaries, whether exclusively or on a fair allocable collective basis to or for the benefit of such Lubricant and Chemical business and one or more other Affiliates of the CPMIC Group or other Persons, it being understood and agreed that *(X)* the CPMIC Fee includes *(i)* the portion of the compensation, benefits, and other amounts allocable and chargeable to the Company and/or the Company's subsidiaries for the provision by the CPMIC Group, as applicable, of the financial, accounting, and supervisory services of Davis in his capacity as the Group CFO of the Company and the Company's subsidiaries (in which capacity Davis shall report directly to the Chairman and Vice Chairman of the Company and the Company's subsidiaries (subject, however, to the general supervision and control of the Board of Directors)) and of the political liaison and other consulting services of Issa as may be reasonably requested by the Company and/or the Company's subsidiaries (which services by Issa shall be only part-time and shall not require Issa to work any particular minimum of hours or provide any particular quantity of services), in each case on a shared basis between the CPMIC Group and its subsidiaries, on the one hand, and the Company and its subsidiaries, on the other hand, *(ii)* the compensation, benefits (including, but not limited to, other amounts paid by the CPMIC Group to or with respect to Colin Hendrick with respect to his serving, on a full time basis as the Director of Operations for the Company and the Company's subsidiaries, *and (iii)* the services provided for under that certain Agreement entered into as of March 1, 2006, *by and between* Cool Petroleum Limited and MZ Holdings Limited regarding the provision of certain services by MZ Holdings to the Company and the Company's subsidiaries (the **"MZ Shared Services Agreement"**), *and (Y)* the CPMIC Fee does not include *(i)* any costs for the Company, the Company's subsidiaries, and/or their Affiliates or invitees to use or direct the use of the airplane owned by Cool Corp and/or its Affiliates when deemed advisable or authorized by the Board of Directors of the Company, *or (ii)* any out-of-pocket expenditures of the types currently paid to third parties by the Company and/or the Company's subsidiaries or paid to third parties by the CPMIC Group and reimbursed by the Company and/or the Company's subsidiaries for any travel (including car or car allowances and including gas), lodging, international telephone calls, and other legitimate business expenses incurred in connection with the provision of services for the benefit of the Company and/or the Company's subsidiaries by Hendrick, Davis, and/or Issa, or by Cool Corp with respect to such individuals, which are within the applicable Approved Budgets of the Company and the Subsidiaries and which are properly reported and accounted for in accordance with the expense reimbursement policies and procedures of the Company and the Company's subsidiaries, *or (iii)* the costs incurred by the Company and/or the Subsidiaries in providing BUPA Family Medical Insurance and corporate protection insurance for Hendrick and Issa at current coverage levels, which the Company shall continue to pay, or *(iv)* any costs incurred by Cool Corp and/or its Affiliates associated with providing intellectual, human or other capital resources to or for the benefit of the Company and/or any of the Company's subsidiaries to the extent that *(A)* such intellectual, human, or other capital resources are not already required to be so provided pursuant to currently existing agreements with the Company and/or any of the Company's subsidiaries (or any amendments, extensions, renewals, or novations thereof), *(B)* such intellectual, human, or other capital resources have not otherwise been generally provided by Cool Corp and/or its Affiliates to or for the benefit of the Company prior to the Effective Date of this Agreement, *(C)* such intellectual, human, or other capital resources are not specifically included in the CPMIC Back-Office Services set forth above, *and (D)* the provision of such intellectual, human, or other capital resources is undertaken, and the costs therefor incurred, pursuant to and in accordance with the terms and conditions of a written agreement entered into by and between one or more of Cool Corp and/or Cool Corp's Affiliates, on the one hand, and one or more of the Company and/or the Company's subsidiaries, on the other hand. The CPMIC Fee shall supersede *inter alia* the fee provided for under the MZ Shared Services Agreement, which fee provided for under the MZ Shared Services Agreement shall therefore no longer be separately due and payable by the Company or any of its subsidiaries to MZ Holdings.

**(g)**     The term **"Net Proceeds"** with respect to any Liquidity Event shall mean the gross proceeds derived by the Company and/or the Shareholders directly from such Liquidity Event *reduced by (i)* payment of all reasonable expenses incurred by the Company or the Shareholders, as the case may be, in furtherance of implementing such Liquidity Transaction, *including, but not by way of limitation,* any brokerage commissions, fees, and costs payable by the Company or, with the Company's consent, to or by the Shareholders, in connection with such Liquidity Event (*provided, however,* that any commission or fee payable to Blue Equity, Cool Corp, or any other Related Party or Shareholder for arranging such Liquidity Event may not, when added to the brokerage commissions and/or fees payable by the Company to Persons other than Related Parties in connection with such Liquidity Event,

exceed a amount equal to 5% of the value of the total consideration from such Liquidity Event), *(ii)* payment of the amount of any indebtedness of the Company (*including* principal, interest, prepayment fees, and/or other fees, costs, or charges) made with such gross proceeds, *(iii)* capital expenditures or other expenditures required to made from the gross proceeds of such Liquidity Event under the applicable agreements with respect to such Liquidity Agreement, *and (iv)* any reasonable reserve established by the Board of Directors of the Company for satisfaction of any of the foregoing, any indemnities, escrow, or contingencies therefor. In determining the gross proceeds and Net Proceeds with respect to any Liquidity Event, any equity interests, bonds, and/or other tangible or intangible property (other than cash and cash equivalents) received with respect to a Liquidity Event shall be valued at the same amount as such equity interests, bonds, and/or other tangible or intangible property are valued for purposes of the Liquidity Event.

(h)     The term **"Person"** means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, syndicate, joint stock company, limited liability company, governmental authority, or other entity of any kind.

(i)     The term **"Tax"** or **"Taxes"** with respect to any Person shall mean any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental taxes, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated basis, or unitary basis or in any other manner which are required to be paid, withheld or collected by such Person.

(j)     The term **"Tax Return"** shall mean any return, declaration, reports and forms, claim for refund, or information return or statement relating to Taxes, including any necessary schedule or attachment thereto, and including any necessary amendment thereof.

## 1.2    Accounting Terms

All accounting terms which are used in this Agreement and which are not otherwise expressly defined in this Agreement shall have the respective meanings given to them in accordance with generally accepted International Financial Reporting Standards, consistently applied from period to period (**"IFRS"**) and all accounting concepts and principles referred to in this Agreement shall be construed in accordance with IFRS *except* to the extent otherwise specifically and expressly provided in this Agreement.

## ARTICLE 2

## NAME AND OFFICE

## 2.1    Name

*Unless and until* changed by the Board of Directors of the Company, the name of the Company shall be as set forth in Section A(1) of the Initial Portion of this Agreement. The Board of Directors of the Company and each subsidiary of the Company shall have the right and authority to operate the Company or such subsidiary, as applicable, under such name(s) as may be necessary or appropriate in any jurisdiction in which the Company or such subsidiary operates. Furthermore, the Board of Directors of the Company and each subsidiary of the Company shall have the right, power and authority, with full power of attorney on behalf of each of the Shareholders, *(i)* to change the name of the Company or such subsidiary, as applicable, at any time and from time to time, *and (ii)* to amend the Governing Instruments of the Company and/or the Company's subsidiaries, or take any other actions as may be necessary to effect and implement any such change of name, without any further, separate, or express authorization by any of the Shareholders.

## 2.2    Assumed Name Certificates

The Board of Directors of the Company and/or any subsidiary of the Company may cause the Company or such subsidiary of the Company, as applicable, to file such certificates of assumed name or fictitious name as shall be required by law or otherwise deemed advisable by such Board of Directors.

## 2.3    Registration as a Foreign Limited Liability Company in Other Jurisdictions

The Board of Directors of the Company and/or any subsidiary of the Company may cause the Company or such subsidiary to file such registrations to conduct business as a foreign corporation or other entity in any jurisdictions as may be required by law or otherwise deemed advisable by such Board of Directors.

## 2.4    Principal Office

The principal office of the Company and each subsidiary of the Company shall be at such place as shall be determined by the Board of Directors of the Company or such subsidiary from time to time with notice to the Shareholders. The books of the

Company and each subsidiary of the Company shall be maintained at such principal place of business or such other place that the applicable Board of Directors may deem appropriate.

## ARTICLE
3

### PURPOSES AND TERM

**3.1    Purposes**

The purposes of the Company and each of the Company's subsidiaries are as follows:

(a)    To engage directly or through one or more subsidiaries in the Business as described in Section C(1) of the Initial Portion of this Agreement to such extent and in such manner as the Board of Directors of the Company or such subsidiary of the Company, as applicable, may deem advisable from time to time.

(b)    To purchase, acquire, invest in, own, improve, maintain, lease, sell, exchange, and otherwise deal in and with respect to such property, real, personal or mixed, tangible or intangible, *including, but not limited to,* closely held and publicly held securities and interests in business entities as the Board of Directors of the Company or such subsidiary, as applicable, may reasonably deem necessary or appropriate in connection with the conduct of the Business referred to in Section 3.1(a) above, and related activities.

(c)    To use, invest, and distribute the funds of the Company and the Company's subsidiaries as contemplated in this Agreement or as otherwise required by law.

(d)    To do all other things necessary or desirable in connection with the foregoing or otherwise contemplated in this Agreement.

**3.2    Company's Power**

In furtherance of the purposes of the Company and each of the Company's subsidiaries as set forth in Section 3.1, the Company and such subsidiary, as applicable, shall have the power to do any and all things whatsoever necessary, appropriate or advisable in connection with such purposes, or as otherwise contemplated in this Agreement.

## ARTICLE
4

### CAPITAL

**4.1    No Liability of Shareholders**

*Except* as otherwise specifically provided under applicable law or specifically provided under a separate written agreement executed by such Shareholder, no Shareholder shall have any personal liability for the obligations of the Company and/or any subsidiary of the Company. Furthermore, no Shareholder shall be obligated to contribute additional funds or loan money to, or personally guarantee or endorse any debts or obligations of, the Company and/or any subsidiary of the Company *except* to the extent, if any, that such Shareholder specifically agrees under a separate written agreement executed by such Shareholder.

**4.2    Loans**

In order to facilitate the conduct of business and activities by the Company and each of the Company's subsidiaries, the Board of Directors of the Company or such subsidiary, as applicable, may cause the Company or such subsidiary to borrow such amounts from time to time as such Board of Directors may deem advisable on such terms, and with such mortgages, liens, and/or security interests in, on, or otherwise with respect to any of the assets of the Company or such subsidiary, as applicable, as collateral, as such Board of Directors may deem advisable. Such loans may be from commercial lenders or from any one or more other Persons, *including, but not limited to,* any one or more of the Shareholders, Directors, and/or their Affiliates, and a guarantee fee may be paid to any guarantor of any loan from a commercial lender*, including, but not limited to,* any one or more of the Shareholders, Directors, and/or their Affiliates, provided such fee does not exceed a percentage rate of **1% per annum** on the outstanding balance of such loan during the period of such guaranty. There shall be no guaranty fee charged by Blue Equity and/or Blue Equity's Affiliates with respect to its provision, contemporaneously with the Effective Date of this Agreement, of a certain partial guaranty with respect to a Tranche C of the current Common Creditor/Bondholder debt of the certain subsidiaries of the Company.

**4.3    Percentage Interest Definition**

(a)    For purposes of this Agreement, the term **"Percentage Interest"** at any time shall have the following meaning, as applicable:

(i)    The term **"Percentage Interest"** as to any Class A Preferred Shareholder, solely with respect to the Class A Preferred Shareholders as a group, shall mean that percentage which the number of Class A Preferred Shares (*including, but not*

*limited to,* any fractional Class A Preferred Shares) then held by such Class A Preferred Shareholder at such time *bears* to the aggregate of all Class A Preferred Shares (*including, but not limited to,* any fractional Class A Preferred Shares) then issued and outstanding;

(ii)     The term **"Percentage Interest"** as to any Common Shareholder, solely with respect to the Common Shareholders as a group, shall mean that percentage which the number of Common Shares (*including, but not limited to,* any fractional Common Shares) then held by such Common Shareholder at such time *bears* to the aggregate of all Common Shares (*including, but not limited to,* any fractional Common Shares) then issued and outstanding;

(iii)    The term **"Percentage Interest"** as to any Shareholder with respect to all of the Shareholders as a group, regardless of the Class of Shares held by such Shareholders, shall mean that percentage which the number of Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then issued and outstanding; *and*

(iv)    The term **"Percentage Interest"** as to any Shareholder with respect to any group of Shareholders consisting of fewer than all of such Shareholders, regardless of the Class of Shares held by such Shareholders (for purposes of Section 4.4 of this Agreement or otherwise) shall mean that percentage which the number of Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then held by such Shareholder at such time *bears* to the aggregate of all Shares (regardless of the Class of Shares and *including, but not limited to,* any fractional Shares) then held by all Shareholders of the applicable group, in the aggregate.

(b)     Except when determining the Percentage Interest of any Shareholder with respect to all or some of the Shareholders, regardless of the Class of Shares held by any such Shareholder, pursuant to Section 4.3(a)(iii) or Section 4.3(a)(iv) above, the Percentage Interest of any Shareholder who holds Shares of more than one Class of Shares shall be determined on a Class of Shares-by-Class of Shares basis, taking into account only such Shareholder's holdings of Shares of the Class of Shares in question and disregarding such Shareholder's holdings of the Shares of any other Class of Shares.

**4.4     Additional Capital Contributions**

(a)     If at any time the Board of Directors of the Company determines reasonably and in good faith that, in order *(i)* to provide cash for the expansion of the business of the Company and/or the Company's subsidiaries, through acquisition or otherwise *(ii)* to provide working capital reasonably necessary in the ordinary course of the business of the Company and/or the Company's subsidiaries, *and/or (iii)* to provide funds to repay any or all debts, obligations, and/or other liabilities of the Company and/or the Company's subsidiaries if the Company is unable to pay such debts, obligations, and/or other liabilities as they becomes due, it is advisable for the Company and/or any one or more subsidiaries of the Company to seek additional capital beyond that already then contributed, or required to be contributed, by the Shareholders of the Company, the Board of Directors of the Company shall cause notice of such determination to be given to each of the Shareholders (regardless of the Class of Shares held by such Shareholders) at least **90 days** before the last day on which such capital must be contributed or such shorter period of time (but not less than **30 days**) before the last day on which such capital must be contributed as is reasonably necessary to avoid hardship to the Company or any subsidiary of the Company or to avoid the loss of the proposed acquisition or other expansion transaction or opportunity, as the case may be (as applicable, the **"Capital Raise Notice Period"**). Such notice shall set forth the total additional capital contribution then being sought from all of the Shareholders in the aggregate and the number of Shares or other equity interests which will be issued by the Company and/or any subsidiary of the Company in exchange for such additional capital contribution (and the rights, preferences, and other characteristics of any such equity interests other than Shares). Any other equity interests so authorized by resolution of the Board of Directors of the Company may have such other rights, distribution preferences, voting preferences, liquidation preferences, and other characteristics as the Board of Directors may determine in its reasonable discretion and in good faith, *including, but not limited to,* preferences which make such class of equity interests senior in distributions and/or voting to any of the Shares or to any other class of equity interests previously issued; *provided, however,* that any dilution to be caused by the issuance of such new equity interests shall affect all of the then issued and outstanding Common Shares  on a proportionate basis. No vote of the Shareholders, or any Class of Shareholders, shall be required in connection with the issuance of additional Shares or any other class of equity interests, *except* to the extent, if any, provided by resolution of the Board of Directors of the Company in connection with the prior issuance of Shares or other equity interests under this Section 4.4.

(b)     Within such Capital Raise Notice Period, if any Shareholder wishes to acquire such Shareholder's pro rata portion of the Shares or other equity interests being offered by the Company and/or any of the Company's subsidiaries, as the case may be, in connection with such additional capital contribution, such Shareholder shall contribute in cash to the capital of the Company or such subsidiary or subsidiaries, as applicable, a pro rata portion of the total additional capital contribution then being sought in the aggregate, in accordance with such Shareholder's respective Percentage Interest with respect to all of the Shareholders of the Company (regardless of the Class of Shares held by any Shareholder) at such time.

(c)     If any Shareholder fails to contribute such Shareholder's pro rata portion of such additional capital contribution within the specified Capital Raise Notice Period, then the Shareholders who have contributed their pro rata portions of such additional capital contribution within the specified Capital Raise Notice Period shall have the right (but not the obligation), during a period of **10 days** thereafter, to make the additional capital contribution for which such Shareholder failed (with or without reason) to make, in accordance with their respective Percentage Interests among themselves as a group, or in such other percentages as those Shareholders wishing to make all or any part of such capital contribution may otherwise agree. In such event, the Shares or

other equity interests offered with respect to such additional capital contribution shall be issued to those Shareholders who actually make such capital contribution in accordance with the percentage of such capital contribution contributed by each.

**(d)** If the Shareholders of the Company, in the aggregate, do not timely contribute the full amount of any additional capital contribution sought by the Company and/or the Company's subsidiaries, as applicable, then the Company and/or the Company's subsidiaries, as applicable, shall have an additional **90 day** period to obtain such uncontributed funds from any one or more Shareholders or other Persons on the same terms as offered to the Interest Shareholders in exchange for the issuance to such Person(s) of the Shares or other equity interests which were offered to the Shareholders in connection with such portion of the additional capital contribution.

**(e)** Notwithstanding anything herein which might be construed to the contrary, the Board of Directors of the Company, acting reasonably and in good faith, may cause the Company and/or any subsidiary of the Company at any time to issue new Shares or other equity interests, or options to acquire new Shares or other equity interests, as an incentive in connection with the employment of any new or existing employee of the Company and/or any subsidiary of the Company, and the foregoing notice and "preemptive rights" as to the Shareholders of the Company shall not apply with respect to such issuances, provided such issuance is within the parameters set forth in Section F(1)(h)(v).

#### 4.5    No Interest on Capital Contributions

No Shareholder shall be entitled to interest on any capital contribution made to the Company and/or any subsidiary of the Company, *except* to the extent otherwise expressly set forth in this Agreement or pursuant to the provisions of Section 4.4 hereof.

### ARTICLE 5

### ACCOUNTING

#### 5.1    Books and Records

The Company and each of the Company's subsidiaries shall maintain the financial books and records of the Company or such subsidiary of the Company, as applicable, at the Company's or such subsidiary's principal place of business and/or at such other places as the Board of Directors of the Company or such subsidiary, as applicable, shall determine. All books and records shall be open to the inspection and examination of all Shareholders in person or by their duly authorized representatives at all reasonable times and may be copied at the expense of the Shareholder desiring such copies.

#### 5.2    Fiscal Year

The Fiscal Year of the Company and the Company's subsidiaries shall be such **12-month** period as the Board of Directors of the Company may determine from time to time ("**Fiscal Year**"). The Company and/or any subsidiary of the Company may have a short or partial Fiscal Year as and when appropriate by reason of a change of Fiscal Year, a dissolution, or otherwise.

#### 5.3    Reports

Within **120 days** after the close of each Fiscal Year of the Company and each subsidiary, the Company or such subsidiary, as applicable, shall furnish to each Person who was a Shareholder at any time during such Fiscal Year all the information relating to the Company or such subsidiary which shall be reasonably requested by such Person for the preparation of such Person's Federal and state income or other tax returns.

#### 5.4    Shareholder's Request for Additional Information

The Company and each its subsidiaries shall furnish to any Shareholder, at the reasonable expense of Company or such subsidiary, as applicable, such information regarding the Company's or such subsidiary's operations and condition as may reasonably be requested by any Shareholder.

#### 5.5    Accounting

Unless otherwise determined by the Board of Directors, the parties agree that the accountant for any or all financial, accounting, and/or tax purposes of the Company and the Company's subsidiaries shall be such certified public accountant as is designated from time to time by the Board of Directors of the Company (which accountant may, in such Board of Director's sole discretion, be the same certified public accountant who performs services for any Director, Shareholder, or any of their Affiliates, notwithstanding any actual or apparent conflict of interest or other fiduciary duties or standards).

ARTICLE
6

**BANK AND OTHER DEPOSITORY ACCOUNTS**

6.1    **Bank and Other Depository Accounts**

All funds of the Company and each of the Company's subsidiaries shall be deposited into such checking, savings and/or money market accounts, time certificates, or other reasonably liquid and short-term investments as shall be designated by the Board of Directors of the Company or such subsidiary, as applicable. Withdrawals therefrom shall be made upon such signature or signatures as the Board of Directors of the Company or such subsidiary, as applicable, may designate. Only with the prior written consent of a majority-in-number of the Common Directors of the Company or such subsidiary of the Company, as applicable, then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company or such subsidiary of the Company, as applicable, then in office, acting as a separate group (which consents shall not be unreasonably withheld or delayed) may the funds of the Company or any of the Company's subsidiaries be commingled or co-invested with those of any other individual or entity *other than* the Company and/or the Company's subsidiaries.

ARTICLE
7

**DISTRIBUTIONS**

7.1    **Distributions of Net Cash Flow and Net Proceeds From Liquidity Events**

(a)    The Net Cash Flow for each Fiscal Quarter with respect to the Company and the Company's subsidiaries *(i)* shall be distributed, with respect to the first three Fiscal Quarters of each Fiscal Year, within **30 days** after the end of such Fiscal Quarter, and with respect to the last Fiscal Quarter of every Fiscal Year, **30 days** following the finalization of the Company's audited consolidated statements with respect to such Fiscal Year *and (ii)* shall be distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries, as applicable, then held by each of them.

(b)    The Net Proceeds from Liquidity Events with respect to the Company and/or any subsidiary of the Company *(i)* shall be distributed within **120 days** following the receipt of such Net Proceeds by the Company or the Company's subsidiary, as applicable, *and (ii)* shall be authorized, if necessary, and distributed to the Shareholders of the Company and/or any other equityholders of the Company and/or the subsidiaries of the Company in accordance with, and subject to, the respective rights and preferences of the Shares and/or other equity interests of the Company and/or the subsidiaries then held by each of them.

ARTICLE
8

**MANAGEMENT**

8.1    **Management In General**

(a)    *Except* to the extent otherwise specifically provided under this Agreement, all rights, powers and authority of the Company and each subsidiary of the Company shall be exercised by or under the authority of, and the business and affairs of the Company or such subsidiary, as well as any liquidation or dissolution of the Company or such subsidiary, as applicable, shall be controlled and managed by or under the authority of, a Board of Directors for the Company or such subsidiary, as applicable, established as provided under Section F of the Initial Portion of this Agreement (the **"Board of Directors"**), each of the members of which may be referred to as a Director.

(b)    Any *(i)* officer of the Company or any subsidiary of the Company expressly authorized and empowered by law, under this Agreement, or under a resolution of, or acting upon or at the express written direction of, the Board of Directors of the Company or such subsidiary of the Company, as applicable, *(ii)* Director of the Company or such subsidiary, *or (iii)* other Person who is specifically authorized and empowered under a resolution of, or acting upon or the express written direction of, the Board of Directors of the Company or such subsidiary, as the case may be, may execute any document or take any action on behalf of the Company or such subsidiary, as applicable, and such action shall be binding upon the Company or such subsidiary, as applicable; *provided, however,* that unless already expressly and specifically or categorically authorized as a part of an Approved Budget, any material contracts or commitments which any officer, employee, or agent of the Company or any subsidiary of the Company wishes to cause the Company or such subsidiary to enter into shall be first presented to, and specifically authorized by, the Board of Directors, Chairman, or Vice Chairman of the Company or such subsidiary, as applicable, acting reasonably and in good faith. In this regard, a material contract or commitment shall mean any oral or written contract or other agreement or understanding requiring *(i)* the expenditure or the incurrence of any liability by the Company and/or any subsidiary, in one or a series of related transactions, exceeding **$10,000.00** in the aggregate, *and/or (ii)* a continuing obligation or liability on the part of the Company and/or any subsidiary of the Company (*including, but not limited to,* employment or compensation agreements or arrangements) which cannot be cancelled without penalty or premium upon **90 or fewer days** prior notice. Notwithstanding any of the foregoing which might be

construed to the contrary, without the prior consent of the Board of Directors, Chairman, or Vice Chairman of the Company or subsidiary of the Company, as applicable, no such variance from the Approved Budget for any period, none of the officers, employees, or agents of the Company and/or any subsidiary shall direct or authorize the incurrence or payment by the Company or such subsidiary of any amount or liability during such period which would, when added to all other amounts and/or liabilities previously paid or incurred by the Company and/or the Company's subsidiaries during such period, cause the total amount and/or liabilities paid or incurred by the Company and/or the Company's subsidiaries during such period to exceed by more than **10%** the total amount of budgeted expenses under the Approved Budget for such period.

**(c)**      The Approved Budgets are intended to apply with respect to the operations of the business of the Company and the Company's subsidiaries in the ordinary course and shall not be construed as imposing any limitation on the power of the Board of Directors of the Company or any subsidiary of the Company to authorize a sale, exchange, or other such transaction by the Company or such subsidiary, as applicable, which is not in the ordinary course of such entity's business.

**(d)**      The Board of Directors, by written consent of both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group, may fix and change the compensation, if any, of the Directors (in their capacities as such) at any time, and no Director shall be prevented from receiving any such compensation by reason of the fact that such Director is also an officer, employee, or Shareholder of the Company and/or any subsidiary of the Company.

### 8.2    Number, Election and Term of Directors

**(a)**      The number of Directors of the Company and each of the Company's subsidiaries, and classes thereof, shall be such number and classes as are set forth in, and the initial Directors of the Company and each of the Company's subsidiaries and the class of each such Director shall be as set forth in, Section F(1) of the Initial Portion of this Agreement. Each Class A Preferred Director (*other than* the initial Class A Preferred Directors) shall be elected or appointed by vote or consent of a Majority-in-Interest of the Class A Preferred Shareholders and each Common Director (*other than* the initial Common Directors) shall be elected or appointed by vote or consent of Cool Corp. A Person need not be a Shareholder in order to be a Director.

**(b)**      The term of each Director shall continue until such Director dies, resigns, becomes Disabled, (as defined below) or is removed pursuant to Section 8.3(a) below. For purposes of this Agreement, the term **"Disabled"** shall mean that a Director is physically or mentally incapacitated so as to render such Director incapable of performing the essential functions of his or her job as a Director and such incapacity cannot be reasonably accommodated without undue hardship as determined either by *(i)* such Director and the Board of Directors or *(ii)* if such Director and the Board of Directors cannot agree, by a panel of three doctors, one appointed by such Director, one by the Board of Directors and the third by the first two doctors so appointed. The determination of the panel shall be final and binding upon the parties with the costs of the panel to be paid by the Company.

### 8.3    Removal and Resignation of Directors; Vacancies

**(a)**      A Director may be removed at any time, with or without cause *(i)* in the case of a Class A Preferred Director, by a vote of a Majority-in-Interest of the Class A Preferred Shareholders and *(ii)* in the case of a Common Director, by a vote of a Cool Corp. A successor to a Director shall be elected *(1)* in the case of a Class A Preferred Director, by a vote of a Majority-in-Interest of the Class A Preferred Shareholders *and (2)* in the case of a Common Director, by Cool Corp.

**(b)**      Any Director may resign from the Board of Directors of the Company and/or any subsidiary of the Company at any time by giving written notice to *(i)* all of the other Directors on such Board of Directors, *(ii)* the Chairperson or Chairpersons of such Board of Directors, if there shall be any Chairperson or Chairpersons then acting, *(iii)* the Chief Executive Officer(s) of the Company or such subsidiary, as applicable, if there shall be any Chief Executive Officer(s) then acting, *or (iv)* all of the Shareholders, and unless otherwise specified in such notice of resignation, the acceptance of such resignation shall not be necessary to make it effective.

**(c)**      Any vacant Director position (arising by reason of removal, resignation or for any other reason) shall remain vacant unless and until such successor is elected or the position is eliminated *(i)* in the case of a Class A Preferred Director, by a vote of a Majority-in-Interest of the Class A Preferred Shareholders and *(ii)* in the case of a Common Director, by Cool Corp.

### 8.4    Meetings of the Board of Directors; Quorum and Voting Requirements

**(a)**      The Board of Directors of the Company and each subsidiary of the Company may provide by resolution the time and place, either within or outside of Jamaica, for the holding of regular meetings of the Board of Directors without other notice than such resolution.

**(b)**      Special meetings of the Board of Directors of the Company and/or any subsidiary of the Company may be called by, or at the request of, the Chairman, Vice Chairman, Chief Executive Officer, or any Director of the Company or such subsidiary, as applicable. *Unless* otherwise agreed in writing by all of the applicable Directors, all special meetings of the Board of Directors of the Company and/or any subsidiary of the Company shall be held at the principal office of the Company or at such other place in Jamaica, Miami, Florida, or Louisville, Kentucky, metropolitan areas as may be specified in the notice of the meeting.

**(c)**      Notice of any special meeting of the Board of Directors of the Company and/or any subsidiary of the Company shall be given at least **seven (7)** days prior thereto by written notice to all of the applicable Directors. Any Director may waive notice

of any such meeting. The attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, *except* where such Director attends such meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

(d)     The business to be transacted at, and/or the purpose of, any special meeting of the Board of Directors of the Company and/or any subsidiary of the Company shall be generally specified in the notice or wavier of notice of such meeting.

(e)     The presence of any Director at a duly called meeting of the Board of Directors of the Company and/or any subsidiary of the Company shall constitute a quorum, but, notwithstanding the presence of a quorum, no action (other than adjournment of a meeting) may be taken by the Board of Directors except in strict accordance with the voting requirements and provisions set forth in Section F(1) of the Initial Portion of this Agreement.

(f)     The voting requirements with respect to acts of the Board of Directors of the Company and each subsidiary of the Company shall be as set forth in Section F(1) of the Initial Portion of this Agreement. The parties acknowledge that the provisions of Section F(1) of the Initial Portion of this Agreement may provide for unequal voting power and authority as to the various Directors and/or classes of Directors with respect to the Company and/or any subsidiary of the Company.

(g)     A Director who is present at a meeting of the Board of Directors of the Company and/or any subsidiary of the Company when action is taken shall be deemed to have assented to the action taken *unless (i)* such Director objects at the beginning of the meeting (or promptly upon such Director's arrival) to holding the meeting or transacting business at the meeting, *(ii)* such Director dissents or abstains from the action taken and the chairman of the meeting expressly acknowledges at such meeting the dissension or abstention of the Director, *or (iii)* such Director delivers written notice of such Director's dissent or abstention to the presiding officer of the meeting before the meeting's adjournment or to the Company or subsidiary of the Company, as applicable, promptly after adjournment of the meeting. The right of dissent or abstention with respect to any action shall *not* be available to any Director who votes in favor of the action taken.

### 8.5   Committees

(a)     The Board of Directors of the Company or any subsidiary of the Company may, by written resolution, create one or more committees for the Company or such subsidiary, as applicable, and appoint Directors and/or other Persons to serve on them. Each committee shall have two or more members, who shall serve at the pleasure of the applicable Board of Directors.

(b)     The provisions of Section 8.4 above, which govern meetings, quorum requirements, and voting requirements with respect to the Board of Directors, shall apply to committees and their members as well.

(c)     The Board of Directors of the Company or any subsidiary of the Company may, by written resolution, delegate to any committee of the Company or such subsidiary, as applicable, such of the applicable Board of Directors' duties, powers, and authority under this Agreement as such Board of Directors may deem advisable, *subject to* such terms and conditions as such Board of Directors may deem advisable *and subject to* change, modification, or amendment at any time by such Board of Directors.

### 8.6   Approved Budgets

(a)     No later than **60 days** prior to the beginning of each Fiscal Year of the Company, the Chief Executive Officer and other applicable officers and employees of the Company shall cooperate and coordinate with the Board of Directors of the Company, Issa, Blue Equity, LLC, as a contract administrator, and such outside accountants and/or consultants to the Company as Blue Equity, LLC and/or the Board of Directors of the Company may determine to be necessary or appropriate (collectively, the **"Budgeting Team"**) in such reasonable manner as will enable them to understand the business and operational plans and expectations of the Chief Executive Officer's and the Company's Board of Directors for the upcoming Fiscal Year. The Budgeting Team shall then prepare *(i)* a **"Proposed Financial Budget"**), *and (ii)* a proposed reasonably comprehensive business and marketing plan for the Company and the Company's subsidiaries with respect to the upcoming Fiscal Year (with respect to each Fiscal Year, the **"Proposed Business Plan"**) (the Proposed Financial Budget and the Proposed Business Plan with respect to each Fiscal Year are hereinafter sometimes referred to collectively as the **"Proposed Budget"** with respect to such Fiscal Year) which Proposed Budget shall then be submitted for consideration by the Company's Board of Directors. *Unless and until* changed by the Company's Board of Directors, the proforma or projection of the performance and projected business and marketing plans of the Company and the Company's subsidiaries which is attached as **EXHIBIT 8.6(a)** shall serve as the Approved Budget of the Company and the Company's subsidiaries for the Fiscal Years and portions thereof following the Effective Date of this Agreement which are reflected therein.

(b)     The Proposed Financial Budget with respect to each Fiscal Year, as approved by the Chief Executive Officer of the Company and submitted for consideration by the Company's Board of Directors in accordance with the provisions of Section 8.6(a) above, shall be a detailed line-item budget reflecting both monthly amounts and a total annual amount with respect to each line item, and the entries therein shall be supported by appropriate supplemental schedules and information. At a minimum, *except* to the extent, if any, permitted by the Company's Board of Directors, the Proposed Financial Budget with respect to each Fiscal Year shall contain *(i)* a budgeted income statement (statement of earnings), *(ii)* a budgeted balance sheet (statement of financial position), *(iii)* a budgeted statement of cash flows (statement of sources and uses of funds), *including, but not limited to,* a projection of all disbursements of principal which are anticipated to be needed during such Fiscal Year under any loans and/or lines of credit available to the Company and/or the Company's subsidiaries and a proposed cash reserve (the **"Budgeted Cash Reserve"**) to be maintained by the Company and the Company's subsidiaries, as applicable, during such Fiscal Year, *and (iv)* one or more

schedules comparing the budgeted amounts to actual amounts earned or incurred with respect to each line item during the first nine months of the immediately preceding Fiscal Year and amounts then estimated to be earned or incurred with respect to each line item during the last three months of such immediately preceding Fiscal Year. No contingency for the payment of unforeseen expenses of the Company or any subsidiary of the Company shall be included as a separate line item of the Proposed Financial Budget with respect to any Fiscal Year, it being understood and agreed by the parties that each separate line item of the Proposed Financial Budget will reflect any amount for contingency applicable to such line item which the Budgeting Team may deem advisable, as detailed in the supplemental information included as a part of the Proposed Financial Budget with respect to such line item.

(c)     Within **45 days** after the date on which the Chairman of the Company shall have been given a copy of the Proposed Budget with respect to any Fiscal Year, the Board of Directors of the Company shall endeavor to agree upon and instruct the Chairman or any Director or officer of the Company to deliver to the Chief Executive Officer of the Company a notice *either (i)* approving and adopting the Proposed Budget as submitted, *or (ii)* rejecting such Proposed Budget as submitted by giving written notice (a **"Rejection Notice"**) to the Chief Executive Officer stating the specific reasons for such rejection and/or the specific or general modifications, amendments, or other changes to the Proposed Budget deemed advisable by the Board of Directors. Upon receipt of a Rejection Notice, the Chief Executive Officer shall have **20 days** to submit, with such assistance of the Budgeting Team as the Chief Executive Officer may request, to the Board of Directors an amended Proposed Budget addressing such reasons for rejection and taking into account such modifications, amendments or other changes, if any, specified in the Rejection Notice (the **"Amended Proposed Budget"**). Upon receipt of an Amended Proposed Budget, the Board of Directors of the Company shall within **20 days** either *(i)* adopt such Amended Proposed Budget if the Board of Directors reasonably determines that such Amended Proposed Budget materially addresses the reasons for rejection set forth in, and otherwise incorporates the modifications, amendments, or other changes, if any, specified in, the Rejection Notice *or (ii)* reject such Amended Proposed Budget if the Board of Directors reasonably determines that such Amended Proposed Budget does not materially address the reasons for rejection set forth in, or otherwise incorporate the modifications, amendments, or other changes specified in, the Rejection Notice. If the Board of Directors rejects an Amended Proposed Budget or if no Amended Proposed Budget is delivered to the Board of Directors within the **20-day** period, then the Board of Directors of the Company may adopt such other financial budget and business plan for the next Fiscal Year as it may in good faith determine. For purposes of this Agreement any Proposed Budget, Amended Proposed Budget, or other financial budget and business plan, as the case may be, approved and adopted with respect to any Fiscal Year shall constitute the **"Approved Budget"** with respect to such Fiscal Year. Upon adoption of any Approved Budget, the Company's Board of Directors shall promptly notify the Chief Executive Officer in writing. If no such notice is delivered to the Chief Executive Officer within the **45-day** period established herein for Board of Directors' consideration of a Proposed Budget or within the **20-day** period established herein for Board of Directors' consideration of an Amended Proposed Budget, then such Proposed Budget or Amended Proposed Budget, as the case may be, shall be deemed to have been approved by the Company's Board of Directors as the Approved Budget for the applicable Fiscal Year.

(d)     If no Approved Budget with respect to a Fiscal Year is approved and adopted by the Company's Board of Directors on a timely basis pursuant to the procedures provided for above, then the Approved Budget for the immediately preceding Fiscal Year shall automatically become the temporary Approved Budget for such Fiscal Year until such time, if any, as the Company's Board of Directors issues a replacement Approved Budget for such Fiscal Year.

(e)     The Company's Board of Directors may subsequently reconsider, modify, amend, and/or make any other changes to any Approved Budget at any time, if and when deemed advisable in good faith by such Board of Directors.

**8.7     Meetings of the Shareholders**

(a)     A special full meeting of the Shareholders or a special meeting of any Class of Shareholders may be called by, or at the request of, any Director or the holders of at least **20%** of the then issued and outstanding Shares of the Class of Shares in respect of which Class of Shareholders the meeting is to be called (*for example, but not by way of limitation,* (i) the holders of **20%** of the then issued and outstanding Common Shares could call a meeting of the Common Shareholders, or a joint meeting of the Common Shareholders and Class A Preferred Shareholders (*that is,* a full meeting of the Shareholders), *but not* a meeting of just the Class A Preferred Shareholders, *or (ii)* the holders of **20%** of the then issued and outstanding Class A Preferred Shares could call a meeting of the Class A Preferred Shareholders or a joint meeting of the Common Shareholders and Class A Preferred Shareholders (*that is,* a full meeting of the Shareholders), *but not* a meeting of just the Common Shareholders).

(b)     Notice of any special full meeting of the Shareholders or any Class of Shareholders shall be given at least **seven (7) days** prior thereto by written notice to all of the applicable Shareholders. Any Shareholder may waive notice of any meeting. The attendance of a Shareholder at any meeting shall constitute a waiver of notice of such meeting, *except* where such Shareholder attends such meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

(c)     The business to be transacted at, and/or the purpose of, any special full meeting of the Shareholders shall be generally specified in the notice or wavier of notice of such meeting.

(d)     A quorum of the Common Shareholders at any meeting of just the Common Shareholders or a quorum of the Class A Preferred Shareholders at any meeting of just the Class A Preferred Shareholders, as the case may be, shall consist of a Majority-in-Interest of such Class of Shareholders, and no action may be taken at any such meeting (other than adjournment) without the affirmative vote of a Majority-in-Interest of the Shareholders of such Class of Shareholders (as opposed to merely a

majority of the Shareholders attending such meeting). A quorum of the Common Shareholders and Class A Preferred Shareholders at any joint meeting of the Common Shareholders and Class A Preferred Shareholders (*that is,* a full meeting of the Shareholders) shall consist of a Majority-in-Interest of the Shareholders (regardless of the Class of Shareholders) then entitled to vote, and no action may be taken at such meeting (other than adjournment) without the affirmative vote of a Majority-in-Interest of such Shareholders (regardless of the Class of Shareholders) as opposed to merely a majority of that number of Shares held or represented by the Shareholders attending such meeting.

(e)     The affirmative vote of a Majority-in-Interest of the Common Shareholders (in the case of a meeting of just the Common Shareholders), a Majority-in-Interest of the Class A Preferred Shareholders (in the case of a meeting of just the Class A Preferred Shareholders while any of the Class A Preferred Shares are outstanding), or a Majority-in-Interest of the Shareholders (in the case of a joint meeting of both the Common Shareholders and, if any of the Class A Preferred Shares are then outstanding, the Class A Preferred Shareholders)(sometimes referred to in this Agreement as a **"full meeting of the Shareholders"**), as the case may be, shall constitute the act of such Class of Shareholders or the act of the Shareholders, as applicable, with respect to any matter.

(f)     A Common Shareholder or Class A Preferred Shareholder who is present at a full meeting of the Shareholders, or at a meeting of the Class of Shareholders to which such Shareholder belongs, when action is taken, shall be deemed to have assented to the action taken *unless (i)* such Shareholder objects at the beginning of the meeting (or promptly upon such Shareholder's arrival) to holding the meeting or transacting business at the meeting, *(ii)* such Shareholder dissents or abstains from the action taken and the chairman of the meeting expressly acknowledges at such meeting the dissention or abstention of the Shareholder, *or (iii)* such Shareholder delivers written notice of such Shareholder's dissent or abstention to the presiding officer of the meeting before the meeting's adjournment or to the Company promptly after adjournment of the meeting. The right of dissent or abstention with respect to any action shall *not* be available to any Shareholder who votes in favor of the action taken.

### 8.8     Participation in Meetings Through Electronic Means; Proxies

Any Director may participate in a meeting of the Board of Directors of the Company and/or any subsidiary of the Company, and any Shareholder may participate in a full meeting of the Shareholders or any Class of Shareholders, as the case may be, through the use of any means of communication (*including, but not limited to,* telephone conferencing, video conferencing, and/or internet, intranet, or other computer communications) by which all participants may simultaneously hear or otherwise fully communicate with each other during the meeting, and a meeting may be exclusively held through the use of such means of communication. A Director or Shareholder, as the case may be, participating in a meeting by such means shall be deemed to be present in person at such meeting. Whenever in this Agreement any Director or Shareholder shall have the right to vote, such Director or Shareholder shall be entitled to vote by proxy.

### 8.9     Action by Written Consent

Any vote and/or any action required or permitted to be taken at a meeting by the Board of Directors of the Company and/or any subsidiary of the Company may be taken without a meeting so long as *(i)* a written consent specifying the resolutions and/or actions to which such Board of Directors is requested to assent is provided on a contemporaneous basis to each of the Directors on such Board of Directors pursuant to the notice provisions hereof and *(ii)* such written consent shall be signed by the number of Directors of either or both classes of Directors, as applicable, who would have been required to approve such action at a meeting of the Board of Directors. Any vote and/or any action required or permitted to be taken at a meeting by the Shareholders or any Class of Shareholders may be taken without a vote or meeting if a consent in writing, setting forth the action so taken, shall be signed by a Majority-in-Interest of all of the voting Shareholders (in the case of a joint meeting of the Shareholders) or by a Majority-in-Interest of the particular Class of Shareholders (in the case of a meeting of just one Class of Shareholders), as may be applicable.

### 8.10    Officers and Chairperson(s) of the Board

(a)     To the extent deemed advisable by them at any time and from time to time, the Board of Directors of the Company or any subsidiary of the Company may designate one or more Persons to act as officers or assistant officers of the Company or such subsidiary, *including, but not limited to (i)* a Chairman or Co-Chairmen, *(ii)* a Vice Chairman or co-Vice Chairmen, *(iii)* a President or Co-Presidents, *(iv)* one or more Group Chief Financial Officers, Managing Directors, Executive Vice Presidents, Senior Vice Presidents and Vice Presidents, *(v)* a Secretary, *(vi)* a Chief Executive Officer or Co-Chief Executive Officers, *(vii)* a Chief Operating Officer or Co-Chief Operating Officers, *(viii)* a Chief Financial Officer or Co-Chief Financial Officers, *(ix)* a Chief Marketing Officer or Co-Chief Marketing Officers, and/or *(x)* a Chief Administrative Officer or Co-Chief Administrative Officers. Any two or more offices may be held by the same Person, and a Person need not be a Shareholder in order to be an officer.

(b)     Unless and until changed by the applicable Board of Directors, the Persons designated as officers in Section F(4) of the Initial Portion of this Agreement shall be the duly authorized officers of the Company and/or one or more of the subsidiaries of the Company, as applicable.

(c)     Subject to any written employment, management, engagement, development, or other agreement between such officer with the Company and/or any subsidiary of the Company, each officer shall serve at the pleasure of the Board of Directors of the Company or such subsidiary, and, *except* as otherwise provided in such written agreement, may be removed and/or replaced at any time by the applicable Board of Directors with or without reason; *provided, however,* that any such removal or replacement shall

be without prejudice to the written contract rights, if any, of the Person removed or replaced. Election or appointment of an officer or agent shall not in and of itself create any contract rights, and, in order to be effective and enforceable, any contract rights must be set forth in a specific separate written employment, engagement, or other agreement executed by the Company and/or a subsidiary of the Company, as applicable, with the knowledge and written approval of the applicable Board of Directors. *Except* as otherwise provided under any employment, engagement, or other separate agreement with such officer, any officer of the Company and/or any subsidiary of the Company may resign at any time by giving written notice of such resignation to any Director of the Company or such subsidiary, who shall inform the other Directors of the Company and/or the subsidiaries, if any, of such resignation as soon as reasonably practicable thereafter. In such event, *unless* a later date is specified in such notice and approved by the applicable Board of Directors, an officer's resignation shall be effective upon delivery of the notice of resignation, without any action or acceptance by any Board of Directors being necessary.

(d)    *Except* to the extent, if any, otherwise provided in Section F(4) of the Initial Portion of this Agreement or otherwise provided by the Board of Directors at any time and from time to time, each officer shall have such powers, authority, duties, and obligations as are hereinafter provided under this Agreement. Notwithstanding any other provision of this Agreement which might be construed to the contrary, each officer shall be subject to the legal direction and control of the applicable Board of Directors at all times and no officer shall take any action on behalf of the Company or any subsidiary of the Company which is contrary to any Approved Budget or resolution of the Board of Directors of the Company or the applicable subsidiary (*unless* such action is contemporaneously or subsequently ratified by the applicable Board of Directors, in such Board of Directors' sole discretion).

(e)    The Chairman, if that office be created and filled, shall be the highest officer of the Company and each subsidiary of the Company and, as such, shall have the power and authority, subject to the applicable Board of Directors, to supervise and direct the President, Chief Executive Officer, and other officers of the Company and/or such subsidiary. The Chairman shall preside at all meetings of the shareholders and Board of Directors of the Company and each subsidiary of the Company. If no President is appointed, the Chairman shall have all of the rights, duties, and privileges of the President.

(f)    The Vice Chairman, if that office be created and filled, shall be the second highest officer of the Company and each subsidiary of the Company and, as such, shall have the power and authority, subject to the applicable Board of Directors and the Chairman, to supervise and direct the President, Chief Executive Officer, and other officers of the Company and/or such subsidiary. In the absence of the Chairman, the Vice Chairman shall preside at all meetings of the shareholders and Board of Directors of the Company and each subsidiary of the Company. Except as otherwise provided by the Board of Directors and/or the Chairman, the Vice Chairman shall have all the rights and powers of, and be subject to all the restrictions upon, the Chairman. The Vice Chairman shall also perform such other duties as from time to time may be assigned to the Vice Chairman by the Chairman and/or the Board of Directors.

(g)    The President of the Company and/or any subsidiary of the Company, *unless* a separate Chief Executive Officer is appointed, shall be the chief executive officer of the Company or such subsidiary, as applicable. If no Chairman has been appointed or, in the absence of the Chairman and any Vice Chairman, the President shall preside at all meetings of the shareholders and of the Board of Directors. Subject to the provisions of the Governing Instruments of the Company, the applicable subsidiary of the Company, and this Agreement and except as otherwise provided or directed by the Chairman or the Board of Directors, the President may sign certificates for shares of the Company or the applicable subsidiary, and any deeds, mortgages, bonds, contracts or other instruments. Subject to the power and authority of the Chairman, if any, the President shall, in general, perform all duties commonly incident to the office of president of corporations and such other duties as may be prescribed by the Board of Directors and/or the Chairman from time to time. Unless otherwise ordered by the Board of Directors and/or the Chairman, and subject to the power and authority of the Board of Directors and the Chairman, the President of the Company and/or any subsidiary shall have full power and authority on behalf of the Company or such subsidiary, as applicable, to attend, act and vote at any meetings of shareholders of any corporation in which the Company or such subsidiary, as applicable, may hold stock, and at any such meeting shall hold and may exercise all rights incident to the ownership of such stock which the Company, as owner, would have had and exercised if present. The Board of Directors and/or the Chairman may confer like powers on any other person or persons. If a Chairman and/or Vice Chairman is then serving, the President shall report to, and be subject to the direction and control of, such Chairman and/or Vice Chairman, and the Chairman and/or Vice Chairman may, in the Chairman's or Vice Chairman's sole discretion (unless otherwise provided by the Board of Directors) directly exercise any power and authority of, and directly take any actions which could be taken by, the President with respect to the Company.

(h)    In the absence of the President, or in the event of the inability or refusal of the President to act, the Vice-President (or, in the event there be more than one Vice-President, the Vice-Presidents in order designated at the time of their election, or in the absence of any designation, then in the order of their election), if that office be created and filled, shall, subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, and the Board of Directors, perform the duties of the President and when so acting shall have all the powers of and be subject to all the restrictions upon the President. The Vice-Presidents shall also perform such other duties as from time to time may be assigned to such Vice-President by the President, the Chairman, the Vice Chairman and/or the Board of Directors. Unless otherwise determined by the Chairman, any Group Chief Financial Officer or Managing Director of the Company and/or any subsidiary of the Company shall constitute an Executive Vice President of the Company and/or such subsidiary.

(i)    Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, and the Board of Directors, the Treasurer shall have charge and custody of and be responsible for all funds and securities of the Company; receive and give receipts for monies due and payable to the Company from any source whatsoever, and deposit all such monies in

the name of the Company in such banks, trust companies and other depositories as shall be selected by the applicable Board of Directors; and, in general, perform all the duties commonly incident to the office of treasurer and such other duties as from time to time may be assigned to the treasurer by the Chairman, the Vice Chairman, the President, or the applicable Board of Directors. If required by the Board of Directors, the Treasurer shall give a bond for the faithful discharge of the Treasurer's duties in such sum and with such surety or sureties as the Board of Directors shall determine.

(j)   Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, and the Board of Directors, the Secretary shall *(a)* keep the minutes of the shareholders' meetings and of the Board of Directors' meetings in one or more books provided for that purpose; *(b)* see that all notices are duly given in accordance with the provisions of these By-Laws or as required by law; *(c)* be custodian of the corporate records and of the seal, if any, of the Company; *(d)* keep a register of the mailing address of each shareholder; *(e)* sign with the President or Vice-President certificates for shares of stock of the Company; *(f)* have general charge of the stock transfer books of the Company; and, in general, perform all duties commonly incident to the office of Secretary and such other duties as from time to time may be assigned to the Secretary by the Chairman, the Vice Chairman, the President, or by the applicable Board of Directors.

(k)   Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, the Treasurer and the Board of Directors, and in the absence of the Treasurer or in the event of the inability or refusal of the Treasurer to act, the Assistant Treasurers, if any, shall perform the duties of the Treasurer and when so acting shall have all the powers of and be subject to all the restrictions upon the Treasurer. Each Assistant Treasurer shall also perform such other duties as from time to time may be assigned to such Assistant Treasurer by the Chairman, the Vice Chairman, the President, the Treasurer, and/or the applicable Board of Directors. The Assistant Treasurer, if that office be created and filled, shall, if required by the Board of Directors, give bond for the faithful discharge of his duty in such sum and with such surety as the Board of Directors shall determine.

(l)   Subject to the supervision, control, and direction of the Chairman, the Vice Chairman, the President, the Chief Executive Officer, the Secretary and the Board of Directors, and in the absence of the Secretary or in the event of the inability or refusal of the Secretary to act, the Assistant Secretaries, if any, shall perform the duties of the Secretary and when so acting shall have all the powers of and be subject to all the restrictions upon the Secretary. Each Assistant Secretary shall also perform such other duties as from time to time may be assigned to such Assistant Secretary by the Chairman, the Vice Chairman, the President, the Secretary, and/or the applicable Board of Directors.

(m)   The compensation of the officers of the Company and/or any subsidiary may be fixed and changed at any time by the Board of Directors of the Company or such subsidiary, as applicable *(subject, however,* to any contract rights of such officer under any written employment, engagement, management, engagement, development, or other separate agreement executed by the Company or such subsidiary, as applicable), and no officer shall be prevented from receiving such compensation by reason of the fact that such officer is also a Director or Shareholder of the Company and/or any subsidiary of the Company.

**8.11   Standard of Care of Directors and Officers; Disclaimers and Exculpations**

**(a)   The provisions of this Section 8.11 are intended to define the standard of conduct and fiduciary duties (*including, but not limited to,* any duty of loyalty to the Company, the Company's subsidiaries, and/or their Shareholders and other equityholders) of the Directors, officers, Shareholders and other equityholders of the Company and/or the Company's subsidiaries in a manner to reflect the understandings and agreements of the Shareholders. The Shareholders agree that the provisions of this Section 8.11 are reasonable. Furthermore, the Shareholders acknowledge and agree that the provisions of this Section 8.11 shall eliminate or materially limit the personal liability of a Director, officer, Shareholder, or other equityholders to the Company, the Company's subsidiaries, and/or their Shareholders or other equityholders for monetary damages for breach of fiduciary duties and/or other duties to the extent provided herein.**

(b)   *Except* as may be provided under any written employment, engagement, management, or other separate agreement between such Person and the Company and/or any subsidiary of the Company, no Director, officer, and/or Shareholder or other equityholder of the Company and/or any subsidiary of the Company shall be liable, responsible or accountable in damages to the Company, the Company's subsidiaries, and/or any Shareholder or other equityholder of the Company for any act or omission on behalf of the Company and/or any subsidiary of the Company performed or omitted by such Director, officer, Shareholder, or other equityholder in good faith and in a manner reasonably believed by such Director, officer, and/or Shareholder or other equityholder to be within the scope of the authority granted to such Director, officer, Shareholder, or other Shareholder by this Agreement, *unless* such Director, officer, and/or Shareholder or other equityholder has been guilty of gross negligence, intentional misconduct, or a knowing violation of law and/or the provisions of this Agreement with respect to such acts or omissions. A Director, officer, and/or Shareholder or other equityholder of the Company and/or any of the Company's subsidiaries who takes, or omits to take, any act on behalf of the Company and/or any subsidiary of the Company upon a written opinion of the Company's legal counsel shall be conclusively deemed to have been acting, or refraining to act, in such regard, in good faith, in a manner reasonably believed by such Director, officer, and/or Shareholder or other equityholder to be within the scope of the authority granted to such Director, officer, Shareholder or other equityholder by this Agreement, and not in a manner which constitutes gross negligence, intentional misconduct or a knowing violation of law.

(c)   *Except* to the extent limited by any written employment, engagement, management, or other agreement between such Person and the Company and/or a subsidiary of the Company, each Director, officer, Shareholder, or other equityholder of the Company and/or the Company's subsidiaries shall devote such amount of his, her or its business time and attention as such Director, officer, Shareholder or other equityholder, in his, her or its sole discretion, deems necessary.

(d)     *Except* to the extent limited by any written employment, engagement, management, or other agreement between such Person and the Company or otherwise provided under Section 8.13 or any other provision under this Agreement, any Director, officer, and/or Shareholder or other equityholder of the Company and/or any of the Company's subsidiaries, and/or any Affiliate of any of such Persons, may engage in, or possess an interest in, other business ventures or activities (collectively, "**Businesses/Activities**") of any nature and description, independently or with others, whether or not such Businesses/Activities are competitive with those of the Company. None of the Company, any of the subsidiaries of the Company, or any Shareholder or any equityholder of the Company or any subsidiary shall have any rights by virtue of this Agreement in and to such independent ventures, or to the income or profits derived therefrom. *Except* to the extent limited by any written employment, engagement, management, or other agreement between such Person and the Company or otherwise provided under this Agreement, no Director, officer, Shareholder or other equityholder of the Company and/or any subsidiary, or any Affiliate of any such Person shall be obligated to disclose or present any particular business opportunity of a character which, if disclosed or presented to the Company and/or any subsidiary of the Company, could be taken by the Company and/or any subsidiary of the Company and each such Director, officer, Shareholder, equityholder, and/or Affiliate shall have the right to take for his, her, or its own account, or to recommend to others, any such particular business opportunity to the exclusion of the Company, the Company's subsidiaries, and/or the Shareholders or other equityholders of the Company and/or the Company's subsidiaries. Notwithstanding the foregoing, Issa, Davis, Hendrick, Kennedy, Blue, Roth, and each Common Shareholder shall be obligated to present to the Company and/or the subsidiaries of the Company each Germane Opportunity (as hereinafter defined) which becomes available to Issa, Davis, Hendrick, Kennedy, Blue, Roth, or such Common Shareholder and/or any Affiliate of Issa, Davis, Hendrick, Kennedy, Blue, Roth, or such Common Shareholder, as the case may be, and, if desired by the Company and/or one or more of the Company's subsidiaries, Issa, Davis, Hendrick, Kennedy, Blue, Roth, or such Common Shareholder and/or Issa's, Davis', Hendrick's, Kennedy's, Blue's, Roth's, or such Common Shareholder's Affiliates shall, in good faith, endeavor to cause such Germane Opportunity to be made available to the Company and/or the Company's subsidiaries (but nothing herein shall be construed *(i)* as requiring that the Company or any subsidiary of the Company actually negotiate, accept, take, invest in, or otherwise deal in or with respect to any such Germane Opportunity *or (ii)* as requiring any Director, Shareholder, any of their Affiliates, or any other Person to contribute, loan, invest, or otherwise make any funds or financing available to the Company or any subsidiary of the Company for purposes of funding, enabling, or facilitating any such Germane Opportunity). For purposes of this agreement, the term "**Germane Opportunity**" shall mean any opportunity to acquire, undertake, engage in, or otherwise deal in or with respect to any Businesses/Activities that are the same or similar to, or otherwise competitive with, the Business (*other than and excluding* as opportunities the current business operations of Cool Oasis, *but not excluding* in such regard any new opportunities which constitute Germane Opportunities and become available to, or which may be consummated by, Cool Oasis after the Effective Date).

(e)     The fact that any Director, officer, Shareholder or other equityholder of the Company and/or any subsidiary of the Company, and/or any Affiliate of such Person, constitutes, or is directly or indirectly interested in or connected with, an individual, firm or corporation employed or engaged by the Company and/or any one or more subsidiaries of the Company (each a "**Related Party**") to render or perform a service, or to or from whom the Company and/or any one or more subsidiaries of the Company, may purchase, sell or lease any tangible or intangible, real or personal property, shall not prohibit the Company and/or any of the Company's subsidiaries, with the consent of the Board of Directors of the Company, from employing such individual, firm or corporation or from otherwise dealing with him, her or it, and none of the Company, the subsidiaries of the Company, or any of the other Directors, officers, Shareholders, or other equityholders, shall have any rights in or to any income or profits derived therefrom by the contracting party. *Unless* otherwise provided under this Agreement or with the written consent of both a majority-in-number of the Common Directors of the Company then in office, acting as a separate group, and a majority-in-number of the Class A Preferred Directors of the Company then in office, acting as a separate group (regardless whether any such Director or any Affiliate of any such Director may be interested parties as to such dealings), all such dealings of the Company and/or any subsidiary of the Company with any Related Party shall be at arms' length and on terms which are reasonably competitive and comparable in general with amounts which would be charged by independent third parties for similar services or goods; *provided, however,* that no actual bidding or open competition shall be necessary in determining the applicable pricing.

### 8.12   Indemnification of Directors, Officers, and Shareholders

(a)     To the fullest extent permitted by, and in accordance with the provisions of, applicable law, the Company and the Company's subsidiaries shall indemnify each Director, officer, and Shareholder against reasonable expenses (including reasonable attorneys' fees and disbursements), judgments, taxes, penalties, fines (including any excise tax assessed with respect to an employee benefit plan) and amounts paid in settlement (collectively "**Liability**"), incurred by such Person in connection with defending or participating as a witness with respect to any threatened, pending or completed action, suit or proceeding (whether civil, criminal, administrative or investigative, and whether formal or informal) rising from or related to, the Company and/or any subsidiary of the Company or any act or omission of the Director, officer, or Shareholder on behalf of the Company and/or any subsidiary of the Company (*other than* an action, suit or proceeding by the Company, any subsidiary of the Company, and/or any Shareholder of the Company) to which such Person is, or is threatened to be made, a party because such Person is or was a Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, or is or was serving at the request of the Company and/or any subsidiary of the Company as a director, officer, partner, member, manager, governor, employee or agent of any other domestic or foreign corporation, partnership, joint venture, limited liability company, trust, or other enterprise, *including, but not limited to,* service with respect to employee benefit plans. A Director, officer, or Shareholder shall be considered to be serving an employee benefit plan at the request of the Company or a subsidiary of the Company if such Person's duties to the Company and/or any subsidiary of the Company also impose duties on, or otherwise involve services by, such Person to the plan or to participants in or beneficiaries of the plan. To the fullest extent authorized or permitted by, and in accordance with the provisions of, the Act, the Company and/or the Company's subsidiaries shall, at such indemnified Person's request, pay or reimburse

reasonable expenses (including reasonable attorneys' fees and disbursements) incurred by such indemnified Person who is a party to such a proceeding in advance of final disposition of such proceeding.

**(b)** The indemnification against Liability and advancement of expenses provided by, or granted pursuant to, this Section 8.12 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement may be entitled under any agreement, action of disinterested Shareholders or other Shareholders, equityholders or Directors, or otherwise, both as to action in their official capacity and as to action in another capacity while holding such office of the Company and/or any subsidiary of the Company, shall continue as to a Person who has ceased to be a Director, officer, or Shareholder of the Company, and shall inure to the benefit of the heirs, executors and administrators of such a Person.

**(c)** Notwithstanding any other provision of this Agreement which might be construed to the contrary and without indemnity from the Company or any subsidiary of the company pursuant to the other provisions of this Section 8.12 or otherwise, each Class of Shareholders shall be responsible for and shall each indemnify each of the Company, the subsidiaries of the Company, and the other Directors, officers, and employees of the Company and/or the subsidiaries of the Company against any claim by any Director appointed by such Class of Shareholders for loss of office, unfair or wrongful dismissal, or other compensation or liability as a result of such Director's replacement or removal from office; *provided, however,* that the foregoing provisions of this Section 8.12 shall not extend or apply to any claims made by a Director against the Company, any subsidiary of the Company, and/or any other Director, officer, or employee of the Company and/or any subsidiary of the Company in such Director's capacity as an employee and/or officer of the Company and/or any subsidiary of the Company rather than in such Director's capacity as a Director.

**(d)** Any repeal or modification of this Section 8.12 shall not adversely affect any right or protection of a Director, officer, or Shareholder of the Company and/or any subsidiary of the Company under this Section 8.12 with respect to any act or omission occurring prior to the time of such repeal or modification.

**8.13   Confidentiality and Nondisparagement Covenants**

**(a)** At no time during or after termination of such Person's capacity as such shall any of the Directors, officers, or Shareholders of the Company and/or any of the subsidiaries, or any of such Person's Affiliates, communicate, divulge or use for the benefit of such Person, any Affiliate of such Person, and/or any other Person *other than* the Company or any Affiliate of the Company, any business secrets, manuals of instructions, franchise or system manuals, reports, data, business plans, business strategies, customer, or client lists or information, vendor or supplier lists or information, budgets, records, financial or accounting information, systems coding or passwords, personnel information, account records, product plans, software, or any other confidential or proprietary information or trade secrets of the Company or any Affiliate of the Company, or of any customer, or client of the Company or any Affiliate, of any type or description, whether written or not (**"Confidential Information"**); *provided, however,* that the provisions of this Section 8.13(a) shall not apply to *(i)* any Confidential Information which is in the public domain for a reason *other than* the negligence, omission or willful misconduct of such Person or such Person's Affiliates, *(ii)* any disclosures which are required by law, subpoena, court order, or administrative order (*provided, however,* that such Person or such Person's Affiliate, as applicable, shall, prior to any such disclosure, immediately notify the Board of Directors of the Company of such required disclosure and provide the Company and/or its Affiliates with the opportunity, prior to any such disclosure by such Person or such Person's Affiliates and at the expense of the Company and/or its Affiliates, to object to such disclosure and/or seek confidential treatment or other protections with respect to the Confidential Information to be so disclosed, as the Company and/or its Affiliates may deem advisable), *(iii)* the inclusion of information on Tax Returns that is required by law to be reported thereon, *or (iv)* any disclosure to such Person's legal counsel and accountants to the extent necessary in connection with such Person's Tax and legal affairs, if such recipients of the Confidential Information shall agree to maintain the confidentiality of such Confidential Information.

**(b)** Each Director, officer, and Shareholder of the Company and/or any of the subsidiaries of the Company, and his, her, or its Affiliates, shall fully comply with the provisions of which such Person has knowledge under any confidentiality agreements entered into by the Company or any of its Affiliates in the course of their business dealings with any Persons.

**(c)** Upon termination of a Director's, officer's, or Shareholder's status as such, such Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, and the Affiliates of such Director, officer, or Shareholder, as may be applicable, shall immediately deliver to the Company all lists, records, manuals, reports, operating plans, business plans, product plans, data, software and other documents, information, and materials in such Person's possession which constitute or contain Confidential Information, *including, but not limited to,* all copies, reproductions, and/or excerpts of any such Confidential Information whether held, stored, or maintained in written form, photographic form, by means of any electronic, magnetic, laser or other computer or data processing media (*including, but not limited to,* storage on a computer network, hard drive, flash drive, CD, DVD, disk, or diskette), or otherwise.

**(d)** At no time during or after termination of such Person's capacity as such shall any Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, or any Affiliate of such Director, officer, or Shareholder, issue or circulate publicly, to any customers or suppliers of the Company and/or any of the Company's subsidiaries, in any marketing materials or to the media, any false or disparaging statements, remarks or rumors about the Company and/or any of the Company's subsidiaries (*including, but not limited to,* any such statements, remarks, or rumors about the business, clients, customers, Directors, officers, Shareholders, or employees of the Company and/or any of the Company's subsidiaries).

(e)     Should any Director, officer, or Shareholder of the Company and/or any subsidiary of the Company, or any Affiliate of such Director, officer, or Shareholder, violate the provisions of this Section 8.13 in addition to any other rights or remedies available to the other parties hereto, such other parties shall each have the right to enjoin such activities and obtain any other equitable relief which a court of competent jurisdiction may grant.

### 8.14   Key Man Life and Disability Insurance

Each of Issa, Davis, Hendrick, and the other Shareholders who are individuals recognize that *(i)* the direct and/or indirect services and involvement of such Person is important to the Company and the subsidiaries of the Company and *(ii)* the Company, the Company's subsidiaries, and the Shareholders, *including, but not limited to,* the Blue Equity, subsequent Class A Preferred Shareholders, and their Affiliates, as Shareholders of the Company and/or any subsidiaries of the Company and, if applicable, as the guarantor(s) of any indebtedness or obligations of the Company and/or any of the subsidiaries of the Company, would be materially and adversely affected by the loss of any of such services or involvement. Therefore, each of Issa, Davis, Hendrick, and the other Shareholders who are individuals agree that any one or more of *(i)* the Company, *(iii)* the subsidiaries of the Company, *or (iii)* the Shareholders (but only at sole cost of such Shareholder(s) and without reimbursement from the Company and/or any of the Company's subsidiaries), as the case may be, may seek to obtain such key man life and/or disability insurance policies with respect to any one or more of such Persons, and providing for such levels of benefit payable to the Company and/or the Company's subsidiaries (in the case of any such insurance paid for by the Company and/or any of the Company's subsidiaries) or to such Shareholder(s) who pay for such insurance (or to the designee(s) of the Company, any subsidiary of the Company, or such Shareholder(s)), as the Board of Directors (in the case of any such insurance paid for by the Company and/or any subsidiary of the Company) or the paying Shareholder(s), as applicable, determine to be advisable and financially feasible initially and from time to time thereafter. In such regard, each of Issa, Davis, Hendrick, and the other Shareholders who are individuals hereby agrees to promptly complete and execute such applications and other documents, and submit to such normal insurance-related physical examinations, as may be reasonably required by any potential insurer selected by the Board of Directors (in the case of any such insurance paid for by the Company and/or any of the subsidiaries) or by the paying Shareholder(s), as applicable.

### 8.15   Effect of Equity Issuances Pursuant to Section 4.4

Any and all of the provisions of Article 8 shall be subject to amendment, change, or modification to such extent as the Board of Directors of the Company may reasonably deem necessary to implement the terms and conditions of any new issuance of equity interests pursuant to Section 4.4 hereof; *provided, however,* that such amendments, changes, or modifications may only be with respect to management controls if such new equity interests authorized pursuant to Section 4.4 hereof are only issued to Persons who are not already then Shareholders of the Company.

### 8.16   Restricted Competition and Restricted Solicitation Covenants

(a)     **Restricted Competition and Solicitation Covenants Applicable to the Cool Corp Restricted Parties**

Each of the Cool Corp Restricted Parties (as defined in Section I(1) of the Initial Portion of this Agreement) hereby jointly and severally agrees, warrants, represents and covenants with the Company and the other Parties hereto as follows:

(i)     During the Cool Corp Restricted Competition Period (as defined in Section I(3) of the Initial Portion of this Agreement) and *except and excluding* the Cool Corp Permitted Activities (as defined in Section I(6) of the Initial Portion of this Agreement), none of Cool Corp or any of the other Cool Corp Restricted Parties shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, *(i)* own, *(ii)* operate, *(iii)* manage, *(iv)* join, *(v)* control, *(vi)* advise, *(vii)* consult with, *(viii)* provide any marketing, advertising, or sales services for, *(ix)* participate in the ownership, management, operation, or control of, *(x)* furnish any capital or financing to, *(xi)* permit Cool Corp's or any other Cool Corp Restricted Party's name or goodwill to be used in connection with, *(xii)* be connected in any manner with, *(xiii)* provide services to or for the benefit of, *(xiv)* have any interest in the profits of, *or (xv)* permit any real or personal property owned or controlled by Cool Corp or any other Cool Corp Restricted Party to be used for less than full fair market value or full fair rental value, as applicable, by or for, any business or enterprise engaged in all or any part of the Business, or in connection with any activity which is the same as similar to any of those activities carried on with respect to the Business, anywhere within the Restricted Area (as defined in Section I(4) of the Initial Portion of this Agreement). For the avoidance of doubt, nothing in this Section 8.16(a)(i) shall be construed as restricting in any way the right of any Party or any Party's Related Party or Affiliate to sell, distribute, market, export, import, and otherwise deal with respect to grocery, convenience, sundry, and/or other consumer products through any retail, wholesale, commercial, and/or other channel (but, in such regard, the term "grocery, convenience, sundry, and/or other consumer products" shall not be construed as including any Petro Products or Shared LPG Activities),

(ii)    During the Cool Corp Restricted Solicitation Period (as defined in Section I(3) of the Initial Portion of this Agreement), none of Cool Corp or any of the other Cool Corp Restricted Parties shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the

shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit or entice away, or assist any other Person in soliciting or enticing away, from the employment of, or from the engagement as a commission agent or other independent contractor by, the Company or any of the Company's Affiliates, or hire, engage as a commission agent or other independent contractor, or assist any other Person in hiring or engaging as a commission agent or other independent contractor, any Person who is currently, or who becomes at any time during the Cool Corp Restricted Solicitation Period, an employee, commission agent, or other independent contractor of the Company or any of the Company's Affiliates.

(iii)    During the Cool Corp Restricted Solicitation Period, *other than* as an employee, shareholder, officer, consultant, member, or other interest holder of, and for the benefit of, the Company and/or the Company's Affiliates at such time and *except and excluding* the Cool Corp Permitted Activities (as defined in Section I(6) of the Initial Portion of this Agreement), none of Cool Corp or any of the other Cool Corp Restricted Parties shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit, request, or entice, or assist or encourage any other Person in soliciting, requesting, or enticing, any Person who is currently, or who becomes at any time during the Cool Corp Restricted Solicitation Period, a Client of the Company and/or any Affiliate of the Company, or with whom the Company and/or any Affiliate of the Company had more than *de minimis* discussions at any time during the 12 month period prior to the Cool Corp Restricted Solicitation Period regarding the possibility of such Person becoming a Client of the Company and/or any Affiliate of the Company, *(i)* to curtail or cancel its business with the Company and/or any Affiliate of the Company *or (ii)* to not engage the Company and/or any Affiliate of the Company, as the case may be. Discussions with a Person shall be deemed to be more than *de minimis* if they consist of more than a mere introduction or introductory meeting, conversation, or correspondence without proposal or discussion of any potential terms of engagement.

(b)    **Restricted Competition and Solicitation Covenants Applicable to Blue Petroholdings Restricted Parties**

(i)    During the Purchaser Restricted Competition Period (as defined in Section I(4) of the Initial Portion of this Agreement) and *except and excluding* the Blue Petroholdings Permitted Activities (as defined in Section I(7) of the Initial Portion of this Agreement), none of the Blue Petroholdings Restricted Parties (so long as they are Blue Petroholdings Restricted Parties under this Agreement) shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, *(i)* own, *(ii)* operate, *(iii)* manage, *(iv)* join, *(v)* control, *(vi)* advise, *(vii)* consult with, *(viii)* provide any marketing, advertising, or sales services for, *(ix)* participate in the ownership, management, operation, or control of, *(x)* furnish any capital or financing to (other than loans in the ordinary course of a commercial banking business owned or controlled by any one or more of the Blue Petroholdings Restricted Parties), *(xi)* permit any Blue Petroholdings Restricted Party's name or goodwill to be used in connection with, *(xii)* be connected in any manner with, *(xiii)* provide services to or for the benefit of (other than in the ordinary course of the ice business or any other business owned or controlled by any one or more of the Blue Petroholdings Restricted Parties that is not competitive with the petroleum business), *(xiv)* have any interest in the profits of, *or (xv)* permit any real or personal property owned or controlled by Blue Petroholdings or any other Blue Petroholdings Restricted Party (other than in the ordinary course of the ice business or any other business owned or controlled by any one or more of the Blue Petroholdings Restricted Parties that is not competitive with the petroleum business) to be used for less than full fair market value or full fair rental value, as applicable, by or for, any business or enterprise engaged in all or any part of the Business, or in connection with any activity which is the same or similar to any of those activities carried on with respect to the Business, anywhere within the Restricted Area (as defined in Section I(4) of the Initial Portion of this Agreement).

(ii)    During the Blue Petroholdings Restricted Solicitation Period (as defined in Section I(4) of the Initial Portion of this Agreement), none of the Blue Petroholdings Restricted Parties (so long as they are Blue Petroholdings Restricted Parties under this Agreement) shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit or entice away, or assist any other Person in soliciting or enticing away, from the employment of, or from the engagement as a commission agent or other independent contractor by, the Company or any of the Company's Affiliates, or hire, engage as a commission agent or other independent contractor, or assist any other Person in hiring or engaging as a commission agent or other independent contractor, any Person who is currently, or who becomes at any time during the Blue Petroholdings Restricted Solicitation Period, an employee, commission agent, or other independent contractor of the Company or any of the Company's Affiliates; *provided, however,* that the foregoing shall not apply with respect to **Steven Whittingham, Mauricio Gojman**, or any other Person who has a pre-existing relationship with any of the Blue Petroholdings Restricted Parties.

(iii)    During the Blue Petroholdings Restricted Solicitation Period, *other than* as an employee, shareholder, officer, consultant, member, or other interest holder of, and for the benefit of, the Company and/or the Company's Affiliates at such

time and *except and excluding* the Blue Petroholdings Permitted Activities (as defined in Section I(7) of the Initial Portion of this Agreement), none of the Blue Petroholdings Restricted Parties (so long as they are Blue Petroholdings Restricted Parties under this Agreement) shall, directly or indirectly (through the use of any one or more holding companies, Affiliates, related parties, or other Persons, or otherwise), whether for compensation or otherwise, alone or in conjunction or connection with or otherwise through the use of any one or more Persons, as an agent, consultant, principal, partner, officer, employee, trustee, director, shareholder (but in the case of a publicly traded company, only if the shareholder owns in the aggregate, directly or indirectly, at least one percent (1%) of any one or more classes of issued and outstanding securities of such company), member or in any other capacity, solicit, request, or entice, or assist or encourage any other Person in soliciting, requesting, or enticing, any Person who is currently, or who becomes at any time during the Blue Petroholdings Restricted Solicitation Period, a Client of the Company and/or any Affiliate of the Company, or with whom the Company and/or any Affiliate of the Company had more than *de minimis* discussions at any time during the 12 month period prior to the Blue Petroholdings Restricted Solicitation Period regarding the possibility of such Person becoming a Client of the Company and/or any Affiliate of the Company, *(i)* to curtail or cancel its business with the Company and/or any Affiliate of the Company *or (ii)* to not engage the Company and/or any Affiliate of the Company, as the case may be. Discussions with a Person shall be deemed to be more than *de minimis* if they consist of more than a mere introduction or introductory meeting, conversation, or correspondence without proposal or discussion of any potential terms of engagement.

(c)    **Reasonability of Restrictions; Severability**

(i)    Each of the Cool Corp Restricted Parties and the Blue Petroholdings Restricted Parties, acknowledges and agrees that the scope of the foregoing restricted competition and restricted solicitation covenants, *including, but not limited to,* the scope of the business and activities which are restricted, the geographic area (Restricted Area) in which Cool Corp, Blue Petroholdings, and the other Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties are restricted from competing pursuant to the foregoing restricted competition covenants, and the period of time (Cool Corp Restricted Competition Period, Cool Corp Restricted Solicitation Period, Blue Petroholdings Restricted Competition Period and Blue Petroholdings Restricted Solicitation Period) during which Cool Corp, Blue Petroholdings, and the other Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties are restricted from competing or soliciting pursuant to the foregoing restricted competition and restricted solicitation covenants, are reasonable restrictions with respect to scope, area, and time.

(ii)    The running of the Cool Corp Restricted Competition Period and the Cool Corp Restricted Solicitation Period with respect to Cool Corp and each of the other Cool Corp Restricted Parties shall be tolled for any period during which Cool Corp and/or any of the other Cool Corp Restricted Parties is in breach of any of the covenants and agreements contained in Section 8.16(a) for any reason whatsoever. The running of the Blue Petroholdings Restricted Competition Period and Blue Petroholdings Restricted Solicitation Period with respect to Blue Petroholdings and each of the other Blue Petroholdings Restricted Parties shall be tolled for any period during which any of the Blue Petroholdings Restricted Parties is in breach of any of the covenants and agreements contained in Section 8.16(b) for any reason whatsoever.

(iii)    If any court of competent jurisdiction or arbitrator or arbitration panel pursuant to the Alternative Dispute Resolution Provisions set forth in Section 10.4 below should finally adjudicate that the restrictions provided under this Section 8.16 are too broad as to scope, geographic area, or time, said scope, geographic area or time shall be reduced to such extent as the court may deem reasonable, and the restriction shall be enforced as to such reduced scope, geographic area, and/or time. The court may sever any invalid covenant or language contained in this Section 8.16 and, upon such severance, the terms of this Section 8.16 shall be interpreted as if such invalid covenants or language were not contained herein.

(d)    **Specific Performance**

Each of Cool Corp, Blue Petroholdings, and the other Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties hereby agrees and acknowledges that none of the Company or the other Parties hereto or their Affiliates would have any adequate remedy at law for the breach or threatened breach by such Cool Corp Restricted Party or Blue Petroholdings Restricted Party, as the case may be, of the covenants and agreements set forth in this Section 8.16 applicable to such Cool Corp Restricted Party or Blue Petroholdings Restricted Party and, accordingly, each of the Parties further *(i)* agree that the Company, the other Parties, and/or their Affiliates, as applicable, may, in addition to the other remedies which may be available to it or them hereunder or otherwise at law or in equity, seek through the Alternative Dispute Resolution Provisions set forth in Section 10.4 below to enjoin, or file suit in equity to enjoin, any of the others of them, as applicable, from such breach or threatened breach *and (ii)* consent to the issuance of injunctive relief hereunder. Each of the Cool Corp Restricted Parties and the Blue Petroholdings Restricted Parties understands and agrees that the act of the Parties in entering into this Agreement, and Parties' covenants hereunder, shall and do constitute sufficient consideration for the restrictive covenants set out in this Section 8.16. Furthermore, each of the Cool Corp Restricted Parties and Blue Petroholdings Restricted Parties acknowledges and agrees that its agreement to the restrictive covenants set out in this Section 8.16 (directly or through an Affiliate who is a Party hereto on their behalf) constitutes a material inducement for the Parties to enter into this Agreement. The covenants provided for under this Section 8.16 are intended to be enforceable separately from, and without affecting, any other restrictions on competition or solicitation that may be applicable to any of the Parties under the Share Purchase Agreement or any other agreement.

## ARTICLE 9

### WITHDRAWAL, ASSIGNMENT AND ADDITION OF SHAREHOLDERS

#### 9.1    Assignment of Shares

*Except* as otherwise provided and permitted under this Article 9, no Shareholder may sell, assign, transfer, pledge, hypothecate, encumber, withdraw or otherwise dispose of (each of which actions constitutes a **"Transfer"** for all purposes of this Agreement) all or any portion of such Shareholder's Shares to any Person. Any purported Transfer which is not in compliance with the provisions of this Article 9 shall be null and void *ab initio* and of no force or effect, and the Shareholder purporting to make such Transfer shall, for all purposes hereof, remain a Shareholder.

#### 9.2    Tag Along and Drag Along Rights

If, *other than* in a Transfer permitted under Section 9.5 below, any one or more of Blue Equity and/or any Affiliates of Blue Equity which are Shareholders (collectively, the **"Selling Shareholder(s)"**) desire to sell or exchange, in any single Transfer or group of related Transfers, a number of Shares owned by such Selling Shareholder(s) which constitute more than **50%** in voting power of all of the voting Shares of the Company then owned by Blue Equity and Blue Equity's Affiliates, in the aggregate (collectively, the **"Shares To Be Transferred"**), such Selling Shareholder(s) may consummate such sale or exchange of the Shares To Be Transferred, *but if and only if* such Selling Shareholder(s):

(a)    Cause the proposed purchaser of such Shares To Be Transferred to offer in writing to similarly purchase or exchange, in a sale or exchange to be consummated at the same time as the purchase or exchange of the Shares To Be Transferred is consummated, from each of the other Shareholders (each a **"Tag-Drag Shareholder"**) a number of the Shares of the Company then owned by such Tag-Drag Shareholder (collectively, the **"Tag-Drag Shares"** of such Tag-Drag Shareholder) *which bears the same ratio to* the total number of Shares (regardless of the Class of Shares) then owned by such Tag-Drag Shareholder, in the aggregate, *as* the total number of Shares To Be Transferred *bears* to the total number of Shares (regardless of the Class of Shares) then owned by all of the Selling Shareholder(s), in the aggregate, at the same price or exchange value per Share, and on the same payment or exchange terms, as is applicable with respect to the Shares To Be Transferred; *and*

(b)    Either, in the sole discretion of the Board of Directors of the Company (*that is,* the Board of Directors must select one of the following two rights to apply),

(i)    Require each of the Tag-Drag Shareholders to sell or exchange all of the Tag-Drag Shares of such Tag-Drag Shareholder to the Purchaser, at the same price or exchange value per Share, and on the same payment or exchange terms, as applicable with respect to the Shares To Be Transferred, in which case each of such Tag-Drag Shareholders and the purchaser must comply with such required sale or exchange (**"Drag-Along Rights"**); *or*

(ii)    Allow each of the Tag-Drag Shareholders to accept or reject such offer, in such Tag-Drag Shareholder's sole discretion, in which case, and if such offer is accepted by such Shareholder, the proposed purchaser must purchase or acquire in exchange, and such Tag-Drag Shareholder must sell or exchange, the Tag-Drag Shares of such Tag-Drag Shareholder at the same price or exchange value per Share and on the same payment or exchange terms as applicable with respect to the Shares To Be Transferred (**"Tag-Along Rights"**).

(c)    At the closing of the purchase and sale of the Shares To Be Transferred, the Tag-Drag Shareholder whose Shares are required to be sold pursuant to the Drag-Along Rights or who elects to sell any Tag-Drag Shares pursuant to the Tag-Along Rights, as the case may be, shall execute such instruments of assignment as shall be reasonably requested by the purchaser and/or the Board of Directors of the Company. If such Tag-Drag Shareholder fails to execute any such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Agreement or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 9.2(c) with respect to such Tag-Drag Shareholder's applicable Tag-Drag Shares if such Tag-Drag Shareholder fails to do so on a timely basis. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it.

#### 9.3    Voluntary Transfers By Certain Minority Common Shareholders

(a)    If, at any time after *the first to occur of (x)* the **third anniversary** of the Effective Date of this Agreement, *or (y)* the date on which Class A Base Payback is achieved, any Common Shareholder who, together with all Related Parties and Affiliates of such Common Shareholder, then owns or controls, in the aggregate, less than **5%** of the then issued and outstanding Common Shares of the Company (a **"Selling Minority Shareholder"**) receives a bona fide written offer (**"Offer"**) by any Person, other than with respect to a Transfer permitted under Section 9.5 below or pursuant to the provisions of Section 9.2 above, to

purchase all or any portion of such Selling Minority Shareholder's Common Shares and if the Selling Minority Shareholder desires to accept such Offer, then such Common Shares shall be subject to the following right of first refusal options:

(i)      The Selling Minority Shareholder shall give, or cause to be given, written notice of the options set forth below to the Company and to all of the other Common Shareholders, which notice shall contain a true and correct copy of the Offer (the **"Sales Notice"**). An election to exercise an option granted under this Section 9.3 shall be made by written notice given to the Selling Minority Shareholder within the time period permitted for exercise of such option. Unless otherwise specified in the notice of exercise, any exercise of an option under this Section 9.3 shall be deemed to be effective as to the maximum number of Common Shares of the Selling Minority Shareholder which such option holder is eligible to purchase pursuant to exercise of such option (which could be all of the Common Shares of the Selling Minority Shareholder then subject to the options granted under this Section 9.3 if no other option holder exercises such option holder's option with respect to such Common Shares). Any exercise of an option granted under this Section 9.3 shall be irrevocable once made (*subject, however,* to the provisions of Section 9.3(d) below).

(ii)     The Sales Notice shall constitute a first offer by the Selling Minority Shareholder to sell all of the Common Shares covered by the Offer to the other Common Shareholders (the **"Other Common Shareholders "**), and such Other Common Shareholders shall have the first option to purchase any or all of the Common Shares subject to the Offer, at the price and upon the other terms and conditions set forth below. If more than one of the Other Common Shareholders exercise the option granted under this Section 9.3(a)(ii), then such exercising Other Common Shareholders shall have the right to purchase the subject Common Shares on a prorata basis in accordance with their respective Common Share holdings, or in such other percentages as they may unanimously agree. The option granted each Other Common Shareholder under this Section 9.3(a)(ii) shall expire and no longer be exercisable if not exercised by such Other Common Shareholder within **30 days** following the date of delivery of the Sales Notice to such Other Common Shareholder.

(iii)    In the event, and to the extent, that the Other Common Shareholders shall fail or neglect to timely exercise their options as to all of the Common Shares which are subject to the Offer, then the Company shall have the second option to purchase any or all of such remaining Common Shares, at the price and upon the other terms and conditions set forth below. The option granted the Company under this Section 9.3(a)(iii) shall expire and no longer be exercisable if not exercised by the Company within **60 days** following the date of delivery of the Sales Notice to the Company.

(b)      The options of the Other Common Shareholders with respect to the Common Shares which are subject to the Offer and the option of the Company with respect to such Common Shares, as set forth above, shall be exercisable at a price for each such Common Share equal to the purchase price for such Common Share set forth in, or calculable under, the Offer. Such purchase price shall be payable in accordance with the payment terms set forth in the Offer; *provided, however,* that, unless otherwise agreed by the Selling Minority Shareholder and the purchasing Shareholder(s) and/or Company, as applicable, the closing of any such purchase and sale of Common Shares pursuant to this section shall take place at the general offices of the Company no later than **90 days** after the latest date of delivery of the Sale Notice to any of the Other Common Shareholders or the Company. At the option closing, the Selling Minority Shareholder shall transfer and assign all of the Common Shares which are being sold to such other Common Shareholder(s) and/or the Company, as applicable, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee, other than the Company, shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased.

(c)      Upon the failure or neglect of the other Common Shareholders and the Company, in the aggregate, to purchase all of the Common Shares offered to them pursuant to the foregoing options, the Selling Minority Shareholder shall have, for a period of **60 days** following the date on which the last such option to purchase expires, the right to sell the Common Shares described in the Offer to the Person making the Offer at exactly the same price and upon exactly the same other terms and conditions set forth in the Offer; *provided, however,* that the Person making the Offer, or such Person's Affiliates, do not directly or indirectly compete with the Company or any of the Company's subsidiaries. In the event of such sale pursuant to the Offer, the transferee of the subject Common Shares shall take and hold such Common Shares as an Common Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to the Selling Minority Shareholder and such Common Shares (*including, but not limited to,* those with respect to the subsequent Transfer of such Common Shares). Furthermore, the Person making the Offer and purchasing the subject Common Shares shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a Common Shareholder in place of the Selling Minority Shareholder with respect to the Common Shares purchased. If the Selling Minority Shareholder fails or neglects to sell such Common Shares within such **60 day** period in accordance with the foregoing, or if any material term of the Offer is changed, modified or supplemented, then such Common Shares shall continue to be owned by the Selling Minority Shareholder, shall continue to be subject to the terms and conditions of this Agreement, and may not be sold without first again giving the other Common Shareholders and the Company the options to purchase such Units as provided in this Agreement.

(d)      *Notwithstanding anything herein which might be construed to the contrary,* if the other Common Shareholders and the Company, pursuant to their options under this Agreement, shall fail to exercise their options, in the aggregate, to purchase

*all* of the Common Shares covered by the Offer, then none of the option exercises as to any of such Common Shares shall be valid or recognized and the Selling Minority Shareholder may sell the applicable Common Shares as provided under Section 9.3(c) above.

(e)     *Notwithstanding the foregoing,* if Luminus is the Selling Minority Shareholder and Luminus is then a party to another shareholders agreement with Blue Equity and/or any Affiliates of Blue Equity providing for a right of first refusal option in favor of Blue Equity and/or any Affiliates of Blue Equity in the case of a voluntary Transfer of the type described above, then such right of first refusal option in favor of Blue Equity and/or Blue Equity's Affiliates shall be primary and only to the extent that such right of first refusal option is not exercised and consummated shall the right of first refusal options provided under this Section 9.3 then be triggered.

### 9.4   Involuntary Transfers

(a)     In the event that any Shares of any Shareholder ("**Transferring Shareholder**") are sought to be Transferred by any involuntary means (*other than* any Transfer by reason of the death or adjudication of incompetency of any Shareholder, *but including, but not limited to,* any Transfer by reason of attachment, garnishment, execution, levy, bankruptcy, or seizure or by reason of a transfer or division of interests as a result of, or in connection with, a divorce, marital dissolution, or other marital property settlement), then such Shares shall be subject to the following options:

(i)     The other Shareholders (the "**Other Shareholders**") shall have the first option to purchase any or all of the Shares sought to be involuntarily Transferred at the price and upon the other terms and conditions set forth below. Each of the Other Shareholders shall have the right to purchase the applicable Shares in accordance with their Percentage Interests of Common Shares, among themselves, or in such other percentages as they may unanimously agree. If not all of the Other Shareholders exercise their options with respect to the applicable Shares, then those Other Shareholders exercising their options shall be entitled to purchase the balance in accordance with their Percentage Interests among themselves, or in such other percentages as they may unanimously agree.

(ii)     In the event that the Other Shareholders shall fail to exercise their options as to all of the Shares which are sought to be so involuntarily Transferred, then the Company shall have the second option to purchase any or all of such remaining Shares of the applicable Class of Shares, at the price and upon the other terms and conditions set forth below. If the Company purchases any of such Shares pursuant to this option, all of such purchased Shares shall be immediately distributed and reissued to the Other Shareholders on a prorata basis in accordance with their respective Percentage Interests.

(iii)     Whenever a Transferring Shareholder's Shares shall be subject to an option under this Section 9.4, substantially simultaneous notice of the option shall be given in writing by the Transferring Shareholder (or by the Transferring Shareholder's personal representative, heir, or other representative) to the Company and to each of the Other Shareholders; *provided, however,* that if there is an attempted (or assertedly completed) involuntary Transfer and the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable), fails to give the foregoing notice of the option within **five (5) days** after written demand therefor by the Company or any Shareholder, then the Company or any Shareholder may give such notice on behalf of, and in the name of, the Transferring Shareholder (or the Transferring Shareholder's personal representative, heir, or other representative, as applicable). Such notice shall state the number and Class of Shares which is are subject to the attempted (or assertedly completed) involuntary Transfer. The option period with respect to the option given the Other Shareholders shall commence upon the last date of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **30 days** thereafter, unless sooner terminated by written refusal of all of the Other Shareholders to exercise such option. The option period with respect to the option given the Company shall commence upon the last day of delivery of the notice of the option to the Company and the Other Shareholders and shall terminate **60 days** thereafter. An election to exercise any option shall be made in a written instrument delivered to the Transferring Shareholder (or to such Transferring Shareholder's personal representative, heir, or other representative). Unless otherwise specified in the notice of exercise, *(A)* any exercise of an option under this Section 9.4 shall be deemed to be effective as to the maximum number of Shares of the Transferring Shareholder which such holder is eligible to purchase pursuant to exercise of such option (which could be all of the Shares of the Transferring Shareholder then subject to the options granted under this Section 9.4 if no other option holder exercises such holder's option with respect to such Shares), *and (B)* the exercise of any option by the Company shall only be effective as to any Shares sought to be involuntarily Transferred as to which none of the Other Shareholders has exercised its option under this Section 9.4,. Any exercise of an option granted under this Section 9.4 shall be irrevocable once made *unless* revocation of such option is permitted by written consent of the Board of Directors.

(iv)     If, notwithstanding the provisions of this Agreement, any Shares are Transferred by involuntary means without compliance with the foregoing provisions of this Section 9.4, then the options referred to in this Section 9.4 shall be to purchase such Shares from the transferee(s).

(b)     For purposes of this Section 9.4, the option purchase price for the Shares of a Transferring Shareholder to be purchased pursuant to the options shall be an amount equal to the Applicable Amount (as hereinafter defined) determined using the date of the notice of the attempted (or assertedly completed) involuntary Transfer as the Determination Date.

(c)     The option purchase price for the portion of the applicable Shares of a Transferring Shareholder to be purchased by each purchasing Shareholder or the Company, as applicable, shall, at the option of such purchasing party, be paid either *(i)* in immediately available funds on the option closing date, *or (ii)* at least **20%** in immediately available funds on the option closing date,

with the balance represented by a promissory note of such purchasing Shareholder or the Company, as applicable with respect to such Share(s), bearing interest at the Prime Rate (as hereinafter defined) *minus* **2%** and payable in not more than ten equal semi-annual installments of principal together with accrued interest.

(d)    The option closing date with respect to the purchase of any Shares pursuant to the exercise of any option under this Section 9.4 shall occur on such date designated by the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, but in any event within **30 days** following the end of the option period during which such option could be exercised. At the option closing on the option closing date, the Transferring Shareholder (or other seller) shall transfer and assign to the purchaser(s) all of the Shares which are then required to be sold pursuant to exercise of the applicable option, free and clear of all liens, claims and encumbrances of any nature whatsoever, *except* that each such transferee (other than the Company) shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares or their subsequent Transfer. At the option closing, the Transferring Shareholder (or other seller) shall execute such instruments of assignment as shall be reasonably requested by each purchaser. If the Transferring Shareholder (or other seller) fails to execute such document, any other Shareholder or Director of the Company may do so pursuant to the power of attorney granted in the following sentence. Each Shareholder (*including, but not limited to,* any Person who becomes a party to this Agreement or subject to its provisions after the date hereof) hereby irrevocably constitutes and appoints each of the other Shareholders and each of the Directors of the Company, with full power of substitution, as such party's true and lawful attorney-in-fact, with full power and authority, in such party's name, place and stead, to execute and acknowledge all instruments of assignment as contemplated in this Section 9.4(d) if such party is a Transferring Shareholder (or other seller) under this Section 9.4 and fails to do so. Such powers of attorney shall constitute special powers of attorney coupled with an interest, shall be irrevocable, and shall survive the bankruptcy or adjudication of incompetency or insanity, of the Person granting it.

(e)    Upon the failure of the Other Shareholders and/or the Company to purchase all of the Shares sought to be involuntarily Transferred in accordance with this Section 9.4, the unpurchased Shares may be involuntarily Transferred. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a "Shareholder" for purposes thereof.

(f)    For all purposes of this Agreement, **"Applicable Amount"** as of any Determination Date with respect to the applicable Shares of the applicable Shares of the Transferring Shareholder to be purchased and sold pursuant to the options shall mean an amount determined as follows:

(i)    If the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 9.4 shall agree upon an amount to constitute the Applicable Amount with respect to such purchase and sale of Shares, such agreed price shall constitute the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares (the **"Contemporaneously Agreed Price"**).

(ii)    If the purchasing and selling parties with respect to any applicable purchase and sale of Shares of a Transferring Shareholder pursuant to this Section 9.4 shall fail or neglect to agree upon a Contemporaneously Agreed Price with respect to such purchase and sale of Shares within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a Contemporaneously Agreed Price be agreed upon, then the **"Applicable Amount"** with respect to the Shares which are subject to such purchase and sale of Shares shall be an amount equal to the Appraised Value (as hereinafter defined) of such Shares as of the applicable Determination Date (the applicable **"Determination Date"**.

(g)    For all purposes of this Section 9.4, the term **"Appraised Value" "** with respect to any Shares as of any Determination Date shall mean an amount determined in the following manner:

(i)    Whenever the Appraised Value of any Shares of a Transferring Shareholder as of any Determination Date is required to be determined with respect to a purchase or sale of Shares pursuant to this Section 9.4, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall attempt to mutually agree upon a single appraiser to appoint to determine the fair market value of the applicable Shares of the Transferring Shareholder to be so purchased and sold. If such purchasing and selling parties fail or neglect to agree upon a single appraiser within **10 days** after any selling party or purchasing party gives written notice to the other of them demanding that a single appraiser be agreed upon, then, the purchasing party or parties (acting as determined by the vote of a majority-in-interest of them), on the one hand, and the selling party, on the other hand, shall each appoint a qualified appraiser within **15 days** thereafter to determine the fair market value as of such Determination Date of the applicable Shares of the Transferring Shareholder to be purchased and sold.

(ii)    If a single appraiser is agreed upon by the purchasing and selling parties, such appraiser shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder with **30 days** following the date of such appraiser's engagement to render such appraisal (or within such reasonably longer period as may be required by such appraiser, and the Appraised Value of such Shares shall conclusively be deemed to be the value determined by such appraiser.

**(iii)**    If two appraisers are appointed, each of the two appraisers shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder to be purchased and sold within **30 days** following the close of the **15-day** period referred to in Section 9.4(g)(i) above (or within such reasonably longer period as may be agreed upon by the two appraisers), each of which determinations shall be delivered to the purchasing and selling parties. If the two appraisals differ by **10% or less** of the higher appraisal, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the average of such two appraisals. If the two appraisals differ by **more than 10%** of the higher appraisal, the two appraisers shall, within **10 days** after delivery to the purchasing and selling parties of the second to be delivered of the two appraisals, appoint a third qualified appraiser who shall make a determination of the fair market value of the applicable Shares of the Transferring Shareholder within **30 days** following such third appraiser's appointment. In such event, the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the middle appraisal of the three appraisals. If the first two appraisers are unable to agree upon a third appraiser within such **10 day** period, then any party may petition any court of competent jurisdiction to appoint the third appraiser (the first such valid petition filed to be the one effective for such purpose).

**(iv)**    If either the purchasing party or parties, on the one hand, *or* the selling party, on the other hand, shall fail to timely appoint its appraiser, or if the appraisal prepared by either party's designated appraiser shall not be provided to the other party within the applicable time period set forth in Section 9.4(g)(iii) above, then such defaulting party or parties shall be deemed to have forfeited its or their right to an appraisal and the Appraised Value of the applicable Shares of the Transferring Shareholder to be purchased and sold shall conclusively be deemed to be the appraisal of the appraiser appointed by the other party or parties, as the case may be.

**(h)**    For all purposes of this Agreement, the term **"Prime Rate"** with respect to any period shall mean the average base rate on corporate loans posted by at least **75%** of the **30** largest banks in the United States as being in effect during such period, as published in *The Wall Street Journal* or reported by any reliable internet-based service (or such reasonably comparable average interest rate as may be readily available if such average interest rate is not readily available in *The Wall Street Journal* or on any such internet-based service), as such average interest rate may change from time to time during such period.

**(i)**    *Notwithstanding the foregoing,* if Luminus is the Transferring Shareholder and Luminus is then a party to another shareholders agreement with Blue Equity and/or any Affiliates of Blue Equity providing for any purchase option in favor of Blue Equity and/or any Affiliates of Blue Equity in the case of an involuntary Transfer of the type described above, then such purchase options in favor of Blue Equity and/or Blue Equity's Affiliates shall be primary and only to the extent that such purchase options are not exercised and consummated shall purchase options provided under this Section 9.4 then be triggered.

**(j)**    *Notwithstanding the foregoing,* although the Transfer any of the equity interests in CIHL to a Person other than Issa, Davis Hendrick, Kennedy, or their Affiliates will constitute a Transfer of a prorata portion of the Shares of CPHL owned by CIHL, a Transfer of any equity interests in CIHL between or among Issa, Davis, Hendrick, Kennedy, or their Affiliates will not constitute a transfer of any of the Shares of CPHL owned by CIHL.

**9.5    Death, Incompetency, Etc. of a Shareholder; Gifts; Transfers To Affiliates**

**(a)**    In the event of the death, bankruptcy or adjudication of incapacity or incompetence of a Shareholder, the personal representative, heirs, legatees and devisees of the Shareholder, as the case may be, shall have all of the rights of an assignee and Shareholder with respect to the Shares transferred thereby to such successor-in-interest (*subject, however,* to the Share purchase provisions of any applicable employment or engagement agreement, if any, between the Shareholder and the Company and/or any of the Company's subsidiaries). In all of the above cases, the successor-in-interest to the Shareholder shall not have any right to demand any payment or compensation with respect to the Shares by reason of any diminution or asserted diminution in value, or other damages or losses, by reason of any loss of voting rights or restrictions on Transfer with respect to such Shares. In such event, such successor-in-interest of any such Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares. In such event, the successor-in-interest shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the successor-in-interest of the provisions of this Agreement as a "Shareholder" for purposes thereof.

**(b)**    With the prior consent of the Board of Directors, which consent shall not be unreasonably withheld, conditioned, or delayed, any Shareholder may Transfer all or any part of such Shareholder's Shares to the Company and/or any subsidiary of the Company, to another Shareholder of the Company and/or any subsidiary of the Company at such time, or to an Affiliate of the transferring Shareholder if the proposed transferee is willing to accept such Transfer. In such event, the transferee of the Shares shall take and hold such Shares as a Shareholder subject to all of the terms, conditions, duties, obligations, restrictions, and limitations imposed under this Agreement with respect to such Shares. In such event, the transferee shall execute and acknowledge such instruments as the Board of Directors of the Company may reasonably deem necessary or desirable, *including, but not limited to,* the written acceptance and adoption by the transferee of the provisions of this Agreement as a "Shareholder" for purposes thereof.

**9.6   Admission of New Shareholder**

In connection with the issuance of Shares by the Board of Directors, the Board may cause new Shareholders to be admitted to the Company, provided that such new Shareholders agree in writing to be bound by the terms of this Agreement to the extent reasonably applicable.

**ARTICLE
10**

**DURATION, TERMINATION, ARBITRATION, AND REMEDIES**

**10.1   Duration and Termination**

This Agreement shall have unlimited duration unless, until, and to the extent terminated pursuant to Section 10.2 below and/or by order of an arbitrator/panel pursuant to the provisions of Section 10.4 below.

**10.2   Automatic Termination**

**(a)**   This Agreement shall terminate automatically upon the first to occur of any of the following events:

**(i)**   On the date on which the Company completes its dissolution and winding-up procedures.

**(ii)**   On such date as is stated to be the effective date of termination of this Agreement in a written resolution to such effect signed by all of the Shareholders (which such termination of this Agreement may be limited in effect to only one or more of the Company and/or the subsidiaries of the Company to the extent stated in such written resolution).

**(iii)**   On such date occurring on or after the effective date of an initial public offering or subsequent public offering of securities by the Company, or on or after the effective date of any sale or exchange of more than **50%** in voting power of all of the voting Shares of the Company then issued and outstanding, in the aggregate, as is stated to be the effective date of termination of this Agreement in a written resolution adopted by the Board of Directors of the Company (which such termination of this Agreement may be limited in effect to only one or more of the Company and/or the subsidiaries of the Company to the extent stated in such written resolution).

**(b)**   Any termination of this Agreement shall be without prejudice to any obligations or rights of any of the Parties which have accrued prior to such termination and shall not terminate or otherwise affect any provision of this Agreement which is expressly or by implication provided to come into effect upon, or continue in effect after, such termination of this Agreement, *including, but not limited to,* the confidentiality and nondisparagement provisions set forth in Section 8.13 of this Agreement.

**10.3   Rights and Remedies**

**(a)**   If any Party is in default or breach of any provision of this Agreement which is applicable to such Person, the nondefaulting or nonbreaching Party or Parties shall be entitled to all rights and remedies available at law, in equity, in bankruptcy or otherwise, including, but not limited to, a full right of offset. All such rights and remedies shall be cumulative to the fullest extent provided by law, and the exercise by any Party of any right or remedy under this Agreement shall not affect the right of such party or any other Party to exercise any other right or remedy at law or in equity, to recover damages, or to obtain equitable or other relief.

**(b)**   Should any nonbreaching or nondefaulting party or parties seek recourse to equity to enforce any of its or their rights under this Agreement by specific performance, injunction, or other equitable relief, each breaching or defaulting party agrees to, and hereby does waive any defense or defenses which it might otherwise have that there is any adequate remedy at law.

**(c)**   Upon a default or breach of any provision of this Agreement by any Party, the Company and/or any subsidiary of the Company shall be permitted to demand immediate repayment of any or all loans and/or other amounts due to the Company and/or such subsidiary of the Company from the defaulting or breaching Party and/or any Affiliate of such defaulting or breaching Person, regardless of any maturity date or other provisions contained in the loan documents or any other documents regarding such obligations and the defaulting or breaching Party shall then promptly repay, and/or cause its Affiliates, as applicable, to promptly repay, such loans or other amounts due.

**10.4   Alternative Dispute Resolution Procedures**

**(a)**   In the event of any deadlock by the Board of Directors or the Shareholders as to a Joint Consent Matter or any dispute, controversy, claim, or assertion (as applicable, a **"Dispute"**) by, between, or among any Shareholder(s) and/or the Company arising out of or relating to this Agreement and/or any of the Governing Instruments of the Company and/or any subsidiary of the Company and/or any of the transactions and/or relationships contemplated herein or therein (in each case, an **"Arbitratable Matter"**), *including, but not limited to,* any breach by any Party of the provisions of this Agreement and/or any dispute, controversy, claim, or assertion as to the interpretation of any provision of this Agreement and/or any of the Governing Instruments of the Company and/or any subsidiary of the Company or as to the arbitrability of any issue or asserted issue arising hereunder or thereunder, the alternative dispute resolution provisions set forth in this Section 10.4 (the **"Alternative Dispute Resolution Provisions"**) shall apply.

(b)      Unless the disputing parties as to an Arbitratable Matter otherwise agree to a different mutually acceptable alternative dispute resolution (**"ADR"**) mechanism for resolving the Dispute of such Arbitratable Matter within **10 days** from the date of the initial proposal from any party with respect thereto, then the Dispute as to such Arbitratable Matter shall be resolved solely by binding arbitration pursuant to the **United States Arbitration Act**, 9 U.S.C. Section 1 *et seq.* Either party may commence arbitration proceedings at any time after the **10th day** after notice from one disputing party to the other of the inability of the disputing parties to agree upon a mutually acceptable ADR mechanism as set forth above.

(c)      Any arbitration shall be conducted in the Miami, Florida, metropolitan area (or such other area mutually agreeable to all disputing parties) before a single arbitrator mutually selected by the parties thereto or, in the event the parties shall fail to agree, by a three-person panel acting pursuant to the Commercial Arbitration Rules and, if applicable at such time, the Streamlined Arbitration Rules and Procedures then in effect, of the American Arbitration Association. The three person arbitration panel shall consist of one arbitrator selected by each disputing party (or group of disputing parties with common interests) and a third arbitrator selected by the first two arbitrators. All matters of discovery, the presentation of evidence, and procedure shall be governed and controlled in all respects by the arbitrator/panel, in the arbitrator/panel's sole discretion. At any time and from time to time during the arbitration proceeding, the arbitrator/panel may issue interim orders with respect to any matter. Such interim orders shall be immediately binding upon and enforceable against the parties without waiting for the issuance of any final award or order with respect to the arbitration.

(d)      Unless the disputing parties with respect to such arbitration otherwise specifically agree in writing, the arbitration award and/or order with respect to such arbitration:

(i)      Shall be reduced to writing and, if requested by any party, set forth the arbitrator/panel's findings of fact and conclusions of law;

(ii)      Shall specify any damages in U.S. dollars and shall afford any other remedy, legal or equitable, as is deemed advisable by the arbitrator/panel, *including, but not limited, to (A)* an order terminating this Agreement, or any provision of this Agreement, in whole or in part and/or as to any one or more Persons to any extent, *and/or (B)* an award ordering the sale or other Transfer of any or all Shares of a defaulting or breaching Party under this Agreement to any one or more of the Company and/or any non-defaulting or non-breaching Party under this Agreement at all or any portion of such fair market value for such Shares as is determined by the arbitrator/panel or, if and to the extent so directed by the arbitrator/panel, by one or more appraisers under such procedures as are directed by the arbitrator/panel (against which fair market value, any damages awarded by the arbitrator/panel shall, to the extent possible, be deducted, offset, and/or paid to the claiming Party or Parties and/or any other applicable Persons);

(iii)      Shall be made on an expedited basis to the extent deemed feasible by the arbitrator/panel;

(iv)      Shall be final and binding upon the parties, without any right of further appeal absent fraud or intentional malfeasance by the arbitrator/panel, and may be entered for enforcement in any court of competent jurisdiction, or an application may be made to any such court for a judicial acceptance of such award and an order of enforcement, as the case may be;

(v)      Shall include a determination by the arbitrator/panel as to the whether any one or more of the disputing parties shall be responsible for *(A)* paying the arbitrator/panel's fees and expenses and any charge by the American Arbitration Association or other organization with respect to the arbitration, and if so, the amount or percentage of such fees, expenses, and charges to be paid by each, and *(B)* paying the fees and expenses (*including, but not limited to,* reasonable attorneys', accountants', and other professionals' fees and disbursements) incurred or paid by any one or more other disputing parties with respect to the arbitration and any preceding procedures pursuant to the Alternative Dispute Resolution Procedures provided for under this Section 10.4, and, if so, the amount or percentage of such fees and expenses to be paid by each;

(vi)      Shall include a determination whether any disputing party required to pay any amount to any other disputing party shall also pay interest to the payee on such amount until paid in full, and, if so, *(A)* the date from which interest shall accrue (which starting date could be the date of breach or violation by the disputing party obligated to make such payment, the date of the award or order, or such other date as the arbitrator/panel may deem advisable, in the arbitrator/panel's sole discretion) *and (B)* the rate of interest which shall apply (which applicable interest rate shall, *unless* otherwise specified by the arbitrator/panel, be the Federal post-judgment rate then in effect during the period interest is computed, as the same may change from time to time during such period); *and*

(vii)      Shall include such other terms, conditions, and provisions as the arbitrator/panel may deem advisable, in the arbitrator/panel's sole discretion.

(e)      *Unless and except to the extent that* the arbitration award or order specifies otherwise in accordance with the provisions of Section 10.4(d)(v) above, *(i)* the two disputing parties (or two groups of similarly interested disputing parties) shall each pay **50%** of the arbitrator/panel's fees and expenses and any charge by the American Arbitration Association or other organization with respect to the arbitration, *and (ii)* each disputing party shall pay its own fees and expenses (*including, but not limited to,* attorneys', accountants', and other professionals' fees and disbursements) incurred with respect to the arbitration and any preceding procedures pursuant to the Alternative Dispute Resolution Procedures provided for under this Section 10.4.

(f)      Each party will participate in any such arbitration in good faith and will (and will cause its representatives, employees and Affiliates to, and will request each participant in any ADR mechanism and each arbitrator to) hold the existence,

content and result of any dispute in confidence *except* to the extent that disclosure of any such information is required by law, reasonably necessary or advisable from a business or financial standpoint with respect to the party making the disclosure (or any of such party's Affiliates), or required under any loan or other applicable third party contract requirements with respect to the party making the disclosure (or any of such party's Affiliates).

(g)    The arbitration shall proceed in the absence of a disputing party who fails to answer or appear after notice in accordance with the notice provisions of this Agreement or such other notice procedures, if any, as the arbitrator/panel may order, in such arbitrator/panel's sole discretion. An award or order shall not be made solely by reason of the default of any such party to appear, but the arbitrator/panel shall issue an award or order after receiving evidence from any other disputing party in the arbitration proceeding.

(h)    If an arbitrator, whether sole or part of a panel, should die, withdraw or otherwise become incapable of serving, or should such arbitrator refuse to serve, a successor arbitrator shall be selected and appointed in the same manner as the original arbitrator and the arbitration shall then continue.

(i)    This Section 10.4 shall be a complete defense to any suit, action or proceeding instituted before any court or agency with respect to any Arbitratable Matter resolvable under these Alternative Dispute Resolution Provisions, *provided, however,* that, notwithstanding these Alternative Dispute Resolution Provisions, any party may seek judicial relief (legal or equitable) in aid of an ADR mechanism or arbitration in order to prevent a violation of this Agreement pending the implementation of such ADR mechanism or arbitration or to enforce any award or order issued pursuant to such ADR mechanism or arbitration (and the prevailing party in any such enforcement action shall be entitled to recover any fees or costs incurred or paid by such party, *including, but not limited to,* any reasonable attorneys' fees and costs, from the party against whom such enforcement is sought).

(j)    The disputing parties shall promptly pay all amounts required to be paid by them under, and otherwise fully comply with all terms, conditions, and other provisions of, any agreed resolution or any award or order issued pursuant to an ADR mechanism or arbitration implemented pursuant to these Alternative Dispute Resolution Provisions.

## ARTICLE 11

## GENERAL

### 11.1   Ratification and Incorporation By Reference of ROFO/ROFR Options

The Parties hereby ratify and affirm, and incorporate by reference as if fully set forth herein, all of the terms, conditions, and provisions of Section I of that certain **Share Purchase Agreement** entered into as of **September 29, 2011**, by and among all of the initial Parties hereto except Luminus, CIHL, and Davis, *as amended by* that certain **First Amendment to Share Purchase Agreement** dated **December 12, 2011** (*as amended,* the **"Share Purchase Agreement"**).

### 11.2   Notices

(a)    All notices, demands, requests, consents, approvals, offers, option exercises, counteroffers or other communications (hereinafter referred to collectively as **"Notices"** and each individually as a **"Notice"**) required or permitted under this Agreement shall be in writing and *(i)* delivered by personal delivery to such intended recipient, which personal delivery shall be evidenced by a written receipt therefor signed by such recipient, *(ii)* sent by certified, registered or express mail, return receipt requested, postage prepaid, or by reputable express delivery service (such as Federal Express, UPS, Airborne, Purolator, or DHL), fees prepaid, addressed to the intended recipient thereof, at the postal address or street address set forth in this Agreement as a part of the Initial Address for such intended recipient (or at such other postal address or street address as such intended recipient shall have furnished in writing to the other parties to this Agreement), *(iii)* transmitted by email to such intended recipient at the email address set forth in this Agreement as a part of the Initial Address for such intended recipient (or such other email address as such intended recipient shall have furnished in writing to the other parties to this Agreement), receipt of which transmission shall be confirmed by such intended recipient, *or (iv)* transmitted by fax to such intended recipient at the fax number set forth in this Agreement as a part of the Initial Address for such intended recipient (or such other fax number as such intended recipient shall have furnished in writing to the other parties to this Agreement), receipt of which transmission shall be confirmed by such recipient. The copies provided for as part of the Initial Address for any intended recipient (or as subsequently required by any intended recipient by written notice to the other parties to this Agreement) shall be considered a material part and condition of any valid notice unless the party to whom such copy is required to be given is no longer available at the specified address.

(b)    All such Notices shall be effective upon being personally delivered and properly receipted, **two (2) days** after being properly addressed and deposited in the mail or with a reputable express delivery service or upon being transmitted by fax or email and properly receipted, as set forth above. However, the time period in which a response to any such Notice must be given shall commence to run from the date of receipt of personal delivery, the date on the return receipt or express delivery receipt, or the date of confirmation of receipt of the fax or email, as the case may be, of the Notice by the addressee thereof; *provided, however,* that if any Person rejects delivery of any such Notice properly sent by mail or express delivery service, or fails or neglects to accept delivery after **two (2) attempts** to so deliver by postal or express delivery authorities, as the case may be, the time period for a response shall commence **two (2) days** following the proper mailing or depositing with the express delivery service, as the case may be, of such Notice.

**11.3   Amendment and Termination**

(a)      *Except* as provided in Section 11.3(b) below, this Agreement may be modified or amended from time to time only in accordance with the terms and conditions set forth in a written resolution adopted by the holders of at least **80%** of the voting Common Shares of the Company at such time (*and, thus, excluding* the Class B Nonvoting Preferred Shares).

(b)      In the event that the Company and/or any subsidiary of the Company shall issue additional Shares or other equity interests (**"New Shares"**) for the reasons set forth in Section 4.4(a) (whether or not such New Shares will be sold and issued to a Person who is already then a Shareholder of the Company and/or any subsidiary of the Company, or to any Affiliate of any such Person), the Board of Directors of the Company may, in good faith and without the vote of any of the Shareholders, amend this Agreement and the Governing Instruments of the Company and/or any of the Subsidiaries to such extent as is reasonably necessary or appropriate *(i)* to facilitate and provide for the issuance of such New Shares and the implementation of the rights and privileges to which the holders of such New Shares are entitled, *(ii)* to provide for the inclusion of such New Shares and their holders in the various definitions, descriptions, and concepts regarding Shares, Shareholders, Shareholders, Classes of Shares, Classes of Shareholders, Percentage Interests, meetings, management, and similarly general definitions, descriptions, and concepts, *and/or (iii)* to provide for the adoption and execution of this Agreement (as amended) by the holders of such New Shares; *provided, however,* any other provision of this Agreement which might be construed to the contrary, any amendment of the provisions of Section F(1)(b) of this Agreement pursuant to this Section 11.3(b) will only be permitted if such amendment still empowers any Shareholder who holds **15%** or more of the issued and outstanding Shares of the Company in the aggregate (*other than and excluding* any Class B Nonvoting Preferred Shares) to elect or appoint at least one Director of the Company *unless and until* a Liquidity Event occurs.

(c)      This Agreement shall terminate upon the consummation of any IPO and/or other Liquidity Event resulting in the achievement of Class B Base Payback, Class A Base Payback, Class A Return Payback, and Class B Return Payback, the conversion of the Class A Preferred Shares, and significant amounts or other valuable consideration being received by the Shareholders.

**11.4   Governing Law; Jurisdiction**

This Agreement shall be construed in accordance with the laws of the State of Delaware without regard to any conflicts of law provisions. However, *subject to* the arbitration provisions hereinafter provided, each Party to this Agreement hereby irrevocably consents to, and agrees to submit to, personal jurisdiction and venue in any Federal or state court located in Miami, Florida, for all purposes and as to any and all claims. In such regard, as an alternative to personal service, each Shareholder residing outside of Miami, Florida, hereby irrevocably consents to service of any and all process in any such action or proceeding by the mailing of copies to such Shareholder at the address for such Shareholder then reflected in the records of the Company. The parties agree that any final judgment in any such action or proceeding, or any final award in arbitration, may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Shareholder hereby waives any objection to venue in Miami, Florida, and any objection to any action or proceeding there on the basis of forum non-convenience. Each Shareholder further agrees that, *subject to* the arbitration provisions hereinafter provided, any action or proceeding brought against the Company, any subsidiary of the Company, or any other Shareholder shall be brought only in a Federal or state court sitting in Miami, Florida. Nothing in this section shall affect the right of the Company, any subsidiary of the Company, or any Shareholder, *subject, however, to* the arbitration provisions hereinafter provided, to serve legal process in any other manner permitted by law.

**11.5   Entire Agreement**

It is expressly understood and agreed by and among the Parties hereto that, *except* for any written employment, sharing, or other separate agreement entered into between any Party and the Company contemporaneously herewith or pursuant to the terms and conditions set forth in this Agreement and *except* for the Share Purchase Agreement, which shall continue in full force and effect in accordance with its terms, *(i)* this Agreement sets forth all of the promises, agreements, representations, warranties, conditions and understandings among the parties with respect to the subject matter hereof, *(ii)* this Agreement supersedes all prior and/or other contemporaneous promises, agreements, representations, warranties, conditions, and understandings, oral or written, of the parties (*including, but not limited to,* any letter of intent, letter of mutual understandings in principle, and/or term sheet), *and (iii)* there are no other promises, agreements, representations, warranties, conditions or understandings, either oral or written, among them other than as are set forth in this Agreement.

**11.6   Controlling Agreement**

In the event of any ambiguity, inconsistency, or discrepancy between the provisions of this Agreement and the Governing Instruments of the Company and/or any subsidiary of the Company, it is the intention that the provisions of this Agreement shall prevail and, accordingly, each of the Shareholders hereby agrees that such Shareholder shall exercise all voting and other rights and powers available to such Shareholder, and will cause such Shareholder's Affiliates to exercise all voting and other rights and powers available to such Shareholder's Affiliates, so as *(i)* to give effect to the provisions of this Agreement to the fullest extent possible, *and (ii)* to procure any amendment or change to the Governing Instruments of the Company and/or the subsidiaries of the Company necessary or appropriate in connection with the provisions of this Agreement.

**11.7   No Partnership or Agency**

Nothing in this Agreement shall be construed as creating or constituting any partnership or joint venture between or among any or all of the Parties and/or any Affiliates of any of the Parties.

**11.8   No Waiver**

No waiver by any Party of any provisions of this Agreement, nor any default by any Party, shall affect the rights of the waiving or non-defaulting Party thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether similar or dissimilar. No waiver shall be binding unless executed in writing by the Party making the waiver, nor shall any waiver constitute a continuing waiver.

**11.9   Binding Agreement; Successors and Assigns**

This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, and their respective heirs, personal representatives, successors and permitted assigns. Any purported assignment not in accordance herewith shall be null and void *ab initio.*

**11.10   Execution in Counterparts; Photocopies or Faxed, Scanned, or Emailed Copies**

This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument. It shall not be necessary that the signature of, or on behalf of, each Party, or that the signatures of all parties, be affixed to each counterpart. The signature pages of the counterparts may be detached from them and be reattached to any other counterpart identical in form hereto, but having attached to it one or more additional signature pages, and it shall not be necessary in making proof of this Agreement to produce or account for any particular number of counterparts so long as one or more counterparts collectively shall contain the respective signatures of, or on behalf of, all of the parties hereto. A photocopy or faxed, scanned, or emailed copy of this Agreement or any signed signature page to this Agreement shall have the same validity and enforceability as an originally signed copy.

**11.11   Severability**

If any provision of this Agreement, or the application thereof to any individual, entity or circumstances, shall be invalid or unenforceable to any extent, the remainder of this Agreement, and the application of such provision to other individuals, entities or circumstances, shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

**11.12   Further Assurances**

**(a)**   Each of the Parties hereby agrees *(i)* to execute and deliver all of the agreements, documents and instruments required to be executed and delivered by such Party under this Agreement *and (ii)* without further consideration, to execute and deliver such additional instruments and documents and to take such additional actions as may reasonably be requested by any of the Parties at any time and from time to time in order to effectuate the transactions and arrangements contemplated by this Agreement.

**(b)**   Without limiting the generality of the provision set forth in Section 11.12(a):

**(i)**   Each of the Shareholders hereby agrees to vote, and/or cause each of such Shareholder's Affiliates to vote, as applicable, any and all shares of the Company in such manner as will facilitate the transactions and arrangements provided for under this Agreement.

**(ii)**   Each of the Parties hereby agrees that, to the extent possible, such Party shall take all actions and enter into all agreements, documents, and arrangements, and cause such Party's Affiliates to take all actions and enter into all agreements, documents, and arrangements, necessary or appropriate *(i)* to give effect to the provisions of this Agreement to the fullest extent possible, *and (ii)* to procure any amendment or change to the Governing Instruments of the Company and/or the subsidiaries of the Company necessary or appropriate in connection with the provisions of this Agreement.

**(iii)**   Each of the Parties hereby agrees that, to the extent possible, such Party shall refrain from taking any action, and cause such Party's Affiliates to refrain from taking any action, which would be contrary or adverse to, or in violation of, the provisions of this Agreement.

**11.13   Rules of Usage**

The following rules of usage shall apply to this Agreement, unless otherwise required by the context or unless otherwise defined therein:

**(a)**   Except as otherwise expressly provided, the use of any gender in this Agreement shall include all other genders, the singular shall include the plural, and the plural shall include the singular, as the context may require.

(b)     Except as otherwise expressly provided, references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits are references to articles, sections, paragraphs, clauses, annexes, appendices, schedules, attachments, or exhibits in or to this Agreement. Any annexes, appendices, schedules, and exhibits to this Agreement are incorporated into this Agreement by reference at the point where first mentioned and are expressly made a part of this Agreement, and any or all of such annexes, appendices, schedules, attachments, and exhibits to this Agreement may be bound separate from, or otherwise separated from, the other portions of this Agreement for reasons of convenience or otherwise without affecting the validity of this Agreement or the treatment of any such annexes, appendices, schedules, attachments, or exhibits as being a part of this Agreement.

(c)     The captions, headings, subheadings, indices, and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement or affect in any way the meaning, interpretation, construction or effect of any provision of this Agreement.

(d)     Except as otherwise expressly provided, reference to any agreement means such agreement as amended, modified, extended or supplemented from time to time in accordance with the applicable provisions thereof.

(e)     Except as otherwise expressly provided, references to any law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement thereof.

(f)     When used in this Agreement, words such as "hereunder", "hereto", "hereof" and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Agreement and not to any particular article, section, subsection, paragraph or clause hereof.

(g)     References to "including" means including without limiting the generality of any description preceding such term and, thus, the rule of *ejusdem generis* shall not be applicable with respect to this Agreement.

(h)     Except as otherwise expressly provided or clearly indicated by context, reference herein to "days," "months," "quarters," or "years" means calendar days, calendar months, calendar quarters, or calendar years.

(i)     Each of the parties to this Agreement and their counsel have reviewed and revised, or requested revisions to, this Agreement, and the usual rule of construction that any ambiguities are to be resolved against the drafting Party shall be inapplicable in the construing and interpretation of this Agreement and any amendments or exhibits thereto.

**11.14 Waiver of Right of Partition**

The Shareholders agree that the Company's assets are not and will not be suitable for partition. Accordingly, each of the Shareholders hereby irrevocably waives any and all right, if any, which such Shareholder may have to maintain an action for partition of any of the Company's assets. No Shareholder shall have any right to any specific assets of the Company upon the liquidation of, or any distribution from, the Company.

**11.15 Legend on Stock Certificates**

All Shares of the Company now or hereafter owned by any of the Shareholders shall be subject to the provisions of this Agreement and the certificates representing such Shares shall bear the following legend or such other legend as the Company's St. Lucia legal counsel may reasonably deem advisable:

"The Shares represented by this certificate are subject to, and are transferrable only in compliance with, and the voting, dividend and other rights of the shareholder with respect to these Shares are subject to and limited by, a Shareholders Agreement dated as of December 30, 2011, by and among Cool Petroleum Holdings Limited, Blue Jamaica Petroholdings, Ltd., Cool Corp. Limited, Joseph Issa, Colin Hendrick, Gwen Kennedy, Luminus Capital Partners Limited, Caribbean Property Managers International Corp, Rodney Davis, and Cool International Holdings Limited, a copy of which Agreement is on file in the office of the Secretary of the Company."

**ARTICLE
12**

**REPRESENTATIONS, WARRANTIES AND COVENANTS
OF THE PARTIES**

**12.1   Representations, Warranties and Covenants of the Shareholders**

**Each of the Parties represents and warrants to the other Parties as follows:**

(a)     Such Party or representative acting for such Party with respect to this Agreement has full capacity, right, power and authority to execute and deliver this Agreement and to perform such Party's obligations under this Agreement. This Agreement constitutes the valid and legally binding obligation of such Party and is enforceable against such Party in accordance with its terms.

The execution and delivery of this Agreement has been approved by all necessary action of such Party under applicable laws governing such Party and, if applicable, any Governing Instruments of such Party.

(b)      The execution and delivery of this Agreement, the consummation of the transactions contemplated in this Agreement, and such Party's performance and fulfillment of the obligations and undertakings under this Agreement which are applicable to such Party *will not: (i)* violate any provision of, result in the breach of, or accelerate or permit the acceleration of, any performance required by the terms of *(A)* such Party's Governing Instruments, if applicable, *(B)* any contract, agreement, arrangement or undertaking to which such Party is a party or by which such Party is bound, provided approval from the Bondholders is duly obtained prior to the transfer of the Shares in the Company, *(C)* any judgment, decree, writ, injunction, order or award of any arbitration panel, court, or governmental authority, *or (D)* any applicable law, ordinance, rule, or regulation of any governmental body, *or (ii)* result in the creation of any claim, lien, charge, or encumbrance upon any properties of the Company and/or any subsidiary of the Company.

(c)      There are no claims of any kind or any actions, suits, proceedings, arbitrations, or investigations pending or, to the knowledge of such Party, threatened in any court or before any governmental agency or instrumentality or arbitration panel, or otherwise relating to such Party that adversely affects, or could adversely affect, the ability of such Party to enter into and perform such Party's obligations under this Agreement.

(d)      No consents, approvals, authorizations, releases, or orders, other than those obtained at the time of or prior to the execution of this Agreement by such Party, are required of or by such Party for the authorization, execution and delivery of, and for the performance and consummation of the transactions contemplated by, this Agreement.

(e)      In connection with such Party's acquisition of any Shares, such Party has been fully informed by such Party's independent counselors and advisors as to the applicability of the requirements of all applicable securities and/or "blue sky" laws.

*[End of General Terms and Conditions]*

## SIGNATURE PAGE

*Shareholders Agreement of Cool Petroleum Holdings Limited*

By signing below, each of the undersigned hereby agrees, effective as of the Effective Date *(i)* to all of the terms and conditions set forth in Sections A through H above (which constitute the Initial Portion of this Agreement), *(ii) except* as otherwise specifically and expressly provided in Sections A through H above, to all of the terms and conditions set forth in Articles 1 through 17 above (which constitute the General Terms and Conditions of this Agreement), *and (iii)* to each and all of the schedules, attachments, and exhibits, if any, attached to this Agreement.

COMPANY:

COOL PETROLEUM HOLDINGS LIMITED

By: ➤
Name:
Title:

COOL CORP:
COOL CORP. LIMITED

By: ➤
Frederick March   JOSEPH ISSA
Director

ISSA:

➤
Joseph Issa

LUMINUS:
LUMINUS CAPITAL PARTNERS LIMITED

By: ➤
Mauricio Gojman, Director

By: ➤
Steven Whittingham, Director

DAVIS:

➤
Rodney Davis

BLUE EQUITY:

BLUE EQUITY PETROHOLDINGS, LTD.

By: ➤
David M. Roth
Vice Chairman and Director

HENDRICK:

➤
Colin Hendrick

KENNEDY:

➤
Gwen Kennedy

CPMIC:
CARIBBEAN PROPERTY MANAGERS INTERNATIONAL CORP

By: ➤
Joseph Issa
Director

CIHL:
COOL INTERNATIONAL HOLDINGS LIMITED

By: ➤
Joseph Issa, Director

By: ➤
Rodney Davis, Director

By: ➤
Colin Hendrick, Director

By: ➤
Gwen Kennedy, Director

## SIGNATURE PAGE

*Shareholders Agreement of Cool Petroleum Holdings Limited*

---

By signing below, each of the undersigned hereby agrees, effective as of the Effective Date *(i)* to all of the terms and conditions set forth in Sections A through H above (which constitute the Initial Portion of this Agreement), *(ii) except* as otherwise specifically and expressly provided in Sections A through H above, to all of the terms and conditions set forth in Articles 1 through 17 above (which constitute the General Terms and Conditions of this Agreement), *and (iii)* to each and all of the schedules, attachments, and exhibits, if any, attached to this Agreement.

COMPANY:

COOL PETROLEUM HOLDINGS LIMITED

By: ➢
Name:
Title:

COOL CORP:

COOL CORP. LIMITED

By: ➢
~~Frederick March~~ JOSEPH ISSA
Director

ISSA:

➢
Joseph Issa

LUMINUS:

LUMINUS CAPITAL PARTNERS LIMITED

By: ➢
Mauricio Gojman, Director

By: ➢
Steven Whittingham, Director

DAVIS:

➢
Rodney Davis

BLUE EQUITY:

BLUE EQUITY PETROHOLDINGS, LTD.

By: ➢
David M. Roth
Vice Chairman and Director

HENDRICK:

➢
Colin Hendrick

KENNEDY:

➢
Gwen Kennedy

CPMIC:

CARIBBEAN PROPERTY MANAGERS INTERNATIONAL CORP

By: ➢
Joseph Issa
Director

CIHL:

COOL INTERNATIONAL HOLDINGS LIMITED

By: ➢
Joseph Issa, Director

By: ➢
Rodney Davis, Director

By: ➢
Colin Hendrick, Director

By: ➢
Gwen Kennedy, Director

---

## SIGNATURE PAGE

*Shareholders Agreement of Cool Petroleum Holdings Limited*

By signing below, each of the undersigned hereby agrees, effective as of the Effective Date *(i)* to all of the terms and conditions set forth in Sections A through H above (which constitute the Initial Portion of this Agreement), *(ii) except* as otherwise specifically and expressly provided in Sections A through H above, to all of the terms and conditions set forth in Articles 1 through 17 above (which constitute the General Terms and Conditions of this Agreement), *and (iii)* to each and all of the schedules, attachments, and exhibits, if any, attached to this Agreement.

COMPANY:

COOL PETROLEUM HOLDINGS LIMITED

By:➤ _____
Name: _____
Title: _____

COOL CORP:

CODL CORP. LIMITED

By:➤ _____
Frederick March
Director

ISSA:

➤ _____
Joseph Issa

LUMINUS:

LUMINUS CAPITAL PARTNERS LIMITED

By:➤ _____
Mauricio Gojman, Director

By:➤ _____
Steven Whittingham, Director

DAVIS:

➤ _____
Rodney Davis

BLUE EQUITY:

BLUE EQUITY PETROHOLDINGS, LTD.

By:➤ _____
David M. Roth
Vice Chairman and Director

HENDRICK:

➤ _____
Colin Hendrick

KENNEDY:

➤ _____
Gwen Kennedy

CPMIC:

CARIBBEAN PROPERTY MANAGERS INTERNATIONAL CORP

By:➤ _____
Joseph Issa
Director

CIHL:

COOL INTERNATIONAL HOLDINGS LIMITED

By:➤ _____
Joseph Issa, Director

By:➤ _____
Rodney Davis, Director

By:➤ _____
Colin Hendrick, Director

By:➤ _____
Gwen Kennedy, Director

**EXHIBIT 8.6(a)**

*Approved Budget for Initial Period*

*[Approved Budget For Initial Period Follows]*

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2013-20458-CA-01

COOL INTERNATIONAL HOLDINGS
LTD-COOL PETROLEUM, a British Virgin
Islands incorporated company, individually
and derivatively in the right and for
the benefit of BE TAG HOLDINGS LIMITED,
a St. Lucia International Business Company,

        Plaintiff,

v.

BLUE EQUITY PETROHOLDINGS, LTD.,
a St. Lucia International Business Company;
BLUE EQUITY LLC; JONATHAN BLUE,
an individual; DAVID ROTH, an individual;
and MAUREEN SMITH, an individual,

        Defendants.

_____/



### ORDER ON EX PARTE MOTION FOR TEMPORARY INJUNCTION

**THIS CAUSE** came before the Court on the *ex parte* motion for temporary injunction

("Motion") filed by the plaintiff, Cool International Holdings ("CIHL"), acting individually and

derivatively on behalf of BE TAG Holdings Limited ("BE TAG"), against the defendants, BLUE

EQUITY PETROHOLDINGS, LTD., a St. Lucia International Business Company ("BEP"),

BLUE EQUITY, LLC ("Blue Equity"), a Delaware Business company, JONATHAN BLUE

("Jonathan Blue"), a resident of Kentucky, DAVID ROTH ("Roth"), a resident of Kentucky,

(collectively referred to herein as the "Blue Equity Defendants"), and MAUREEN SMITH ("Ms.

Smith"), a resident of Kingston, Jamaica., W.I., (together, the Blue Equity Defendants and Ms.


A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

CASE NO. 2013-20458-CA-01

Smith shall be referred to collectively as the "defendants"). Having reviewed the Verified

Complaint and the Motion, having heard argument of counsel, and being otherwise advised in

the premises,

### IT IS ORDERED AND ADJUDGED:

1.  CIHL's Motion is **GRANTED** based on the factual allegations contained in the

Verified Complaint and the Motion predicated thereon.

2.  The Court finds that absent entry of this Order, CIHL will suffer imminent and

irreparable injury through irreversible loss of its equity position and subsequent revenue resulting

from the recent sale of other corporate assets, permanent dilution, dissipation, and waste of the

company's only remaining corporate assets following the sale of its shares, loss or damage of

corporate records and loss of revenue from a viable and ongoing business concern. *See, e.g.,*

*Georgia Banking Co. v. GMC Lending & Mortgage Servs. Corp.*, 923 So. 2d 1224, 1225 (Fla. 3d

DCA 2006) (finding injunctive relief is appropriate to prevent dissipation of corporate funds); *In*

*re Estate of Barsanti*, 773 So. 2d 1206, 1208 (Fla. 3d DCA 2000 (remanding with directions to

grant the temporary injunction because of potential dissipation of assets); *Korn v. Ambassador*

*Homes, Inc.*, 546 So. 2d 756, 757 (Fla. 3d DCA 1989) (affirming temporary injunction where

there was a "probable danger of dissipation"); *Sanchez v. Solomon*, 508 So. 2d 1264, 1265 (Fla.

3d DCA 1987) (affirming denial of motion to dissolve injunction "freezing the disputed funds

pending a final determination of ownership" to prevent the removal of the assets from the

jurisdiction).

3.  The Court further finds that there is no adequate remedy at law. CIHL has

claimed the existence of specific, identifiable funds which are the proceeds of the sale of

corporate shares. Since there has been no distribution, these funds should be isolated and readily



A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

identifiable. In addition, the parties to the Shareholders' Agreement specifically agreed that remedies at law for breach of the Shareholders' Agreement would be inadequate. *See* Verified Complaint at Exhibit A (Shareholders' Agreement § 10.3(b)).

4.      CIHL has a clear legal right to relief and has a substantial likelihood of success on the merits of its underlying claims based on its shareholder status, the defendants' apparent violation of CIHL's rights as shareholder and other facts set forth in the Verified Complaint and CIHL's Motion. For example, CIHL alleges that it has received no meaningful information since the closing of the sale on December 31, 2012. CIHL further alleges that it has received no distribution or indication of distributable amounts and neither the shareholders nor the full Board of Directors have been advised of the majority shareholder's actions leading up to or subsequent to closing. In short, the causes of action are recognized under Florida law and the allegations supporting those causes of action, if true, would establish a substantial likelihood of success on the merits.

5.      An order granting temporary injunctive relief will result in no harm to the defendants. For example, it is alleged that the defendants claim to have not disbursed monies from the sale. CIHL thus seeks only to enjoin the defendants from prematurely—or improperly—disbursing these monies. Further, as named shareholders themselves, the Court finds that any action taken to preserve and maintain the assets of BE TAG, also will inure to the benefit of the Blue Equity Defendants and/or their agents and assigns.

6.      This temporary injunction will not disserve the public interest, and will not prejudice the defendants in this action, as it seeks only to preserve the status quo to determine what course of action is in the best interest of the subject corporation and all its shareholders, and


A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

will ensure an equitable and orderly and legal distribution of corporate assets, including all sales proceeds.

7.       Accordingly, the entry of a temporary injunction is appropriate. *See, e.g.,* *Georgia Banking Co.*, 923 So. 2d at 1225 (reinstating injunction freezing assets of $426,638.94 in breach of contract action as "[i]njunctive relief is appropriate to prevent dissipation of the funds in such circumstances"); *Riverland and Indian Sun L.C. v. L.J. Melody & Co.*, 879 So. 2d 1271, 1272 (Fla. 3d DCA 2004) (affirming temporary injunction over $900,000 in breach of contract case); *Vargas v. Vargas*, 771 So. 2d 594, 596 (Fla. 3d DCA 2000) (affirming temporary injunction and denial of motion to dissolve freezing $4.4 million in assets because if the assets are taken outside the court's jurisdiction, "the corpus of any possible constructive trust would no longer be available, thereby rending such equitable relief unattainable should the sisters ultimately prevail on their complaint").

**IT IS FURTHER ORDERED AND ADJUDGED:**

8.       This Order is being granted without notice to the defendants because the Court finds that counsel on behalf of Plaintiff has certified that there is an immediate danger that one or more of the defendants individually, or in concert, may dissipate, transfer, secret or hide away assets that are properly owned by CIHL and/or other minority shareholders. This would result in immediate and irreparable harm to CIHL before the Court is able to enter an order on this Motion or otherwise enter an order preserving the *status quo* of the assets in dispute. *See, e.g.,* *Orlando Orange Groves Co. v. Hale*, 144 So. 674, 678 (Fla. 1952) (affirming temporary injunction in shareholders derivative lawsuit). Additionally, plaintiff's Motion and Verified Complaint demonstrate that the giving of notice would accelerate or precipitate the injury. *See State v. Beeler*, 530 So. 2d 932, 933 (Fla. 1988) (upholding *ex parte* temporary injunction where

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

CASE NO. 2013-20458-CA-01

notice of a hearing will prompt a defendant to destroy records and cause unsecured assets to be liquidated in the context of a fraudulent enterprise), *Lewis v. Lewis*, 66 So. 2d 260, 262-63 (Fla. 1953) (finding temporary injunction without notice proper to prevent partner from disposing of asset of partnership subject to an order for accounting).

**IT IS FURTHER ORDERED AND ADJUDGED:**

9.     The defendants and financial institutions shall comply with the following terms of this temporary injunction as follows:

a.     The defendants are enjoined from preventing CIHL's immediate access to all of the TAG/CPL related accounting books and records in Blue Equity's possession, custody, or control, including but not limited to its capital call accounts and any accounts that held or still hold "capital call" related funds;

b.     The defendants are enjoined from preventing CIHL's immediate access to all records of closing and post-closing accounting and documentation including any records of disbursements as of December 31, 2012;

c.     The defendants are enjoined from preventing CIHL's immediate access to all general ledgers, profit and loss statements, and tax returns, as well as access to all of TAG/CPL's bank account records, signatory rights, and information regarding the location of all funds being held for or on behalf of TAG/CPL;

d.     The defendants are enjoined from preventing CIHL's immediate access to all of TAG/CPL's business records and corporate documents held by or on behalf of Blue Equity;


A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

CASE NO. 2013-20458-CA-01

f.   The defendants and or their agents and assigns are enjoined from moving, distributing, or otherwise dissipating in any way BE TAG and/or BEP corporate assets wherever and however located;

g.   The defendants and or their agents and assigns are enjoined from selling or in any way transferring or encumbering any remaining ownership interests in any assets of or held on behalf of BE TAG or BEP; and

h.   All bank accounts belonging to or held for the benefit of Blue Equity, BE TAG Holdings Limited, BEP, David Roth, David M. Roth PSC Attorney Trust Company or Jonathan Blue at the following financial institutions shall be frozen with immediate effect:

JP Morgan/Chase Bank
ABA Rtg. # 083000137
416 West Jefferson Street
Louisville, Kentucky 40202

PNC Bank
ABA Rtg. # 083000108
Louisville, Kentucky

Citibank New York
111 Wall Street
New York, NY 10043

Citibank Jamaica branch
19 Hillcrest Avenue
Kingston 6, Jamaica

**IT IS FURTHER ORDERED AND ADJUDGED:**

10.   This Order shall automatically be vacated if CIHL does not post a bond in the amount of $ _100,000.00_ , proof of which shall be filed with the Clerk of the Court within seven business days of the date of this Order.

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

CASE NO. 2013-20458-CA-01

**IT IS FURTHER ORDERED AND ADJUDGED:**

11.    CIHL shall serve a copy of this Order along with the Summons, Verified Complaint, and Motion by service of process.

12.    The Court's Order does not constitute a finding on the merits of the litigation. Should any or all of the defendants file a motion to dissolve, vacate, or amend the temporary injunction, the Court will schedule an expedited hearing on the motion.  Further, should any or all of the defendants file such a motion, the Court will enter an order permitting expedited discovery to be completed in advance of the hearing on the motion.

**DONE and ORDERED** in Chambers in Miami-Dade County, Florida, at ⁷3 p.m. on this 17 day of June, 2013.

DARYL E. TRAWICK
CIRCUIT COURT JUDGE

Conformed copies furnished to:
Counsel for the plaintiff

STATE OF FLORIDA, COUNTY OF DADE
I, HEREBY CERTIFY that the foregoing is a true and correct copy of the original on file in this office. JUNE 17 AD 20 13
HARVEY RUVIN, Clerk of Circuit and County Courts
Deputy Clerk

0365

7