UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  13-22198-CIV-KING

COOL INTERNATIONAL HOLDINGS
LTD, a British Virgin Islands
Incorporated Company, individually
and derivatively in the right and for
the benefit of BE TAG HOLDINGS LIMITED,
a St. Lucia International Business Company,

        Plaintiff,

v.

BLUE EQUITY PETROHOLDINGS, LTD.,
a St. Lucia International Business Company;
BLUE EQUITY LLC; JONATHAN BLUE,
an individual; DAVID ROTH an individual;
and MAUREEN SMITH, an individual,

        Defendants.

_____/

## MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

The plaintiff Cool International Holdings Ltd. ("CIHL"), individually and derivatively on behalf of BE TAG Holdings Limited ("BE TAG"), files this motion for preliminary injunction to preserve the sole remaining assets of BE TAG from further dissipation and corporate waste. That asset, a segregated account containing approximately $5 million, constitutes the last remaining portion of a $70 million dollar sale transaction, the proceeds of which have been distributed by the majority shareholders without authorization or advice to the minority shareholders and to the majority shareholders' sole benefit.

CIHL has sued[1] the defendants, BLUE EQUITY PETROHOLDINGS, LTD., ("BEP"),

_____

[1] The parties have agreed to submit this matter to arbitration without prejudice to the pending or

BLUE EQUITY, LLC ("Blue Equity"), JONATHAN BLUE ("Jonathan Blue"), DAVID ROTH ("Roth"), (collectively referred to herein as the "Blue Equity Defendants"), and MAUREEN SMITH ("Ms. Smith"), (the Blue Equity Defendants and Ms. Smith shall be referred to collectively as "the Defendants") for damages resulting from a breach of their collective and individual fiduciary responsibilities to CIHL, for breach of contract, unjust enrichment, conversion, fraud, declaratory relief and for temporary and permanent injunctive relief.  (A true and correct copy of the Verified Complaint is attached hereto as Exhibit A).  In support of its instant motion, CIHL states as follows:

## PROCEDURAL BACKGROUND

On June 7, 2013, CIHL filed a Verified Complaint in Miami-Dade County Circuit Court against the Defendants, seeking equitable and injunctive relief as well as compensatory damages as well as an *ex parte* motion for temporary injunction.  On June 17, 2013, the state court entered an Order On *Ex Parte* Motion For Temporary Injunction.

On June 19, 2013, the Defendant David Roth, Esq., filed his Notice of Removal [D.E. 1] and on June 28, 2013, along with several other defendants, including Jonathan Blue, filed an Emergency Motion to Dissolve *Ex Parte* Temporary Injunction.  [D.E. 8]

On July 10, 2013, this Court entered an Order Dissolving Temporary Injunction and granted the Plaintiff leave to file an immediate Motion For Preliminary Injunction. [D.E. 26]

## SUMMARY OF ARGUMENT

The allegations of the Verified Complaint as reflected and incorporated herein by reference, demonstrate that through a web of half-truths, fraudulent misrepresentations, financial manipulation, omissions and carefully planned deception, the Blue Equity Defendants

prospective motions regarding temporary and preliminary injunctive relief.

fraudulently induced CIHL, and its shareholders to enter into an arrangement to jointly acquire the shares of Cool Petroleum Limited Jamaica ("CPL"), later re-named by the Blue Equity Defendants as The Antilles Group ("TAG").[2]

Through a carefully planned campaign of fraud, deception and omission, the Defendants all conspired to conceal material information from CIHL and other minority shareholders, resulting in significant losses to CIHL and its shareholders in the form of a fraudulent capital call, the ultimate loss of the company to an imprudent and secretly negotiated sale, loss of share equity and the equivalent monetary value of that interest and loss of future revenues.

The Blue Equity Defendants' fraudulent conduct including, but not limited to their recently admitted undisclosed distribution of at least 92%[3] of the corpus of the sale transaction and their illicit and improper efforts to acquire and retain additional equity interests belonging to the minority shareholders through a fraudulent capital call, has placed CIHL and its shareholders at significant risk of irreparable loss through illegal dilution, loss of ongoing revenue, loss of equity and continuing waste and dissipation of a significant and the sole remaining corporate asset of BE TAG that could be moved beyond the reach of the court's jurisdiction if not enjoined.

These improper acts have been compounded by the Blue Equity Defendants' inexplicable

---

[2] The names "TAG" and "CPL" shall be used interchangeably throughout these papers to refer to the same company. Similarly, the names "CPHL" and "BE TAG" shall be used interchangeably throughout these papers to refer to the same company. In early 2012, the names of the two companies formerly known as "CPL" and "CPHL" were changed to "TAG" and BE TAG, respectively. For all relevant purposes, there is no difference between the entities after their respective name changes.

[3] CIHL still has not received formal confirmation regarding the actual sales price, although that sale closed on December 31, 2012 (nearly eight months ago). But for a few (draft) pre-sale documents that indicated a sales price of $70 million, there has been no confirmed documentation of the actual price. The Blue Equity Defendants admitted, through their counsel, to the Court at a hearing on July 2, 2013 [DE 16], that all that remains is a little over $5 million.

failure to advise the full Board of Directors and the minority shareholders of BE TAG of their improper distribution of funds exclusively to themselves and to the exclusion of the minority shareholders.

Similarly, based in part upon the fraudulent capital call, the Blue Equity Defendants have also improperly converted funds and equity, rightfully belonging to the minority shareholders, or otherwise failed to properly account to the Board of Directors and the minority shareholders for the distribution of funds from the sale of the BE TAG business to a third party.

If a preliminary injunction is not entered, the Defendants may continue their underhanded and wrongful dissipation of BE TAG's sole remaining asset—a dissipation that has already seen at least $65 million distributed without advising or obtaining authorization from the minority shareholders or their Board representatives.  Accordingly, a preliminary injunction is required in order to preserve the corpus of a company's sole remaining asset, which has been dissipated by the underhanded and wrongful conduct of a few.

### SUMMARY OF FACTS SUPPORTING PRELIMINARY INJUNCTION[4]

On or about 2006, Cool Corp Limited ("Cool Corp"), along with Neal and Massy Holdings, Ltd. ("Neal and Massy"), formed Cool Petroleum Holdings Ltd., ("CPHL") to acquire and hold all the business assets then owned by Shell Jamaica.  Through its main subsidiary CPL, and other related subsidiaries, the new company's assets included among other things, 54 owned and/or branded service stations; a commercial fuels and lubricants business; a chemicals business; two petrol tank farms; and, by virtue of a call option entered into with Shell Jamaica, the beneficial rights to a shared interest in a sea-port located in Montego Bay, Jamaica.

In or about 2010, Neal and Massy expressed an interest in being bought out of the CPHL

---

[4] A Declaration from CIHL in support of this Motion For Preliminary Injunction is attached hereto as "Exhibit C."

partnership and the search for a new equity investor to replace Neal and Massy began in earnest.

**CPL Meets Blue Equity and Jonathan Blue**

In or about late August 2010, CPL was introduced to Blue Equity and Jonathan Blue by Mayberry Investments Jamaica.  The parties met on several different occasions in Miami, Jamaica and Trinidad and discussed among other things, the fact that the CPL business survived primarily because of its reliable access to working capital financing through a Letter of Credit ("LC") facility guaranteed by Neal and Massy.

At the initial meeting with Blue Equity, CPL informed Jonathan Blue and Blue Equity that any prospective replacement partner would be required, at a minimum, to provide a guarantee for a LC primarily for the purpose of acquiring imported petroleum products—which was an integral part of the CPL financial and operations model—or, alternatively, would be required to provide other forms of working capital financing for said purpose.

This point (regarding the working capital financing), was raised and reiterated at every subsequent meeting between CPL, Jonathan Blue and Blue Equity in Miami, Jamaica and Trinidad, respectively.  Blue Equity and in particular Jonathan Blue purported to accept this condition and repeated their representations that access to working capital financing, and in particular a LC facility, would not be a problem or an issue for Blue Equity.  Jonathan Blue represented that his and Blue Equity's existing relationship with JP Morgan Chase bank in Louisville, Kentucky was such that the necessary working capital LC facility would be "easily" obtained by Blue Equity.

Based in large part upon these several repeated misrepresentations from the Blue Equity Defendants regarding "easy" access to working capital financing, CPL and its shareholders and bond holders, eventually decided to consummate the relationship with Blue Equity as a

KIM VAUGHAN LERNER LLP

replacement equity partner.

The original terms agreed to by the parties anticipated that Blue Equity was to acquire 48.5% of the CPL business in exchange for payment of approximately $10 million in cash, plus a $6 million LC to secure the debt to the bondholders and further access to working capital of an additional $10 to $16 million in readily accessible working capital financing.

In about April 2011, it became obvious that notwithstanding an initially contemplated May 2011 closing, Blue Equity was doing nothing to move the transaction along, but seemed instead to be stalling the transaction. At the same time, Jonathan Blue, David Roth and Blue Equity continued to insist to CPL, Cool Corp and other stakeholders that securing the required LC was not an issue as it had a strong relationship and "preapproval" from J.P. Morgan Chase.

In or about April 2011 and towards the end of the initial due diligence exercise, Blue Equity disclosed the key terms of the pending CPL/Blue Equity transaction to persons at Neal and Massy and determined based upon those conversations, to try and secure a larger equity position relative to the other shareholders in exchange for its agreed-upon investment as a CPL equity partner. The Blue Equity Defendants then set upon a concerted effort to fraudulently wrest as much additional equity or cash as they could from CPL, Cool Corp and the other minority shareholders in exchange for Blue Equity's previously agreed upon investment.

The Blue Equity-CPL transaction eventually closed on or about January 2012.

**The Fraudulent Capital Call**

In or about February 2012, now a shareholder in CPHL, BEP and Blue Equity through Jonathan Blue and Mr. Roth, raised what they described as the "urgent" cash needs of CPL/TAG with the company CFO, Rodney Davis. Blue Equity demanded that a capital call had to take place—although the whole reason Blue Equity was approved to become a shareholder was its

continued representations regarding access to working capital financing and that it had access to an LC facility and thus could address the working capital needs of the business.

The decision to issue a capital call was made in May 2012 over the objections of the minority shareholders and in particular, CIHL.  The capital call was issued in June 2012.  This capital call would turn out to be fraudulent.

The terms of the capital call required that any shareholder who wished to exercise the option to purchase additional shares—dubbed "Class C" shares—would be required within thirty days of the capital call notice, to deposit funds equivalent to their pro-rata share of the full $10 million dollar share issue.

Specific instructions were set forth in the Notice of Capital Call, which detailed the instructions for deposit and the deadline to deposit payment for the Class C shares issued per the capital call.  Contrary to their representations to the minority shareholders and the express terms of the Notice of Capital Call, the Blue Equity Defendants could never demonstrate that they made the required deposits within the time required or in the manner prescribed, to allow them to exercise purchase rights for *any* shares under the forced capital call—let alone all of the outstanding Class C shares.  Indeed, as confirmed by David Roth in several subsequent emails to CIHL, Blue Equity never deposited the funds in the time and manner provided by the terms of the capital call.

Not only did Blue Equity fail to demonstrate that it made the capital call deposit as required, it Blue Equity never provided a lump sum capital injection at all, but rather arranged to make funds available on an as needed basis.  Contrary to the express terms of the Notice of Capital Call, Blue Equity never deposited the $10 million dollars it claims that it deposited on account for TAG and which was the alleged basis for its allocation—to itself—of all ten Class C

shares or the equivalent of 5,740 additional common shares.

Despite demand, the Blue Equity Defendants refused, and were in fact unable to provide any original bank statements proving their "deposit" of the funds pursuant to the forced capital call because the deposit was never made.  Rather, to support the Blue Equity Defendants' claim of a "capital call deposit", Jonathan Blue and David Roth caused the Blue Equity Defendants to create and provide a "Statement of Account" reflecting "deposits" and "withdrawals" from an alleged capital call "Escrow Account" in which these funds were comingled with "funds held for others as well."

**The Surprise Sale To Rubis**

On or about November 13, 2012, a joint shareholder/board meeting was held.  At this meeting, which was less than four months after the fraudulent capital call, Blue Equity disclosed that it had been in "talks" to sell the assets of BE TAG to a third party.

Blue Equity had not previously disclosed—and still has not—that it had been actively engaged in these sales "talks" and negotiations for many months.  Indeed, these "talks" apparently had been in progress and ongoing long before the fraudulent capital call.  Yet, the Defendants (including Ms. Smith) did not disclose this information to CIHL, to any other BE TAG minority shareholder, or to any of the minority shareholder Board representatives so that it could be considered as part of the "capital call" raise and resultant redistribution of share equity.

In addition, at the November 13 meeting, the Defendants refused to disclose the identity of the potential buyer(s).  This November 13 meeting was eventually temporarily suspended "to allow" for the minority shareholders to review such minimal information and financial models regarding the potential sales alternatives as the Blue Equity Defendants unilaterally chose to disclose to the minority shareholders and their Board representatives.  Requests for more

information were summarily rejected by the Blue Equity Defendants.  In short, the minimal documentation provided regarding the potential transactions being proposed, severely restricted, if not prohibited entirely, any meaningful analysis or ability of the minority shareholders or their Board representatives to object or question the proposed sales alternatives that had been secretly, or were being secretly, negotiated.

Seven days later, on or about November 20, 2012, at the continuation of the joint shareholder/Board meeting, the Blue Equity Defendants continued to refuse to disclose the details of the pending sales proposals and refused to provide any additional meaningful information to the minority shareholders or their Board representatives to review and analyze the terms of the proposed alternatives—citing, incredibly, "confidentiality" concerns as a basis for refusing to share that information with the Board and the minority shareholders.

Despite demand for the information, the Blue Equity Defendants provided only such information as they determined—in their sole discretion—to be "relevant" to the minority shareholders' and their Board representative's analysis of the proposed sale as described by the Blue Equity Defendants.  The Blue Equity Defendants provided the minority shareholders with no information regarding the ultimate disbursements to the shareholders; no information regarding any associated fees and expenses associated with the transaction; no information regarding associated transactions which may have affected the terms or nature of the transaction; and, no information regarding how the sales price was ultimately determined.

A selection of some closing documents were ultimately made available for review and comment by CIHL—on a restricted basis for a period of less than 48 hours—shortly before the date of the proposed closing.  (The Defendants, including the majority shareholders and their Board representatives on the other hand, had full access to review and consider this information

and had all the information required to make any required decision regarding the sale.)

Indeed, up until December 31, 2012—the day of closing—no closing statement or other document(s) detailing the manner or amount of anticipated distribution or proceeds of sale to the shareholders was provided to the minority shareholders and in particular, CIHL.  Since the December 31 closing, through the date of this motion, little if any information regarding gross revenue, post-closing adjustments or anticipated distribution have been provided to the full Board of Directors of BE TAG or to the minority shareholders, including CIHL.

Indeed, although CIHL has been forced to file this lawsuit to protect its interests individually and derivatively, the Defendants have yet to disclose a confirmed sales price and to confirm or explain how at least $65 million has been distributed from the sales proceeds apparently, in part to the Blue Equity Defendants and in part to others but not to CIHL and the other minority shareholders.  The Blue Equity Defendants have failed to explain how such distributions were made without any notice to BE TAG's Board of Directors or minority shareholders.

## MEMORANDUM OF LAW

Pursuant to the Shareholder Agreement, CIHL and Blue Equity agreed to the following provision:

> **(b)**     Should any nonbreaching or nondefaulting party or parties seek recourse to equity to enforce any of its or their rights under this Agreement by specific performance, injunction, or other equitable relief, each breaching or defaulting party agrees to, and hereby does waive any defense or defenses which it might otherwise have that there is any adequate remedy at law.

*Exhibit A at Ex. B, p. 38.*  Accordingly, a court may issue injunctive relief.

The decision to grant or deny a preliminary injunction is within the discretion of the

district court.[5]  To support an order granting preliminary injunctive relief, the moving party must demonstrate: (a) that there is a substantial likelihood of success on the merits; (b) that plaintiff will be irreparably harmed if a preliminary injunction is not granted; (c) that the threatened injury outweighs whatever damage the injunction may cause to the alleged infringer; and (d) that the injunction, if issued, will not be adverse to the public interest.[6]  Each of these elements is met in this instance.

The Verified Complaint and facts revealed subsequent to the imposition of the temporary injunction by the state court [D.E. 1-1 pp. 304-10] also establish and confirm that CIHL has a substantial likelihood of success on the merits of its allegations in the Verified Complaint, that there is no adequate remedy at law (a fact agreed to in advance by the parties), and that the balance of harms weigh heavily in favor of granting the preliminary injunction and are not adverse to the public interest.

The fears expressed in CIHL's Verified Complaint and in CIHL's earlier motion for ex parte injunctive relief [D.E. 1-1 pp. 141-303], have in large part been proven true and are now a matter of record following the parties' respective filings and the July 2 emergency hearing in this Court regarding the (then existing) temporary injunction.  Indeed, rather than merely confirming an imminent but "unrealized" threat, the subsequently revealed facts and representations on the record,  confirm that the bulk of the corporate assets have already been distributed by the Blue Equity Defendants—to themselves or for their own benefit—and that CIHL's fears were indeed warranted and justified.

---

[5] *Carillon Importers, Ltd. v. Frank Pesce Int'l Group Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997) (per curiam).
[6]  *See Palmer v. Braun*, 287 F. 3d 1325, 1329 (11th Cir. 2002) (citing *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001)); *see also CBS BroadcastingBroad. Inc. v. EchoStar Communs. Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001).

Simply stated, CIHL seeks to freeze the money which directly relates to and arises out of the transaction at issue.   Given the relief requested, the Court has the authority to enter a preliminary injunction in this instance, enjoining Defendants from using specific money, which is traceable to an identifiable account and would be subject to a permanent injunction entered in this matter.[7]   The remaining funds at issue here have already been "identified" and "segregated."

### A. The Plaintiff Has Suffered And Will Continue To Suffer Irreparable Injury Unless a Preliminary Injunction Is Granted

> "THE COURT:  Do you agree with that or disagree with that, that money was distributed?
>
> MR. WAKSHLAG:  I believe that there were certain payments that were made in accordance with the agreements that were reached between the parties."

*See* Excerpt of Transcript, dated July 2, 2013, attached as Exhibit B, at 32:14-18.[8]

After the closing, there was no "agreement" between the parties regarding distribution. In fact, there was no information at all upon which to base such an agreement.   While the Shareholders' Agreement, and the amendments thereto, contemplate a prioritization of proper legal distributions following a "liquidity event", nowhere does it contemplate an abrogation of the majority shareholders' or their appointed Board representatives' fiduciary responsibilities and obligations to the minority shareholders and/or their appointed Board representatives.   More important, nowhere would such a distribution agreement allow the Blue Equity Defendants to

---

[7] *See Bloomfield Institutional Opportunity Fund, LLC v. Allen Inv. Props., LLC*, 2010 U.S. Dist. LEXIS 88192 (M.D. Fla. Aug. 9, 2010) (finding that the court has authority to enter a preliminary injunction to freeze identifiable funds in an account).

[8] Statements made by an attorney representing a party may constitute admissions by that party. *See e.g., Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 2010 U.S. Dist. LEXIS 112784 (S.D. Fla. Oct. 20, 2010) ("No authority is required for the general proposition that a statement authorized by a party to be made should have the status of an admission by the party").  In addition, the Court made clear at the July 2 hearing it was relying on such representations by the attorneys as officers of the court.  *See* Exhibit B at 36:17

distribute funds without notifying the Board and then skip over or forego issuing distributions to some entitled shareholders.  But that is exactly what was done here where at least 92% of BE TAG's only remaining assets were secretly distributed to the benefit of all but the minority shareholders.

Without having initiated this action, CIHL would likely ***not*** have received the above admissions within the time it did and would likely never have learned of the secret distributions to and by the majority shareholders.  Without court intervention by way of a preliminary injunction, CIHL will likely suffer continued irreparable harm in the form of:

- Further irreversible loss of its equity position and subsequent revenue from the sale:
- Additional improper and secret distributions of sales funds to unknown and possibly foreign Blue Equity and Jonathan Blue accounts and out of BE TAG accounts or accounts held for the benefit of BE TAG.
- Further fraudulent and permanent dilution pursuant to the fraudulent capital call which in all likelihood did not actually occur pursuant to its own terms;
- Continuing dissipation of corporate assets, waste, loss of any asset currently on the company's asset ledger.

Upon information and belief, the Blue Equity Defendants have "doctored" the books and records of BE TAG—and in particular the alleged statements of the capital call account(s)—to their sole and illicit benefit and will continue to do so absent immediate court intervention to secure and preserve these records in their present condition.

Since the closing of the sale—more than six months ago—there has been precious little disclosure from the majority shareholders and their Board representatives regarding the financial terms of the transaction, beyond representations regarding the total proposed sales price and the amount to be distributed to pay off existing bondholder debt.  There has been no disclosure regarding any final accounting to, or distribution of revenue to the minority shareholders—let

alone advice regarding distributions, to preferred shareholders or otherwise.

Since the imposition of the temporary injunction that was recently vacated, CIHL has learned—with the assistance of the Court—that as much as twenty million dollars (the balance of the transaction revenue, net the required pre-closing payment to the bondholders) may have already been "distributed" by the majority shareholders and their appointed Board representatives to themselves or for their singular benefit, without any advice to, or authorization from, the minority shareholders or their appointed Board representatives.

From this approximately $70 million dollar transaction, only a mere $5 million dollars remain—without even one cent being distributed to any of the minority shareholders—some of whom also own preferred shares and would be entitled to receive a distribution before common shareholder distributions are made. The "secret" distributions alone to the tune of 92% of the corpus of the assets—regardless of any alleged justification—support an order for preliminary injunctive relief.[9]

While the Defendants represent to the Court that this remaining sum is in a "segregated interest bearing account" and have confirmed as a matter of record that this sum is the sole remaining corpus of the company's assets, it is undisputed that even these funds were transferred out of the transaction account(s) into another Blue Equity related company—without advice to, or authorization from CIHL or its appointed Board representatives.

CIHL fears the continued illicit and improper distribution and secret movement of funds and revenue from the sale and the continued waste of corporate assets and the waste and dissipation of the company's and CIHL's assets by these Defendants who have bestowed unto

---

[9] *See Bloomfield Institutional Opportunity Fund, LLC*, 2010 U.S. Dist. LEXIS 88192, 17-20 (finding irreparable harm where one or all Defendants may continue to further dissipate the remaining funds at issue).

themselves full, autonomous and unfettered control of the pre and post-closing process and who have reserved unto themselves, sole discretion to distribute BE TAG's assets as they alone see fit and primarily for their own unique benefit.

Despite the fact that CIHL owned between 35-49% of the outstanding shares of BE TAG, it was excluded from the closing process and denied any and all access to the details of the anticipated flow of funds from the sale of the company's shares.  If the fraudulent capital call is ultimately deemed a nullity, Blue Equity, Jonathan Blue and David Roth will have to return share value in excess of fifteen percent of the value of the company—which amounts it now appears have *already* been distributed without advice to or authorization from the minority shareholders.

CIHL is in substantial fear that the Blue Equity Defendants as majority shareholders and stewards of the sale transaction will be unwilling or unable to satisfy their financial obligations to the CIHL shareholders now that they have secretly distributed company assets to unknown accounts without authorization or disclosure to the Board of Directors and shareholders and without regard to their fiduciary obligation as majority shareholders and Board members.

Prior to the temporary injunction, any efforts to get meaningful information from the Blue Equity Defendants regarding the planned distribution of post-closing funds or an accounting of the revenue from the December 2012 closing, had all proven futile.  Without a preliminary injunction to secure and preserve the company's rapidly depleting assets and accounts, CIHL, BE TAG and the other minority shareholders will collectively and individually continue to suffer irreparable harm in the form of:

- Possible exposure to litigation with third parties for failure to meet their respective contractual obligations;

- Continued corporate waste and significant dissipation of assets; and

- Further loss of equity and revenue from the sale.

Monetary damages will not adequately compensate CIHL for the injuries it (and the company itself) have suffered and continue to suffer at the hands of the Blue Equity Defendants. At bottom, the facts in the Verified Complaint, as well as those outlined in this motion, *supra*, indicate that without intervention by this Court, BE TAG and its minority shareholders, including all of CIHL's interests, equity and investments, will likely face further *irreparable* risk of dissipation, waste and diversion of corporate assets by the controlling shareholders.

Further, the parties to the Shareholder Agreement have also specifically agreed that remedies at law for breach of the shareholder agreement would be inadequate—all parties conceding and agreeing in advance that the balance of harms weigh in favor of the party seeking injunctive relief predicated upon alleged breaches of the shareholder agreement.

This Court has the inherent power to enjoin the actual, proven, misappropriation, waste and dissipation of the corporate assets managed and controlled by the Defendants which was obtained as a result of the sale of the BE TAG shares.

**B.      CIHL Claims Have a Substantial Likelihood Of Success On the Merits**

> MR. WAKSHLAG:  I don't know.  But the way that the sale transaction of the subsidiary works is there was a buyer.  There are all sorts of post closing reconciliations that need to be done.  There are guarantees.  There are earn-outs.  There are credits.  There are debts.
>
> THE COURT:  All of that was done, though, right?
>
> MR. WAKSHLAG:  No.  Those are all pending.
>
> THE COURT:  Oh, My goodness.
>
> MR. WAKSHLAG:  And those are going to be outstanding for quite some time.  That's why the monies are sitting there.  That's why the monies haven't been distributed.

Exhibit B at 27:2-12.

The transcript excerpt above demonstrates in summary fashion the internal inconsistency—and the fatal flaw—in the Defendants' defense of their position. Because, while they attempt to justify their failure to make any distributions to the minority shareholders or provide them with any meaningful information, they have by their own admission, already distributed to themselves, directly or indirectly, sums quite possibly in excess of $20 million dollars. Regardless of their position, however, they cannot justify their absolute failure to advise the minority shareholders and the Board of Directors of these already completed distributions and how the distribution amounts were determined.

As directors, officers and controlling shareholders of BE TAG, the Blue Equity Defendants have and continue to owe an ongoing fiduciary duty to BE TAG and to CIHL. As a part of that duty, the Defendants were required to exercise the utmost good faith in the exercise of their powers in the interest of the corporation and CIHL—especially when they took to themselves sole stewardship of CPL/TAG's only remaining asset.[10]

The Blue Equity Defendants have systematically been dissipating corporate assets and have already siphoned off millions of dollars from the BE TAG sale in the form of "distributions" without advice to the board of directors or shareholders and without shareholder or board authorization to do so. While taking these singularly beneficial distributions for themselves, the Blue Equity Defendants have failed to distribute any sums to other "preferred" shareholders including some of the minority shareholders or to the common shareholders and have "held back" sums which likely are disproportionately those monies belonging primarily to the minority shareholders. All this despite continuing to represent that there are "post-closing reconciliations that need to be done" that would preclude *any* distributions.

---

[10] *See e.g.*, *Flight Equip. & Eng'ing Corp. v. Shelton*, 103 So. 2d 615, 626 (Fla. 1958).

The majority position is untenable.  Their two positions are inherently inconsistent and prove the duplicity of the majority shareholders and their appointed Directors with respect to the minority shareholders and their appointed board representatives.

As outlined here and in the Verified Complaint, the Blue Equity Defendants have effected—through pretext—a fraudulent "capital call" resulting in the theft or misappropriation of over 15% of the total share value of the company and through these confessed secret distributions, have now managed to distribute unto themselves any and all anticipated proceeds of the fraudulent capital call—possibly even including interest payments—without advice to, without hearing objections from, or without receiving authorization from the minority shareholders or their appointed Board representatives.

If nothing else, the Blue Equity Defendants, after granting unto themselves, *carte blanche* rights to negotiate, act upon and execute a sale of the company's entire schedule of assets, have done so in secret and in the six months period after closing, have yet to account to the Board of Directors and the minority shareholders for **any** of the revenues realized from the sale while nevertheless managing to distribute "their share" of the proceeds to themselves.  That alone constitutes a breach of their fiduciary obligations as majority shareholders and board members.

### C.    A Preliminary Injunction Will Not Be Adverse To The Public Interest

Intervention by this Court in the form of a preliminary injunction is necessary to prevent any continued injury to BE TAG and to CIHL, a minority shareholder.  Immediate court intervention will further allow CIHL, individually and on behalf of BE TAG, to properly litigate and resolve the issues surrounding the fraudulent capital call while preserving the necessary proof and more important sole remaining asset of BE TAG, while not unjustly enriching the Blue Equity Defendants in the interim.

Indeed, the preliminary injunction furthers the public interest in ensuring full and fair compliance with existing contractual and fiduciary obligations flowing from the majority interests in a corporation to the minority interests and ensures that parties do not benefit from their own abusive and bad faith conduct in the exercise of their fiduciary obligations.[11] Otherwise, to permit a majority shareholder to plunder a company and otherwise abuse other investors through self-dealing and underhanded conduct, would shake the confidence of the public in future investment.

**D.     The Balance Of Harms Weigh In Favor Of CIHL**

An order granting preliminary injunctive relief will result in no harm to the Defendants. Indeed, because CIHL seeks only to enjoin the Defendants from further distributing BE TAG's sole remaining assets (assets that are not required to pay employees or vendors given that BE TAG has been sold and no longer operates).  Because the sole remaining assets have already been segregated, the Blue Equity Defendants would not be entitled to any access to these funds and would certainly not be entitled to access these funds for "Blue Equity related expenses" and therefore would suffer no harm.[12]

Further, even if the relatively small percentage of funds remaining after the Blue Equity Defendants' admitted distributions to themselves, are not entirely the property of the minority shareholders, as named shareholders themselves, any action taken to preserve and maintain the remaining assets of the company, will also inure to the benefit of the Blue Equity Defendants

---

[11] *See Bloomfield Institutional Opportunity Fund, LLC*, 2010 U.S. Dist. LEXIS 88192, 21-22 (the entry of a preliminary injunction would serve the public interest by preventing Defendants from dissipating the fraudulently obtained monies.)

[12] *See Id*. 17-20 (finding that where plaintiff may very likely suffer a complete loss of the monies and defendants will simply be prevented from using the money, the threatened harm to plaintiff outweighs the harm a preliminary injunction may cause to defendants.)

and/or their agents and assigns who represent the majority in interest.[13]  Indeed, there is little

harm that can follow as the remaining asset has already been segregated into an interest bearing

account.  *See* Exhibit B at pp. 25 - 26.

## CONCLUSION

**WHEREFORE**, CIHL respectfully moves the Court to enter a preliminary injunction as follows:

- Providing immediate access to all BE TAG related accounting books and records in the Blue Equity Defendant's Possession or control, including but not limited to its capital call accounts and any accounts that held "capital call" related funds;

- providing access to all records of closing and post-closing accounting and related documentation including any records of disbursements;

- general ledger, profit and loss statements and tax returns,  as well as access to all of BE TAG's bank accounts, signatory rights and information regarding the location of all funds being held for or on behalf of BE TAG;

- providing immediate access to all of BE TAG's business records and corporate documents held by or on behalf of the Blue Equity Defendants;

- freezing the "segregated" bank account belonging to or held for the benefit of BE TAG, at the following financial institution:

> JP Morgan/Chase Bank
> Account in the Name of Blue Equity International LLC
> FBO BE TAG Holdings Ltd.
> Louisville, Kentucky 40202

- enjoining the Defendants from unilaterally effecting any further distributions on the behalf of BE TAG either directly or indirectly without further order of Court or the arbitrator;

- enjoining the Defendants from further dissipating in any way BE TAG's corporate assets or BEP's corporate assets wherever and however located;

- and what is alleged to be approximately $50,000 held in a bank account in Jamaica.

---

[13] *See Id.* at 20-21 ("the preliminary injunction will allow the parties to maintain the status quo thereby ensuring Defendants will not have an opportunity to access or squander the money remaining in the account or further frustrate Bloomfield's recovery efforts of the funds").

Dated:  July 11, 2013

Respectfully submitted,

s/Robert C. L. Vaughan
Robert C. L. Vaughan, P.A. (Fla. Bar No. 130095)
rvaughan@kvllaw.com
Brian L. Lerner, P.A. (Fla. Bar No. 177202)
blerner@kvllaw.com
Cherine Smith Valbrun, Esq. (Fla. Bar No. 27046)
cvalbrun@kvllaw.com
Kim Vaughan Lerner LLP
One Financial Plaza, Suite 2001
Fort Lauderdale, Florida 33394
Telephone:    (954) 527-1115
Facsimile:    (954) 527-1116
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document was served via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on all counsel or parties of record on the Service List below.

s/Robert C. L. Vaughan

## SERVICE LIST

John D. Cox (Pro Hac)
jcox@lynchcox.com
Donald L. Cox (Pro Hac)
doncox@lynchcox.com
Lynch, Cox, Gilman &Goodman, P.S.C.
500 West Jefferson Street, Suite 2100
Louisville, Kentucky 40202
Telephone:      (502) 589-4215
Facsimile:      (502) 589-4994
Attorneys for Defendant David Roth
Via Transmission of Notices of Electronic
Filing Generated by CM/ECF

Robert C. L. Vaughan
rvaughan@kvllaw.com
Brian L. Lerner
blerner@kvllaw.com
Cherine Smith Valbrun
cvalbrun@kvllaw.com
Kim Vaughan Lerner LLP
One Financial Plaza
100 SE Third Avenue, Suite 2001
Fort Lauderdale, Florida 33394
Telephone:      (954) 527-1115
Facsimile:      (954) 527-1116
Attorneys for Plaintiff
Via Transmission of Notices of Electronic
Filing Generated by CM/ECF

Stanley H. Wakshlag
swakshlag@knpa.com
Kenny Nachwalter P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:      (305) 373-1000
Facsimile:      (305) 372-1861
Attorneys for Defendant David Roth
Via Transmission of Notices of Electronic Filing
Generated by CM/ECF